## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ART TOBIAS, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF LOS ANGELES; SGT. | ) |
| SANCHEZ, #25339; DETECTIVE | ) |
| MICHAEL ARTEAGA, #32722; | ) **JURY TRIAL DEMANDED** |
| DETECTIVE JEFF CORTINA, | ) |
| #35632; DETECTIVE J. MOTTO, | ) |
| #25429; DETECTIVE JULIAN PERE, | ) |
| #27434; OFFICER MARSHALL | ) |
| COOLEY, #38940; OFFICER BORN, | ) |
| #38351; L.A. SCHOOL POLICE | ) |
| OFFICER DANIEL EAST, #959; and | ) |
| UNIDENTIFIED EMPLOYEES of the | ) |
| CITY OF LOS ANGELES | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>COMPLAINT</u>

Plaintiff ART TOBIAS, by his undersigned attorneys, complains of

Defendants, the CITY OF LOS ANGELES; SGT. SANCHEZ, #25339; DETECTIVE

MICHAEL ARTEAGA, #32722; DETECTIVE JEFF CORTINA, #35632;

DETECTIVE J. MOTTO, #25429; DETECTIVE JULIAN PERE, #27434; OFFICER

MARSHALL COOLEY, #38940; OFFICER BORN, #38351; L.A. SCHOOL POLICE

OFFICER DANIEL EAST, #959; and UNIDENTIFIED EMPLOYEES of the CITY

OF LOS ANGELES, acting pursuant to the City's policies and practice, states as

follows:

## INTRODUCTION

1.      As a consequence of the shocking misconduct of officers in Los Angeles Police Department ("LAPD"), Plaintiff Art Tobias was convicted of a homicide that he did not commit. Just a child at the time of the shooting—a short, skinny 13 year-old with no criminal history—Plaintiff was sentenced to 25-years to life, and spent nearly three and-a-half years incarcerated before his conviction was overturned.[1]

2.      The homicide for which Plaintiff was wrongfully convicted was a shooting and captured on video surveillance footage. On account of that footage, LAPD officers knew that there was absolutely no way Plaintiff had committed the crime; the perpetrator was a heavy-set adult, not a small teen. Nonetheless, and despite the clear footage, LAPD officers—the Defendants to this suit—decided to frame Plaintiff for a crime he did not commit. To start, just moments after the shooting, rather than assembling a photo array or in-person lineup for witnesses to view, Defendants decided instead themselves to falsely claim that Plaintiff was the person in the video even though none of them had never met or interacted with Plaintiff. Defendants did not use any legitimate identification procedure for a simple, malicious reason: Plaintiff obviously did not look like the perpetrator.

3.      If that were not enough, Defendants took their misconduct a step further by subjecting a 13-year old to a grueling, unlawful interrogation. The interrogation, which is also captured on video, reveals the unconscionable

---

[1] The criminal prosecution of Plaintiff, a minor at the time, proceeded through the California juvenile court. Though the terminology is different, the prosecution of Plaintiff via the "delinquency proceedings" where Plaintiff was "adjudicated delinquent" by the juvenile court is no different than a criminal prosecution via resulting in a conviction a bench trial. Accordingly, Plaintiff uses the term "conviction" and other more universal terms to refer to the result of his criminal prosecution.

misconduct of the Defendant Officers who—with guns on their hips and Plaintiff handcuffed to a chair—used blatantly unconstitutional and coercive tactics to produce a false, forced, and fabricated confession. Defendants made false promises, screamed and yelled, lied, refused Plaintiff's repeated pleas to see his mother, refused Plaintiff's request for an attorney, swore at Plaintiff, and one officer even put his hands on Plaintiff. Without that misconduct, which succeeded in unlawfully-creating false evidence, Plaintiff would have never been convicted.

4.      Plaintiff will never regain the foundational years of his life stolen from him on account of Defendants' misconduct in securing his wrongful conviction. This lawsuit seeks redress for those injuries.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and venue is proper under 28 U.S.C. § 1391(b).  The events giving rise to the claims asserted herein occurred here, and most parties live here or are affiliated with this District.

## THE PARTIES

6.      Plaintiff Art Tobias is an 18 year-old high school student, with a permanent residence in Los Angeles, California.

7.      At all times relevant, Defendants Sergeant Sanchez, #25339; Detective Michael Arteaga, #32722; Detective Jeff Cortina, #35632; Detective J. Motto, #25429; Detective Julian Pere, #27434; Officer Born, #38351; Officer Marshall

Cooley, #38940; and Unidentified Employees of the Los Angeles Police Department were police officers in the Los Angeles Police Department. All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murder at issue.

8.　　At all times relevant hereto, Defendant Daniel East was a Los Angeles School Police Department Officer and is being sued in his individual capacity for actions taken under the color of law and within the scope of his employment during the investigation of the murder at issue.

9.　　Defendant City of Los Angeles is a California municipal corporation. The City of Los Angeles is or was the employer of each individually-named Defendant and the other Unidentified Officers.

## THE ALVARADO TERRACE SHOOTING

10.　　On August 8, 2012, forty minutes after midnight Alex Castaneda was shot and killed on the 1400 block of Alvarado Terrace in Los Angeles, California.

11.　　At the time of the shooting, Castaneda was with a group of friends, two of whom were also shot but whose injuries were not fatal.

12.　　Two perpetrators fired guns at the group; one in a dark shirt on the far side of the street and one in a white shirt closer to the group.

13.　　The perpetrators had a third associate, who picked them up after the shooting in a red Hyundai.

14.　　Several witnesses were present at the time of the shooting, and at least three of them were interviewed about what happened. All who provided descriptions

4

about the perpetrator in the white shirt reported that he shooter was an adult.

15.    One witness specifically told the officers that the shooter in the white shirt was about six feet tall and around 200 pounds.

16.    In addition, surveillance footage captured the shooting. The video of the shooting is consistent with the account provided by the witnesses, as well as their description of the perpetrator: he was wearing a white shirt, an adult, and had a larger/heavier build.

17.    Plaintiff had absolutely nothing to do with the shooting of Alex Castaneda and the two other victims.

**DETECTIVES DECIDE TO PROSEUCTE PLAINTIFF
RATHER THAN CONDUCT AN HONEST INVESTIGATION**

18.    Two seasoned detectives from the Rampart Homicide Division of the LAPD, Defendants Pere and Motto, were dispatched to the crime scene the night of the shooting and assumed investigative responsibility for the case.

19.    While processing the scene, Defendants Pere and Motto were made aware that there was video footage of the shooting, which they viewed.

20.    Hours before the shooting, on August 17, 2012, Plaintiff's mother, Helen Contreras, had filed a missing-persons report for Plaintiff.

21.    At the station, Contreras met with Defendant Marshall Cooley. Defendant Cooley told Contreras that he did not know Plaintiff and had never met him personally. To confirm this, Contreras briefly showed Defendant Cooley a cell-phone picture of Plaintiff, and Cooley confirmed he had never met or interacted with Plaintiff.

22.     Plaintiff returned home before the shooting at Alvarado Terrace occurred. Plaintiff's mother called the Rampart station to inform them that the missing-persons report could be terminated.

23.     Nonetheless, rather than focusing on investigating, the Defendant Officers decided to pursue Plaintiff for the Castaneda homicide, using the missing-persons report as a pretext for focusing on Plaintiff.

24.     This began with Defendants Pere and Motto, who subsequently interacted with each of the individually-named Defendant Officers, each of whom agreed to join and assist Defendants Pere and Motto in their efforts to prosecute Plaintiff for the Castaneda homicide, despite the fact that he was innocent.

25.     In fact, the Defendant Officers agreed to falsely prosecuted Plaintiff for the Castaneda shooting, even though they *knew* he was not involved. In agreeing to prosecute Plaintiff, the Defendant Officers had agreed that they would not conduct a legitimate, honest investigation of the shooting and would, instead, focus their efforts on obtaining Plaintiff's wrongful conviction.

## DEFENDANTS GENERATE FALSE "IDENTIFICATIONS" FROM AMONGST EACH OTHER

26.     In the aftermath of the shooting, LAPD officers interviewed both of the surviving victims, as well as several other witnesses, three of whom are documented in official reports. To varying degrees, these witnesses described the perpetrators.

27.     None of these witnesses were ever shown a photo array.

28.     None of these witnesses were ever asked to view an in-person lineup.

29.     None of the witnesses identified Plaintiff as the shooter, even at trial.

30.    Instead, the Defendants took it upon themselves to generate false reports purporting to contain "identifications" of Plaintiff as the shooter. The Defendants did so in an egregious manner: by deciding themselves to just claim that Plaintiff looked like the perpetrator in the video and treat that as "identification."

31.    Defendants Pere and Motto brought Defendant Cooley to the scene. Once there, Defendant Cooley, in furtherance of her agreement with Defendants, falsely claimed that Plaintiff was the person in the white shirt depicted in the crime scene video footage despite the fact that he had never met or interacted with him.

32.    Defendants knew his so-called "identification" was completely flawed and false, but, in fabricating evidence, falsely described it otherwise in their reports.

33.    Knowing that Defendant Cooley's purported "identification" was meaningless and invalid, Defendants decided to bring in call another LAPD officer, Defendant Born, to attempt to make it appear as if Cooley's claim that Plaintiff was the one depicted in video, as well as the false statements in police reports, were truthful, accurate, and reliable even though they knew they were not.

34.    Defendant Born arrived on scene and, like Defendant Cooley, falsely claimed that Plaintiff was the person in the white shirt depicted in the crime scene video footage despite the fact that he had never met or interacted with him.

35.    As before, Defendants knew his so-called "identification" was completely flawed and false, but, in fabricating evidence, falsely described it otherwise in their reports.

36.    Both of these "identifications" were false; no reasonable person would

have believed that the picture of the shooter was Plaintiff.

37.    In addition to being false, these "identifications" were gratuitous and unnecessary. No exigency demanded this course of conduct, and nothing prevented Defendants from assembling a photo-array or later seeking an in-person lineup to determine whether any witness could identify the shooter depicted in the video.

38.    Defendants refused to use accepted identification procedures because they knew doing so would result in Plaintiff not being identified, owing in large part to the fact that the person who did the shooting—an adult of 200 lbs or more—looked nothing like 13-year old Plaintiff, who was roughly 5 feet tall and 115 lbs.

39.    The bogus so-called "identifications" of Plaintiff by Officers Cooley and Born did not provide any reasonable basis to arrest Plaintiff; nor did they supply Defendants with probable cause to arrest him either.

40.    In addition, the Defendants' police reports concerning the "identifications" made by Cooley and Born contain false information, rendering the reports themselves as fabrications. During the criminal prosecution of Plaintiff, defendants failed to reveal or admit these falsehoods.

## PLAINTIFF'S ARREST

41.    At the time of the shooting, Plaintiff was a 13-year old child. He attended Berendo Middle School, and was present in school the Monday after the Alvarado Terrace shooting.

42.    On August 20, 2012, knowing the purported "identifications" of Plaintiff as the shooter were false, Defendant Officers sought to convince other

8

employees of the City of Los Angeles to go along with their scheme in order to make it appear reasonable and honest, even though it was not.

43.     At Plaintiff's middle school, Defendants spoke with an employee, Roger Negroe, who did not go along with Defendants' scheme and did not falsely identify Plaintiff, as Defendants had and as they hoped he would.

44.     Undeterred, Defendants spoke with Defendant Daniel East, the L.A. School Police Department officer at the middle school, who agreed to falsely claim that Plaintiff was the shooter depicted in the video surveillance of the Castaneda shooting. Defendant East made these false claims—another purported "identification"—knowing that doing so would assist in Plaintiff's prosecution.

45.     At the time of his arrest, Defendants did not have probable cause to believe Plaintiff was involved in the Castaneda homicide.

46.     Despite the lack of probable cause, Defendants placed Plaintiff under arrest and took him to the police station.

47.     Defendants wrote reports falsely claiming that Plaintiff was being arrested in relationship to the missing-persons report, even though they knew that the arrest had nothing to do with the (now extinguished) missing-persons report and was related solely to the Castaneda homicide.

### THE RECORDING OF PLAINTIFF'S CONFESSION

48.     Plaintiff's interrogation was recorded via video. The video provides context and information that goes beyond the transcript of allegations of the complaint. Indeed, a review of the manner in which the adult detectives treated

Plaintiff reveals that the interrogation shocks the conscience. The Defendants'
actions toward a 13 year-old child, as shown on the video, reveal that the
interrogating Defendants were argumentative, manipulative, coercive, threatening,
intimidating, and even involved physical contact with Plaintiff. In other words,
Defendants conduct toward Plaintiff, as depicted in the video, was unconscionable.

49.    The Defendant Officers at the police station during Plaintiff's
interrogation, including Defendants Pere, Motto, Cortina, and Arteaga, and other
unidentified officers, worked together to secure Plaintiff's wrongful conviction.
Defendants not in the interrogation room were able to observe the audio and video
recording of the interrogation of Plaintiff as it was going, which allowed them to
coordinate their efforts to secure Plaintiff's false conviction. Defendants also
conferred before interrogating Plaintiff as to what their strategies would be for
getting Plaintiff to confess.  Accordingly, when different detectives would take turns
in the manner in which they interrogated Plaintiff, they were relying upon and
working with knowledge of the others' actions and conduct toward Plaintiff, as it
was part of their plan to overbear Plaintiff's will.

50.    Sergeant Sanchez, as the supervisor of the Detectives and other
officers who interrogated Plaintiff and questioned his mother, approved the actions
of the detectives and was involved in coordinating their efforts to secure Plaintiff's
false confession.

51.    The Defendant Officers at the station while Plaintiff was being
interrogated were aware of the misconduct being perpetrated against Plaintiff.

Nonetheless, none of them intervened to stop the unconstitutional interrogation, even though all were perfectly able to do so.

### INTERROGATION PART 1: DEFENDANTS BEGIN BY VIOLATING PLAINTIFF'S RIGHTS

52.     Defendants knew Plaintiff was only 13 years old at the time, and that, as a very young juvenile he was substantially more vulnerable than adults to the pressures of custodial interrogation than an adult would be.

53.     The Defendants decided to disregard completely the constitutional standards concerning the treatment of juveniles after an arrest and concerning their custodial interrogation. The Defendant Officers disregarded these constitutional standards due to their malice for Plaintiff.

54.     Indeed, the Defendant Officers also blatantly disregarded department policy, which also requires officers to treat juveniles differently than adults both during and after their arrest.

55.     As just one example, minors must be advised of their *Miranda* rights upon being taken into custody, regardless of whether they are to be interrogated. The Defendants intentionally and blatantly disregarded this rule, as it stood in the way of their agreement to manufacture and coerce a confession from Plaintiff.

56.     Thus, once the Defendant Officers had Plaintiff at the police station, they decided to forego any treatment of Plaintiff as a 13-year-old.

57.     Before the interrogation began, Plaintiff's mother, Helen Contreras arrived at the police station, and asked to see her son; a request that was refused.

58.     Over the next several hours, the Defendant Officers took turns going

11

between Plaintiff and Contreras. Plaintiff and his mother repeatedly asked speak with each other. These requests were denied until after Plaintiff falsely confessed.

59.     Given that Plaintiff was only 13 years old, Contreras had a right to see her son before any questioning. Defendants knowingly and intentionally violated this right.

60.     Given that Plaintiff was only 13 years old, a request to see his mother was tantamount to requesting to speak with an attorney or legal guardian, and was his rights. Defendants knowingly and intentionally violated this right.

61.     At the outset, for example, Defendant Officers put Plaintiff in an interrogation room, handcuffed him to a chair, and began questioning him. When Plaintiff asked about his mother, the Defendants refused to answer, and would not let him inquire any further.

62.     Defendants trampled Plaintiff's right to be silent, telling him they were not going to answer any of his questions, including those about his mother, until they were able to "get the answers to our questions."

63.     Telling Plaintiff he had to answer their questions in order to even be eligible to get his own questions answered further violated Plaintiff's constitutional right to be silent as well as *Miranda* by suggesting that Plaintiff was *required* to answer the questions in the first place.

64.     From there, the unconscionable interrogation continued to down its unlawfully coercive path. For example, during the background questioning required the California Supreme Court, the defendants departed from the non-accusatory

role they were required to use and instead invoked the accusatory language of
interrogation to apply even more pressure on Plaintiff.

65.     When Plaintiff answered these accusatory questions, and still before
receiving any form of *Miranda* warning, the Defendants took steps to indicate that
they would only accept certain answers (the ones they wanted), and that answers
they did not like were unacceptable.

66.     These tactics were coercive, owing to their psychological effect on
Plaintiff as a 13 year old. Indeed, the very reason for providing these forms of
pressure, including overt interrogation under the guise of background, was to
attempt to overbear Plaintiff's will.

67.     Defendant Motto was instrumental in the coordination of Plaintiff's
interrogation and would enter the interrogation room with guns on his side and at
strategic times in order to exert additional pressure on Plaintiff.

68.     Both before and during the interrogation, Defendant Sanchez
coordinated with the Detective defendants, approved their actions, and did nothing
to intervene in the unlawful interrogation even though he knew that the detectives
were actively trampling Plaintiff's rights.

## INTERROGATION PART 2: DEFENDANTS' REFUSE TO FOLLOW THE
## LAW AND VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS

69.     Plaintiff was arrested about 30 minutes after school let out, around
3:40 pm. Two hours later, over 20 minutes into the interrogation, Defendant
Officers finally decided that give Plaintiff some sort of *Miranda* warnings.

70.     As depicted in the video, Defendants' equivocated about whether they

even should provide Plaintiff with any sort of *Miranda* rights, illustrating their complete and total disregard for his constitutional rights.

71.    When providing Plaintiff with his *Miranda* rights, the Defendants did so in a manner that they knew was completely ineffective. Defendants took absolutely no steps to ensure that the *Miranda* admonishments were actually understood by the 13-year old child handcuffed and sitting in front of them.

72.    Instead, to intentionally obscure any impact that the *Miranda* warnings could have had, Defendants engaged in long, misleading, confusing, and inappropriate monologues designed to get Plaintiff to think of things in terms of "survival of the fittest" and friends "rolling" on one another, and coming forward to avoid the claustrophobia of being incarcerated.

73.    Defendants never asked Plaintiff whether he wished to waive his *Miranda* rights, to sign a waiver form, or try to explain the rights in his own words.

74.    Plaintiff never knowingly and voluntarily waived his constitutional right to silence, to an attorney, or any of his constitutional rights.

75.    An action that contributed to their fabrication of the false confession, Defendants showed Plaintiff the video footage of the shooting. Through the interrogation that followed, Defendants worked to create a confession that appeared reliable by providing Plaintiff with details and non-public facts about the crime, all of which he did not know. In addition to what might have been gleaned from viewing the video, these facts included the time, date, and location of the shooting.

76.    After seeing the video, and having no idea who was involved in the

shooting, Plaintiff honestly asked Defendants "Who is that?"

77. In the time that followed, and before he falsely confessed, Plaintiff truthfully denied being involved in the Castaneda shooting dozens of times.

78. Defendants ignored Plaintiff's repeated denials and attempts to explain how and why he could not have been involved.

79. Instead, in violation of his constitutional rights, Defendants undertook multiple actions designed to overbear Plaintiff's will. For example, Defendants evoked a false evidence ploy of claiming that the only reason Plaintiff had been arrested him was because he had been "given up" by someone else when in fact this statement was false. Likewise, Defendants implied that Plaintiff was expected to give a statement, negating the idea that he could be silent at all, saying things like "we're here to get your statement" and other words to that effect. In addition, Defendants repeatedly invoked the idea of confessing as a way of obtaining leniency "instead of … staying in jail" for who knows how long.

## INTERROGATION PART 3: PLAINTIFF SPECIFICALLY INVOKES HIS RIGHT TO AN ATTORNEY, BUT UNLAWFUL QUESTIONING CONTINUES

80. Plaintiff's prior requests to speak with or see his mother should have ended all questioning, as they were the equivalent of invoking Plaintiff's right to Counsel. Nonetheless, questioning continued.

81. Plaintiff invoked his right to an attorney, stating "Could I have an attorney? Because that's not me."

82. Rather than stopping their questioning, and in violation of his constitutional rights, Defendants told Plaintiff "No, don't worry."

83.    Egregiously, not only did the Defendants refuse to provide Plaintiff
with access to his mother or to an attorney, they decided to ratchet-up their
misconduct by threatening Plaintiff.

84.    Plaintiff again asked to see his mother. In order to provide Plaintiff
with false hope, Defendants told Plaintiff he will be allowed to see his mother even
though they knew that was not the case. Rather than bring him is mother,
Defendants left the room with Plaintiff still handcuffed, and still crying.

## INTERROGATION PART 4: DEFENDANT ARTEAGA'S UNCONSCIONABLE CONDUCT

85.    The Defendants left Plaintiff by himself in order to make him feel
desperate and isolated. Minutes later, Plaintiff was given a rude awakening: he
would not be seeing his mother, as promised.

86.    Instead, Defendant Arteaga, in agreement and acting with other
Defendants, stormed into the interrogation room. In so doing Defendant Arteaga
practically pounced on Plaintiff, who was still stuck in the corner of the room
handcuffed to the chair. Defendant Arteaga's presence alone—as a large man,
yelling, and with a gun on his hip—was coercive and threatening.

87.    Defendant Arteaga's actions toward Plaintiff were unconscionable. In
summary, Defendant Arteaga:

a)  put his hands on plaintiff, an act of physical abuse under the
    circumstances;

b)  repeatedly lied to Plaintiff;

c)  repeatedly intimidated Plaintiff's with his body and (including yelling,

pounding on the table, and getting in Plaintiff's face);

d)  repeatedly threatened Plaintiff (including his numerous claims that judge would think Plaintiff was a "cold blooded killer" if he did not confess);

e)  repeatedly made promises of leniency (including telling Plaintiff that unless he confessed the judge would see him as a "big fucking liar" or "cold blooded killer" and would therefore get a "much reduced sentence");

f)  repeatedly claimed he would "help" Plaintiff if he confessed;

g)  repeatedly invoked Plaintiff's love for his family as a threat by suggesting that, unless he confessed, Plaintiff would be dragging them into court, which would be "fucked up"; and

h)  repeatedly cursed and swore at 13-year-old Plaintiff, especially after he denied his involvement (including telling Plaintiff to "stop playing these fucking games," and that he "doesn't give a fuck" about Plaintiff's denials).

88.    Defendant Arteaga also provided non-public crime facts and other unknown information about the Castaneda shooting to Plaintiff, including but not limited to telling Plaintiff.

89.    In the end, in an extremely aggressive and threatening manner, Defendant Arteaga used the phrase "cold blooded killer" or something to that effect more than 20 times.

90.    The remaining Defendant Officers at the station observed Defendant Arteaga's blatant misconduct, but refused to intervene. Defendant Motto even entered the room simply to intimidate Plaintiff and make him more likely to

acquiesce to Defendants' questioning. None of the Defendants intervened because Defendant Arteaga's conduct was in part of their coordinated efforts to fabricate a confession, and to coerce Plaintiff into making a false confession.

91.     In sum, in addition to failing to respect Plaintiff's constitutional rights as required given his young juvenile status, the Defendants did not even follow the constitutional standards applicable for adults—they refused to provide him with *Miranda* warnings before conducting the interrogation; they ignored his unequivocal requests for an attorney; and they used both physically and psychologically coercive techniques against him despite his obvious vulnerabilities.

## PLAINTIFF'S FABRICATED, FALSE, AND COERCED CONFESSION

92.     The Defendants' actions were successful. Eventually, Plaintiff's will was overborne and he made an inculpatory statement.

93.      By the time he gave-in, Plaintiff had asked to see his mother at least three times, specifically asked for an attorney, and denied his involvement in the Alvarado Terrace shooting more than 25 times.

94.     Thereafter, with his will over-born, Defendants provided Plaintiff with even more non-public additional details of the crime he did not know. These steps were taken, in an effort to make the confession seem more reliable, even though it was fabricated and coerced. These additional facts included but were not limited to the fact: that there was a car involved; that three people worked together (two shooters and a driver); and that there were two types of guns.

95.     The confession was obviously false. Other than facts supplied by the

Defendants, Plaintiff was unable to make up a story that was consistent with the actual shooting. For example, he described a coffee brown van, but the vehicle involved in the shooting was a red Hyundai. As a consequence, after these "errors," the Defendants corrected Plaintiff, to fabricate evidence, supplied Plaintiff with false details to fit the facts of the crime that were unknown to Plaintiff and the Defendants own narrative about what happened. Plaintiff agreed to these suggestions, as his will was completely over-born.

96.    Following the interrogation, Defendants fabricated additional evidence—reports concerning the interrogation. These reports falsely portray the manner in which Plaintiff was treated, how he responded, and the circumstances of his confession. These false reports were used to instigate Plaintiff's prosecution.

97.    Upon reading these reports, and despite his knowledge that the reports contained falsehoods, Defendant Sanchez approved the Detective Defendants' conduct and reports, both ratifying and endorsing their conduct, as he had agreed.

## WRONGFUL PROSECUTION AND CONVICTION

98.    As a result of the Defendant Officers' misconduct, Plaintiff was charged with the first degree murder of Alexa Castaneda, as well as other crimes related to the Alvarado Terrace shooting.

99.    There was no probable cause to believe that Plaintiff was involved in the murder of Alex Castaneda before or after Defendants' misconduct.

100.    Nonetheless, the Defendants used the fruits of their misconduct to cause Plaintiff to be prosecuted.  Over a year later, after a bench trial in the

19

juvenile court, Plaintiff was wrongfully convicted of murdering Alex Castaneda, attempted murder of the two other victims, and other handgun specifications. He was sentenced to twenty-five years to life.

101.    Plaintiff was thus faced with the prospect of spending the remainder of his teenage years in prison for a crime he did not commit, only becoming eligible for parole over decades later.

102.    There was no physical evidence tying Plaintiff to the crime; no fingerprints, DNA, or any other forensic evidence linked Plaintiff to the shooting.

103.    Without Defendants' misconduct, Plaintiff would not have been prosecuted or convicted.

### PLAINTIFF'S CONVICTION IS OVERTURNED

104.    In 2015, the Court of Appeals overturned Plaintiff's conviction, specifically finding that the Defendant Officers who participated in the interrogation violated Plaintiff's constitutional rights during the interrogation.

105.    The Appellate Court specifically found that Plaintiff's confession was obtained after the violation of his constitutional rights and vacated the conviction on that basis.

106.    The State of California later dismissed the charges against Plaintiff.

### THE CITY OF LOS ANGELES' PROBLEMS WITH FABRICATED EVIDENCE AND FALSE AND COERCED CONFESSIONS

107.    The Defendant Officers' coercion of false statements from Plaintiff was also undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department.

108.    The wrongful convictions of innocent persons who gave coerced and false confessions include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Plaintiff in this case. These tactics include: (a) physical contact; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (d) misleading of parents and denial of parents' access to their children during interrogations; (e) concealment of exculpatory information; (f) false promises of leniency for reduced sentences or other "help" in exchange for a confession; and (g) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt.

109.    For example, in 2011, LAPD officers extracted a false confession from a juvenile in the shooting of Wilbert Gaitan, leading to false criminal charges against him. As here, video surveillance illustrated the falsity of the confession. Indeed, even spokeswoman for the Los Angeles County District Attorney's office even dubbed the confession as "false."

110.    Likewise, also in 2011, a superior court judge found that LAPD officers had coerced Edward Arch, who was 19 at the time of his 2007 arrest and spent more than three years in jail awaiting trial, into confessing. The Superior Court dismissed the criminal case on that basis.

111.    Years before, LAPD officers extracted a false and coerced confession from Harold Hall in 1985. Hall's charges were eventually and finally dismissed in 2004. That same year, David Allen Jones was exonerated by DNA testing which proved that he had not committed the 1992 crimes for which he was convicted and had falsely confessed.

112.    Indeed, Plaintiff's wrongful conviction on the basis of fabricated evidence by Rampart Division officers of the LAPD was no aberration. Instead, the City has long had troubles, including a scandal and consent decree, resulting from misconduct of officers working out of Rampart, as nearly all Defendants are. Unfortunately, the culture that pervaded then is still at work today, and can be seen in the brazen misconduct of the Defendants in this case.

113.    At the time of the events leading to Plaintiff's confession and wrongful conviction, members of the Department systematically promoted the malicious prosecution of teenagers and other vulnerable individuals by using abusive and coercive interrogation tactics to force them to confess to crimes they did not commit.

114.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Los Angeles Police Department.  In accordance with this code, another on-going area of misconduct with antecedents in the Rampart Scandal, Department Detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

115.    In addition, despite the number of coerced confessions in LA, the City

has undertaken no steps to ensure that civilians, and particularly juvenile suspects,

do not falsely confess. Indeed the City has refused to do so despite the fact of its

knowledge of the need for reform to prevent false and coerced confessions of

juveniles due to their vulnerability. The Department has not disciplined its officers

for failures in the investigative process, including violations of a suspect's

constitutional rights and for departures from policy, as happened here.

116.    As a result of the City of Los Angeles's established practices of failing

to investigate cases in which the police are implicated in obtaining coerced and false

confessions; failing to discipline officers accused of this unlawful conduct; and

facilitating a code of silence within the Department, Los Angeles police officers

(including the Defendant Officers here) have come to believe that they may violate

the civil rights of members of the public and cause innocent persons to be charged

with serious crimes without fear of adverse consequences.

117.    The City's failure to train, supervise, and discipline its officers

effectively condones, ratifies, and sanctions the kind of misconduct that the

Defendant Officers committed against Plaintiff in this case. Constitutional

violations such as occurred in this case are encouraged and facilitated as a result of

the City's practices and de facto policies, as alleged above.

118.    The City of Los Angeles and officials within the Department failed to

act to remedy the abuses described in the preceding paragraphs, despite actual

knowledge of the pattern of misconduct. They thereby perpetuated the unlawful

practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

119.    The policies and practices described in the foregoing paragraphs were consciously approved by City of Los Angeles policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

## PLAINTIFF'S DAMAGES

120.    Plaintiff spent nearly three and-a-half years incarcerated for crimes that he did not commit. Plaintiff must now attempt to make a life for himself outside of prison without the benefit of the foundational life experiences which juveniles normally develop throughout high school.

121.    Additionally, the emotional pain and suffering caused by these important years, is substantial and ongoing.  Plaintiff missed out on the ability to share holidays, births, and other life events with loved ones, and to enjoy high school. As the judge put it at sentencing, Plaintiff is a "victim" in this case: "He's given up a substantial period of his childhood."

122.    Plaintiff has suffered tremendous damage, including physical suffering and emotional damages, all proximately caused by Defendants' misconduct.

## COUNT I – Federal Law
## Fifth and Fourteenth Amendments (Self-Incrimination, Right to Counsel)

123.    Each paragraph of this Complaint is incorporated as if restated fully herein.

124.    In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of

law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

125.   As described more fully above, the Defendant Officers conducted an unconstitutional interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in the murder of Alex Castaneda, and attempted murder of two others.

126.   In the manner described more fully above, the Defendant Officers refused to provide Plaintiff with his legal guardian and an attorney when he asked to see his legal guardian and when he invoked his right to an attorney while being interrogated. In doing so, the Defendants violated their clearly established duty to terminate an interrogation once an individual subject to a custodial interrogation invokes their right to counsel.

127.   The false statements coerced by the Defendant Officers and made after Plaintiff asked to see his legal guardian and after Plaintiff invoked his right to counsel were used against Plaintiff to his detriment in a criminal case.  These statements were the only reason that Plaintiff was prosecuted and convicted of the murder of Alex Castaneda and attempted murder of two others.

128.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

129.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to physical sickness, loss of liberty, and emotional distress.

## COUNT II – Federal Law
## Fourteenth Amendment (Due Process)

130.   Each paragraph of this Complaint is incorporated as if restated fully herein.

131.   In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fourteenth Amendment.

132.   As described more fully above, the Defendant Officers unconstitutional interrogation of Plaintiff shocks the conscience and involved truly egregious and unreasonable actions by defendants, which caused Plaintiff to make involuntary statements implicating himself in the murder of Alex Castaneda and attempted murder of two others.

133.   The false statements unconscionably obtained by the Defendant Officers were used against Plaintiff to his detriment in a criminal case.  These statements were the only reason that Plaintiff was prosecuted and convicted of the murder of Alex Castaneda.

134.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

135.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to physical injury and sickness, loss of liberty, and emotional distress.

### COUNT III– Federal Law
### Sixth and Fourteenth Amendments (Due Process, Fair Trial)

136.    Each paragraph of this Complaint is incorporated as if restated fully herein.

137.    As described more fully above, all of the Defendant Officers while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

138.    In the manner described more fully above, the Defendant Officers and individually, jointly, and/or in concert and in conspiracy, fabricated evidence— including but not limited to reports concerning Defendants' false claims purporting to "identify" Plaintiff, the content of Plaintiff's oral confession, and reports purporting to memorialize Plaintiff's confession—and/or deliberately withheld exculpatory evidence.  In doing so, the Defendants violated their clearly established duty to report all material exculpatory and impeachment information.

139.    Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have proceeded, and Plaintiff would not have been convicted.

140.    The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

141.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

142.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT IV – Federal Law
## Malicious Prosecution

143.    Each paragraph of this Complaint is incorporated as if restated fully herein.

144.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

145.    The Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

146.    Statements of the Defendants regarding Plaintiff's alleged culpability
were made with knowledge that said statements were false. The same is true of
Defendants purported "identifications," which contradicted the surveillance camera.
The Defendants also fabricated evidence through their "identifications," through
their efforts to obtain a false statement from Plaintiff, including their report
purporting to memorialize that confession and withheld exculpatory evidence that
would have demonstrated their misconduct.  The Defendants were aware that, as
described more fully above, no true or reliable evidence implicated Plaintiff in the
shooting.

147.    The Defendants intentionally withheld from and misrepresented to
prosecutors facts that further vitiated probable cause against Plaintiff, as set forth
above, and failed to investigate evidence which would have led to the actual
perpetrator.  The Defendants withheld the facts of their plan and resulting
fabrications from Plaintiff.

148.    The misconduct described in this Count was undertaken intentionally,
with malice, willfulness, and reckless indifference to the rights of others.

149.    In 2015, the prosecution terminated in Plaintiff's favor when, after his
conviction was vacated, the State dismissed the charges against him.

150.    As a direct and proximate result of this misconduct, Plaintiff
sustained, and continues to endure, injuries as set forth above.

**COUNT V – Federal Law
Failure to Intervene**

151.    Each paragraph of this Complaint is incorporated as if restated fully herein.

152.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

153.    As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

154.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT VI – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

155.    Each paragraph of this Complaint is incorporated as if restated fully herein.

156.    After the murder of Alex Castaneda, the Defendant Officers acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights against self-incrimination due

process, and to a fair trial, all as described in the various paragraphs of this
Complaint.

157.    Additionally, before and after Plaintiff's conviction, the Defendant
Officers further conspired to deprive Plaintiff of exculpatory information to which
he was lawfully entitled and which would have led either to his not being charged,
his acquittal, or his more timely exoneration.

158.    In this manner, the Defendant Officers, acting in concert with other
unknown co-conspirators, conspired by concerted action to accomplish an unlawful
purpose by unlawful means.

159.    In furtherance of the conspiracy, each of the co-conspirators engaged in
and facilitated numerous overt acts, including but not limited to those set forth
above and was an otherwise willful participant in joint activity.

160.    As a direct and proximate result of the illicit prior agreement and
actions in furtherance of the conspiracy referenced above, Plaintiff's rights were
violated, and he suffered injuries, including but not limited to loss of liberty,
physical harm, and emotional distress.

161.    The misconduct described in this Count was objectively unreasonable
and was undertaken intentionally, with malice, willfulness, and deliberate
indifference to Plaintiff's rights.


**COUNT VII – 42 U.S.C. § 1983**
***Monell* Policy Claims**

162.    Each paragraph of this Complaint is incorporated as if restated fully herein.

163.    The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Los Angeles with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

164.    The policies and practices described in this Count were maintained and implemented by the City of Los Angeles with deliberate indifference to Plaintiff's constitutional rights.

165.    As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

166.    The City of Los Angeles is therefore liable for the misconduct committed by the Defendant Officers.

### COUNT VIII – State Law Claim
### Malicious Prosecution

167.    Each paragraph of this Complaint is incorporated as if restated fully herein.

168.    The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements

to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

169.    The Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

170.    Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured. The Defendants also fabricated evidence by coercing false inculpatory testimony from co-defendants and withheld exculpatory evidence that would have demonstrated Plaintiff's absolute innocence. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Castaneda homicide.

171.    The Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. The Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

172.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

173.    In 2015, the prosecution terminated in Plaintiff's favor when his conviction was vacated.

174.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above.

### COUNT IX – State Law Claim
### Intentional Infliction of Emotional Distress

175.    Each paragraph of this Complaint is incorporated as if restated fully herein.

176.    The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

177.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

### COUNT X – State Law Claim
### Civil Conspiracy

178.    Each paragraph of this Complaint is incorporated as if restated fully herein.

179.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

180.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

34

181.   The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

182.   As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## COUNT XI – State Law Claim
### Respondeat Superior

183.   Each paragraph of this Complaint is incorporated as if restated fully herein.

184.   In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Department, acting at all relevant times within the scope of their employment and under color of law.

185.   Defendant City of Los Angeles is liable as principals for all torts committed by their agents.

## COUNT X – State Law Claim
### Indemnification

186.   Each paragraph of this Complaint is incorporated as if restated fully herein.

187.   California law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

188.   The Defendant Officers are or were employees of the Los Angeles Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, ART TOBIAS, respectfully requests that this Court enter judgment in his favor and against Defendants, the CITY OF LOS ANGELES; SGT. SANCHEZ, #25339; DETECTIVE MICHAEL ARTEAGA, #32722; DETECTIVE JEFF CORTINA, #35632; DETECTIVE J. MOTTO, #25429; DETECTIVE JULIAN PERE, #27434; OFFICER MARSHALL COOLEY, #38940; OFFICER BORN, #38351; L.A. SCHOOL POLICE OFFICER DANIEL EAST, #959; and UNIDENTIFIED EMPLOYEES of the CITY OF LOS ANGELES, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, ART TOBIAS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**ART TOBIAS**

By: _____

One of his attorneys

David B. Owens
LOEVY & LOEVY
311 N. Aberdeen St., 3rd FL
Chicago, IL 60607
(312) 243-5900