1   David B. Owens, Cal. Bar No. 275030
2   david@loevy.com
    *Attorney for Plaintiff, Art Tobias*
3   LOEVY & LOEVY
    311 N. Aberdeen Street, 3rd Floor
4   Chicago, Illinois 60607
    (312) 243-5900

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**
9            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10  ART TOBIAS,                         )  Case No. 2:17-cv-1076-DSF-AS
                                        )
11              Plaintiff,              )
        v.                              )
12                                      )
    CITY OF LOS ANGELES; SGT.           )  **FIRST AMENDED COMPLAINT**
13  SANCHEZ, #25339; DETECTIVE          )  **FOR DAMAGES AND OTHER**
    MICHAEL ARTEAGA, #32722;            )  **RELIEF**
14  DETECTIVE JEFF CORTINA,             )
    #35632; DETECTIVE J. MOTTO,         )
15  #25429; DETECTIVE JULIAN PERE,      )
    #27434; OFFICER MARSHALL            )
16  COOLEY, #38940; OFFICER BORN,       )
    #38351; L.A. SCHOOL POLICE          )
17  OFFICER DANIEL EAST, #959; and      )
    UNIDENTIFIED EMPLOYEES of the       )
18  CITY OF LOS ANGELES,                )
                                        )
19              Defendants.             )

20

1

Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331, Plaintiff ART TOBIAS, by his undersigned attorneys, complains of Defendants, the CITY OF LOS ANGELES; SGT. SANCHEZ, #25339; DETECTIVE MICHAEL ARTEAGA, #32722; DETECTIVE JEFF CORTINA, #35632; DETECTIVE J. MOTTO, #25429; DETECTIVE JULIAN PERE, #27434; OFFICER MARSHALL COOLEY, #38940; OFFICER BORN, #38351; L.A. SCHOOL POLICE OFFICER DANIEL EAST, #959; and UNIDENTIFIED EMPLOYEES of the CITY OF LOS ANGELES, acting pursuant to the City's policies and practice, states as follows:

**INTRODUCTION**

1.     As a consequence of the shocking misconduct of officers in Los Angeles Police Department ("LAPD"), Plaintiff Art Tobias was convicted of a homicide that he did not commit.

2.     Just a child at the time of the shooting—a short, skinny 13 year-old with no criminal history—Plaintiff was sentenced to 25-years to life, and spent nearly three and-a-half years incarcerated before his conviction was overturned.[1]

_____

[1] The criminal prosecution of Plaintiff, a minor at the time, proceeded through the California juvenile court. Though the terminology is different, the prosecution of Plaintiff via the "delinquency proceedings" where Plaintiff was "adjudicated delinquent" by the juvenile court is no different than a criminal prosecution via resulting in a conviction a bench trial. Accordingly, Plaintiff uses the term "conviction" and other standard criminal terms (like "trial" rather than "adjudication") to refer his criminal prosecution and its outcome.

2

3.      The homicide for which Plaintiff was wrongfully convicted was a shooting and captured on video surveillance footage. On account of that footage, LAPD officers knew that there was absolutely no way Plaintiff had committed the crime; the perpetrator was a heavy-set adult, not a small teen. Nonetheless, and despite the clear footage, LAPD officers—the Defendants to this suit—decided to frame Plaintiff for a crime he did not commit.

4.      To start, just moments after the shooting, rather than assembling a photo array or in-person lineup for witnesses to view, Defendants decided instead themselves to falsely claim that Plaintiff was the person in the video even though none of them had never met or interacted with Plaintiff. Defendants did not use any legitimate identification procedure for a simple, malicious reason: Plaintiff obviously did not look like the perpetrator.

5.      If that were not enough, Defendants took their misconduct a step further by subjecting a 13-year old to a grueling, unlawful interrogation. The interrogation, which is also captured on video, reveals the unconscionable misconduct of the Defendant Officers who—with guns on their hips and Plaintiff handcuffed to a chair—used blatantly unconstitutional and coercive tactics to produce a false, forced, and fabricated confession. Defendants made false promises, screamed and yelled, lied, refused Plaintiff's repeated pleas to see his mother, refused Plaintiff's request for an attorney, swore at Plaintiff, and one

3

officer even put his hands on Plaintiff. Without that misconduct, which succeeded in unlawfully-creating false evidence, Plaintiff would have never been convicted.

6.     Plaintiff will never regain the foundational years of his life stolen from him on account of Defendants' misconduct in securing his wrongful conviction. This lawsuit seeks redress for those injuries.

## JURISDICTION AND VENUE

7.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331. Venue is proper under 28 U.S.C. § 1391(b).  The events giving rise to the claims asserted herein occurred here, and most parties live here or are affiliated with this District.

## THE PARTIES

8.     Plaintiff Art Tobias is an 18 year-old high school student, with a permanent residence in Los Angeles, California.

9.     At all times relevant hereto, Defendants Sergeant Sanchez, #25339; Detective Michael Arteaga, #32722; Detective Jeff Cortina, #35632; Detective J. Motto, #25429; Detective Julian Pere, #27434; Officer Born, #38351; Officer Marshall Cooley, #38940; and Unidentified Employees of the Los Angeles Police Department were police officers in the Los Angeles Police Department. All are sued in their individual capacities, and acted under color of law and within the

4

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

scope of their employment during the investigation and prosecution of the murder at issue.

10.     At all times relevant hereto, Defendant Daniel East was a Los Angeles School Police Department Officer and is being sued in his individual capacity for actions taken under the color of law and within the scope of his employment during the investigation and prosecution of the murder at issue.

11.     Defendant City of Los Angeles is a California municipal corporation. The City of Los Angeles is or was the employer of each individually-named Defendant and the other Unidentified Officers.

## THE ALVARADO TERRACE SHOOTING

12.     On August 8, 2012, forty minutes after midnight Alex Castaneda was shot and killed on the 1400 block of Alvarado Terrace in Los Angeles, California.

13.     At the time of the shooting, Castaneda was with a group of friends, two of whom were also shot but whose injuries were not fatal.

14.     Two perpetrators fired guns at the group; one in a dark shirt on the far side of the street and one in a white shirt closer to the group.

15.     The perpetrators had a third associate, who picked them up after the shooting in a red Hyundai.

16.     Several witnesses were present at the time of the shooting, and at least three of them were interviewed about what happened. All who provided

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

1    descriptions of the perpetrator in the white shirt reported that he was an adult.

2        17.    One witness specifically told the officers that the shooter in the white

3    shirt was about six feet tall and around 200 pounds.

4        18.    In addition, surveillance footage captured the shooting.

5        19.    The video of the shooting is consistent with the account provided by

6    the witnesses, as well as their description of the perpetrator: he was wearing a

7    white shirt, an adult, and was of a larger/heavier build.

8        20.    Plaintiff had absolutely nothing to do with the shooting of Alex

9    Castaneda and the two other victims at Alvarado Terrace.

10    **DETECTIVES DECIDE TO PROSEUCTE PLAINTIFF**
**RATHER THAN CONDUCT AN HONEST INVESTIGATION**

11

12        21.    Two seasoned detectives from the Rampart Homicide Division of the

13    LAPD, Defendants Pere and Motto, were dispatched to the crime scene the night of

14    the shooting and assumed investigative responsibility for the case.

15        22.    While processing the scene, Defendants Pere and Motto were made

16    aware that there was video footage of the shooting, which they viewed.

17        23.    Hours before the shooting, on August 17, 2012, Plaintiff's mother,

18    Helen Contreras, had filed a missing-persons report for Plaintiff.

19        24.    At the station, Contreras met with Defendant Marshall Cooley.

20    Defendant Cooley told Contreras that he did not know Plaintiff and had never met

him personally.

6

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

25.     To confirm this, Contreras briefly showed Defendant Cooley a cell-phone picture of Plaintiff, and Cooley truthfully stated that he had never met or interacted with Plaintiff.

26.     Plaintiff returned home before the shooting at Alvarado Terrace occurred. Plaintiff's mother called the Rampart station to inform them that the missing-persons report could be terminated.

27.     Nonetheless, rather than focusing on investigating, the Defendant Officers decided to pursue Plaintiff for the Castaneda homicide, using the missing-persons report as a pretext for focusing on Plaintiff.

28.     This began with Defendants Pere and Motto, who subsequently interacted with each of the individually-named Defendant Officers.

29.     All of the individually-named Defendant Officers agreed to join and assist Defendants Pere and Motto in their efforts to prosecute Plaintiff for the Castaneda homicide, despite the fact that he was innocent.

30.     In fact, the Defendant Officers agreed to falsely prosecuted Plaintiff for the Castaneda shooting, even though they *knew* he was not involved.

31.     In agreeing to prosecute Plaintiff, the Defendant Officers determined that they would not conduct a legitimate, honest investigation of the shooting but would, instead, focus their efforts on obtaining Plaintiff's wrongful conviction.

7

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

## DEFENDANTS GENERATE FALSE "IDENTIFICATIONS" FROM AMONGST EACH OTHER

32.     In the aftermath of the shooting, LAPD officers interviewed both of the surviving victims, as well as several other witnesses. To varying degrees, these witnesses described the perpetrators.

33.     None of these witnesses were ever shown a photo array.

34.     None of these witnesses were ever asked to view an in-person lineup.

35.     None of the witnesses identified Plaintiff as the shooter, even at trial.

36.     Instead, the Defendants took it upon themselves to generate false reports purporting to contain "identifications" of Plaintiff as the shooter. The Defendants did so in an egregious manner: deciding themselves to just claim that Plaintiff looked like the perpetrator in the video and treat that false claim as if it were an actual identification.

37.     Defendants Pere and Motto brought Defendant Cooley to the scene. Once there, Defendant Cooley, in furtherance of her agreement with Defendants, falsely claimed that Plaintiff was the person in the white shirt depicted in the video footage despite the fact that he had never met or interacted with Plaintiff at all.

38.     Defendants knew his so-called "identification" was completely flawed and false. Nonetheless, in fabricating evidence, Defendants falsely described Defendant Cooley's "identification" otherwise in official police reports.

39.     Knowing that Defendant Cooley's purported "identification" was

8

1    completely meaningless and invalid, Defendants decided to bring in another LAPD

2    officer, Defendant Born.

3         40.    Defendant Born arrived on scene and, like Defendant Cooley, falsely

4    claimed that Plaintiff was the person in the white shirt depicted in the crime scene

5    video footage despite the fact that he had never met or interacted with him.

6         41.    Defendant Born made another fake "identification" of Plaintiff to

7    attempt to make it appear as if Cooley's claim that Plaintiff was the one depicted in

8    video as well as the false statements in police reports were truthful, accurate, and

9    reliable even though they knew they were not.

10         42.    As before, Defendants knew his so-called "identification" was flawed

11    and false. Nonetheless, in fabricating evidence, Defendants falsely described

12    Defendant Born's "identification" otherwise in their official police reports.

13         43.    Both of these "identifications" were false; no reasonable person would

14    have believed that the picture of the shooter was Plaintiff.

15         44.    In addition to being false, these "identifications" were gratuitous and

16    unnecessary. No exigency demanded this course of conduct, and nothing prevented

17    Defendants from assembling a photo-array or later seeking an in-person lineup to

18    determine whether any witness could identify the shooter depicted in the video.

19         45.    Defendants refused to use accepted identification procedures because

20    they knew doing so would result in Plaintiff not being identified, owing in large

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

part to the fact that the person who did the shooting—an adult of 200 lbs or more—looked nothing like Plaintiff, a 13-year old who was barely 5 ft. tall and about 115 lbs.

46.    The bogus so-called "identifications" of Plaintiff by Officers Cooley and Born did not provide any reasonable basis to arrest Plaintiff; nor did they supply Defendants with probable cause to arrest him either.

47.    In addition, Defendants' police reports concerning the "identifications" made by Cooley and Born contain false information, rendering the reports themselves as fabrications. During the criminal prosecution of Plaintiff, defendants failed to reveal or admit these falsehoods.

**PLAINTIFF'S ARREST**

48.    At the time of the Alvarado Terrace shooting, Plaintiff was a 13-year old middle school student. He attended Berendo Middle School, a public school in Los Angeles, and was present on Monday thereafter.

49.    On August 20, 2012, knowing their claims purporting to "identify" Plaintiff as the shooter were false, Defendant Officers sought to convince other employees of the City of Los Angeles to go along with their scheme in order to make their efforts appear reasonable and honest, even though they were not.

50.    At Berendo middle school, for example, Defendants spoke with an employee, Roger I. Negroe, who did not go along with Defendants' scheme and

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

did not falsely identify Plaintiff, as Defendants had and as they hoped he would.

51.     Undeterred, Defendants spoke with Defendant Daniel East, the L.A. School Police Department officer at the school. Defendant East agreed to falsely claim that Plaintiff was the shooter depicted in the video surveillance of the Castaneda shooting.

52.     Defendant East made these false claims—another purported "identification"—knowing that doing so would assist in Plaintiff's prosecution.

53.     At the time of his arrest, and Defendants did not have probable cause to believe Plaintiff was involved in the Castaneda homicide.

54.     Despite the lack of probable cause, Defendants placed Plaintiff under arrest and took him to the police station.

55.     Defendants wrote reports falsely claiming that Plaintiff was being arrested in relationship to the missing-persons report, even though they knew that the arrest had nothing to do with the (now extinguished) missing-persons report.

56.     Plaintiff's arrest was related solely to the Castaneda homicide.

**THE RECORDING OF PLAINTIFF'S CONFESSION**

57.     Plaintiff's interrogation was recorded via video. The video provides context and information that goes beyond the cold transcript of the complaint.

58.     Indeed, a review of the manner in which the adult detectives treated Plaintiff reveals that the interrogation shocks the conscience. The Defendants'

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

actions toward a 13 year-old child, as shown on the video, reveal that the interrogating Defendants were argumentative, manipulative, coercive, threatening, intimidating. One of the Defendant Officers, after looming over Plaintiff even resorted to physical contact while screaming and threatening a teenager.

59.    The video is difficult to watch because Defendants conduct toward Plaintiff, as depicted therein, was not just patently illegal; it was unconscionable. No person—let alone a small child—should be forced to endure the brazen misconduct Defendants' perpetrated upon Plaintiff.

60.    The Defendant Officers at the police station during Plaintiff's interrogation, including Defendants Pere, Motto, Cortina, and Arteaga, and other unidentified officers, worked together to secure Plaintiff's wrongful conviction. Defendants not in the interrogation room were able to observe the audio and video recording of the interrogation of Plaintiff as it was going, which allowed them to coordinated their efforts to secure Plaintiff's false conviction. Defendants also conferred before interrogating Plaintiff as to what their strategies would be for getting Plaintiff to confess.  Accordingly, when different detectives would take turns in the manner in which they interrogated Plaintiff, they were relying upon and working with knowledge of the others' actions and conduct toward Plaintiff, as it was part of their plan to overbear Plaintiff's will.

61.    Sergeant Sanchez, as the supervisor of the Detectives and other

12

officers who interrogated Plaintiff and questioned his mother, approved the actions of the detectives and was involved in coordinating their efforts to secure Plaintiff's false confession.

62.   The Defendant Officers at the station while Plaintiff was being interrogated were aware of the misconduct being perpetrated against Plaintiff. Nonetheless, none of them intervened to stop the unconstitutional interrogation, even though all were perfectly able to do so.

## INTERROGATION PART 1:
## DEFENDANTS BEGIN BY VIOLATING PLAINTIFF'S RIGHTS

63.   Defendants knew Plaintiff was only 13 years old at the time, and that, as a very young juvenile he was substantially more vulnerable than adults to the pressures of custodial interrogation than an adult would be.

64.   Defendants decided to disregard completely the constitutional standards concerning the treatment of suspects after an arrest concerning the rights of those subject to custodial interrogation. Defendants also decided to disregard completely the constitutional standards regarding the treatment of juvenile suspects after an arrest concerning the treatment of juveniles subject to custodial interrogation.

65.   The Defendant Officers disregarded these constitutional standards due to their malice for Plaintiff.

66.   Indeed, the Defendant Officers also blatantly disregarded department

policy, which also requires officers to treat juveniles differently than adults both during and after their arrest.

67.     As just one example, minors must be advised of their *Miranda* rights upon being taken into custody, regardless of whether they are to be interrogated. The Defendants intentionally and blatantly disregarded this rule, as it stood in the way of their agreement to manufacture and coerce a confession from Plaintiff.

68.     Thus, once the Defendant Officers had Plaintiff at the police station, they decided to forego any treatment of Plaintiff as a 13-year-old.

69.     Before questioning began, Plaintiff's mother, Helen Contreras, arrived at the police station, and asked to see her son. Defendants refused this request.

70.     Over the next several hours, the Defendant Officers took turns going between Plaintiff and Contreras. Both Plaintiff and his mother repeatedly asked to see or even speak with each other. These requests were denied until after Plaintiff falsely confessed.

71.     Given that Plaintiff was only 13 years old, Contreras had a right to see her son before any questioning. Defendants knowingly and intentionally violated this right.

72.     Given that Plaintiff was only 13 years old, a request to see his mother was tantamount to requesting to speak with an attorney or legal guardian, and was his right. Defendants knowingly and intentionally violated this right.

14

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

73.     Specifically, the Defendant Officers put Plaintiff in an interrogation room, handcuffed him to a chair, and began questioning him. When Plaintiff asked whether the Detectives had spoken with his mother, the Defendants refused to answer, and would not let him inquire any further.

74.     Given his age, Plaintiff's requests to see his mother were an exercise of his constitutional rights under the Fifth Amendment, both to have counsel and to remain silent.

75.     The Defendants unlawfully rejected this request and would not allow Plaintiff to see his mother or an attorney.

76.     Defendants trampled Plaintiff's right to be silent, telling him they were not going to answer any of his questions, including those about his mother, until "we get the answers to our questions."

77.     Telling Plaintiff he had to answer their questions in order to even be eligible to get his own questions answered further violated Plaintiff's constitutional right to be silent as well as *Miranda* by suggesting that Plaintiff was *required* to answer the questions in the first place.

78.     From there, the unconscionable interrogation continued to down its unlawfully coercive path. For example, during the "background" questioning required the California Supreme Court, the defendants departed from the non-accusatory role they were required to use and instead invoked the accusatory

15

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

language of interrogation apply even more pressure on Plaintiff.

79.    When Plaintiff answered these accusatory questions, and still before receiving any form of *Miranda* warnings, Defendants took steps to indicate that they would only accept certain answers (the ones they wanted), but that answers they did not like were unacceptable. For example, when Plaintiff gave answer they approved of Defendants they would say things like "that makes sense," "now we're talking," or words to that effect. By contrast, when plaintiff would give the Defendant Officers an answer they did not like they would resist, challenge, interrupt or even threaten him.

80.    These tactics were coercive, owing to their psychological effect on Plaintiff as a 13 year old. Indeed, the very reason for providing these forms of pressure, including overt interrogation under the guise of background, was to attempt to overbear Plaintiff's will.

81.    Defendant Motto was an instrumental part of the coordination of Plaintiff's interrogation and would enter the interrogation room with guns on his side, knowing what was going on because he had been observing, in order to exert additional pressure on Plaintiff .

82.    Both before and as the interrogation wore on, Defendant Sanchez coordinated with the Detective defendants, approved their actions, and did nothing to intervene in the unlawful interrogation even though he knew that the detectives

16

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

were actively trampling Plaintiff's rights.

## INTERROGATION PART 2:
## DEFENDANTS' REFUSE TO FOLLOW THE LAW
## AND VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS

83.     Plaintiff was arrested about 30 minutes after school let out, around 3:40 pm. Two hours later, and after twenty minutes of the interrogation, the Defendant Officers finally decided that they might want to give Plaintiff some sort of *Miranda* warnings.

84.     As depicted in the video, Defendants' equivocated about whether they even should provide Plaintiff with any sort of *Miranda* rights. This equivocation illustrates Defendants' total disregard for Plaintiff's constitutional rights.

85.     When they eventually provided Plaintiff with some form of *Miranda* rights, Defendants did so in a manner that they knew was completely ineffective.

86.     Defendants took absolutely no steps to ensure that the *Miranda* admonishments were actually understood by the 13-year old child handcuffed and sitting in front of them.

87.     Defendants never asked Plaintiff whether he wished to waive his *Miranda* rights, or to sign the standard waiver form.

88.     Defendants never asked Plaintiff to explain each warning back in his own words, or even tell Plaintiff that he could, despite being a minor, be given a lengthy prison sentence and eventually transferred to an adult facility.

17

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

89.     Plaintiff did not ever knowingly and voluntarily waive his
constitutional right to silence, to an attorney, or any of the other rights protected
under the constitution.

90.     Instead, and to intentionally obscure any impact that the *Miranda*
warnings could have had, Defendants engaged in long, misleading, confusing, and
inappropriate monologues designed to get Plaintiff to think of things in terms of
"survival of the fittest" and friends "rolling" on one another, and coming forward
to avoid the claustrophobia of being incarcerated.

91.     As an action that would contribute to their efforts to fabricate the false
confession, Defendants Plaintiff the video footage of the shooting. Through the
interrogation that followed, Defendants worked to create a false confession by
providing Plaintiff with details about the crime that he did not know. In addition to
what might have been gleaned from the video, these facts included the time of the
shooting, the date of the shooting, and the location of the shooting.

92.     After seeing the video, and having no idea who was involved in the
shooting, Plaintiff honestly asks the Defendants a simple question: "Who is that?"

93.     In the time that followed, and before he falsely confessed, Plaintiff
truthfully denied being involved in the Castaneda shooting dozens of times.

94.     Defendants ignored Plaintiff's repeated denials and attempts to
explain how and why he could not have been involved.

18

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

95.    Instead, Defendants undertook multiple actions designed to overbear

Plaintiff's will, and violate his constitutional rights.

96.    For example, Defendants evoked a false evidence ploy of claiming

that the only reason Plaintiff had been arrested him was because he had been

"given up" by someone else when in fact this statement was false.

97.    Likewise, Defendants implied that Plaintiff was expected to give a

statement, negating the idea that he could be silent at all, saying things like "we're

here to get your statement" or words to that effect.

98.    In addition, Defendants repeatedly invoked the idea of confessing as a

way of obtaining "help." These statements also included the idea of obtaining

leniency by confessing "instead of … staying in jail" for a lengthy period of time.

**INTERROGATION PART 3:**
**PLAINTIFF SPECIFICALLY INVOKES HIS RIGHT TO AN**
**ATTORNEY, UNLAWFUL QUESTIONING CONTINUES**

99.    Plaintiff's prior requests to speak with or see his mother should have

ended all questioning, as they were the equivalent of invoking Plaintiff's right to

Counsel. Nonetheless, questioning continued.

100.    Plaintiff also unambiguously invoked his right to an attorney after

being show the video and subject to lengthy interrogation. Plaintiff stated: "Could I

have an attorney? Because that's not me."

101.    Rather than ceasing all questioning, the Defendants pressed on, telling

19

Plaintiff "No, don't worry."

102.   Egregiously, not only did the Defendants refuse to provide Plaintiff with access to his mother or to an attorney, the Defendants decided to ratchet-up their misconduct by threatening Plaintiff.

103.   As a vulnerable juvenile seeking help, Plaintiff again asked to see his mother. In order to provide Plaintiff with false hope, Defendants told Plaintiff he will be allowed to see his mother even though they knew that was not the case. Rather than bring him is mother, Defendants left the room with Plaintiff still handcuffed, and still crying.

## INTERROGATION PART 4:
## DEFENDANT ARTEAGA'S UNCONSCIONABLE CONDUCT

104.   Defendants left Plaintiff by himself in order to make him feel desperate and isolated.

105.   Minutes later, Plaintiff was given a rude awakening: he would not be seeing his mother, as promised.

106.   Instead, Defendant Arteaga, in agreement and acting with other Defendants, stormed into the interrogation room. In so doing, Defendant Arteaga practically pounced on Plaintiff, who was still stuck in the corner of the room handcuffed to the chair.

107.   Defendant Arteaga's presence alone—as a large man, yelling, and with a gun on his hip—was coercive and threatening.

20

108.    Defendant Arteaga's actions that followed were unconscionable.

109.    In summary, Defendant Arteaga:

    a)  Put his hands on plaintiff, in an effort to use physical contact to convince Plaintiff to confess;

    b)  repeatedly lied to Plaintiff;

    c)  repeatedly used his advantage in size and Plaintiff's position to intimidate and threaten Plaintiff (including yelling, pounding on the table, and getting in Plaintiff's face);

    d)  repeatedly used threats (including his numerous claims that judge would think Plaintiff was a "cold blooded killer" if he did not confess);

    e)  repeatedly invoked promises of leniency (including telling Plaintiff that unless he confessed the judge would see him as a "big fucking liar" or "cold blooded killer" and would therefore get a "much reduced sentence");

    f)  repeatedly claimed he would "help" Plaintiff if he confessed;

    g)  repeatedly used Plaintiff's love for his family as a threat by suggesting that, unless he confessed, Plaintiff would be dragging them into court, which would be "fucked up"; and

    h)  repeatedly cursed and swore at 13-year-old Plaintiff, especially

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

after he denied his involvement (including telling Plaintiff to "stop playing these fucking games," and that he "doesn't give a fuck" about the fact that Plaintiff did not wear a white shirt like the perpetrator had).

110.   Defendant Arteaga also provided information to Plaintiff that he did not know, which would ultimately contributed to the fabrication of the confession, including but not limited to telling Plaintiff: (a) that two people were involved; (b) that it was him and a friend; and (c) that the victim actually died.

111.   In the end, Defendant Arteaga used the phrase "cold blooded killer" or something to that effect more than 20 times, all an effort to overbear Plaintiff's will, because if he confesses the officers will try to seek "help" for Plaintiff.

112.   The remaining Defendant Officers at the station observed Defendant Arteaga's blatant misconduct, but refused to intervene. Defendant Motto even entered the room simply to intimidate Plaintiff and make him more likely to acquiesce to Defendants' questioning. None of the Defendants intervened because Defendant Arteaga's conduct was in part of their coordinated efforts to fabricated a confession, and coerce Plaintiff into making a false confession.

113.   In sum, in addition to failing to respect Plaintiff's constitutional rights as required given his young juvenile status, the Defendants did not even follow the constitutional standards applicable for adults—they refused to provide him with

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

*Miranda* warnings before conducting the interrogation; they ignored his

unequivocal requests for an attorney; and they used both physically and

psychologically coercive techniques against him.

## PLAINTIFF'S FABRICATED, FALSE, & COERCED CONFESSION

114.    The Defendants' actions were successful. Eventually, Plaintiff's will

was overborne and he made an inculpatory statement.

115.    By the time he gave-in, Plaintiff had asked to see his mother at least

three times, specifically asked for an attorney, and denied his involvement in the

Alvarado Terrace shooting more than 25 times.

116.    Thereafter, with his will over-born, Defendants provided Plaintiff with

additional details of the crime, in an effort to make the confession seem reliable,

including but not limited to: that there was a car involved; that three people worked

together (two shooters and a driver); that there were two types of guns; and the

motive for the shooting.

117.    The confession was obviously false. Other than facts supplied by the

Defendants, Plaintiff was unable to make up a story that was consistent with the

actual shooting. For example, he described a coffee-brown van, but the vehicle

involved in the shooting was a red Hyundai. As a consequence, after these

"errors," the Defendants corrected Plaintiff, to fabricate evidence, supplied

Plaintiff with false details to fit the facts of the crime that were unknown to

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

Plaintiff and the Defendants own narrative about what happened. Plaintiff agreed

to these suggestions, as his will was completely over-born.

## WRONGFUL PROSECUTION AND CONVICTION

118.   As a result of the Defendant Officers' misconduct, Plaintiff was

charged with the first degree murder of Alexa Castaneda, as well as other crimes

related to the Alvarado Terrace shooting.

119.   There was no probable cause to believe that Plaintiff was involved in

the murder of Alex Castaneda, of the Alvarado Terrace shooting in anyway, either

before or after any of the Defendants' misconduct.

120.   Nonetheless, the Defendants used the fruits of their misconduct to

cause Plaintiff to be prosecuted. Eventually, after a bench trial in the juvenile

court, Plaintiff was wrongfully convicted crimes associated with the Alvarado

Terrace shooting—murdering Alex Castaneda, attempted murder of two other

victims, and handgun specifications. He was sentenced to twenty-five years to life.

121.   Plaintiff was thus faced with the prospect of spending the remainder

of his teenage years in prison for a crime he did not commit, only becoming

eligible for parole over decades later.

122.   There was no physical evidence tying Plaintiff to the crime; no

fingerprints, DNA, or any other forensic evidence ever linked Plaintiff to the

Castaneda shooting.

24

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

123.   Indeed, the trial court acknowledged that the video evidence of the shooting would have been insufficient to convict. Instead, the court relied upon the fabricated, coerced, and false confession extracted by the Defendants in deciding to find Plaintiff guilty of First Degree murder, two counts of attempted murder, as well as other charges.

124.   Without Defendants' misconduct, Plaintiff would not have been prosecuted or convicted.

### PLAINTIFF'S CONVICTION IS OVERTURNED

125.   In 2015, the Court of Appeals overturned Plaintiff's conviction, specifically finding that the Defendant Officers who participated in the interrogation violated Plaintiff's constitutional rights during the interrogation.

126.   The Appellate Court found that Plaintiff's confession was obtained after the violation of his constitutional rights and vacated Plaintiff's confession on that basis. In so doing, the Appellate Court concluded that the trial court "should have granted the motion to suppress the statements elicited by the police" Plaintiff made after unambiguously invoking his right to an attorney.

127.   The State of California later dismissed the charges against Plaintiff.

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

**THE CITY OF LOS ANGELES' COERCED CONFESSION PROBLEM**

128.    The Defendant Officers' coercion of false statements from Plaintiff was also undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department.

129.    The wrongful convictions of innocent persons who gave coerced and false confessions include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Plaintiff in this case. These tactics include: (a) physical contact; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (d) misleading of parents and denial of parents' access to their children during interrogations; (e) concealment of exculpatory information; (f) false promises of leniency for reduced sentences or other "help" in exchange for a confession; and (g) use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt.

130.    For example, in 2011, LAPD officers extracted a false confession from a juvenile in the shooting of Wilbert Gaitan, leading to false criminal charges against him. As here, video surveillance illustrated the falsity of the confession. Indeed, even spokeswoman for the Los Angeles County District Attorney's office even dubbed the confession as "false."

26

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

131.   Likewise, also in 2011, a superior court judge found that LAPD officers had coerced Edward Arch, who was 19 at the time of his 2007 arrest and spent more than three years in jail awaiting trial, into confessing. The Superior Court dismissed the criminal case on that basis.

132.   Years before, LAPD officers extracted a false and coerced confession from Harold Hall in 1985. Hall's charges were eventually and finally dismissed in 2004. That same year, David Allen Jones was exonerated by DNA testing which proved that he had not committed the 1992 crimes for which he was convicted and had falsely confessed.

133.   At the time of the events leading to Plaintiff's coerced confession and wrongful conviction, members of the Department systematically promoted the malicious prosecution of teenagers and other vulnerable individuals by using abusive and coercive interrogation tactics to force them to confess to crimes they did not commit.

134.   As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Los Angeles Police Department.  In accordance with this code, Department Detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

135.   In addition, despite the number of coerced confessions in LA, the City has undertaken no steps to ensure that civilians, and particularly juvenile suspects, do not falsely confess. Indeed the City has refused to do so despite the fact of its knowledge of the need for reform to prevent false and coerced confessions of juveniles due to their vulnerability. The Department has not disciplined its officers for their failures in the investigative process, including their violations of a suspect's constitutional rights and for not even following department policy, as happened here.

136.   As a result of the City of Los Angeles's established practices of failing to investigate cases in which the police are implicated in obtaining coerced and false confessions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Los Angeles police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

137.   The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

138.   The City of Los Angeles and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

139.   The policies and practices described in the foregoing paragraphs were consciously approved by City of Los Angeles policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

## PLAINTIFF'S DAMAGES

140.   Plaintiff spent nearly three and-a-half years incarcerated for crimes that he did not commit. Plaintiff must now attempt to make a life for himself outside of prison without the benefit of the foundational life experiences which juveniles normally develop throughout high school.

141.   Additionally, the emotional pain and suffering caused by these important years, is substantial and ongoing.  Plaintiff missed out on the ability to share holidays, births, and other life events with loved ones, and to enjoy high school. As the judge put it at sentencing, Plaintiff is a "victim" in this case: "He's given up a substantial period of his childhood."

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

142.   Plaintiff has suffered tremendous damage, including physical

suffering and emotional damages, all proximately caused by Defendants'

misconduct.

## COUNT I – Federal Law
## Fifth & Fourteenth Amendments (Self-Incrimination, Right to Counsel)

143.   Each paragraph of this Complaint is incorporated as if restated fully

herein.

144.   In the manner described more fully above, the Defendant Officers,

individually, jointly, and in conspiracy with one another, as well as under color of

law and within the scope of their employment, forced Plaintiff to incriminate

himself falsely and against his will, in violation of his rights secured by the Fifth

and Fourteenth Amendments.

145.   As described more fully above, the Defendant Officers conducted an

unconstitutional interrogation of Plaintiff, which caused Plaintiff to make

involuntary statements implicating himself in the murder of Alex Castaneda, and

attempted murder of two others.

146.   In the manner described more fully above, the Defendant Officers

refused to provide Plaintiff with his legal guardian and an attorney when he asked

to see his legal guardian and when he invoked his right to an attorney while being

interrogated. In doing so, the Defendants violated their clearly established duty to

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

terminate an interrogation once an individual subject to a custodial interrogation invokes their right to counsel.

147.    The false statements coerced by the Defendant Officers and made after Plaintiff asked to see his legal guardian and after Plaintiff invoked his right to counsel were used against Plaintiff to his detriment in a criminal case.  These statements were the only reason that Plaintiff was prosecuted and convicted of the murder of Alex Castaneda and attempted murder of two others.

148.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

149.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to physical sickness, loss of liberty, and emotional distress.

## COUNT II – Federal Law
### Fourteenth Amendment (Due Process)

150.    Each paragraph of this Complaint is incorporated as if restated fully herein.

151.    In the manner described more fully above, the Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate

31

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

himself falsely and against his will, in violation of his rights secured by the Fourteenth Amendment.

152.   As described more fully above, the Defendant Officers unconstitutional interrogation of Plaintiff shocks the conscience and involved truly egregious and unreasonable actions by defendants, which caused Plaintiff to make involuntary statements implicating himself in the murder of Alex Castaneda and attempted murder of two others.

153.   The false statements unconscionably obtained by the Defendant Officers were used against Plaintiff to his detriment in a criminal case.  These statements were the only reason that Plaintiff was prosecuted and convicted of the murder of Alex Castaneda.

154.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

155.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to physical injury and sickness, loss of liberty, and emotional distress.

### COUNT III– Federal Law
### Fifth & Fourteenth Amendments (Due Process, Fair Trial)

156.   Each paragraph of this Complaint is incorporated as if restated fully herein.

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

157.   As described more fully above, all of the Defendant Officers while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

158.   In the manner described more fully above, the Defendant Officers and individually, jointly, and/or in concert and in conspiracy, fabricated evidence— including but not limited to reports concerning Defendants' false claims purporting to "identify" Plaintiff, the substance of Plaintiff's oral confession, reports purporting to memorialize Plaintiff's confession—and/or deliberately withheld exculpatory evidence.  In doing so, the Defendants violated their clearly established duty to report all material exculpatory and impeachment information.

159.   Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been further prosecuted, and Plaintiff would not have been convicted.

160.   The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

161.   As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

162.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

**COUNT IV – Federal Law**
**Malicious Prosecution**

163.   Each paragraph of this Complaint is incorporated as if restated fully herein.

164.   The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

165.   The Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

166.   Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false. The same is true of Defendants purported "identifications," which contradicted the surveillance camera.  The Defendants also fabricated evidence through their "identifications"

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

and through their efforts to obtain a false statement from Plaintiff, including their report purporting to memorialize that confession. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the shooting.

167.   The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

168.   In 2015, the prosecution terminated in Plaintiff's favor when, after his conviction was vacated, the State dismissed the charges against him.

169.   As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

## COUNT VI – 42 U.S.C. § 1983
## Failure to Intervene

170.   Each paragraph of this Complaint is incorporated as if restated fully herein.

171.   In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

172.   As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff

suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

173.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT VII – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

174.   Each paragraph of this Complaint is incorporated as if restated fully herein.

175.   After the murder of Alex Castaneda, the Defendant Officers acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights against self-incrimination due process, and to a fair trial, all as described in the various paragraphs of this Complaint.

176.   Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

177.   In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

178.   In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above and was an otherwise willful participant in joint activity.

179.   As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

180.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

### COUNT VIII – 42 U.S.C. § 1983
### *Monell* Policy Claims

181.   Each paragraph of this Complaint is incorporated as if restated fully herein.

182.   The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Los Angeles with final policymaking authority.  These policies and practices included the failure to adequately train,

37

supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

183.   The policies and practices described in this Count were maintained and implemented by the City of Los Angeles with deliberate indifference to Plaintiff's constitutional rights.

184.   As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

185.   The City of Los Angeles is therefore liable for the misconduct committed by the Defendant Officers.

## COUNT IX – State Law Claim
## Malicious Prosecution

186.   Each paragraph of this Complaint is incorporated as if restated fully herein.

187.   The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

188.   The Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

38

189.   Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false. The same is true of Defendants purported "identifications," which contradicted the surveillance camera.  The Defendants also fabricated evidence through their "identifications," and through their efforts to obtain a false statement from Plaintiff, including their report purporting to memorialize that confession. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the shooting.

190.   The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

191.   In 2015, the prosecution terminated in Plaintiff's favor when, after his conviction was vacated, the State dismissed the charges against him.

192.   As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

193.   Plaintiff has complied with the California Tort Claims Act and, through their online portal and otherwise, provided the City of Los Angeles with a timely notice of the claim. The City of Los Angeles denied the claim by letter. This suit was initiated less than six months after Plaintiff reached the age of majority.

## COUNT X – State Law Claim
## Intentional Infliction of Emotional Distress

194.   Each paragraph of this Complaint is incorporated as if restated fully herein.

195.   The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

196.   As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

197.   Plaintiff has complied with the California Tort Claims Act and, through their online portal and otherwise, provided the City of Los Angeles with a timely notice of the claim. The City of Los Angeles denied the claim by letter. This suit was initiated less than six months after Plaintiff reached the age of majority.

## Count XI —State Law Claim
## False Imprisonment

198.   Each paragraph of this Complaint is incorporated as if restated fully herein.

199.   In the alternative to Count IX, Plaintiff alleges that he was falsely imprisoned as a result of Defendants' conduct.

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

200.   Plaintiff was non-consensually and intentionally confined without lawful privilege on account of Defendants' actions, and Plaintiff was held imprisoned for years thereafter.

201.   The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

202.   Plaintiff has complied with the California Tort Claims Act and, through their online portal and otherwise, provided the City of Los Angeles with a timely notice of the claim. The City of Los Angeles denied the claim by letter. This suit was initiated less than six months after Plaintiff reached the age of majority.

## COUNT XII – State Law Claim
## Civil Conspiracy

203.   Each paragraph of this Complaint is incorporated as if restated fully herein.

204.   As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

205.   In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

41

206.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

207.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

208.    Plaintiff has complied with the California Tort Claims Act and, through their online portal and otherwise, provided the City of Los Angeles with a timely notice of the claim. The City of Los Angeles denied the claim by letter. This suit was initiated less than six months after Plaintiff reached the age of majority.

## COUNT XIII – State Law Claim
## Respondeat Superior

209.    Each paragraph of this Complaint is incorporated as if restated fully herein.

210.    In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Department, acting at all relevant times within the scope of their employment and under color of law.

211.    Defendant City of Los Angeles are liable as principals for all torts committed by their agents.

212.    Plaintiff has complied with the California Tort Claims Act and, through their online portal and otherwise, provided the City of Los Angeles with a

42

timely notice of the claim. The City of Los Angeles denied the claim by letter. This suit was initiated less than six months after Plaintiff reached the age of majority.

## COUNT XIV – State Law Claim
## Indemnification

213.   Each paragraph of this Complaint is incorporated as if restated fully herein.

214.   California law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

215.   The Defendant Officers are or were employees of the Los Angeles Police Department, who acted within the scope of their employment in committing the misconduct described herein.

216.   Plaintiff has complied with the California Tort Claims Act and, through their online portal and otherwise, provided the City of Los Angeles with a timely notice of the claim. The City of Los Angeles denied the claim by letter. This suit was initiated less than six months after Plaintiff reached the age of majority.

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS

WHEREFORE, Plaintiff, ART TOBIAS, respectfully requests that this Court enter judgment in his favor and against Defendants, the CITY OF LOS ANGELES; SGT. SANCHEZ, #25339; DETECTIVE MICHAEL ARTEAGA, #32722; DETECTIVE JEFF CORTINA, #35632; DETECTIVE J. MOTTO, #25429; DETECTIVE JULIAN PERE, #27434; OFFICER MARSHALL COOLEY, #38940; OFFICER BORN, #38351; L.A. SCHOOL POLICE OFFICER DANIEL EAST, #959; and UNIDENTIFIED EMPLOYEES of the CITY OF LOS ANGELES, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, ART TOBIAS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,
**ART TOBIAS**

By: /s/ David B. Owens_____
*One of Plaintiff's attorneys*

David B. Owens, Cal. Bar No. 275030
david@loevy.com
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
(312) 243-5902 (Fax)

Plaintiff's First Amended Complaint
2:17-cv-1076-DSF-AS