David B. Owens, Cal. Bar No. 275030
david@loevy.com
Anand Swaminathan*
*Attorney for Plaintiff, Art Tobias*
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
*admitted pro hac vice

Charles Snyder
csnyder@kbkfirm.com
KENDALL BRILL KELLY
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067
(310) 556-2700

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ART TOBIAS, | ) Case No. 2:17-cv-1076-DSF-AS |
| | ) |
| Plaintiff, | ) **PLAINTIFF'S OPPOSITION TO** |
| v. | ) **DEFENDANTS' MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| CITY OF LOS ANGELES, et al. | ) |
| | ) **DATE: August 27, 2018** |
| Defendants. | ) **TIME: 1:30 p.m.** |
| | ) **DEPT: Courtroom 7D** |
| | ) **JUDGE: Hon. Dale S. Fischer** |
| | ) |

# TABLE OF CONTENTS

Introduction ............................................................................................. 1

I.      Legal Standard ........................................................................... 3

II.     Relevant Material Facts ............................................................ 4

III.    Plaintiff's Fifth Amendment Claim Must Go To the Jury ........... 5

    A.  The Interrogation of Plaintiff Was Coercive, Unlawful,
        and Produced a False Confession ......................................... 6

        1.   Coercive Interrogation Techniques Were Employed Here .............. 8

        2.   The Characteristics of the Accused, and Particularly of
             Juveniles, Must Be Considered ........................................ 13

        3.   Construing the Record in Plaintiff's Favor, the Interrogation
             Violated Established Law ................................................ 15

        4.   Qualified Immunity Is Unavailable .................................. 26

IV.     Plaintiff's *Monell* Claim Must go to the Jury ........................... 29

    A.  Applicable Law ................................................................... 29

    B.  Background ......................................................................... 31

    C.  The City's Policies And Practices, in Refusing To Differentiate
        Between Juvenile and Adult Interrogations, are Unconstitutional ........... 32

    D.  The City has failed to Adopt Adequate Procedural Safeguards ................ 34

    E.  The City Fails To Train Its Officers In How to Conduct Non-Coercive
        Interrogations of Juveniles .................................................. 35

V.      The Jury Must Determine Whether Plaintiff's Interrogation
        Shocks The Conscience ......................................................... 36

i

VI.    The Individual Defendants Fabricated Evidence .......................................... 39

    A. Defendants Fabricated Volumes of Evidence Against Plaintiff ................. 40

        1.    Directly Fabricated Evidence ............................................................. 40

        2.    The Fabricated Confession .................................................................. 45

    B. The Jury Must Resolve the Fact Issues On This Claim .............................. 47

VII.    Whether Plaintiff Was Seized In The Absence of Probable Cause
      Is A Fact-Dependent Question that Must Be Resolved By the Jury .......... 47

    A. Applicable Law ........................................................................................... 48

    B. The Available Evidence At the Time of Arrest Was Nearly Entirely
       Fabricated, Making Probable Cause Impossible ........................................ 50

    C. Defendants' Attempt To Expand The Scope of Evidence, And
       Construe It In their Favor, Should Be Rejected ......................................... 52

    D. The Fabricated And Materially Misleading Reports Preclude Reliance
       On A Presumption of Independent Prosecutorial Discretion ..................... 54

VIII.    The Detective Defendants Suppressed Exculpatory Evidence of An
      Alternative Suspect ...................................................................................... 57

    A.    The Detectives Withheld Material Evidence
       Favorable To Plaintiff ................................................................................. 57

        1.    Evidence Concerning Eric Martinez Was
            Materially Favorable ......................................................................... 58

        2.    Evidence Concerning Eric Martinez Was Suppressed ....................... 59

    B.    Suppression of Evidence Concerning Martinez Was Prejudicial ............. 62

    C.    The Record Illustrates an Intentional *Brady* Violation ............................. 63

IX.    Defendants Agreed to Prosecute Plaintiff For A Crime He

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

Did Not Commit and Refused to Intervene Though They Had
More than Ample Opportunity to Do so.......................................... 65

X.    No "Residual" Qualified Immunity ............................................. 70

XI.    East's Remaining Arguments Fail ................................................ 71

Conclusion .......................................................................................... 72

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

## TABLE OF AUTHORITIES

*Abraham P. v. Los Angeles Unified School District*,
    2017 WL 4839071 (C.D. Cal. Oct. 5, 2017) ............................................. 71

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ..................................... 3

*Alvarez v. Gomez*, 185 F.3d 995 (9th Cir. 1999) ...................................... 21

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................... 3

*Baker v. Roman Catholic Archdiocese of San Diego*,
    725 F. App'x 531, 532 (9th Cir. 2018) ............................................. 4

*Banks v. Dretke*, 540 U.S. 668 (2004) ..................................................... 60

*Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991) .................................... 40, 56, 71

*Beck v. City of Upland*, 527 F.3d 853 (9th Cir. 2008) ................................ 55

*Blackburn v. Alabama*, 361 U.S. 199 (1960) ............................................. 7

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ................... 40

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001) ......................................... 59

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................. 57, 59, 63

*Bram v. United States,* 168 U.S. 532 (1897) ............................................. 9

*Brown v. Mississippi,* 297 U.S. 278 (1936) ............................................. 6

*Brown v. Rowland*, 215 F.3d 1332 (9th Cir. 2000) ................................... 21

*Calderon v. Sisto*, 609 F. Supp. 2d 1077 (C.D. Cal. 2009) (Fischer, J.) ........... 23

*Caldwell v. City and County of San Francisco*,
    889 F.3d 1105 (9th Cir. 2018) ............................................. *passim*

*Carillo v. County of Los Angeles*, 798 F.2d 1210 (9th Cir. 2015) ................ 59

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Cf. Collazo v. Estelle*, 940 F.2d 411 (9th Cir. 1991) .............................................. 18

*Cf. Frimmel Mgmt., LLC v. United States,* ___ F.3d ___,
    2018 WL 3579876 (9th Cir. July 26, 2018) ................................................ 55

*Cf. Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) ............................ 59

*Chaney v. Wadsworth*, 700 F. App'x 592 (9th Cir. 2017) ...................................... 4

*Chavez v. Martinez*, 538 U.S. 760 (2003) ............................................................... 6

*Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090 (9th Cir. 2005) ..................... 4

*Collazo v. Estelle,* 940 F.2d 411 (9th Cir. 1991) ....................................... 18, 21, 22

*Colorado v. Spring*, 479 U.S. 564 (1987) ............................................................. 26

*Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) ............................................. 6, 37

<u>*Costanich v. Dep't of Soc. & Health Servs.*</u>,
    627 F.3d 1101 (9th Cir. 2010) ...................................................... 39, 40, 47

*Crowe v. County of San Diego,* 608 F.3d 406 (9th Cir. 2010) ..................... *passim*

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000) ........................................ 69

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ............................................ 39

*Dickerson v. United States,* 530 U.S. 428 (2000) ................................................... 7

*Donahoe v. Arpaio*, 986 F. Supp. 2d 1091 (D. Ariz. 2013) ................................. 49

*Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) ................................................. 24, 28

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) .......................................................... 14

*Edwards v. Arizona*, 451 U.S. 477 (1981) ...................................................... 12, 22

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*,
    515 F.3d 1019, 1030 (9th Cir. 2008) .......................................................... 49

*Fare v. Michael C.*, 442 U.S. 707 (1979) ...................................... 12, 13, 20

*Feyko v. Yuhe Int'l, Inc.,* No. 11–cv–05511,
    2013 WL 3467067 (C.D. Cal. July 10, 2013) ...................................... 62

*Franklin v. Fox*, 312 F.3d 423 (9th. Cir. 2002) .................................... 66

*Furnace v. Sullivan*, 705 F.3d 1021 (9th Cir. 2013) ................................ 4

*Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) .................. 48

*Gallegos v. Colorado*, 370 U.S. 49 (1962) .......................................... 13

*Gausvik v. Perez,* 345 F.3d 813 (9th Cir.2003) ...................................... 47

*Graham v. Connor*, 490 U.S. 386 (1989) .............................................. 49

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................... 57

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999) ..................... 67

*Gonzalez v. Cty. of Los Angeles*,
    2009 WL 10691184 (C.D. Cal. June 9, 2009).................................... 50

*Graham v. Connor*, 490 U.S. 386 (1989) .............................................. 49

*Graham v. Florida*, 560 U.S. 48 (2010) .............................................. 14

*Grumpy Cat Ltd. v. Grenade Beverage LLC*,
    2018 WL 2448126 (C.D. Cal. May 31, 2018)..................................... 64

*Hampton v. Hanrahan,* 600 F.2d 60 (7th Cir.1979) ................................... 66

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999) .................................. 64

*Haynes v. State of Wash.*, 373 U.S. 503 (1963) ...................................... 7

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Heck v. Humphrey*, 513 U.S. 477 (1994) ................................................................ 49

*Henry v. Kernan*, 197 F.3d 1021(9th Cir. 1999) .................................................... 28

*Henry v. United States*, 361 U.S. 98 (1959) .......................................................... 48

*Hill v. City of Chicago*, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) .................... 11

*In re Gault*, 387 U.S. 1 (1967) ................................................................ 13, 29, 32

*J.D.B. v. North Carolina*, 564 U.S. 261 (2011) .............................. 13, 14, 32, 35

*Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014) ................................................ 12

*Jefferson v. United States*, 730 F.3d 537 (6th Cir. 2013) .................................... 60

*John v. City of El Monte,* 515 F.3d. 936 (9th Cir. 2008) ...................................... 51

*Krysinski v. Rowland*, 89 F.3d 845 (9th Cir. 1996) ............................................. 21

*Kunik v. Racine County,* 946 F.2d 1574 (7th Cir. 1991) ...................................... 65

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................. 57

*Long v. Cnty. of Los Angeles,* 442 F.3d 1178 (9th Cir. 2006) ............................. 30

*Luna v. Lamarque*, 400 F. App'x 169, 172 (9th Cir. 2010) ................................. 21

*Lynumn v. Illinois*, 372 U.S. 528 (1963) ................................................................ 9

*Malloy v. Hogan*, 378 U.S. 1 (1964) ....................................................................... 9

*Maryland v. Pringle*, 540 U.S. 366 (2003) .......................................................... 50

*Medeiros v. Shimoda,* 889 F.2d 819 (9th Cir. 1989) .............................................. 7

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999) .......... 65

*Miller v. Alabama*, 567 U.S. 460 (2012) .............................................................. 14

*Miller v. Fenton*, 474 U.S. 104 (1984) ................................................................. 13

*Minnick v. Mississippi*, 498 U.S. 146 (1990) ....................................................... 21

*Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, (9th Cir. 2004) ........................ 47

*Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) ............. 30

*Plascencia v. Estelle*, 990 F.2d 1259 (9th Cir. 1993) ........................................... 11

*Reed v. Lieurance*, 863 F.3d 1196 (9th Cir. 2017) ............................................... 50

*Rehberg v. Paulk*, 566 U.S. 356 (2012) ................................................................ 49

*Robinson v. Borg*, 918 F.2d 1387 (9th Cir. 1990) ......................................... 20, 21

*Rodriguez v. McDonald*, 872 F.3d 908 (9th Cir. 2017) .................................. 12, 28

*Rogers v. Richmond,* 365 U.S. 534(1961) .............................................................. 9

*Roper v. Simmons*, 543 U.S. 551 (2005) .............................................................. 14

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) .............................................. 8, 24

*Schuering v. Traylor Bros., Inc.*, 476 F.3d 781 (9th Cir. 2007) ............................ 3

*Scott v. Harris*, 550 U.S. 372 (2007) ............................................................. 44, 54

*Shamsnia v. Anaco,* 2015 WL 12672091 (C.D. Cal. Mar. 30, 2015) ................... 61

*Shedelbower v. Estelle*, 885 F.2d 570 (9th Cir. 1989) .......................................... 21

*Sierra Medical Services Alliance v. Kent*,
      883 F.3d 1216 (9th Cir. 2018) ..................................................................... 3

*Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981) ................................................. 55

*Smith v. Almada*, 640 F.3d 931 (9th Cir. 2011) .................................................. 48

*Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir. 1988) ................................... 21, 22

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

*Smith v. Illinois*, 469 U.S. 91 (1984) ........................................ 12, 20, 21

*Spano v. New York*, 360 U.S. 315 (1959) ........................................ 9-10

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009) ............................. 26, 38, 39

*Strickler v. Greene*, 527 U.S. 263 (1999) ........................................ 60

*Tennison v. City & Cnty. of San Francisco*,
     570 F.3d 1078 (9th Cir.2009) ............................................ 57, 59

*Thomas v. County of Riverside*, 763 F.3d 1167 (9th Cir. 2014) ...................... 29

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014) ......................................... 3, 4

*Townsend v. Sain*, 372 U.S. 293 (1963) .......................................... 7, 26

*Truelove v. D'Amico*, 2018 WL 1070899 (N.D. Cal. Feb. 27, 2018) ................... 49

T*sao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) ......................... 30

*United States v. Bagley*, 473 U.S. 667 (1985) ..................................... 57

*United States v. De La Jara*, 973 F.2d 746 (9th Cir. 1992) ......................... 21

*United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994) ........................... 11

*United States v. Juvenile Female*, 349 F. App'x 240 (9th Cir. 2009) ................ 10

*United States v. McShane*, 462 F.2d 5 (9th Cir. 1972) ............................. 10

*United States v. Miller,* 984 F.2d 1028 (9th Cir.1993) ............................. 12

*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) ........................... 7, 8

*United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) ......................... *passim*

*United States v. Valadez-Nonato*,
     2011 WL 4738544 (D. Id. Oct. 6, 2011) ................................... 12

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

*United States v. Wells*, 719 F. App'x 587 (9th Cir. 2017) .................................... 23

United Steelworkers of Am. v. Phelps Dodge Corp.,
    865 F.2d 1539 (9th Cir.1989) ...................................................... 66

*Walace v. Kato*, 549 U.S. 384 (2007) ................................................. 49

*Ward ex rel. Crystal M. v. Ortega*, 379 F. App'x 687 (9th Cir. 2010) .......... 25, 28

*Ward v. EEOC*, 719 F.2d 311 (9th Cir. 1983) ................................... 65-66

*Whren v. United States*, 517 U.S. 806 (1996) ...................................... 49

*Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) ................................... 59

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) ............................. 10

*Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001) ...................... 8

*Ybarra v. Illinois,* 444 U.S. 85 (1979) ............................................. 50

*Yousefian v. City of Glendale*, 779 F.3d 1010 (9th Cir. 2015) .................. 49

OTHER AUTHORITIES

BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND ................................. 14

FED. R. CIV. P. 56(a) .................................................................. 3

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff ART TOBIAS, by his attorneys, in response and opposition to the
Motions for Summary Judgment filed by all Defendants, *see* Dkt. 99 (Defendants
City of Los Angeles, Born, and Cooley), Dkt. 100 (Defendant East), Dkt. 111
(Defendants Arteaga, Cortina, Motto, and Pere)), states:

### **Introduction**

In August 2012, at the tender of age of 13, Plaintiff Art Tobias was
wrongfully charged and ultimately convicted of a murder he did not commit. He
spent the next three and a half years in prison. Tobias was freed after a California
appellate court held that the interrogation at the issue her was unconstitutional.

The misconduct in securing Plaintiff's wrongful conviction is egregious.
There was no physical or other evidence at the scene tying a 13-year old boy with
no criminal history to this heinous crime. The eyewitness descriptions did not
match Plaintiff at all: they were of a 6-foot tall adult, weighing as much as 200
pounds, which was consistent with surveillance video footage from the scene that
captured the shooter as a heavyset grown man. Plaintiff, meanwhile, was a 4'11",
110 pound child. Tobias should have never been a suspect, let alone convicted.

But-for Defendants misconduct he would have never been. Rather than
conduct an honest investigation, what ensued were a series of fake so-called
"identifications"—remarkably, purportedly made by two police officers comparing
scene surveillance video to a boy they had never met. Officers descended on
Plaintiff's middle school and set out their plan to get more fake "identifications"
from a comparison of the video and announcing, along the way, that they were
going to try to "roll" Plaintiff's mother if need be. Plaintiff was arrested upon a

pretext, and dragged to the police station where he suffered a conscience-shocking

interrogation. In the end, that interrogation of a 13-year old who repeatedly and

truthfully denied his involvement yielded a false confession. The interrogation

involved laundry list of things to do solely if your goal is to coerce: promises,

threats, lies, guns, screaming, swearing, isolation, despair, a denial of *Miranda*

rights and, ultimately, psychological coercion.

But that was not enough. Perhaps most egregious, is that a day after the

Defendants secured Plaintiff's confession, other officers arrested a man who was a

near-perfect match for the shooter, caught in a burgundy car consistent with

descriptions of the getaway car, known to be a member of the gang suspected to be

responsible for the crime, in possession of what turned out to be *the very weapon*

*used in the shooting*. This was powerful evidence that the Defendants had the

wrong guy. But rather than see the case they had concocted fall apart, Defendants

buried the evidence (perhaps because it was also implicitly evidence of their

misconduct up to that point). They did not conduct any meaningful investigation

into the obvious suspect, and suppressed evidence of his likely guilt.

This suit seeks redress for the violation of Plaintiff Art Tobias's

constitutional rights stemming from this shocking conduct. The Defendants'

motions for summary judgment, by contrast, ask this Court to turn a blind eye to

the objective evidence—*e.g.*, audio and video recordings—and in fact misconstrue

it in a manner that suits their self-serving narrative. This Court should reject these

inappropriate efforts. Instead, applying the proper legal standard—construing the

factual disputes in Plaintiff's favor—it is clear that a reasonable jury could easily

find: that the Defendants violated Plaintiff's rights under the Fifth Amendment by

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

coercing his confession; that the City's policies and practices were the moving

force behind Plaintiff's Fifth Amendment violations; that the Detectives used

unconscionable interrogation tactics against Plaintiff in violation of the Fourteenth

Amendment; that the Defendants fabricated evidence against Plaintiff; that

Plaintiff was seized in the absence of probable cause; that the Detectives

suppressed material evidence in violation of due process; and that the individual

defendants agreed to work together and failed to stop one another from violating

Plaintiff's constitutional rights. With one exception, the motions should be denied.[1]

## I.    Legal Standard

Summary judgment is appropriate only where "there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)*.

"A genuine issue of material fact exists 'if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.'" *Sierra Medical Services

Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S.

at 248). "In making that determination, a court must view the evidence 'in the light

most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866

(2014) (quoting *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)*); *see

Schuering v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007) ("In

determining whether summary judgment is appropriate, we view the facts in the

light most favorable to the non-moving party and draw reasonable inferences in

favor of that party." (citing *Anderson*, 477 U.S. at 255)).

---

[1] Plaintiff no longer pursues his *Monell* claims related to the *Brady* violations in this case or
based upon a pattern of constitutional violations.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

1    In *Tolan*, the Supreme Court recently emphasized the "importance of

2 drawing inferences in favor of the nonmovant," while reversing the grant of

3 qualified immunity because the lower court had failed to make inferences in the

4 nonmovant's favor. 134 S. Ct. at 1866; *see also, e.g.*, *Furnace v. Sullivan*, 705 F.3d

5 1021, 1026 (9th Cir. 2013) ("If, as to any given material fact, evidence produced

6 by the moving party . . . conflicts with evidence produced by the nonmoving party .

7 . . we must assume the truth of the evidence set forth by the nonmoving party with

8 respect to that material fact.").

9    In short, every reasonable factual inference must be drawn in favor of the

10 party opposing the motion for summary judgment, from both direct and

11 circumstantial evidence. *See Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090,

12 1095 (9th Cir. 2005) (plaintiff can defeat motion for summary judgment by

13 pointing to either direct or circumstantial evidence); *see also, e.g., Baker v. Roman*

14 *Catholic Archdiocese of San Diego*, 725 F. App'x 531, 532 (9th Cir. 2018)

15 (reversing grant of summary judgment where district court "did not properly

16 consider various pieces of circumstantial evidence in its summary judgment

17 ruling"); *Chaney v. Wadsworth*, 700 F. App'x 592, 592 (9th Cir. 2017) (quoting

18 *Tolan*, 134 S. Ct. at 1863) ("[T]he evidence of the nonmovant is to be believed,

19 and all justifiable inferences are to be drawn in his favor.").

20 **II.    Relevant Material Facts**

21    Defendants have so thoroughly failed to construe material facts in Plaintiff's

22 favor such that seeking to fill the gaps is basically impossible. Accordingly, in an

23 Additional Statement of Facts ("ASOF"), Plaintiff's has set forth in fulsome detail

24

25

4

the material facts that ought to govern here.[2] Specific factual issues are discussed, as necessary, below.

### III.    Plaintiff's Fifth Amendment Claim Must Go To the Jury

The detectives in this case, Jeff Cortina, Julian Pere, John Motto and Michael Arteaga ("Detectives"), forced Art Tobias to give statements implicating himself in a crime that he did not commit. ASOF, ¶60. Those statements were used against Plaintiff at trial to secure his wrongful conviction. In seeking summary judgment, the Detective Defendants' motion asks this Court to resolve a series of fact disputes in their favor and to ignore the totality of the circumstances. For this reason, it should be denied. In addition, as there is no question that it was beyond well established in 2012 that police officers could not coerce—physically or psychologically—a confession from a suspect. Qualified immunity is unavailable.

Defendants have focused heavily on trying to undermine Plaintiff's invocation of his right to counsel, and for obvious reason: denying Plaintiff's request for an attorney was plainly unlawful. Indeed, on the basis of the invocation alone, summary judgment should be denied on Plaintiff's Fifth Amendment claim. But even regardless of whether Plaintiff's invocation was "unequivocal," indeed even if Plaintiff had never sought counsel or said the word "attorney," the totality

---

[2] In filing this omnibus response (which was requested in the application for additional time) Plaintiff's entire ASOF follow each statement of uncontroverted facts filed by the Defendants and filed separately as well. To avoid any confusion that might arise from the fact that each movant stated a different number of facts, Plaintiff's ASOF starts at ¶60.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

of circumstances involved in Plaintiff's interrogation requires a jury to determine

the Defendants' liability on this claim.

## A. The Interrogation of Plaintiff Was Coercive, Unlawful, and Produced a False Confession

It is telling that the Detectives have not addressed head-on the totality of the

circumstances concerning the interrogation of Plaintiff.[3] Instead, the Detectives

seem to suggest that the Fifth Amendment is only violated where their

interrogation involves "extreme," "extraordinary" conduct or "torture." The

conduct here was extreme, but the constitutional bar is not nearly so stringent.

*Cooper v. Dupnik*, 963 F.2d 1220, 1245 (9th Cir. 1992) (en banc) ("This case does

not involve physical torture; but torture is not necessary to render "coercive" police

conduct in the pursuit of a confession. Psychological coercion can suffice."),

*abrogated other grounds by Chavez v. Martinez*, 538 U.S. 760 (2003).

The Supreme Court has long made clear that compelling statements for use

in a criminal prosecution is unconstitutional. *See Brown v. Mississippi,* 297 U.S.

278 (1936). Indeed, nearly 60 years ago the Court indicated that the cases were

"too well known and too numerous to bear citation," as having "established the

principle" that the Constitution "is grievously breached when an involuntary

---

[3] Detectives' brief conflates three distinct issues and claims—(1) Plaintiff's contention that his confession was fabricated; (2) that the interrogation violated due process because it shocks the conscience, and (3) Plaintiff's Fifth Amendment claim that the confession was coerced. Dkt. 111, at 14-18. These are independent issues and addressed separately.

6

confession is obtained by state officers and introduced into evidence in a criminal

prosecution which culminates in a conviction." *Blackburn v. Alabama*, 361 U.S.

199, 205 (1960). The Constitution requires any confession be "made freely,

voluntarily, and without compulsion or inducement of any sort." *Haynes v. State of*

*Wash.*, 373 U.S. 503, 513 (1963). A confession is voluntary only if it is "'the

product of a rational intellect and a free will.'" *Medeiros v. Shimoda,* 889 F.2d 819,

823 (9th Cir. 1989) (quoting *Townsend v. Sain,* 372 U.S. 293, 307 (1963)).

    This Court's inquiry in determining whether a reasonable jury could

conclude that Plaintiff's will was overborne, is an "an inquiry that 'takes into

consideration the totality of all the surrounding circumstances—*both* the

characteristics of the accused *and* the details of the interrogation.'" *United States v.*

*Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting *Dickerson v.*

*United States,* 530 U.S. 428, 434 (2000)). In so doing, both "of these factors, in

company with all of the surrounding circumstances—the duration and conditions

of detention (if the confessor has been detained), the manifest attitude of the police

toward him, his physical and mental state, the diverse pressures which sap or

sustain his powers of resistance and self-control—is relevant." Indeed, the inquiry

"must be broad." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960).

    The Detectives attempt to isolate different coercive interrogation aspects

individually, or at other times suggest that summary judgment is appropriate

7

because certain factors are not (in their view) *necessarily* coercive. Such an

approach is inconsistent with the law; the voluntariness inquiry "is not limited to

instances in which particular police conduct was 'inherently coercive.' *Preston,*

*751 F.3d at 1016* (internal quotes and citation omitted). The totality of

circumstances requires assessing the legality of particular techniques not in

isolation but in the aggregate. *See Schneckloth* , 412 U.S. at 226 (decisions do not

turn "on the presence or absence of a single controlling criterion; each reflect[s] a

careful scrutiny of all the surrounding circumstances"); *Wilson v. Lawrence*

*County*, 260 F.3d 946, 953 (8th Cir. 2001) ("[A] totality of the circumstances

analysis does not permit state officials to cherry-pick cases that address individual

potentially coercive tactics, isolated one from the other, in order to insulate

themselves when they have combined all of those tactics in an effort to overbear an

accused's will.").

### 1.  Coercive Interrogation Techniques Were Employed Here

A wide variety of interrogation tactics short of physical "torture" render

confessions involuntary.[4] As the Ninth Circuit long ago explained:  "a confession

'must not be extracted by any sort of threats or violence, nor obtained by any direct

or implied promises, however slight, nor by the exertion of any improper

---

[4] Even if "torture" were the standard, Detectives' implication that no torture occurred here
because Plaintiff was not physically beaten is a far too narrow concept of torture. Courts have
recognized that "psychological torture" can be an apt way to describe interrogations where
juveniles are "cajoled, threatened, lied to, and relentlessly pressured by teams of police officers,"
just as Plaintiff was. *Crowe v. County of San* Diego, 608 F.3d 406 (9th Cir. 2010).

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

influence."' *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964), in turn quoting *Bram v. United States,* 168 U.S. 532, 542-43 (1897)). As a consequence, "law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.'" *Id.* (citing *Malloy*, 378 U.S. at 7).

Indeed, there "may be no psychological interrogation technique more potent than the use of threats and promises. Promises and threats (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests." Ex. 19, Dr. Leo Declaration (Ex. 2, June 20, 2018 Report) at 24. Threats involving family members, friends, and other loved ones are among the most coercive sorts of threats and are often deemed unconstitutionally coercive. *See, e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 533 (1963) (confession involuntary when suspect told she could get benefits and custody of children); *Rogers v. Richmond,* 365 U.S. 534, 541-45 (1961) (defendant's confession was found to be coerced when it was obtained in response to a police threat to take defendant's wife into custody); *Spano v. New York*, 360 U.S. 315, 323 (1959) (confession involuntary when officer told suspect (a friend of his) that

9

officer would get in trouble if he did not confess); *Tingle*, 658 F.2d at 1336 ("the purpose and objective of the interrogation was to cause Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time," which was coercive in part because the "relationship between parent and child embodies a primordial and fundamental value of our society"); *United States v. McShane*, 462 F.2d 5, 7 (9th Cir. 1972) ("[W]e can readily imagine that the psychological coercion generated by concern for a loved one could impair a suspect's capacity for self control, making his confession involuntary.");*United States v. Juvenile Female*, 349 F. App'x 240, 241 (9th Cir. 2009) (threats against family members ruled coercive).

Promises of leniency can likewise be coercive. *Williams v. Woodford*, 384 F.3d 567, 595 (9th Cir. 2004) ("[A] promise of leniency accompanied by threats or other coercive practices constitutes improper influence and makes a subsequent inculpatory statement involuntary."); *Tingle, 658 F.2d at1336* (interrogating officer accused the defendant of lying, recited the maximum penalties of crimes that could be charged, threatened the defendant that she might not see her two-year-old child if she went to prison, and promised the defendant that the agent would inform the prosecutor if she cooperated or refused to cooperate).

Other lies and misleading statements concerning the consequences for not confessing—like receiving a harsher punishment or view from the prosecutor or

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment 2:17-cv-1076-DSF-AS

court—are also coercive. Indeed, more so than suggesting a possible benefit for

confessing, suggesting a punishment is absolutely coercive. Indeed, "there are *no*

circumstances in which law enforcement officers may suggest that a suspect's

exercise of the right to remain silent may result in harsher treatment by a court or

prosecutor." *United States v. Harrison*, 34 F.3d 886, 891-92 (9th Cir. 1994)

(emphasis in original). But, that is precisely what Detective Arteaga told Plaintiff

here, as the other Detectives looked on. ASOF, ¶131. In *Tingle,* the Ninth Circuit

explained:

> Although it is permissible for an interrogating officer to represent,
> under some circumstances, that the fact that the defendant cooperates
> will be communicated to the proper authorities, the same cannot be
> said of a representation that a defendant's failure to cooperate will be
> communicated to a prosecutor. Refusal to cooperate is every
> defendant's right under the Fifth Amendment. Under our adversary
> system of criminal justice, a defendant may not be made to suffer for
> his silence.

658 F.2d at 1336 n.5.

Similarly, a confession can be coerced when police use abusive language

and feed the suspect the facts that constitute the confession. *See, e.g.*, *Plascencia v.*

*Estelle*, 990 F.2d 1259 (9th Cir. 1993); *Hill v. City of Chicago*, 2009 WL 174994,

at *8 (N.D. Ill. Jan. 26, 2009).

Finally, in addition to being a factor in the totality of the circumstances,

some actions are *per se* coercive and violations of the Fifth Amendment. Physical

abuse against a suspect is always deemed coercive, *see, e.g.*, *United States v.*

11

*Miller*, 984 F.2d 1028, 1030(9th Cir.1993), and failure to give any *Miranda*

warnings can be treated analogously. *See Jackson v. Barnes*, 749 F.3d 755 (9th Cir.

2014). Likewise, the Supreme Court since *Edwards v. Arizona*, 451 U.S. 477

(1981), has presumed that a confession extracted during custodial interrogation

after invocation of the right to counsel violates the Constitution. *See Smith v.*

*Illinois*, 469 U.S. 91, 95 (1984) (noting the "bright-line rule that all questioning

must cease after an accused requests counsel"); *Fare v. Michael C*., 442 U.S. 707,

719 (1979) ("Whether it is a minor or an adult who stands accused, the lawyer is

the one person to whom society as a whole looks as the protector of the legal rights

of that person in his dealings with the police and the courts. For this reason, the

Court fashioned in *Miranda* the rigid rule that an accused's request for an attorney

is *per se* an invocation of his Fifth Amendment rights, requiring that all

interrogation cease). Lower courts have concluded the same.[5]

---

[5] *See, e.g., Rodriguez v. McDonald*, 872 F.3d 908, 922 (9th Cir. 2017) ("Because this pressure
followed Mr. Rodriguez's invocation of his right to counsel, it constituted "badgering" in direct
violation of *Miranda* and *Edwards*."); *Henry v. Kernan*, 197 F.3d 1021, 1028 (9th Cir. 1999)
(police's intentional violation of a suspect's *Miranda* rights by continued interrogation rendered
any subsequent statements involuntary"); *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991)
(en banc)(pressuring defendant to change mind about being silent and invoking right to counsel
"can only be seen as menacing"); *id.* at 417 ("At a point where the law required him to back off,
he did not "scrupulously honor" Collazo's right to cut off questioning; he stepped on it."); *United
States v. Valadez-Nonato*, 2011 WL 4738544, at *4 (D. Id. Oct. 6, 2011) ("[T]hough the Court
does apply a totality of the circumstances test, the Court finds it strongly dispositive that Weekes
responded to a valid invocation by pressuring the Defendant to keep talking.").

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

### 2. The Characteristics of the Accused, and Particularly of Juveniles, Must Be Considered

As it concerns the suspect, considerations include: "the juvenile's age, experience, education, background, and intelligence, and [inquiry] into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725, (1979). Under established law, it was also beyond well-established in 2012 that interrogators were required to consider the unique characteristics of the person they were interrogating, and that such characteristics absolutely—and unequivocally—include the suspect's age and other juvenile factors. *See, e.g. J.D.B. v. North Carolina*, 564 U.S. 261 (2011); *In re Gault*, 387 U.S. 1, 55 (1967); *Miller v. Fenton*, 474 U.S. 104, 109-10 (1984) (whether conduct is "coercive" must be evaluated under the "particular circumstances of the case," including the "unique characteristics of [the] particular suspect"); *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) (it would be a "callous disregard of … constitutional rights" to treat every suspect like "an adult in full possession of his senses and knowledgeable of the consequences of his admissions").

Thus, it has "long been established that the constitutionality of interrogation techniques is judged by a higher standard when police interrogate a minor." *Crow, 608 F.3d at 431* (citing *In re Gault, 387 U.S. 1, 55 (1967)*). This recognition goes back to the Common Law of England. *J.D.B.*, 564 U.S. at 274 (citing

13

BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *464–*465). The fact

that juveniles are different is a matter of social science and brain development

which requires constitutional standards to address these important differences. *See*

*Miller v. Alabama*, 567 U.S. 460, 470-71 (2012) (prohibiting mandatory life

sentences for juveniles based, among other things, on the science that children are

different and "more vulnerable to outside pressures" (quoting *Roper v. Simmons*,

543 U.S. 551, 569 (2005)); *Graham v. Florida*, 560 U.S. 48, 68 (2010)

("[D]evelopments in psychology and brain science continue to show fundamental

differences between juvenile and adult mind).

 Contrary to Defendants' attempts to paint Plaintiff—a small, 13-year-old

who had never been arrested or convicted of a crime—as some sort of

"sophisticated" or "hardened" suspect (which also fails to apply the Rule 56

standard), Plaintiff's age is an objective fact that had to be carefully considered.

"[Y]outh is more than a chronological fact. It is a time and condition of life when a

person may be most susceptible to influence and to psychological damage."

*Eddings v. Oklahoma*, 455 U.S. 104, 115(1982); *see also J.D.B.*, 564 U.S. at 275

(explaining that childhood yields objective conclusions" including that children are

"most susceptible to influence,'" and "'outside pressures'") (quoting *Eddings*, 455

U.S. at 115, and *Roper*, 543 U.S. at 569)); *Gallegos*, 370 U.S. at 54 (noting that "a

14

14-year-old boy, no matter how sophisticated, is unlikely to have any conception

of what will confront him when he is made accessible only to the police").

### 3. Construing the Record in Plaintiff's Favor, the Interrogation Violated Established Law

To accept Defendants' contention that their interrogation of Tobias complied

with the law and resulted in a voluntary confession, this Court would have to

completely disregard central facts in the record, including the entire videotaped

interrogation of Plaintiff, and draw inferences in Defendants' favor. Properly

construed, the record shows an obviously unlawful interrogation that resulted in an

involuntary confession, in violation clearly established law. Indeed, construed in

Plaintiff's favor, all of the factors to be considered under the totality of the

circumstances weigh in favor of the conclusion that Plaintiff's confession was

involuntary. *See generally* ASOF, ¶¶139-80. Those include but are not limited to:

**<u>Lies and False Evidence Ploys or Ruses</u>**

While police may lie in some occasions, such lies can be coercive and

certainly contribute to a coercive environment. "False evidence ploys can lead the

suspect to perceive that he or she is in a hopeless situation," Ex. 19, Declaration of

Leo (Ex. 2 June 10, 2018 Report at 17, and therefore their best option is to confess.

Many were employed here, *see* ASOF, ¶¶147-48, and include:[6]

---

[6] Plaintiff appreciates this Court's standing order—to provide only that which is necessary, and
direct the Court to the relevant passages. As far as the interrogation transcript goes, there are far

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

- "Somebody gave you up" Ex. 13, at 28:21-22.
- "We have proof. Here's the proof. The proof is we already asked somebody that gave you up. That's number one. Number two is we have the video to support what they said you did." *Id.* at 29:13-16.
- "I showed her [your mom] the video. She said that was you." *Id.* at 36:2-3.
- "Juries know that criminals [are] stupid…The bottom line is they're going to see the video. They're going to say yeah, it looks like him. They're going to bring your mom to take the stand, yeah, I identify that as my son. . . .Your homey's ID you." *Id.* at 42:17-22.
- "The evidence is there. We have people rolling on you. We have video." *Id.* at 52:2-3
- "They fucking ratted you out big time, bro. they ratted you out big time." *Id.* at 54:22.
- "One of your homeys who is rolling on you because – he got busted for something else. We have your mom taking your picture saying that's my son." *Id.* at 58:3-4.

## Threats And Promises

The Detectives deny threatening or making promises to Plaintiff during his interrogation. The videotaped interrogation reveals otherwise. Moreover, Tobias himself would strongly disagree, which alone creates a fact dispute for a jury to resolve. *See* ASOF ¶¶ 157-62; Plaintiff Dep. at 214:14-18  (Tobias was asked "did they make any threats to you," responded "yes they did" and elaborated: "That if I didn't say the truth that they'd tell the judge and that I'd get a lot of fucking time, and they threw pieces -- bits and pieces about my dad, my mom. They made false things that made me feel like shit."); *id.* at 290:7-13 ("Well, If I told them their version of the truth, which was what they really wanted, that the judge would see

too many examples to list entirely here or in the statement of facts. If Plaintiff were to highlight all of the coercive or material facts of the interrogation, nearly the entire document would be yellow.

16

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

me as a kid who needed help and I wouldn't get as much time, rather than me not telling them the truth and he would see me as a cold-blooded killer and not giving a fuck, and I would get a lot of time.").

Threats and promises in the video include:

- **Threat:** So listen, I'm done with your bullshit, okay? I've been doing this for too damn long, okay? I'm not going to tell you everything we have. I'm not going to tell you all the evidence we have…You're full of shit.  And when this case is presented to a district attorney's office they're going to see you're a cold-blooded killer….They're going to see that you're a gangster who lies, who kills people, who has no compassion, who fucking doesn't give a shit." Ex. 13, at 49:6-14.
- **Promise:** "I *guarantee* you we're going to get you some help.  You're 13 years of age. You're not – You're not going to prison for life." *Id.* at 47:19-22 (emphasis added)
- **Both:** "You're 13 years of age. You're a young kid. The court is going to take that into consideration.  But you can't sit here and lie to the detectives." *Id.* at 41:7-10.
- **Both:** "Do you think they're going to throw away the key on you? No. They're going to try to get you some help. You're going to go to Eastlake and they're going to try to get you some help. But we can't help you if you're going to sit there and lie and – just be a cold-blooded killer. *Id.* 44:20-45:2.
- **Threat:** "It's going to look like you're down – You're so far down for the hood that you didn't want to speak so they might throw the book at you" (Interrogation Transcript, P. 55).
- **Both**: "I've been telling you, I've been telling you, bro, I don't know what it takes to get into -- into your mind here but when we write this up we're going to write it how -- how it is. And right now it looks like you're a cold blooded MS gangster who doesn't give a fuck, who is down for the hood. That's what it's going to look like. . . . So when the judge looks at the case you think he's going to give a fuck about you?" *Id.* at 62:3-10.

These many threats and promises are entirely coercive, especially because, in many respects, the Detectives tell Plaintiff, a child, that he will be punished

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

(*e.g.*, seen as a cold blooded killer or "gangster" by the judge) if he does not confess. There is "no legitimate purpose for the statement that failure to cooperate will be reported"—"its only apparent objective is to coerce." *Tingle*, 658 F.2d at 1336 n.5; *cf. Collazo v. Estelle*, 940 F.2d 411, 417 (9th Cir. 1991) ("It follows as night the day that Officer Destro's attempt in the police station to impose a penalty on Collazo's choice to remain silent amounts to a serious infringement of Collazo's Fifth Amendment right.").

## <u>Family and Loved Ones</u>

Plaintiff was repeatedly given among the most coercive sorts of threats recognized in the law: that his family, and particularly his mother and sisters, would suffer if he did not confess. *See* ASOF, ¶¶ 157-59, 161. In so doing, the detectives repeatedly used Plaintiff's "primordial and fundamental" connection to his mother and other family members as part of their attempt to coerce Plaintiff. Perhaps most overwhelming is when Plaintiff asks to see his mother, is told that she's there and will be right in, and Plaintiff is left crying in the room by himself. *Id.* ¶154. Rather than getting to see his mother, Detective Arteaga entered the room and led with: "I just talked to your mom right now, okay? She's in there crying her eyes off. She's crying like a baby, bro." Ex. 13, at 35:19-21; ASOF, ¶155.

Other threats, promises, and attempts to capitalize on Plaintiff's family background, include:

18

- Well, you know what? I think it's fucking pitiful you're dragging your mom into this. Ex. 13, at 50: 16-18.
- "Whatever happened happened. But you need to think about this. By you lying and everything and us showing the evidence it makes you— it makes you look like a cold blooded killer. I know you're not a cold blooded killer. You know, your mom was just telling me about your three sisters. You know, she's telling me about your dad, how he's schizophrenic, and she's telling me about your problems." *Id.* at 38:3-10.
- Listen, bro, I understand. Listen to me. I have a kid your age. Okay? Think about your mom, okay? She looked at the video. She said yeah, that's my son. We have your mom. You're going to drag your mom into this? *Id.* at 38:9-13.
- Your mom is going to have to go to court for you not telling the truth. So you're going to drag your family into this? . . . That's fucked up. *Id.* at 38:15-17.
- But listen, you need to man up. You -- you got your mom to miss. You got Officer East in this. You got some of your homeys in this fucking mess. Okay? You're 13 years of age. You're a young kid. The court is going to take that into consideration. But you can't sit here and lie to the detectives. You can't do that. That's making you look like a cold blooded killer. Think about that. Okay? You need to tell us what happened.
- Telling Plaintiff his mother left when she had not. ASOF, ¶166.

**Denial of Constitutional Rights**

Plaintiff attempted to invoke his right to silence, but was not given the

opportunity to refuse to speak with the detectives. ASOF, ¶¶141, 149, & 168.

Refusing to permit Plaintiff to be silent was plainly coercive and illustrates, as

discussed below, he did not voluntarily waive his right to silence—he never had

the chance.

As it concerns the fact that Plaintiff invoked his right to an attorney, it is

worth taking a step back. Defendants have tried to muddy something that is

19

straightforward, basic even: There is no question that an interrogation must cease

when a suspect *asks for* an attorney. *See Smith v. Illinois*, 469 U.S. 91, 98 (1984);

*Fare v. Michael C.*, 442 U.S. 707, 719 (1979). Here, on this record and taking the

facts in the light most favorable to the non-movant, Plaintiff specifically and

expressly *asked for* an attorney. The summary judgment record, with the video

now before the Court, shows that Plaintiff repeatedly denies his involvement in the

crime and states "that's not me," "that's not me, I don't know how else to tell you,

that's not me." Detective Pere is doing the bulk of the speaking at this point, and

then states: "We're here to speak to you to get your statement. Now if your

statement is that that's not you, don't worry, we're going to write it down just the

way you said." ASOF, 149. As shown on the video, Plaintiff' actually interrupts

Detective Pere and, while gesturing, asks: "Could I have an attorney? Because

that's not me." *Id.* ¶150. Rather than ceasing questioning, Detective Pere responds

directly: "But — okay. **No**. Don't worry. You'll have an opportunity." Cortina then

immediately jumps in with a question to continue the interrogation. *Id.* ¶¶151.

Construed in the light most favorable to Plaintiff—and given that "a suspect

is required neither to use any magical formulation to invoke his rights nor to

express his desire to obtain counsel with lawyer-like precision," and need only

"make his desire to consult with an attorney clear"—Plaintiff invoked his right to

an attorney. *Robinson v. Borg*, 918 F.2d 1387, 1393 (9th Cir. 1990).

20

1      Myriad courts have found a plain request like Plaintiff's to be an invocation

2   of his right to an attorney. *See Collazo v. Estelle,* 940 F.2d 411, 416 (9th Cir. 1991)

3   (treating the statement "Oh, you know, ah, can, I, you know, talk to a lawyer?" as a

4   request for counsel that should have ended the questioning). The long line of

5   authorities previously-cited and those relied upon by the Court in prior briefing,

6   illustrate that, despite the Detectives' far-fetched claims otherwise, a 13-year old

7   asking "Could I have an attorney?" was a clear request for counsel that should

8   have ended the questioning.[7] This factor weighs heavily in favor of a finding that

9   Plaintiff's confession was involuntary.

10      Importantly, and for the sake of argument, even if the summary judgment

11  record and legal standard did not compel the conclusion that Plaintiff invoked his

---

[7] *See Smith v. Illinois,* 469 U.S. 91, 93 (1984 (the Supreme Court found the following to be an unequivocal invocation of the right to counsel: Q. You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that. A. Uh, yeah. I'd like to do that."); *Minnick v. Mississippi,* 498 U.S. 146, 148 (1990) (treating the following as unequivocal: "Come back Monday when I have a lawyer."); *Luna v. Lamarque,* 400 F. App'x 169, 172 (9th Cir. 2010) ("We hold that in the circumstances of this interrogation, Luna's final statement—"[I]t sounds like I need a lawyer. And I need help"—was a sufficient invocation of his right to counsel."); *Brown v. Rowland,* 215 F.3d 1332 (9th Cir. 2000) (unpublished) ("[C]an I have my lawyer here or something?" was an unequivocal invocation); *Alvarez v. Gomez,* 185 F.3d 995, 998 (9th Cir. 1999) ("'Can I get an attorney right now, man?'... " "'... 'You can have attorney right now?" is an unequivocal invocation"); *Krysinski v. Rowland,* 89 F.3d 845 (9th Cir. 1996) (unpublished) (finding that "a reasonable interrogating officer would have understood . . . that [Plaintiff] was requesting an attorney when he said, "Do I get to talk to a lawyer or something?"); *United States v. De La Jara,* 973 F.2d 746, 750 (9th Cir. 1992) (holding that "Can I call my attorney?" was an invocation of right to counsel); *Robinson v. Borg,* 918 F.2d 1387, 1389 (9th Cir. 1990) (holding "I have to get me a good lawyer, man. Can I make a phone call?" was a clear invocation of the right to counsel); *Shedelbower v. Estelle,* 885 F.2d 570, 571–73 (9th Cir. 1989), which held that "You know, I'm scared now. I think I should call an attorney" was a clear invocation of the right to counsel; *Smith v. Endell,* 860 F.2d 1528, 1529, 1531 (9th Cir. 1988) (holding that "Can I talk to a lawyer?" was not ambiguous or equivocal).

21

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

right to an attorney, the actions of the Detective Defendants in response still

strongly illustrate the coercive tactics and involuntary nature of Plaintiff's

subsequent confession. The detectives' "immediate interrogation of [Plaintiff] in

direct response to his request for a lawyer is a textbook violation of *Edwards*."

*Collazo*, 940 F.2d at 417-18. As experienced investigators interrogating a child

from whom they had not even attempted to obtain a *Miranda* waiver, the officers

should have stopped questioning to at least minimally assess Plaintiff's statement.

*See Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir. 1988) ("W]hen the initial

request for counsel is ambiguous or equivocal, all questioning must cease, except

inquiry strictly limited to clarifying the request.");[8] ASOF ¶¶ 174, 176-79. Instead

of even considering these rules, the Detectives steamrolled Plaintiff with an answer

that would ensure he would not seek to invoke again: "No." In short, Plaintiff's

invocation of his right to counsel figures heavily in the totality analysis.

## Denial of Requests for a guardian

Plaintiff asked to see his mother several times. ASOF, ¶166. He was denied

such a request and left, entirely alone, with the officers. This, for a juvenile

suspect, is a factor that supports a finding of coercion.

## Physical Environment, Screaming, Guns, and Physical Intimidation

---

[8] This rule has been limited to contexts where a suspect has "already given an unequivocal and
unambiguous waiver" of her rights. *United States v. Rodriguez*, 518 F.3d 1072, 1081 (9th Cir.
2008). Here, the detectives did not seek a waiver, and, on Plaintiff's facts, the mere recitation of
the *Miranda* rights to a 13-year-old being interrogated during their first ever arrest was not
sufficient to "imply" a waiver from his silence.

22

Plaintiff was handcuffed to a chair in the corner of a small, windowless
room. The environment was absolutely coercive. In addition, with the other
Detectives watching and able to intervene, Detective Arteaga screamed at Plaintiff,
swore at him, and put his hands on Plaintiff's shoulder and was towering over
Plaintiff. In addition, Plaintiff was handcuffed to a chair, in a corner with no
possibility of retreat. Plaintiff was also isolated: he was arrested at 3:30 at school,
arrived at the police station around 3:40, and then sat alone in an interrogation
room for more than an hour and a half. By the time his interrogation ended, he had
been in police custody for over 4 hours. *See* ASOF, ¶127, 163-64

Furthermore, as shown on the video, each one of the police officers
displayed firearms throughout the course of the interrogation. *See also* ASOF ¶163.
This factor that contributes to coercion and involuntariness. *Compare United States
v. Wells*, 719 F. App'x 587, 591 (9th Cir. 2017) (discussing coercive impact of
officer displaying weapon during an interrogation); *Calderon v. Sisto*, 609 F. Supp.
2d 1077, 1088 (C.D. Cal. 2009) (Fischer, J.) (assessing interrogation and finding it
voluntary because, among other things, "the detectives who interviewed petitioner .
. . did *not* display their weapons" (emphasis added)).

**Plaintiff's Age and Background**

Plaintiff's tender age further supports the conclusion that his will was
overborne, and must also be considered as part of the totality of the circumstances.

23

See *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (the "fact that [Plaintiff]

was a juvenile is of critical importance in determining the voluntariness of his

confession." Here, two points bear mentioning: (1) Plaintiff's age and background

in and of itself, (2) and the ineffectiveness of the *Miranda* warnings provided to

him as a juvenile.

Plaintiff was just 13-years old, a fact that must be considered as evidence of

vulnerability *regardless* of any notion of "sophistication." *Gallegos*, 370 U.S. at

54.  In addition, Plaintiff had no criminal record, and had never been previously

arrested, much less interrogated or convicted. He was alone with police officers

displaying weapons who would not give him an out when he asked for his mother,

when he asked for an attorney, or when he repeatedly denied his involvement in

the crime. ASOF ¶¶ 139-40, 142, 173, 175.[9]

Second, the manner in which the *Miranda* admonishments were

administered is also relevant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226

(1973). The reading of *Miranda* rights was completely ineffective—the detectives

did not take *any* steps to ensure that Plaintiff actually understood the words in the

*Miranda* admonishments or, as a substantive matter, what his rights actually were.

(Something they plainly should have done, given his age). *See* ASOF ¶ 141-43,

---

[9] Defendants attempt to paint plaintiff in a negative light by saying he was a member of a
"ruthless street gang," which is supposed to somehow supersede (or contradict) the kid seen in
the video. The record, and summary judgment standard, belies this suggestion. Plaintiff was not a
member of MS13. *See* ASOF ¶66. Nor is Defendants unsupported and tenuous speculation about
a 13-year old's social media posts of any value at all.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

146. Then, they deliberately did not ask Plaintiff to waive his rights or otherwise obtain a waiver to ensure they could interrogate Plaintiff, in direct violation of policy. *Id.* ¶146.

Moreover, even assuming such a rote reading of the rights could somehow effectively communicate to a 13-year old the right to silence, any marginal value was certainly diluted, if not completely undermined, by the fact that the detectives began interrogating Tobias *before* reading him the rights. ASOF, ¶142. This included rejecting his answers to certain questions about gangs, saying things like "there's a lot of stuff we already know," and suggesting that Plaintiff was *required* to answer their questions before they would answer his. *Id.* Then, the *Miranda* admonishment was given in a highly manipulative way to imply that the questioning would continue regardless, rendering the admonishment meaningless. *Id.* ¶¶145-56.

In the end, Plaintiff did not give a knowing, voluntary, "unequivocal and unambiguous" waiver of his *Miranda* rights.[10] Accordingly, while it is theoretically possible in some circumstances for police to imply a waiver from silence where the

---

[10] *Compare Ward ex rel. Crystal M. v. Ortega*, 379 F. App'x 687, 690 (9th Cir. 2010) ("Although Crystal agreed to talk to the detective after hearing the standard recitation of *Miranda* rights, this fact alone does not show that she knowingly waived those rights." (citing *Murray v. Earle*, 405 F.3d 278, 289 (5th Cir.2005) (holding that an 11–year–old girl "cannot be held to have knowingly and voluntarily waived her rights to be represented by counsel and to remain silent" because "[o]ther than having [her] sign a *Miranda* card, and briefly explaining her rights to her at the outset of the interrogation, the police took no precautions to ensure the voluntariness of her statement, let alone 'special care'")).

25

suspects understands the rights and is making a voluntary choice, *Colorado v. Spring*, 479 U.S. 564, 573 (1987), that was not the case here.

### 4.  Qualified Immunity Is Unavailable

Defendants cannot seriously suggest that the right at issue here was not clearly established. Their invocation of qualified immunity is entirely fact-bound and foreclosed by established law, rendering qualified immunity unavailable. *See United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) ("A confession is involuntary whether coerced by physical intimidation or psychological pressure.") (citing *Townsend v. Sain*, 372 U.S. 293, 307 (1963); *Stoot v. City of Everett*, 582 F.3d 910, 927 (9th Cir. 2009) ("At the time of the interrogation, [the police officer] was on notice under clearly established law that if he . . . physically or psychologically coerced a statement from [the juvenile plaintiff], the use of the confessions could ripen into a Fifth Amendment violation."); *see Crowe v. County of San Diego*, 608 F.3d 406, 431 (9th Cir. 2010) (similar).

That would be the end of it but for the fact that the Detectives have tried again and again to make it seem as if this lawsuit turned entirely on the invocation issue. It does not. While that was the sole basis for Plaintiff's conviction being overturned, it does not have the same significance here. As noted above, the fact that Plaintiff invoked his right to an attorney and was denied such a request is an important part of the totality of the circumstances. Indeed, like physical abuse,

26

1
2
3
4
5
6

Defendants' denial of Plaintiff's right to counsel amounts to a *per se* violation of his rights. In this respect, if the Court were to find that Plaintiff invoked his right to counsel and was denied, that would be an independently sufficient basis to find that, under the totality of the circumstances, Plaintiff's will was overborne. It would not, however, be the only way.

7
8
9
10
11
12
13
14
15
16
17

        In other words, even if Plaintiff's request for counsel were "equivocal" (a conclusion one cannot reach at this juncture), Count One must still go to the jury. Indeed, even if Plaintiff *never* said anything about an attorney at all, a jury would still be needed to adjudicate his Fifth Amendment claim. As a consequence, Defendants' assertion of qualified immunity as it concerns whether Plaintiff's invocation was equivocal is a non-sequitur and a non-starter: they cannot avoid the fact that the totality of the circumstances requires sending the claim to the jury or the fact that it was beyond clearly established in 2012 that they could not psychologically coerce a confession from a criminal suspect.[11]

18
19
20

        Finally, for completeness, the Detectives' argument that qualified immunity is somehow available because the state trial court reached the wrong conclusion is

21
22
23
24
25

[11] Even if the Court were to frame the issue as the Detectives have—treating the invocation issue as a standalone—their present motion would still fail. Since the motion to dismiss, Dkt. 78, the Detectives have not pointed to any facts that improved their position as it concerns Plaintiff's invocation of his right to counsel. Indeed, the video only reveals the correctness of the Court's prior conclusion that the invocation was unequivocal and clear. Tellingly, though they have been given multiple opportunities to do so, the Detectives have failed to even address the precedent cited by this Court (and Plaintiff) in prior briefing; nor have they even attempted to address this Court's conclusion that the facts and contexts of the cases they keep citing were "significantly different" than those presented here. Dkt. 78. at 6.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

baseless. The fact that a California juvenile trial court reached the wrong conclusion is of no moment. Sometimes state trial and appellate courts make erroneous rulings concerning the voluntariness of a confession or examination of an interrogation, warranting federal relief under the now-exacting standards of 28 U.S.C. §2254. *See, e.g.*, *Rodriguez v. McDonald*, 872 F.3d 908, 922 (9th Cir. 2017) (granting *habeas* on invocation issue under AEDPA); *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) (state court unreasonably applied law and determined facts related to involuntary confession); *Ward ex rel. Crystal M. v. Ortega*, 379 F. App'x 687, 690 (9th Cir. 2010) (same); *Henry v. Kernan*, 197 F.3d 1021, 1027 (9th Cir. 1999) ("A review of the interview transcript illustrates that Henry's questioning by the detectives was psychologically coercive. Although both the California Court of Appeal and the district court found that the interrogation was conducted calmly in a relaxed setting, this determination is belied by the actual record of the interrogation.").

The factors discussed above, independently and certainly when considered in totality, support a finding that Plaintiff's confession was involuntary. The Fifth Amendment claim must go to the jury.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**IV.    Plaintiff's *Monell* Claim Must go to the Jury**

**A. Applicable Law**

It has "long been established that the constitutionality of interrogation

techniques is judged by a higher standard when police interrogate a minor." *Id.* at

431 (citing *In re Gault,* 387 U.S. 1, 55 (1967)). The City of Los Angeles did not

get the memo.

Instead, by its own admissions, the policy and practice of the City of Los

Angeles is that interrogating officers are *not* required to differentiate their

techniques in any respect when it comes to juveniles. Detectives in the LAPD can

lie, threaten, and otherwise interrogate juveniles just as if they were adults. This is

unconstitutional on its face. The City's refusal to adopt any procedural safeguard

amounts to deliberate indifference. In addition, and as a related form of *Monell*

liability, the City of Los Angeles does not adequately train its officers to exercise

special caution—or any caution—when interrogating juveniles.

Municipalities cannot be liable under a *respondeat superior* theory, but they

may be liable where employees are "acting pursuant to an expressly adopted

official policy," or pursuant to a "longstanding practice or custom." *Thomas v.*

*County of Riverside,* 763 F.3d 1167, 1170 (9th Cir. 2014). A "policy" is " 'a

deliberate choice to follow a course of action ... made from among various

alternatives by the official or officials responsible for establishing final policy with

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

respect to the subject matter in question.'" *Long v. Cnty. of Los Angeles,* 442 F.3d

1178, 1185 (9th Cir. 2006). Policies, practices, and customs can involve

affirmative action or they might involve refusing to act; *i.e.*, inaction. A policy "of

inaction or omission may be based on failure to implement procedural safeguards

to prevent constitutional violations." *Tsao v. Desert Palace, Inc*., 698 F.3d 1128,

1143 (9th Cir. 2012) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir.

1992)). In addition to failing to adopt adequate procedural safeguards, a policy of

omission can involve failing to adequately train police officers, where the

municipality has "disregarded the known or obvious consequence that a particular

omission in their training program would cause municipal employees to violate

citizens' constitutional rights." *Tsao*, 698 F.3d at 1143 (9th Cir. 2012).

To establish that there is a policy based on a failure to prevent constitutional

violations—under either a failure to implement procedural safeguards or failure to

train theory—a plaintiff must also show deliberate indifference to the plaintiff's

constitutional rights, and a causal relationship between the constitutional violation

and the municipal failure in the sense that the municipality could have prevented

the violation with an appropriate policy. *Id.; see also Jackson v. Barnes*, 749 F.3d

755, 763 (9th Cir. 2014). "Whether a local government entity has displayed a

policy of deliberate indifference is generally a question for the jury." *Oviatt By &*

*Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992). To establish

causation, "Plaintiff need only demonstrate that the identified deficiency ... [is]
closely related to the ultimate injury." *Id.* (quotes and citation omitted).

## B. Background

A reasonable jury can find for Plaintiff on three different *Monell* theories.
*First*, a reasonable jury can conclude that the City's policies and practices are
themselves unconstitutional, because City policy and practice provides that
detectives need not differentiate between juveniles and adults in the manner in
which they conduct their interrogations. *Second*, a reasonable jury could find that
the City has failed to adopt adequate procedural safeguards to ensure that the
interrogation of juveniles reflects the "special concern" the Constitution demands
they be given when it comes to custodial interrogation due to their inherent
vulnerability. *Third*, a reasonable jury could conclude that the City has failed to
adequately train its officers in conducting juvenile interrogations.

To be perfectly clear: Plaintiff's claim is not about the City's policies and
practices concerning providing juveniles with *Miranda* warnings or addressing a
juvenile's invocation of his right to an attorney. Instead, the gravamen of
Plaintiff's *Monell* claim focuses on the actual substantive interrogation that might
follow any waiver; the manner in which the *interrogation* itself is conducted.

Plaintiff's statement of affirmative facts lays out in further detail the facts
relevant to this claim, and is incorporated by reference. *See generally* ASOF

31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

¶¶216-248.Briefly summarized, for more than half a century the Supreme Court has demanded that special care be taken when interrogating juveniles; that juveniles cannot be treated in the same manner as adults when being interrogated and therefore required that interrogators insure that any admissions are voluntary. *Id.* ¶¶216-220. Doing so requires special caution, not only because coercion violates the Constitution but treating juveniles as adults can actually lead to false confessions. *Id.* ¶219. In short, "children cannot be viewed simply as miniature adults." *J.D.B. v. North Carolina*, 564 U.S. 261, 274 (2011).

### C. The City's Policies And Practices, in Refusing To Differentiate Between Juvenile and Adult Interrogations, are Unconstitutional

Despite the Supreme Court's clear requirement that juvenile interrogations require special caution, *Gault*, 387 U.S. at 45, the policy of the City of Los Angeles is the exact opposite: when it comes to the manner in which suspects are interrogated, the City's official policy is that the technique is going to be the same. ASOF, ¶¶228-31. When it comes to how aggressive the officers are during an interrogation, this is up to an officer's style, and there is no need for officers to adjust their aggressiveness toward a suspect just because they are a juvenile. *Id* ¶232. In addition, the City does not distinguish between juveniles or adults when it comes to using false evidence ploys, lies, or "ruses." ASOF, ¶233-34.

Confirming this practice, nowhere in its three applicable manuals—the Manual of Juvenile Procedures, the Detective Operations Guide, and the Homicide

32

Manual—does the City inform officers that interrogations must, or even *should*, be conducted differently when the suspect is a juvenile rather than an adult. *Id.*, ¶225. This is particularly troubling because the LAPD expects, and has long expected, its officers to use the "confrontation technique" of interrogation. *Id.* ¶222. This technique is the exact opposite of special caution, concern, or care for juveniles: it is premised upon the notion that an interrogator should "establish psychological domination" over the person being interrogated and then, in a guilt presumptive manner, make a confrontation statement designed to "rattle" the suspect. *Id.*

In the end, the Constitution requires interrogators to distinguish between adult and juvenile suspects. The City's policies and practices do not do this basic thing; they do the exact opposite. Indeed, LAPD's policy and practice is to use a controversial and guilt presumptive interrogation technique, and then use that technique on juvenile suspects as if they were adults. Accordingly, a reasonable jury would have no trouble finding that the City's policy and practice exists (this is admitted by the City's designees).

A jury would also have no trouble finding such policies were the moving force behind the violation of Plaintiff's rights in this case: the failure to distinguish between Plaintiff, a juvenile, from an adult was evident in the coercive interrogation. *Cf.* ASOF ¶ 236 (all of the detectives here did not interrogate Plaintiff differently because he was a juvenile).

## D. The City has failed to Adopt Adequate Procedural Safeguards

The facts discussed above illustrate also that a reasonable jury could conclude that the City failed to implement procedural safeguards to prevent juveniles from having their will overborne during interrogations. Given the longstanding and unwavering requirement that juveniles be treated differently than adults when it comes to interrogations and that special caution be used when it comes to juvenile suspects, the City certainly should have known that some procedural safeguards were necessary to ensure that Detectives do not treat children as "little adults." Indeed, the City's failure to have any rules, procedures, or guidance concerning the substantive interrogation that follows the *Miranda* warnings stands in stark contrast to the standards and orders concerning *Miranda* and the other invocation issues. Nonetheless, the City's obligation to adopt rules and guidelines for what happens *after* the *Miranda* admonishments is of fundamental importance. The Homicide Manual recognizes that there are different types of suspects—but it omits juveniles, a crucial and vulnerable subset of suspects, from its consideration. ASOF ¶ 223. The need to adopt safeguards is all the more necessary where detectives are audited to determine whether they followed the confrontation technique by establishing psychological domination at the outset of an interrogation. ASOF ¶ 222.

There can be no serious question of causation here. The Detectives
interrogating Plaintiff have admitted that they did not adjust their interrogation
techniques in any way to account for Plaintiff's age. And that is clear from the
interrogation. The interrogation begins with Detectives Cortina and Pere telling
Plaintiff that his day went from "bad to worse" because he was the person in the
video and that the video shows him "right there on Alvarado Terrace blasting on
people." ASOF ¶ 147-48; *see also* Ex. 12. Ex. Then, when Arteaga gets his turn, he
begins by telling Plaintiff that his mother is "crying her eyes off," and that he
showed her the video and she "said that was you." ASOF ¶155; Ex. 12, ¶36. All of
this is consistent with a technique designed to assert "physical dominance,"
"shake" his composure, and ultimately overbear Plaintiff's will.

Deliberate indifference is one for the jury here. Especially in light of *J.D.B.*
having emphasized in 2011 that juveniles cannot be treated like little adults; the
fact that the City did not update its Manual of Juvenile procedures for *over a*
decade, and the fact that the City "does not catch up to case law in a timely
manner," all support an inference of deliberate indifference.

### E. The City Fails To Train Its Officers In How to Conduct Non-Coercive Interrogations of Juveniles

None of the detectives who interrogated Tobias felt like they needed to treat
him differently during the interrogation because he was a juvenile. This is because
the City does not train its detectives to use special care when interrogating juvenile

35

suspects. ASOF, ¶238. Indeed, this failure to train has been admitted by the City. *Id.* ¶238-39. They are instead trained that they can use interrogation techniques—like lies and "ruses" without regard to the fact that they are interrogating a juvenile. *Id.* ¶241-42. The failure is most acute with respect to determining what constitutes threats and promises (explicit or implied) with juvenile suspects. Threats and promises are particularly powerful with juvenile suspects.

As above, a reasonable jury could easily conclude that the failure to train the Detectives caused the violation of Plaintiff's constitutional rights. Had the officers been properly trained, rather than screaming, yelling, threatening, and ignoring Plaintiff's denials and requests for his mother while sobbing, "special caution" would have strongly (and obviously) led the Detectives to adopt a different tact altogether. That the City reviewed this very case and found no problem at all is particularly egregious, and the fact that it does not "catch up to case law in a timely manner" confirms the City's failures in this regard are not mistaken or neglectful. ASOF, ¶¶ 244-48.  The failure to train constitutes deliberate indifference.

## V.   The Jury Must Determine Whether Plaintiff's Interrogation Shocks The Conscience

Evidence obtained by methods "so brutal and so offensive to human dignity" that they "shock[] the conscience" violate the Due Process Clause of the Fourteenth Amendment. 342 U.S. 165, 174 (1952); *see, e.g.*, *Crowe v. County of San Diego*, 608 F.3d 406, 431-32 (9th Cir. 2010) (reversing grant of summary

36

1
2
3
4
5
6
judgment on "shocks the conscience" due process claims for juveniles who, like

Plaintiff, alleged in a § 1983 suit that police officers' conduct during their

interrogations violated due process and the Fifth Amendment). The Ninth Circuit,

sitting en banc, long ago made it clear that conscience shocking conduct need not

include physical violence to violate due process. *Cooper*, 963 F.2d at 1249–50.

7
8
9
10
11
12
13
14
15
16
        As this Court has already noted, if the allegations in the complaint are

correct, a reasonable jury could determine that the interrogation of Plaintiff shocks

the conscience and, therefore, violated due process. The Court should, of course,

examine the video of the interrogation, from which parts of the Complaint were

derived. The video is in fact starker than what described in the Complaint. The fact

that Plaintiff is thirteen and the fact that the Detectives refused his request for an

attorney figure prominently in illustrating that a reasonable jury could find that the

interrogation shocked the conscience. *See Crowe*, 608 F.3d at 431.

17
18
19
20
21
22
23
24
25
        The analysis from prior cases is applicable here. *Crow* explained: "In

*Cooper*, we held that police violated an *adult* suspect's substantive due process

rights when they "ignored Cooper's repeated requests to speak with an attorney,

deliberately infringed on his Constitutional right to remain silent, and relentlessly

interrogated him in an attempt to extract a confession." *Id.* (citing *Cooper,* 963

F.2d at 1223). The same is true here. The officers ignored Plaintiff's request for an

attorney and his mother, gave him not meaningful right to silence, and subjected

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

him to a relentless and aggressive interrogation. The facts, of course, are even more compelling because Plaintiff was just 13 at the time.

Arteaga used the phrase "cold blooded killer" twenty times. ASOF ¶¶157-64. In addition to the facts discussed above, it bears emphasizing that the interrogation involved extreme and blatant conduct in a number of ways that are completely inconsistent with the concept of ordered liberty because they trampled on other constitutional rights. Those include, but are not limited to undermining his right to silence; refusing Plaintiff's request for an attorney; telling Plaintiff he will *suffer*— and be seen as a coldblooded gang murderer—if he did not confess (an act that can *only* be seen as coercive, *Tingle* 658 F.2d at 1336 n.5); and by invoking Plaintiff's mother and family to attempt to get Plaintiff to confess (*e.g.*, by refusing his request to see his mom, by telling Plaintiff he was "dragging" his family into this, by falsely telling Plaintiff he was alone because his mom had left the station, and by falsely stating that his mom had identified him). With the others watching in another room, the sorts of things done to Plaintiff were unconscionable. A reasonable jury could easily find the foregoing, and the totality of the interrogation, shocked the conscience. Accordingly, summary judgment is unavailable here.[12]

---

[12] Defendants argue that *Stoot* illustrates that Plaintiff's claim fails. Not so. For one, as *Crowe* and *Cooper* illustrate, plaintiff's interrogation was sufficiently offensive that a reasonable jury could find that it violated due process. In addition, each one of these cases stands on their own facts; *Stoot* does not foreclose Plaintiff's claim, because the facts are different. Finally, as it concerns the facts in *Stoot* itself, aside from the fact that Plaintiff was not developmentally disabled, as the child in *Stoot* was, the remaining circumstances in this case are far more severe

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

## VI.    The Individual Defendants Fabricated Evidence

There is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government"; the "proposition is virtually self-evident." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc)).

The Ninth Circuit recognizes at least two sorts of fabrication-of-evidence claims: (1) indirect/circumstantial fabrication of evidence, and (2) direct deliberate fabrication. *See Caldwell v. City & Cty. of San Francisco*, 899 F.3d 1105, 1112 (9th Cir. 2018).  In the former, a plaintiff can point to circumstantial evidence illustrating that (1) [d]efendants continued their investigation ... despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. *Devereaux*, 263 F.3d at 1076.

By contrast, "deliberate fabrication can be shown by direct evidence, for example, when 'an interviewer . . . deliberately mischaracterizes witness statements in her investigative report.'" *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017) (quoting *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010)). On the "direct" route, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved, because the Constitution "prohibits the deliberate fabrication of evidence whether or not the

---

than *Stoot*. There, the plaintiff pointed to improper promises and threats, as Plaintiff here does, but Plaintiff has pointed to other coercive, shocking factors like disregarding his constitutional rights, threatening punishment for refusing to confess (*i.e.,* the "cold-blooded" killer narrative), that they also used false evidence ploys (including Plaintiff's mother), that the promises and threats included Plaintiff's family and the list goes on. Indeed, like *Crowe*, Plaintiff's claim is supported by expert testimony finding that his interrogation was psychologically coercive.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

1   officer knows that the person is innocent." *Spencer*, 857 F.3d at 800; *see id.* at 799

2   ("Because Plaintiff introduced direct evidence of deliberate fabrication, he did not

3   have to prove that Krause knew or should have known that he was innocent.").

4        Direct evidence of fabrication includes false statements in police reports and

5   declarations, such as reports that "contain[] evidence or statements" that were

6   "never made." *Costanich*, 637 F.3d at 1112; *see also, id.* at 1111 (explaining that

7   an "investigator who purposefully reports that she has interviewed witnesses, when

8   she has actually only attempted to make contact with them, deliberately fabricates

9   evidence"); *Caldwell , 899 F.3d at 1112* (triable issue of fact as to evidence

10  fabrication where allegation included the claim that the officer authored "falsified

11  notes"); *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007) ("A

12  police officer who maliciously or recklessly makes false reports to the prosecutor

13  may be held liable for damages incurred as a proximate result of those reports."

14  (citing *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).

15  **A. Defendants Fabricated Volumes of Evidence Against Plaintiff**

16       **1.  Directly Fabricated Evidence**

17       With one exception (Plaintiff's false confession), Plaintiff's fabrication-of-

18  evidence claims are direct, rather than indirect. Police reports that contain

19  information that was never said or are notes that purport to memorialize interviews

20  constitute directly fabricated evidence. *See Caldwell*, 889 F.3d at 1114. In

21  *Constanich v. Dep't Soc. & Health Servs.*, for example, the Ninth Circuit denied

22  summary judgment on a fabrication claim related to official reports that included

23  false information about witness interviews, because such a report "deliberately

24  fabricates evidence."  627 F.3d 1101, 1111 (9th Cir. 2010). In addition, the

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

*Constanich* Court noted that the reports could be deemed fabricated because they
included information that was inaccurate, misleading, including "evidence or
statements" that were "never made".

Plaintiff alleges that the following was directly fabricated evidence:

The "Identifications": (1) Cooley's agreement to claim Plaintiff was the
person in the video, ASOF ¶¶ 82-88, 97-99; (2) Born's agreement to claim Plaintiff
was the person in the video, ASOF ¶¶ 90-92, 97-99; and (2) East's agreement to
claim that he "identified" Plaintiff when he had not. ASOF ¶¶ 111-14.

Reports Concerning the "Identifications": (1) Cooley's two police reports
documenting his "identification" ASOF ¶¶ 96, 99; (2) Born's police report
documenting her "identification" ASOF ¶¶ 96, 99; (3) East's police report
purporting to document an "identification." ASOF ¶¶ 111, 118-124;[13] (4) Arteaga's
notes and reports concerning East. *Id.* ¶¶ 126 ; Arteaga's handwritten notes. *Id.* ¶¶
126 ; and (5) the Detectives' Probable Cause Declaration. *Id.*¶¶184.[14]

Additional Report: Pere/Motto initial report. ASOF ¶¶ 100.

Defendant Cooley claims that in the early morning hours of August 18, he
went to the scene of the Castaneda homicide, where he observed surveillance video
from which he was able to positively identify Plaintiff as Castaneda's shooter.
ASOF ¶ 79, 88. Cooley's identification is wholly fabricated. At the time he made
his purported identification, he had never met Plaintiff before. ASOF ¶ 76. He

---

[13] Defendant East's motion is premised on the erroneous idea that Defendant East is only
possibly liable as a conspirator in this action. He is mistaken. Plaintiff has alleged, and the record
includes, evidence illustrating his liability for fabricating evidence in violation of due process.

[14]  The Aug. 20, 2012 Arrest Report and June 25, 2013 Follow-Up Investigation Report are also
fabricated. In them, Defendants further repeat the fabricated "identifications" of Born, Cooley
and East.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

knew him only through photos that he had seen a few hours earlier when Plaintiff's

mother came to the station to file a missing persons report because she was worried

when her son did not come home on time. ASOF ¶ 74-77. Based on his memory of

those photos, Cooley claims that he watched the video and "immediately

recognized" the person to be Tobias. ASOF ¶ 86, 88. Cooley's claim is utter

nonsense. First, the surveillance video is grainy and low quality, and only captures

the shooter for a few seconds. ASOF ¶ 87; *see also* Ex. 28 (Surveillance Video). It

is questionable whether *anyone* would be able to make a reliable suspect

identification from the video, let alone someone who had never met the suspect in

person before. Second, to the extent anything can be reliably gleaned from the

video, it is that an identification of Tobias could not possibly be made from the

video. The shooter depicted in the video appears to be a heavyset adult, consistent

with the eyewitness descriptions of a 19-20 or 20-30 year old, approximately 6 feet

tall, weighing 190-200 pounds. ASOF ¶¶ 63, 82. Tobias was 13 years old, and

approximately five feet and 110 pounds. ASOF ¶¶ 65, 85.Cooley's identification

was simply made up.

The same goes for the purported identification of Defendant Born. Like

Cooley, she had never met Plaintiff before and had seen only photos of him—in

her case, some unknown number of days, weeks or months earlier. Yet, she too

claims that when she arrived at the scene that night, she "immediately recognized"

Plaintiff in the grainy surveillance video. ASOF ¶¶ 90-92. Her ability to match the

person depicted in the surveillance video to her memory of a boy whose picture

she saw at some unknown earlier point in time us simply incredible. Further

evidence that the identifications of Born and Cooley were fabricated includes the

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

fact that they cannot get their stories straight. ASOF ¶ 95 (each tells a very different story about what Born actually saw (a picture or a video), and where she saw it (street or management office)). In addition, their identifications are not contemporaneously documented—Detective Pere and Motto were at the scene all night, but their report the next morning makes no reference to Born and Cooley's identifications, nor does the murder book's chronological record. ASOF ¶¶ 97-98. Finally, Born and Cooley's statement forms appear to be prepared after the fact; Born's is undated, and Cooley's has an undated version and a September 14, 2012 version. ASOF ¶ 99.

The statement forms of Born and Cooley, when finally created, also constitute fabricated evidence. Both of their reports maintain the lie that they were each able to make a confident identification of Plaintiff from the video that night. ASOF ¶¶ 96, 99. In Born's case, her report omits an important fact she has since admitted: that she saw a picture of Tobias before seeing the surveillance video, tainting her purported identification. ASOF ¶¶ 93-94. Cooley's report also omits the photograph initially shown to Born, and in addition contains fabricated claims about what Plaintiff's mother told him when she came to the station earlier that night to file a missing persons report. Compare Response to Cooley Facts ¶¶ 3-5 with Ex. 27 (Cooley Statement Form).

Each of these fabrications made up part of the probable cause for Plaintiff's arrest, and as such was used to set in motion Plaintiff's wrongful prosecution and conviction. ASOF ¶ 184; Response to Cooley Facts ¶ 15.

The same is true as it concerns East. His decision to say he identified Plaintiff when he did not is of course aided by the audio of his interview. East

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

recognized that the perpetrator in the video is too large to be a middle school student, and admitted that he could not ID someone from the video. ASOF, ¶¶ 105-06. After musing that he was "thinking of" Tobias, East is told: "that's who we think it is." *Id.* 108-09. At this point, East agrees to assist the detectives in implicating Plaintiff and is even pulling photographs of Plaintiff while the Detectives decide what to say he [East] said. ASOF, ¶111.[15]  At no point, ever, does East say he is "fairly sure the suspect in the video *is* Art Tobias." Despite the obvious and absolute contradictions between, on the one hand, the audio including East saying the effect of he was "thinking of Tobias but Tobias is too small to be the perpetrator" and, on the other hand, writing a report that where claiming he stated he was "fairly sure the Suspect *is* Art Tobias," East now claims "the report matches the audio recording." Dkt. 100, at 11. Such a contradiction must be rejected. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Arteaga's notes and subsequent reports contain the same misleading and false details. Notably, *all* of the written reports concerning East's identification omit substantial information, making them misleading on their own, including that East was told by the Detectives who they thought the perpetrator was, and that the East, Motto, and Arteaga searched for pictures, together before East watched the video again. And, naturally, all of the reports omit any mention of the plan to "roll" on Plaintiff's mother or somebody's going to have to "frickin pay." *See* ASOF, ¶114, 126.

Finally, Pere and Motto created a fabricated report of the witness descriptions of the perpetrator at the scene. The witness identifications as reported by the patrol officers that initially responded to the scene, Godoy and Ybanez,

---

[15] The transcript of the audio obscures what is happening when East, Arteaga, and Motto discuss what they will say East said. From the audio, between 14:48 to 15:40, Arteaga is plainly asking Motto what they are going to put in East's statement and East is a part of the discussion.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

describe an older (18-19yo, 20-30yo) and larger shooter (6ft, 190-200 pounds), and make no reference to a person with glasses. But on the Preliminary Investigation Report that Pere created and Motto reviewed and approved, they added "small build, wearing prescription glasses," an unsourced description contained nowhere else in the report and contradicted by the witness descriptions that are part of the report. ASOF ¶ 100; *compare* LAPD 2169 (section re suspect "S-1"), *with* LAPD 2170-71. This additional fabricated evidence that the Detectives created to bolster their frame-up of Plaintiff.

### 2. The Fabricated Confession.

To prove a fabrication claim with circumstantial evidence, Plaintiff may show either that (1) the defendants continued their investigation despite the fact that they knew or should have known the plaintiff was innocent, or (2) that they used investigative techniques that were so coercive and abusive that they knew or should have known those techniques would yield false information. *Caldwell*, 889 F.3d at 1112.

A reasonable jury can find for Plaintiff on both prongs, and summary judgment is therefore improper here.

*First*, the defendants knew or should have known that Plaintiff was innocent. He did not match the description of the perpetrator. He was far too young and small to be the "chubby" person depicted on the video of the shooting. Indeed, Detective Motto's statements to East foreclose any claim to the contrary. Detective Motto essentially admits that they were in search of evidence and would "have a hard time proving what you [East] just saw"—i.e., that the person in the video was Plaintiff—if they could not get people to identify Plaintiff. The Detectives also had

1    other evidence at their disposal: Plaintiff's mother telling them that Plaintiff was at

2    home at the time of the shooting, and that his clothes that night did not match the

3    shooter. Defendants should have investigated these angles, for example by

4    obtaining the phone records. Instead, with Plaintiff handcuffed to a chair in an

5    interrogation room, the officers were hell-bent on securing the confession of

6    Plaintiff at, it seems, virtually any cost. Also relevant to the fabrication of

7    Plaintiff's confession is the fact that the Defendants had already decided to

8    fabricate other evidence—the "identifications" of East, Cooley, and Born.

9        *Second*, the detectives used investigative techniques that were so coercive

10   and abusive that they knew or should have known those techniques would yield

11   false information. The interrogation was "guilt presumptive, accusatory and theory

12   driven" and was "not structured to find the truth but, instead, to intentionally

13   incriminate Art Tobias by coercively, deceptively and unlawfully breaking down

14   his denials of guilt and eliciting a statement of guilt from him that was consistent

15   with the detectives' preexisting and prematurely formed assumptions, beliefs and

16   speculations about who must have committed the crime." ASOF ¶ 139. Indeed,

17   The fulsome discussion above is incorporated here as it concerns the "coercive and

18   abusive" aspects of the fabrication of the confession.

19       But there is additional evidence that bears on the *fabrication* component

20   (rather than just the coercion aspect). Specifically, the interrogators fed Plaintiff

21   the details of the crime throughout. Early on, they feed Plaintiff the location of the

22   crime (Alvarado Terrace, by Pico and Hoover); they tell Plaintiff the time of the

23   crime (12:40); and they feed him details about the crime itself (*e.g.*, MS was

24   involved, there were two shooters, there were two guns, etc.). ASOF ¶¶ 169.In

25

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

sum, each fact concerning the Castaneda homicide Plaintiff recited in the confession was fed to him by the Detectives. *Id.*

### B. The Jury Must Resolve the Fact Issues On This Claim

Though defendants have been so far unwilling to concede any errors in their fabricated reports, to the extent they invoke *Gausvik v. Perez,* 345 F.3d 813, 817 (9th Cir.2003), for the proposition that they are entitled to summary judgment because any discrepancies in the reports are questions of "tone" or "characterization" rather than "actual misrepresentations," that argument must fail. For one, it would be a new argument and theory in reply. In addition, and regardless, at this juncture the Court cannot make this inference in favor of the defendants. *See Costanich*, 627 F.3d at 1113 ("The district court's description of the errors in the investigation as 'recording errors and misstatements' is untenable in light of the principle that, on summary judgment, we must draw all factual inferences in favor of the nonmoving party." (citing *Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, 922 (9th Cir. 2004)). The same is true as it concerns Plaintiff's confession—the claim must go to the jury as the only way Defendants can avoid liability is to contest Plaintiff's facts and the inferences that flow therefrom.[16]

### VII. Whether Plaintiff Was Seized In The Absence of Probable Cause Is A Fact-Dependent Question that Must Be Resolved By The Jury

Plaintiff and the defendants have diametrically opposed views of the evidence that was presented in support of the probable cause determination concerning Plaintiff's arrest. On Plaintiff's version of the events, nearly the

---

[16] Defendants have not made a causation argument with respect to the fabricated evidence. They have waived their opportunity to do so.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

entirety of the evidence available at the time of his arrest was fabricated. On

Defendants version of the events, they conducted an honest investigation and

submitted evidence to the courts. (And, in the Detectives' universe, the quantum of

evidence against Plaintiff far exceeds that which was available at the time of

Plaintiff's arrest). Genuine disputes of material fact pervade nearly every aspect of

the probable cause issue—summary judgment is therefore impossible.

### A. Applicable Law

As the Supreme Court recently affirmed in *Manuel v. City of Joliet*: "The

Fourth Amendment prohibits government officials from detaining a person in the

absence of probable cause." 137 S. Ct. 911, 918 (2017). The "requirement of

probable cause has roots that are deep in our history," and reflects a rejection of

"the oppressive practice of allowing the police to arrest and search on suspicion."

*Henry v. United States*, 361 U.S. 98, 100 (1959).

In the Ninth Circuit, before *Manuel* this type of claim was often referred

been characterized as a § 1983 "malicious prosecution" claim. *See, e.g.*, *Awabdy*,

368 F.3d at 1069; *Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011); *Galbraith v.*

*County of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002) (recognizing

Fourth Amendment malicious prosecution claim). Under such a framework, a

plaintiff must show that the defendants wrongfully caused him to be prosecuted,

with malice and without probable cause, that they did so for the purpose of denying

48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

him a constitutional right, and that the criminal proceeding terminated in Plaintiff's

favor. *Truelove v. D'Amico*, 2018 WL 1070899, at *8 (N.D. Cal. Feb. 27, 2018)

(citing *Awabdy, 368 F.3d at 1066 (9th Cir. 2004); Yousefian v. City of Glendale,*

*779 F.3d 1010, 1015 (9th Cir. 2015).*

      In light of *Manuel,* however, the ad-hoc importation of common law

"malicious prosecution" elements like malice should not be imported into this

claim.[17] Nor should the "favorable termination" requirement be part of the

substantive claim.[18] Instead, to prevail, Plaintiff need only show that he was seized

and that his pretrial detention was without probable cause. Here, there is no

question that Plaintiff was seized. ASOF ¶127.

      The argument thus centers solely on the lack or existence of probable cause.

The "substance of all the definitions of probable cause is a reasonable ground for

belief of guilt, and that belief must be particularized with respect to the person to

---

[17] *See Rehberg v. Paulk*, 566 U.S. 356, 366 (2012) (noting that "§ 1983 is [not] simply a
federalized amalgamation of pre-existing common-law claims."). The Supreme Court has
consistently rejected the notion that the Fourth Amendment includes a subjective component,
like malice. *See Whren v. United States*, 517 U.S. 806, 815 (1996); *Graham v. Connor*, 490 U.S.
386, 398 (1989). Even if this court were to inquire into "malice," the absence of probable cause
would support an inference of malice, and the question would remain one for the jury because
mens rea is a quintessential jury question. *See, e.g., Truelove v. D'Amico*, 2018 WL 1070899, at
*8 (N.D. Cal. Feb. 27, 2018*); Donahoe v. Arpaio*, 986 F. Supp. 2d 1091, 1128 (D. Ariz. 2013).
(noting that "malice is generally a question of fact for the jury," which "may be inferred from a
lack of probable cause"); *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d
1019, 1030 (9th Cir. 2008) ("Malice is usually a question of fact for the jury to determine.").
[18] Favorable termination is still necessary for purposes of claim accrual, but not a requirement
under the Fourth Amendment. *See generally Walace v. Kato*, 549 U.S. 384 (2007) (discussing
claim accrual and analogizing to the common law of malicious prosecution); *Heck v. Humphrey*,
513 U.S. 477 (1994) (same). Regardless, there is no dispute about this element here—the
criminal case undisputedly terminated in Plaintiff's favor when the charges were dropped.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

1  be searched or seized. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) internal

2  quotes and citations omitted); *Ybarra v. Illinois,*444 U.S. 85, 91 (1979) ("Where

3  the standard is probable cause, a search or seizure of a person must be supported

4  by probable cause particularized with respect to that person.").

5       The Supreme Court has consistently emphasized that probable cause must be

6  particular to an offense, not generalized suspicion of wrongdoing. "To determine

7  whether an officer had probable cause to make an arrest, a court must examine the

8  events leading up to the arrest, and then decide whether these historical facts,

9  viewed from the standpoint of an objectively reasonable police officer, amount to"

10 probable cause." *Id.* (internal quotes and citation omitted). If a reasonable jury

11 could find an absence of probable cause, summary judgement should not be

12 granted. *See, e.g.*, *Reed v. Lieurance*, 863 F.3d 1196, 1205 (9th Cir. 2017) ("Here,

13 we find that the district court improperly invaded the province of the jury when, at

14 the summary judgment stage, it resolved factual disputes material to the question

15 of probable cause.").

16 
17      **B.  The Available Evidence At the Time of Arrest Was Nearly Entirely
           Fabricated, Making Probable Cause Impossible**

18 
19      The existence of probable cause must be evaluated from the time of arrest—

20 not things unavailable or unknown at the time. *Gonzalez v. Cty. of Los Angeles*,

21 2009 WL 10691184, at *1 (C.D. Cal. June 9, 2009) ("On plaintiff's Claim for

22 arrest without probable cause, evidence of events subsequent to the arrest,

50

unknown to the officers at the time, is irrelevant. The reasonableness of an officer's decision to arrest is based on the information known to him at the time the decision was made." (citing *John v. City of El Monte, 515 F.3d. 936, 940 (9th Cir. 2008)*). Defendants cannot challenge this point. *See* Dkt. 111, Detective Br. 14 (arguing that "post-arrest happenings" do not bear upon probable cause).

In addition to citing the video of the shooting, there were four components of the probable cause affidavit signed by Defendant Cortina: (1) the "identification" of Born, (2) the "identification" of Cooley, (3) the "identification" of East, and (4) the false and coerced confession Defendants extracted from Plaintiff. ASOF ¶ 184. But, as explained extensively above, the record illustrates that each of these four pieces of evidence contained fabricated information.

It is well established that probable cause cannot be based upon fabricated evidence. In *Manuel* for example: All that the judge had before him were police fabrications about the pills' content. The judge's order holding Mr. Manuel for trial therefore lacked any lawful basis. And that means Manuel's ensuing pretrial detention, no less than his original arrest, violated his Fourth Amendment rights. Or put differently: Legal process did not terminate Manuel's Fourth Amendment claim because the process he received failed to establish what that Amendment makes essential for pretrial detention—probable cause to believe he committed a crime." *See* 137 S. Ct. at 919-20; *accord Milstein*, 257 F.3d at 1011 (probable

cause never existed because the prosecutor and other defendants "concocted the essential facts," namely, fabricated statements from a witness); *Awabdy*, 368 F.3d at 1067 (holding that a court's decision to hold plaintiff after a preliminary hearing "would not prevent him from maintaining his § 1983 malicious prosecution claim if he is able to prove the allegations in his complaint that the criminal proceedings were initiated on the basis of the defendants' intentional and knowingly false accusations and other malicious conduct").

Here, as explained above, every piece of evidence linking Plaintiff to the Castaneda homicide—the "identifications" of East, Born, and Cooley along side Plaintiff's confession—contained falsehoods that. *See* ASOF, ¶96-100 (Born and Cooley; *id.* at 122-26 (East); & ¶169 (confession). Those falsehoods tainted any probable cause determination that could have been made at the time the charges were filed. *Manuel*, 137 S. Ct. at 920 n.8.

## C. Defendants' Attempt To Expand The Scope of Evidence, And Construe It In their Favor, Should Be Rejected

As noted, probable caused must be examined by that which was available at the time of the arrest—and that which was presented to the neutral decision-makers. Despite that fact, the Detectives attempt to expand the pool of possibly relevant information, and they do so in a manner that construes the facts in their favor. This effort should be rejected.

1

Indeed, the Detectives claim that Plaintiff was identified by his mother as

2

being the person in the video. Such a claim is false, and an extremely troubling

3

assertion given the record. In particular, Plaintiff's mother was not shown the

4

video, despite her request to do so—she was shown a single, blurry picture. ASOF

5

¶ 136. And, when first shown that picture her immediate response was "It's not

6

him." *Id.* As the remainder of the recording shows, Ms. Contreras repeatedly (and

7

emotionally) told Arteaga the person in the video was not her son, and she knew

8

9

the truth of the matter then—the officers were wrongfully accusing her son. ASOF,

10

¶¶137. The notion that this sequence of events could somehow amount to an

11

identification and a "recantation" is a total farce.

12

13

Defendants also reference the purported identification of Mr. Negroe in

14

support of probable cause, but Negroe did not identify Plaintiff from the video.

15

ASOF ¶115. And this was not part of the probable cause determination or any

16

documentation even available at the time of the arrest. ASOF ¶¶184-85.

17

18

Accordingly, Negroe's purported story does not support probable cause.

19

The Detectives also claim that the phone calls made after the interrogation

20

were incriminating. This, too, is frivolous. While the police officers' own reports

21

22

contain material omissions and misleading information about those calls, the

23

recordings themselves indicate that in the first call Plaintiff is attempting to convey

24

the fact that he has been arrested—he makes no confession. In the second call, the

25

notion that he confessed is "blatantly contradicted" by the objective record. During that call, Plaintiff repeatedly indicates that he is innocent and was not there. Response to Detective Facts at ¶46. The Court should reject the Detectives' attempted and misleading efforts. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The Detectives also point to purported Facebook posts. But, they did not have those at the time. Ex. 56 (Chrono showing obtaining Facebook records after charges). Indeed, the purported posts about "going on a mission" the night of the Castaneda homicide are themselves exaggerated: no such posts are contained in the murder book at all. Finally, contrary to Defendants' claim, Plaintiff did not ever state to the Detectives that he was an MS13 gang member. ASOF ¶ 144. He was not an MS13 gang member. *Id.*

### D. The Fabricated And Materially Misleading Reports Preclude Reliance On A Presumption of Independent Prosecutorial Discretion

The Ninth Circuit sometimes excepts liability for prosecutions in the absence of probable cause following the charging of a criminal complaint on the basis that it is "presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause existed at the time the

54

charges were filed." *Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981), *overruled by*

*Beck v. City of Upland*, 527 F.3d 853 (9th Cir. 2008). Assuming this sort of

"presumption" survived *Manuel*¸ the presumption is both narrow and rebuttable.[19]

Dispositive here, as *Smiddy* itself recognized, "the presentation by the officers to

the district attorney of information known by them to be false will rebut the

presumption." *Id.* at 266-67. Thus, "[d]eliberately fabricated evidence in a

prosecutor's file can rebut any presumption of prosecutorial independence."

*Caldwell v. City and County of San Francisco*, 889 F.3d 1105, 1116 (9th Cir.

2018). The Supreme Court summarized a related issue well in *Manuel*: "if the

proceeding is tainted—as here, by fabricated evidence—and the result is that

probable cause is lacking, then the ensuing pretrial detention violates the confined

person's Fourth Amendment rights." 137 S. Ct. at 920 n.8.

Likewise, just as with warrant applications, knowingly withholding relevant

information also rebuts the presumption of independence. *See id.* (citing *Smiddy v.*
*Varney*, 803 F.2d 1469, 1471 (9th Cir. 1986)); *cf. Frimmel Mgmt., LLC v. United*

*States,* ___ F.3d ___, 2018 WL 3579876, at *5 (9th Cir. July 26, 2018) ("Under

*Franks*, a police officer who recklessly disregards the truth or knowingly includes

false material information in, *or omits material information from*, a search warrant

---

[19] *Manuel* did not address the presumption specifically. However, the court's rejection of the
notion that legal process—whether by grand jury, by preliminary examination, or obtaining a
warrant from a magistrate—could somehow prevent their from being a Fourth Amendment claim
arguably casts doubt on the notion that there should be a presumption.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

affidavit "cannot be said to have acted in an objectively reasonable manner."

(citations omitted) (emphasis added)). For example, in *Borunda v. Richmond*, the

presumption was rebutted where the evidence was that the "criminal prosecutor

had no information available to him other than that contained in the police report,"

which contained "striking omissions." 885 F.2d 1384, 1390 (9th Cir. 1988).

Likewise, *Barlow v. Ground*, 943 F.2d 1132, 1137 (9th Cir. 1991), affirmed that

where prosecutors had "only the arresting officers' police reports available to

them," and those reports "omitted crucial information," the presumption was

rebutted and a reasonable jury could conclude that "the arresting officers, through

false statements and material omissions in their reports, prevented the prosecutor

from exercising independent judgment." *Id.*

In short: "if a plaintiff establishes that officers either presented false

evidence to or withheld crucial information from the prosecutor, the plaintiff

overcomes the presumption of prosecutorial independence." *Caldwell*, 889 F.3d at

1116. The circumstances of this case fall squarely within *Caldwell*, *Borunda*, and

*Barlow*: the arrest and subsequent filing of charges (one day later) necessarily

involved evidence that was fabricated, including the fabricated identifications of

Born, Cooley and East. ASOF ¶¶ 184-85. In sum, the fabricated evidence rendered

the ensuing seizure one without probable cause. *Manuel*, 137 S. Ct. at 920 n.8.

## VIII. The Detective Defendants Suppressed Exculpatory Evidence of An Alternative Suspect

The government's suppression of material evidence, whether exculpatory or impeaching, deprives the defendant of his right to due process when there is a reasonable probability that, had the favorable evidence been disclosed, the outcome of the trial would have been different. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). In this circuit, a § 1983 plaintiff advancing a *Brady* claim must prove (1) that the defendants withheld material evidence favorable to the defendant, (2) that the withholding was prejudicial; and (3) that the defendants acted with deliberate indifference or reckless disregard of the consequences in withholding the material, favorable evidence. *See Tennison*, 570 F.3d at 1088-89; *Trulove v. D'Amico*, 2018 WL 1070899, at *6 (Feb. 27, 2018).[20]

### A. The Detectives Withheld Material Evidence Favorable To Plaintiff

Plaintiff's criminal defense attorneys had a roughly 300-page version of the "murder book"—the official LAPD file for any homicide investigation. ASOF ¶297. When the full version was finally produced to Plaintiff's counsel for the first

---

[20] *Tennison*'s "deliberate indifference or reckless disregard" standard is inconsistent with *Brady*, which provides that this sort of *mens rea* is irrelevant to a *Brady* claim. At any rate, the standard required to prove recklessness or deliberate indifference is immaterial here: the decision to withhold the exculpatory evidence concerning Eric Martinez was intentional. ASOF, 215.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

time it was a game changer: the 600-plus page file includes scores of information not produced to Plaintiff's criminal defense attorneys. Most significant was evidence concerning an alternate suspect named Eric Martinez including reports generated during Plaintiff's trial that conclusively demonstrated Martinez had the murder weapon. The Detectives argue that defense counsel should have viewed Martinez as a suspect based upon the cryptic and sporadic references to Martinez in the documents they produced to the defense. The argument is at best for the jury.

### 1. Evidence Concerning Eric Martinez Was Materially Favorable

Plaintiff is innocent of the Castaneda Homicide. ASOF, ¶60. He does not fit the description of the person in the video of the shooting, but he was wrongfully convicted of being that very person. *Id*.¶ 65. By contrast, there is a strong possibility that Martinez is the person in the video: (1) he was a member of MS, (2) he had a burgundy car like the one seen at the scene, (3) he was in possession of the murder weapon just days after the crime, and (4) he fit the description provided by the witnesses and confirmed by the video. ASOF ¶¶ 192-93, 206.[21]

Plaintiff was none of these things. In the run-up to Plaintiff's trial, Martinez was prosecuted for a gun case related to the arrest in the burgundy car and the investigating LAPD detective, Officer Jackman, recognized that Mr. Martinez

---

[21] To the extent that Defendants want to characterize Martinez as "Plaintiff's accomplice and the second shooter," Dkt. 111, at 22, they will have merely disputed these facts and cannot obtain summary judgment on this basis. And, even if there were some way to argue Martinez was an "accomplice," that would not cure the *Brady* violation—*Brady* itself dealt with suppressed evidence of an accomplice (a co-defendant, even). 373 U.S. at 84.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

might have been involved in the Castaneda shooting, so she filled out a search

warrant application for Martinez's records and had Martinez's gun checked against

the Castaneda case. *Id.* ¶204. The Defendant Detectives, however, refused to put

this information in the chrono or turn over Jackman's reports. *Id.* ¶195. During the

course of Plaintiff's trial, the LAPD firearms lab confirmed Jackman was right—

Martinez's gun was used in the Castaneda murder. During Plaintiff's trial, the

Detectives even generated criminal history reports and photo identification six-

packs treating Martinez as a suspect. *Id*. ¶ 208.

Accordingly, Mr. Martinez was (and is) a strong suspect. The suppression of

an alternative suspect is "'classic *Brady* material,'" and there is no question that

having another suspect to point to was materially favorable to Plaintiff's defense.

*Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010) (quoting *Boyette v. Lefevre*,

246 F.3d 76, 91 (2d Cir. 2001)); *see also Trulove v. D'Amico*, 2018 WL 1070899,

at *7 (N.D. Cal. Feb. 27, 2018).[22]

## 2.  Evidence Concerning Eric Martinez Was Suppressed

The thrust of the Detectives' argument is that there was no suppression of

evidence because a couple of files referencing Martinez were contained in the

version of the murder book provided to defense counsel. The argument fails.

[22] Qualified immunity is unavailable on this claim. In 2012, it was beyond established that police officers had an obligation to disclose evidence of an alternative suspect. See *Carillo v. County of Los Angeles*, 798 F.2d 1210, 1219-25 (9th Cir. 2015) (holding law in 1984, and as far back as 1978, clearly established that police officers were bound to disclose material exculpatory evidence, including that of an alternative suspect); *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1093 (9th Cir.2009) (no qualified immunity for suppression of evidence of alternative suspect in 1990).

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

*First,* Plaintiff's defense attorneys sought the entire murder book from defense, and it was not provided. ASOF ¶ 201. Nor have the Detectives or the City produced any evidence that the entire file was provided. That fact should be dispositive, given the present posture and the undisputed obligation of police officers to turn over the obviously exculpatory evidence. *See Strickler v. Greene,* 527 U.S. 263, 284 (1999) ("[I]t was reasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials."); Defense attorneys are not required to "repeatedly to scavenge for facts that the prosecution is unconstitutionally hiding from him." *Jefferson v. United States*, 730 F.3d 537, 541 (6th Cir. 2013). Put differently, police may not play hide and seek with the evidence—such a rule is "not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).

*Second*, it bears emphasizing that the Detectives motion is based upon speculation about what defense counsel should have known. But, defense counsel asked for the discovery in the case, and were not provided with the evidence. Plaintiff's defense attorneys did not have the Martinez files, and have attested to its potential importance to their defense. ASOF, ¶ 205, 209-10, 215. That should end the matter.

*Finally*, Detectives' argument is based upon the premise that it was obvious Martinez was a suspect from the few, incomplete and cryptic files they actually did turn over. But, the nature and type of evidence withheld was powerfully different. For one, Officer Jackman's sworn statement avers that Martinez was *directly involved* in the case. And the May 7, 2013 lab report is not speculative; it is *conclusive*. Likewise, that detectives would, during trial, pull Martinez's criminal history and make photo-arrays is both additional evidence that was undisclosed but is also evidence that supports an inference that the May 7, 2013 report was significant. As far as the reports before trial go, nothing cited by the Detectives included anything close to a sworn police officer claiming that there was probable cause to suspect Martinez was likely involved in the Castaneda case. Taking all inferences in Plaintiff's favor, and crediting the evidence put forth by Plaintiff's defense counsel supports an inference that the Martinez evidence was suppressed; the claim must go to the jury.[23]

In sum, and at most, Detectives' arguments come down to some sort of "diligence" issue that is fact bound and for the jury. *See Shamsnia v. Anaco,* 2015 WL 12672091, at *2 (C.D. Cal. Mar. 30, 2015) (noting that "whether the plaintiff exercised reasonable diligence is a question of fact for the . . . jury to decide," and

---

[23] Indeed, the record of the civil litigation itself supports the inference that the evidence in the murder book provided to defense counsel was insufficient to alert counsel to the fact that Martinez was a suspect. *See generally* Plaintiff's Memorandum in Support of Motion for Leave to File a Second Amended Complaint, Dkt. 55-1.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

explaining that the "drastic remedy of summary judgment may not be granted

unless reasonable minds can draw only one conclusion from the evidence"

(citations and internal quotation marks omitted)): *Feyko v. Yuhe Int'l, Inc.,* No. 11–

cv–05511, 2013 WL 3467067, at *4 (C.D. Cal. July 10, 2013) ("due diligence

should generally be reserved for a jury to determine").

### B. Suppression of Evidence Concerning Martinez Was Prejudicial

In order to show that suppression of evidence prejudiced Plaintiff, he need

not definitively prove that it is more likely than not that the withheld evidence

would have resulted in his acquittal, only that the withheld evidence "could

reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). That burden

is met here.

The State's case against Plaintiff was weak. The only evidence purportedly

linking him to the crime at trial was (1) the video of the shooting, and (2) his false

confession to being the person on the video. Notably, no evidence of an alternative

suspect was presented. ASOF¶ 213. Nor did any of the eyewitnesses identify

Plaintiff as the perpetrator. *Id.* Even the trial judge commented that the video of the

shooting was insufficient, on its own, to support a sustained petition (a guilty

verdict). *Id.* ¶¶213. Tellingly, once the state could no longer use the false

confession, the charges against Plaintiff were dismissed. *Id.* ¶214.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

Had the reports about Martinez been disclosed they could have been absolutely valuable to Plaintiff's defense—he could have powerfully suggested to the trier of fact that its intuition about Plaintiff not being in the person in the video was correct—Mr. Martinez was that person. They would have put the case in a new light, by giving Plaintiff an additional mechanism for challenging his confession and by giving him helpful witnesses (e.g., Officer Jackman) to call in his defense. Indeed, the evidence generated during his trial would have been powerful, given that it was *conclusive* proof of a link between Martinez and the Castaneda shooting, not just a probable one. The existence of Martinez would have also provided a mechanism for Plaintiff to at least seek a new trial before spending years on appeal fighting his case or assisted his defense counsel on appeal. *See* ASOF, ¶209; Ex. 65, Patricia Soung Declaration, ¶11. Alternative suspect evidence is always important for a criminal defense attorney, and its importance was heightened here. Ex. 65, ¶12. Undoubtedly, Plaintiff suffered prejudice as a result of the suppression of this evidence.

## C. The Record Illustrates an Intentional *Brady* Violation.

The Detectives claim that the record is insufficient for showing their recklessness or deliberate indifference. The purpose of this requirement is to ensure that police officers are not liable for not making reasonable (or even negligent) mistakes in disclosing evidence that should have disclosed. This factor

has no impact here: properly construed, the record illustrates that the Detectives

withholding of evidence was beyond reckless—it was willful and intentional. Why

was all of the best evidence related to Martinez withheld? Why wasn't there any

reference to Martinez in the chrono? Why is there no record of the Detective

Defendants interviewing Martinez related to the Castaneda homicide upon learning

of his August 21 arrest? Why was no investigation of Martinez done until *after*

Plaintiff's conviction was overturned? Given the fact that the detectives had a

strong motive to suppress evidence of Martinez (*see* ASOF, ¶215)—his emergence

as suspect would undermine their misguided efforts to secure Plaintiff's wrongful

conviction or at least illustrate that they had erred. In the end, all of this supports

an inference that the withholding of the Martinez evidence was not just reckless,

but intentional. A defendant's mental state is a quintessential jury question

rendering summary judgment inappropriate on this basis. *See Harris v. Itzhaki*, 183

F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of

intent, should be left to the jury.") (citations omitted); *Grumpy Cat Ltd. v. Grenade

Beverage LLC*, 2018 WL 2448126, at *6 (C.D. Cal. May 31, 2018) ("[B]ecause the

parties put forth conflicting extrinsic evidence, ascertaining the intent of the parties

regarding this term was a question of fact for the jury.").

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

1

2

**IX.  Defendants Agreed to Prosecute Plaintiff For A Crime He Did Not Commit and Refused to Intervene Though They Had More than Ample Opportunity to Do so.**

3

4       There is more than enough evidence in the record to permit a reasonable jury

5   to find that each one of the individual defendants agreed to participate in the

6   unlawful investigation of Plaintiff for a crime he did not commit both before and

7   after Plaintiff was charged with the crime.

8       To prove a § 1983 conspiracy, a plaintiff must "show an agreement or

9   'meeting of the minds' to violate [her] constitutional rights." *Ward v. EEOC*, 719

10  *F.2d 311, 314 (9th Cir. 1983)*. Such an agreement "may be inferred from conduct

11  and need not be proved by evidence of an express agreement"; a plaintiff need only

12

13  point to some "facts probative of a conspiracy." *Id.*; *see also Mendocino Envtl. Ctr.*

14  *v. Mendocino Cty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999). Put differently, it is

15  well established that an agreement "may be inferred on the basis of circumstantial

16  evidence such as the actions of the defendants" meaning, for example,  a showing

17  that the alleged conspirators have committed acts that 'are unlikely to have been

18  undertaken without an agreement' may allow a jury to infer the existence of

19  a conspiracy. *Mendocino Environmental Center*, 192 F.3d at 1301-02

20

21  (quoting *Kunik v. Racine County,* 946 F.2d 1574, 1580 (7th Cir. 1991)); *see also*

22  *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983) (explaining that an agreement

23

24

25

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

"may be inferred from conduct and need not be proved by evidence of an express agreement; a plaintiff need only point to some facts probative of a conspiracy").

In addition, while each participant must "share the common objective" of the conspiracy, "each participant in the conspiracy need not know the exact details of the plan. *Franklin v. Fox*, 312 F.3d 423, 441 (9th. Cir. 2002); *see also* United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir.1989) (en banc) ("To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.").

Important here, the existence of an "unlawful conspiracy is generally a factual issue and should be resolved by the jury, "so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives." *Mendocino Environmental Center*, 192 F.3d at 1301-02 (quoting *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir.1979)). Likewise, to the extent there is an issue of a defendant's intention or state of mind, such a question is also a factual issue "'inappropriate for resolution by summary judgment." *Mendocino Environmental* Center, 192 F.3d at 102 (quoting *Braxton–Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir.1985)).

An important principle from these cases is that a defendant need not be

66

physically or directly involved in every aspect of the conspiracy to be liable for their agreement. Defendants have not admitted to their conspiracy; but most never do. Indeed, the Ninth Circuit has cautioned: "'Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action.'" *Mendocino Environmental* Center, 192 F.3d at 102; *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856-57 (9th Cir. 1999) ("A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.(citation omitted)).

Here, much of the Defendants' actions is recorded objectively—the interview of East by Motto and Arteaga, the interview of Ms. Contreras, and then the interrogation of Plaintiff— and the Berendo Middle school audio is telling. It both supports an inference about what came before it (with the "identifications" from Born and Cooley) but it also sets out what is to come (an "identification" by East to "prove what he just saw, an attempt at Contreras, and then Tobias was going to "pay."). That the record is so full of other evidence of an agreement from the defendants own testimony makes, further illustrates the agreement and its aim. Both Born and Cooley, for example, agree they met and watched the video, but

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

they cannot get the story straight. The same is true for East and when he wrote his

report that was the subject of his meeting after the audio recording ended.

Defendants have missed the law. There is more than enough evidence to

allow a reasonable jury to conclude that the all of the individual defendants agreed

to falsely implicate Plaintiff in the Castaneda Homicide. Detective Motto (the

highest ranking defendant) and Detective Pere left the scene without a suspect in

mind. But, they learned about the missing persons report and decided to use that as

a pre-text. So, they spoke with Cooley, who agreed to implicate Plaintiff and wrote

a demonstrably false report. Then, Born agreed to do the same. In the ensuing

days, the other detectives—Cortina and Arteaga—joined the agreement. One need

look no further than the audio recording of the interview at Berendo Middle school

to see evidence of a conspiracy that completely defeats Defendants' motions for

summary judgment. There, Detective Motto did not mince words: he told East that

Tobias was their suspect, that they were going to try to get identifications from

Plaintiff's mother (to "rope" her into the case) or somebody was going to have to

"pay." East knew exactly what he was doing when he then wrote his false report, in

support of the prosecution of Plaintiff for the Castaneda shooting. All of the

Detectives were aware of what was happening in the interrogation room—they

participated as a unit, coordinating and monitoring each other's interrogations.

ASOF ¶ 130-32.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

In short, while Defendants Cooley, Born, and East make much of the fact
that they did not participate in the interrogation of Plaintiff, that fact is immaterial.
What matters is the fact that they had already agreed to falsely implicate Plaintiff
in the Castaneda homicide. The same is true of each one of the Detectives. Co-
conspirators need not do every single action together—they are all responsible for
the other unlawful actions of their co-conspirators taken in furtherance of the
agreement. *Cf. Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (en
banc) (noting that conspiracy claims may "enlarge the pool of responsible
defendants by demonstrating their causal connections to the violation; the fact of
the conspiracy may make a party liable for the unconstitutional actions of the party
with whom he has conspired").[24]

Finally, each individual defendant had a "duty to intercede when their fellow
officers violate[d] the constitutional rights of" Plaintiff.  *Cunningham v. Gates*, 229
F.3d 1271, 1289 (9th Cir. 2000) (internal quotes and citations omitted). But, they
did nothing. The same principles and facts related to conspiracy foreclose any
possibility of summary judgment on the failure to intervene claim. Each one of the
officers could have intervened to stop the others from writing or proceeding with

[24] Given this law, there is no issue of freestanding "team liability" in this case, as claimed or
suggested by the Detectives. Dkt. 111, at 11-12. Plaintiff's claim is clear: the detectives each
entered an agreement to frame Plaintiff for a crime he did not commit. Plaintiff does not seek to
hold "an officer liable because of his membership in a group without a showing of individual
participation in the unlawful misconduct." *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002).
Plaintiff seeks to hold each defendant liable *because of* their "individual participation in the
unlawful conduct." *Id.*

69
Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

false police reports.[25] Born, Cooley, and East "stood by" while the Detectives used

and relied upon their false reports. Each of the defendants could have disclosed

their misconduct and fabrications, not just to the department but also to the

prosecutors. Each one of the Detectives could have halted the unconstitutional

interrogation of Plaintiff. The only way to find for the Defendants on this claim is

to believe their denials, and ignore the evidence and inferences therefrom to the

contrary, which is improper at this juncture.

## X.  No "Residual" Qualified Immunity

All of the individual defendants include residual, unspecified requests for

summary judgment on the basis of qualified immunity—asserting that their actions

were "reasonable." As explained above, each one of the constitutional violations at

issue here was well established in 2012. Their requests all turn upon the facts; but

the facts are contested. Even worse, the motions ignore the disputes and make

inferences in movants' own favor.[26]

Had the Defendants accepted Plaintiff's version of events, and taken the

record in the light most favorable to Plaintiff their appeals to qualified immunity

[25] The motion filed by Born and Cooley is deeply troubling. Dkt. 99 at 11. The motion, statement of facts, and Cooley's sham declaration, all claim that Cooley testified *after* Plaintiff was convicted. This is supposed to be a reason to grant the motion. But, it is based upon a blatant falsehood that, given its repetition, does not appear to be inadvertent. Cooley testified during the middle of Plaintiff's trial, before his defense even began. In the end, this is just another reason to reject the self-serving testimony defendants have provided in their declarations and deny their motions as well.
[26] For example, the City's motion states that Born and Cooley made identifications in "good faith' and is entirely premised on their "identifications" were at most mistaken and entirely innocent. Dkt. 99, at 15. But, these are the core disputes about the "identifications," and such a favorable interpretation is inconsistent with both the record and the governing standard at summary judgment.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS

1    could at least hypothetically merit some discussion. However, having elected to

2    ignore the record and proceed on the basis of disputed facts, there can be no

3    summary judgment here. *See Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir.

4    1991) ("In the present case, facts necessary to decide the issue of qualified

5    immunity are in dispute. Summary judgment is therefore appropriate only if the

6    officers are entitled to judgment on the basis of the facts most favorable to Barlow.

7    That is not the case here. Barlow's version of the facts suggest that no reasonable

8    officer could have believed there was probable cause to arrest or that the amount of

9    force used against Barlow was justified. Summary judgment was therefore

10   inappropriate."); *Trulove v. D'Amico*, 2018 WL 1070899, at *7 (N.D. Cal. Feb. 27,

11   2018) ("Qualified immunity for defendants is denied because there are triable

12   issues of material fact on the underlying constitutional violations. Depending upon

13   the jury's determination of the disputed issues of fact, the defendants would not be

14   entitled to qualified immunity, since a reasonable officer at the time would have

15   known that such conduct violated clearly established constitutional rights.").

16   ## XI.    East's Remaining Arguments Fail

17          The remaining argument raised by the Defendant East deserve only but the

18   shortest mention. First, Defendant East claims he was not acting as public actor.

19   This contention is frivolous. He was a public school police officer, assisting in an

20   investigation, filling out official police paperwork, and even obtained a statement

21   from a witness. The Los Angeles Unified School District and its employees, like

22   Defendant East, are routinely and properly defendants in §1983 suits. *See, e.g.*

23   *Abraham P. v. Los Angeles Unified School District*, 2017 WL 4839071 (C.D. Cal.

24   Oct. 5, 2017); Finally, East claims that he cannot be liable because the confession

25

was the sole reason Plaintiff was convicted.  Dkt. 100, at 17. However, his fabricated evidence supplied part of the basis for Plaintiff being charged in the first place. The argument is one for the jury about damages, not summary judgment.

## Conclusion

Defendants' motions for summary judgment should be denied.

Plaintiff's Omnibus Response in Opposition to Defendants' Motions Summary Judgment
2:17-cv-1076-DSF-AS