# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ART TOBIAS,<br>          Plaintiff,<br><br><br>          v.<br><br>CITY OF LOS ANGELES, et al.,<br>          Defendants. | Case No. 17-1076 DSF (ASx)<br><br>Order DENYING the Motions for Summary Judgment of the City of Los Angeles and Officers Born, Cooley, and East (Dkts. 99 and 100) and GRANTING in Part and DENYING in Part the Motion for Summary Judgment of Detectives Arteaga, Cortina, Motto, and Pere (Dkt. 111) |

## I.    BACKGROUND

Plaintiff Art Tobias sues Officer Born, Officer Cooley, Officer East, Detective Arteaga, Detective Cortina, Detective Motto, Detective Pere, and the City of Los Angeles (collectively, Defendants) for violation of his civil rights.  Dkt. 67, Second Am. Compl. (SAC).  Plaintiff alleges Defendants deprived him of his rights under the U.S. Constitution by:  (1) forcing him to falsely incriminate himself and denying his right to counsel; (2) subjecting him to coercive custodial interrogation and generating an involuntary and false confession; (3) fabricating evidence and deliberately withholding exculpatory evidence; (4) acting without probable cause, which caused him to be maliciously prosecuted; (5) failing to intervene; and (6) conspiring to deny him of his

constitutional rights.  Plaintiff also alleges a <u>Monell</u> policy/failure
to train claim against the City of Los Angeles.[1]

Defendants move for summary judgment or, in the
alternative, partial summary judgment.  <u>See generally</u> Dkts. 99
(filed by the City of Los Angeles, Officer Born, and Officer Cooley),
100 (filed by Officer East), and 111 (filed by Detective Arteaga,
Detective Cortina, Detective Motto, and Detective Pere).

## II.    LEGAL STANDARD

"A party may move for summary judgment, identifying each
claim or defense – or the part of each claim or defense – on which
summary judgment is sought.  The court shall grant summary
judgment if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(a).  "This burden is not a light
one."  <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387 (9th Cir.
2010).

A "district court is not entitled to weigh the evidence and
resolve disputed underlying factual issues."  <u>Chevron Corp. v.
Pennzoil Co.</u>, 974 F.2d 1156, 1161 (9th Cir. 1992).  Instead, the
court views the evidence in the light most favorable to the
nonmoving party.[2]  <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors
Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).  "Put another way, if a
rational trier of fact might resolve the issue in favor of the
nonmoving party, summary judgment must be denied."  <u>Id.</u> at 631.

---

[1] Plaintiff has abandoned his <u>Monell</u> claim related to alleged <u>Brady</u> violations
or based on a pattern of constitutional violations.  <u>See</u> Dkt. 138 (Opp'n) at 3
n.1.

[2] The parties submit evidence that is neither relevant nor helpful.  All parties
raise numerous objections to the evidence.  The Court does not consider any
evidence that could not be presented in admissible form at trial.

### III.    UNDISPUTED FACTS

## A. <u>The Castaneda Murder</u>

Alex Castaneda was shot and killed in the early morning hours of August 18, 2012.  Detective UF ¶ 1.[3]  Homicide Detectives Pere and Motto were notified of the incident at approximately 1:15 a.m., and were dispatched to the scene to investigate.  <u>Id.</u> ¶¶ 2, 3; Pl. Ex. 1 (Arrest Report) at 000199.  The investigation revealed a security camera on an adjacent building, which had captured one of the two suspects in the act of shooting.  <u>Id.</u> ¶ 4.

## B. <u>Officer Born and Officer Cooley Identify Plaintiff</u>

Since the shooting appeared to be gang-related, Officer Cooley—a gang enforcement officer—was asked to review the surveillance video.  Detective UF ¶ 5; Officer Ex. A (Cooley Decl.) ¶¶ 3, 6.  By chance, Officer Cooley had seen Plaintiff the day before, when Plaintiff's mother came into the station to report him missing.  Officer UF ¶¶ 2, 3; Pl. Ex. 27 (Cooley Statement Form) at 00473.  Officer Cooley was not provided with any information about the potential suspect, except that he was a potential MS-13 gang member.  Officer UF ¶ 7.  Officer Cooley reviewed the video and stated the shooter was Plaintiff.  <u>Id.</u> ¶ 8.

Because Officer Cooley had never met Plaintiff, he contacted Officer Born (a gang enforcement officer in Olympic division) to have her review the video.  <u>Id.</u> ¶ 9.  Officer Cooley believed Officer Born might know Plaintiff because she had input his Field

---

[3] Detective UF refers to Detectives' Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 111-2).  East UF refers to Officer East's Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 100-1).  Officer UF refers to the City of Los Angeles and Officers Born and Cooley's Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 99-1).  Pl. UF refers to Plaintiff's Statement of Uncontroverted Facts (Dkt. 131).

Identification cards.  Id.; Cooley Decl. ¶ 8; Pl. Ex. 33 (Tobias FI
Card) at LAPD 2327, 2328.  Plaintiff's FI Card described him as
four feet eleven inches tall with a medium build, bushy hair, and
dark framed reading glasses.  Officer UF ¶ 19.  Officer Born had
never met Plaintiff, but had previously seen a "few photos" of him,
as well as his Facebook page.  Id. ¶ 18; Pl. Ex. 30 (Born Dep. Tr.)
at 30:20-34:2.

When Officer Born arrived on scene, she was shown a still
photo of the surveillance footage, from which she identified
Plaintiff.  Officer UF ¶ 22; Officer Ex. B (Born Decl.) ¶ 9.  Officer
Born then reviewed the surveillance video and believed the
suspect to be Plaintiff.  Id.  Officer Born wrote up a statement
form identifying Plaintiff, but otherwise was not involved in his
criminal case.  UF ¶¶ 23-25; Born Decl. ¶¶ 9, 10; Officer Ex. H
(Born Statement Form).

At some point, Officer Cooley completed a statement form.
Although Officer Cooley remembers completing the form on
August 18, 2012, the statement form in Plaintiff's possession has a
date of September 14, 2012.  Compare Officer Ex. E (undated
Statement Form), with Pl. Ex. 27 (9/14/12 Statement Form).
Officer Cooley testified at Plaintiff's criminal trial with respect to
Plaintiff's alleged gang affiliation, but not to his identification on
the day of the shooting.  Officer UF ¶ 13.

## C. Officer East Identifies Plaintiff

On August 20, 2012, Detectives Motto and Arteaga visited
Plaintiff's school to see if anyone could identify him from the
surveillance video.  Id. ¶¶ 4-5.  The principal recommended Officer
East of the Los Angeles Unified School District, and Assistant
Dean Roger Negroe.  Id. ¶ 6.  Before showing him the surveillance
video, Detectives told Officer East they believed the suspect was a
current student.  Id. ¶ 9; Pl. Ex. 6 (East Transcript) at 4:16-20.

Officer East watched the video several times before identifying
Plaintiff:

> Officer East:  I have a hard time IDing that person.
>
> Detective Motto:  Okay.  No problem.
>
> Officer East:  I mean, the full head of hair is throwing
> me off a little bit.
>
> Detective Motto:  Okay.
>
> Officer East:  Unless he shaved it and he did have more
> hair last week.
>
> Detective Motto:  Who are you thinking of?
>
> Officer East:  The guy that I was thinking is a lot
> smaller in stature, though.
>
> Detective Motto:  Okay.
>
> Officer East:  It's Art Tobias.
>
> Detective Motto:  That's who we think it is.
>
> Officer East:  (Laughter.)  But, I mean, God, he's so
> much smaller in real life.

East UF ¶ 10; East Transcript at 10:14-11:5.  Officer East told
Detectives that Plaintiff had "just recently" shaved his head.  East
UF ¶ 11; East Transcript at 11:8-10.  Officer East then watched
the video again:

> Officer East:  Yeah.  The photo – The photo makes him
> look a little bit more bigger [sic] and stockier.  But from
> that photo right there . . .
>
> Detective Motto:  Let me run it all the way through
> again.  Let's see what happens, and then you can watch
> the whole thing and see him move.

Officer East:  I guess it looks very deceiving probably.

Detective Motto:  Always.

Detective Arteaga:  Yes.  What did you say was
throwing you off, the hair?

Officer East:  No.  I thought maybe he looked, like,
taller and bulkier in the camera, which could be
distorting through the mega pixels.

East Transcript at 14:16-15:3.

Officer East left the room when Negroe was interviewed.
East UF ¶ 14.  Negroe, who was not aware that Officer East had
identified Plaintiff, viewed the surveillance video but could not
identify anyone.  Id. ¶¶ 18, 19; East Transcript at 21:19-21 ("And
you said he's a Berendo student?  I can't picture anybody like that
right now."), 22:23-24 ("But if I – You know.  He's chubby, I can
tell you that.  But . . . ").  After leaving the office, however, Negroe
saw Plaintiff, whom he believed to be the individual in the video,
and informed Detectives.  East UF ¶ 20; Dkt. 100-2 (Negroe Decl.)
¶ 8.  Detectives then detained Plaintiff; East detained the student
with Plaintiff and drove him to the LAPD station.  East UF ¶ 22.
East was not involved in Plaintiff's subsequent interrogation.  Id.
¶ 23.

Detectives asked Officer East to prepare a statement, which
he did on either August 20 or 21.  Pl. Exs. 10 (East Dep. Tr.) at
69:17-70:23, 45 (Motto Dep. Tr.) at 116:20-117:14.  Officer East
stated he watched the surveillance video "several times," was
"fairly sure" the suspect was Plaintiff, and "[t]he Person in the
video had a distinct walk and stature which is similar to that of
Art Tobias."  East Ex. G (East Statement).  Negroe's statement
notes that after watching the video he "couldn't remember the
name of the student," but he was able to identify Plaintiff when he

left to go back to his office. East. Ex. D (Negroe Statement). East
declares he dropped off his and Negroe's statements on September
4, 2012, but the LAPD follow-up report states Detective Cortina
received those reports on August 24, 2012. Compare East UF ¶
32; East Decl. ¶ 16, with Pl. Ex. 71 at LAPD 2279.

After August 20, 2012, East did not speak with any
Defendant aside from Detective Cortina. East UF ¶ 29. East
testified at Plaintiff's trial as to Plaintiff's alleged truancy, but not
to his identification of Plaintiff in the surveillance video. Id. ¶ 40.

## D. Detective Arteaga Interviews Plaintiff's Mother

Either before or while Plaintiff was being questioned,
Detective Arteaga questioned Plaintiff's mother, Helen Contreras.
Detective UF ¶ 29; Pl. Exs. 16A and 16B (Contreras Transcript),
17 (Contreras Interview). Detective Arteaga showed Contreras
the still image of the suspect from the surveillance video:

> Detective Arteaga: I told you we would be looking for
> your son. Who's that (indicating)?
>
> Ms. Contreras: (Viewing Laptop.) That's not him.
> That's not what he was wearing that day when he
> came home.
>
> Detective Arteaga: No. He Changed.
>
> Ms. Contreras: He changed? But I spoke to the mom.
>
> Detective Arteaga: Look at the time. That's your son
> right there, right?
>
> Ms. Contreras: Yeah. Where was this, may I ask?
>
> Detective Arteaga: It was in the Rampart Division.
>
> Ms. Contreras: Was he doing some stuff in the street?
>
> Detective Arteaga: He was with some bad people.

Ms. Contreras:  So he wasn't with Giancarlos.

Detective Arteaga:  Is that your son?

Ms. Contreras:  I don't know.  You're telling me it is, but I have no idea.  That's not what he was wearing when he came home.

Detective Arteaga:  But it looks like him, right?

Ms. Contreras:  I don't know.  I can't even see.  I can't see it.  He doesn't – that's not his – He doesn't even have – His shoes are Adidas.  He was wearing Adidas when he came home.  He was wearing Adidas.  He was wearing a black shirt, his Levis, and Adidas.  And I know Giancarlos.  Giancarlos is a really good kid.  He would never cover up for him like that.  He wouldn't do that.

Contreras Transcript at 26:18-27:24.

### E. **Detectives Pere and Cortina Interrogate Plaintiff**

Detectives transported Plaintiff to the police station, where he was placed in an interrogation room and handcuffed to a chair for more than an hour.  Pl. UF ¶ 127.  Plaintiff was questioned by Detectives Pere and Cortina, while Detectives Motto and Arteaga watched the interrogation via a monitor in another room.  Id. ¶ 131; Pl. Ex. 14 (Trial Transcript) at 77:25-28.

The entirety of Plaintiff's interrogation was recorded on video.  Detectives UF ¶ 24; Pl. Ex. 13 (Interrogation Transcript).  Detectives began the interrogation by asking Plaintiff background questions, such as his age, name, and address.  Interrogation Transcript at 3:13-8:13.  Detectives asked Plaintiff about his gang relationships and whether he knew right from wrong.  Id. at 9:12-20:18.

Detectives provided Plaintiff with the <u>Miranda</u> admonition
before questioning him about the murder.  Detective UF ¶ 27;
Interrogation Transcript at 21:20-22:9.  Detective Pere told
Plaintiff his day "went from bad to worse" because a friend "rolled
on him," i.e., implicated him in the crime.  Interrogation
Transcript at 23:1-26-9.  Detectives showed Plaintiff the
surveillance video and accused Plaintiff of being the shooter,
which he repeatedly denied.  <u>Id.</u> at 26:9-30:23.  Eventually,
Plaintiff stated, "Could I have an attorney?  Because that's not
me," to which Detective Pere replied, "But – okay.  No, don't
worry.  You'll have the opportunity;" Detective Cortina then
immediately asked another question.  <u>Id.</u> at 31:4-9

After repeated denials, Plaintiff asked to speak with his
mother.  <u>Id.</u> at 35:6.  Detective Pere said she was at the station,
then the Detectives left the room.  <u>Id.</u> at 35:6-14.

## F. **Detective Arteaga Interrogates Plaintiff**

A few minutes later, Detective Arteaga entered and told
Plaintiff he just spoke to his mother and she was "crying her eyes
off."  <u>Id.</u> at 35:19-22.  Detective Arteaga also told Plaintiff that,
among other things:  his mother and Officer East identified him
from the surveillance video, lying made him look like a "cold
blooded killer," and by lying Plaintiff would drag his family into
the situation.  <u>Id.</u> at 36:2-6, 38:9-39:12.  After Plaintiff continued
to deny any involvement, Detective Arteaga said:

> So listen, I'm done with your bullshit, okay?  I've been
> doing this for too damn long, okay? . . .  But you know
> what?  You're full of shit.  And when this case is
> presented to a district attorney's office they're going to
> see you're a cold blooded killer.  I don't know what they
> can do with you now.  They're going – they're going to
> see that you're a gangster who lies, who kills people,

> who has no compassion, who fucking doesn't give a shit.

Id. at 49:6-18.  Plaintiff again asked to speak with his mother, to which Detective Arteaga repeated that she had identified him in the video along with Officer East, Negroe, and an unknown individual.  Id. at 52:18-55:14.  Detective Arteaga told Plaintiff if he continued to lie, the court would "throw the book at [him]," but if he told the truth, a judge would probably give him a lighter sentence.  Id. at 55:1-57:23, 62:13-63:10.

Eventually, Plaintiff said he killed Castaneda.  Id. at 63:16-86:14.  At that point, Detectives allowed Plaintiff to speak with his mother.  Plaintiff told his mother he falsely confessed because otherwise, Detectives would tell the judge he was a cold-blooded killer and would get more time.  Id. at 88:19-89:24.

## G. Criminal Prosecution and Appeal

After Plaintiff confessed, Detective Cortina filled out a Probable Cause Determination form, which was reviewed by Detective Motto.  Pl. UF ¶ 184, Ex. 54 (Probable Cause Form).  In support of probable cause, Detective Cortina wrote that "Officers identified one of the shooters as being Art Tobias," and that Plaintiff "confessed to the shooting."  Id.  On August 22, 2012, Detective Cortina presented the criminal investigation file to the intake District Attorney; charges were filed immediately thereafter.  Detective UF ¶ 47.

Plaintiff was convicted of first-degree murder and two counts of attempted murder.  Id. ¶ 52.  On February 11, 2015, the California Court of Appeal, Second Appellate District, overturned Plaintiff's conviction and ordered a new trial.  Pl. UF ¶ 214; Ex. 43 (Art T Decision).  Plaintiff was not re-tried.  Pl. UF ¶ 214.

## H. LAPD's Policies and Practices

LAPD's Juvenile Division is responsible for providing Department-wide training on issues related to juvenile policies and procedures. Officer UF ¶ 28. LAPD also maintains the Manual of Juvenile Procedures (Juvenile Manual), which contains policies and procedures relating to juveniles that officers are required to follow. Id. ¶ 29, Dkt. 99.2, Ex. C (Castillo Decl.) ¶ 5. Chapter 7 of the Juvenile Manual pertains to juvenile arrests, including the admonition of rights, requests for attorney services, Gladys R. statements, and notification of parents. Officer UF ¶ 30; Castillo Decl. ¶ 6; Officer Ex. L.

Detectives conducting homicide investigations are required to follow the Department Manual, the Detective's Operation Manual, the Homicide Manual, and the Juvenile Manual. Officer UF ¶ 44. All LAPD officers and detectives are trained to turn over any and all exculpatory evidence during criminal investigations; homicide detectives receive additional discovery instruction. Id. ¶¶ 45, 46; Jenks Decl. ¶ 8. It is also LAPD policy to hand over everything contained within the Murder Book to the District Attorney, who then provides it to defense attorneys. Officer UF ¶ 49; Jenks Decl. ¶ 13.

LAPD Policy 202.10 lays out its procedures for conducting a custodial interrogation. Officer UF ¶ 51. It is against LAPD policy to fabricate evidence or file false police reports. Id. ¶ 56.

## IV.    DISCUSSION

## A. Coercive Interrogation (First Count)

Plaintiff's First Count alleges Detectives continued to question him after he requested an attorney and used coercive interrogation tactics to elicit a confession that was used against him in a criminal proceeding. SAC ¶¶ 166-72.

A coercive confession violates due process rights under the Fifth and Fourteenth Amendments of the Constitution.  <u>See Crowe v. Cty. of San Diego</u>, 608 F.3d 406, 427, 446 (9th Cir. 2010); <u>Stoot v. City of Everett</u>, 582 F.3d 910, 922-23 (9th Cir. 2009). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is [actionable] under 42 U.S.C. § 1983." <u>Tekoh v. Cty. of Los Angeles</u>, 270 F. Supp. 3d 1163, 1176 (C.D. Cal. 2017) (quoting <u>Ricciuti v. New York City</u>, 124 F.3d 123, 130 (2d Cir. 1997)).  "[U]nder the Fourteenth Amendment, an interrogation is coercive only when, in light of the totality of the circumstances, an officer's tactics are so extreme as to undermine a suspect's ability to exercise free will." <u>Id.</u> (citing <u>Cunningham v. City of Wenatchee</u>, 345 F.3d 802, 810 (9th Cir. 2003)).

After careful review of the video and transcript of Plaintiff's interrogation, the Court concludes Detectives Pere, Cortina, and Arteaga's motion for summary judgment as to this claim must be denied.  The video shows that Plaintiff—who was only thirteen years old at the time—was subjected to an interrogation in which he was sworn at, lied to, repeatedly pressured, told his mother was uncontrollably crying and had identified him as the shooter, repeatedly called a "cold-blooded killer," had his request for counsel ignored (and implicitly denied), and was told that if he didn't confess the judge would give him a longer sentence. Viewing these facts in the light most favorable to Plaintiff, a rational trier of fact could decide that Plaintiff's interrogation violated his Fifth and Fourteenth Amendment rights.

Summary judgment is granted as to Detective Motto, however, because there is no evidence he participated in the

interrogation beyond dropping off a document and watching it
from another room.

## B. Coercive Interrogation - Substantive Due Process (Second Count)

Plaintiff's Second Count alleges Detectives employed
interrogation tactics that "shock[ed] the conscience," which caused
Plaintiff to make false and involuntary statements implicating
himself in the murder.  SAC ¶¶ 173-78.

"The standard for showing a Fourteenth Amendment
substantive due process violation . . . is quite demanding."  Stoot,
582 F.3d at 928.  "[O]nly the most egregious official conduct can be
said to be 'arbitrary in the constitutional sense' and therefore a
violation of substantive due process."  Id. (quoting Cty. of
Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).  "More
specifically, a Fourteenth Amendment claim of this type is
cognizable only if the alleged abuse of power 'shocks the
conscience' and 'violates the decencies of civilized conduct.'"  Id.
(quoting Lewis, 523 U.S. at 846).

It a close call whether a reasonable juror could resolve this
issue in favor of Plaintiff.  On this question, the Court is guided by
three Ninth Circuit cases.

In Cooper v. Dupnik, 963 F.2d 1220 (9th Cir. 1992) (en banc),
the Ninth Circuit held that police violated a suspect's substantive
due process rights when they "ignored [his] repeated requests to
speak with an attorney, deliberately infringed on his
Constitutional right to remain silent, and relentlessly interrogated
him in an attempt to extract a confession."  Id. at 1223.  The court
described the officers' techniques as "sophisticated psychological
torture" designed to "extract a confession" after "hours of
mistreatment," the "twentieth-century inquisitorial version of the
Star Chamber."  Id. at 1248.  "The primary aggravating

circumstance" was the officers' "purpose of making it difficult, if
not impossible" for the suspect to take the stand in his own
defense. Id. at 1249.

In Stoot, the 14-year-old plaintiff alleged he was subjected to
"improper promises and threats" and that because he was a
"developmentally delayed young boy, he could not fully and
accurately comprehend if [the] promises were reasonable, or make
an accurate assessment of the potential outcomes in the same
manner as an adult." 582 F.3d at 928-29. The Ninth Circuit
found those allegations to fall "far below what is required to state
a claim under the Fourteenth Amendment." Id. at 929.
"Noticeably lacking, for example, [was] any allegation that [the
officer] 'intended to injure [the juvenile] in some way unjustifiable
by any government interest,' as required by precedent." Id.

In Crowe, a 14 and 15-year-old were subjected to "hours and
hours of interrogation during which they were cajoled, threatened,
lied to, and relentlessly pressured by teams of police officers." 608
F.3d at 433. Noting that the constitutionality of interrogation
techniques is judged "by a higher standard when police
interrogate a minor," the court found "[t]he interrogations violated
[their] Fourteenth Amendment rights to substantive due process."
Id. The court also rejected defendants' claim of qualified
immunity because it was well established that interrogations of
minors be conducted with "the greatest care." Id. (citing In re
Gault, 387 U.S. 1, 55 (1967)).

Plaintiff's interrogation does not fall clearly within any of
these cases. At thirteen, Plaintiff is the youngest, and
experienced some of the interrogation tactics used in Cooper and
Crowe. On the other hand, Plaintiff's interrogation lacked some of
the extreme conduct found in those cases. See, e.g., id. at 431-32
(describing the interrogations as "brutal and inhumane,"
"psychological torture," and an "extreme form of child abuse");

Cooper, 963 F.2d at 1248 (describing Cooper's mistreatment as "sophisticated psychological torture").

The Court therefore declines to find Plaintiff's claim fails as a matter of law.  See T.W. Elec. Serv., Inc., 809 F.2d at 631 (summary judgment must be denied "if a rational trier of fact might resolve the issue in favor of the nonmoving party"). Summary judgment is denied as to Detectives Pere, Cortina, and Arteaga.  Summary judgment is granted as to Detective Motto because of his limited involvement in Plaintiff's interrogation.

## C. Falsification and Withholding of Evidence (Third Count)

Plaintiff's Third Count alleges Defendants fabricated evidence and deliberately withheld exculpatory evidence.  SAC ¶¶ 179-85.

### 1. Applicable Law

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc).  A plaintiff can prove deliberate fabrication with either direct evidence of deliberate fabrication or circumstantial evidence related to a defendant's motive.  Id. at 1075-76.  Direct evidence of fabrication includes false statements in police reports and declarations, such as reports that "contain[] evidence or statements" that were "never made."  Costanich v. Dept. of Social and Health Servs., 627 F.3d 1101, 1112 (9th Cir. 2010).

To prove a fabrication claim using circumstantial evidence, a plaintiff must demonstrate that:  (1) investigators continued their investigation "despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that

they knew or should have known those techniques would yield false information." <u>Devereaux</u>, 263 F.3d at 1076. In this regard, evidence of negligent inaccuracy on the part of investigators alone is insufficient to prove a fabrication of evidence claim, <u>see id.</u> at 1077; but investigators "who maliciously or recklessly make[ ] false reports . . . may be . . . liable for damages incurred as a proximate result of those reports," <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 482 (9th Cir. 2007).

<u>Brady v. Maryland</u>, 373 U.S. 83 (1963) requires both prosecutors and police investigators to disclose exculpatory evidence to criminal defendants. <u>See</u> <u>Tennison v. City & Cty. of San Francisco</u>, 570 F.3d 1078, 1087 (9th Cir. 2009) (allowing § 1983 claim against police inspector for <u>Brady</u> violation). To state a claim under <u>Brady</u>, the plaintiff must allege that (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

## 2. Direct Evidence of Fabrication

Plaintiff relies on direct evidence of fabrication with respect to Officers East, Cooley, and Born, and Detectives Pere and Motto.

While watching the surveillance video, Officer East told Detectives that he had a hard time identifying anyone; he eventually identified Plaintiff and said he was "so much smaller in real life." Yet Officer East's written statement says he was "fairly sure" the suspect was Plaintiff because the individual had a distinct walk and stature similar to Plaintiff, facts not mentioned in his recorded conversation with Detectives. Plaintiff also disputes when Officer East dropped off his and Negroe's

statements and whether Officer East's written statement was influenced by his conversations with Detective Cortina. [4]

For Officers Cooley and Born, Plaintiff argues their identifications were "utter nonsense" and "wholly fabricated" because (1) the surveillance video is grainy and low quality, and (2) neither had ever met Plaintiff; Officer Cooley had seen only one picture of Plaintiff the night before, and Officer Born had seen only a "few photos" at some unknown time prior. Plaintiff also notes small inconsistencies between their written statements.

With respect to Detectives Pere and Motto, Plaintiff argues that the witness identifications as reported by the patrol officers who initially responded to the scene described someone older, taller, and heavier than Plaintiff, but the Preliminary Investigation Report (which Detective Pere created and Detective Motto approved) listed the suspect's description as "Med complexion, small build, wearing prescription lenses." Compare Pl. Ex. 47 at LAPD 2169, with id. at LAPD 2170-71.

Plaintiff argues these inconsistencies and omissions were deliberate; Defendants contend otherwise. Is it readily apparent that Plaintiff's version conflicts with Defendants' version of these events. Summary judgment is not appropriate. See Costanich, 627 F.3d at 1113 ("The district court's description of the errors in the investigation as 'recording errors and misstatements' is untenable in light of the principle that, on summary judgment, we

---

[4] Officer East maintains any Section 1983 claims against him fail because his conduct was not the proximate cause of Plaintiff's injury. But this is simply another disputed issue of fact for the jury. See Caldwell v. City and Cty. of San Francisco, 889 F.3d 1105, 1115 (9th Cir. 2018) (citing NINTH CIR. JURY INSTR. COMM., MANUAL OF MODEL CIVIL JURY INSTRUCTIONS, § 9.33 (2017) ("The defendant [name] deliberately fabricated evidence that was used to [[criminally charge] [prosecute] [convict]] the plaintiff.")).

must draw all factual inferences in favor of the nonmoving
party.").

### 3. Circumstantial Evidence of Fabrication

Plaintiff argues a reasonable juror could find for Plaintiff on
both <u>Devereaux</u> prongs because Detectives (1) knew or should
have known Plaintiff was innocent and (2) used investigative
techniques that were so coercive and abusive that they knew or
should have known they would yield false information.  Mot. at
45-46.

With respect to the first prong, it is unclear whether
"constructive knowledge of innocence is implied merely by the act
of fabricating evidence."  <u>See</u> <u>Spencer v. Peters</u>, No. C11-5424-
BHS, 2014 WL 2208940, at *5 (W.D. Wash. May 28, 2014).  In any
event, Plaintiff alleges that beyond fabricating evidence,
Detectives ignored (or chose not to pursue) evidence of Plaintiff's
innocence.  For the second prong, the Court has already concluded
Plaintiff has presented a triable issue that he experienced a
coercive interrogation.  Because a dispute of material fact exists,
summary judgment as to Plaintiff's <u>Devereaux</u> claims is denied.

### 4. <u>Brady</u> Claim

Plaintiff alleges the "Murder Book" (which LAPD uses to
document homicide investigations) produced to Plaintiff's criminal
defense attorney omitted more than 300 pages, including the
chronology of the investigation, Detective Cortina's notes, and
information related to Eric Martinez, who was eventually found in
possession of the gun that killed Castaneda.  Pl. UF ¶¶ 186-212;
<u>Compare</u> Pl. Exs. 62 (Defense Attorney Murder Book), <u>with</u> 64
(LAPD Murder Book); Pl. Ex. 70 (Albin Decl.) ¶¶ 1-6.  Detectives
contend they turned most everything over to Plaintiff, including
files referencing Martinez.  Clearly, there is a material dispute as
to whether Detectives suppressed exculpatory evidence, the

withholding of which prejudiced Plaintiff. Summary judgment is not appropriate.

## D. Malicious Prosecution (Fourth Claim)

Plaintiff's Fourth Count alleges Defendants caused him to be subjected to judicial proceedings for which there was no probable cause. SAC ¶¶ 186-192.

"A criminal defendant may maintain a malicious prosecution claim not only against prosecutors but also against others—including police officers and investigators—who wrongfully caused his prosecution." Smith v. Almada, 640 F.3d 931, 938 (9th Cir. 2011). To assert a malicious prosecution claim, a plaintiff must show that "the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her [a] specific constitutional right." Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995); see also Lassiter v. City of Bremerton, 556 F.3d 1049, 1054-55 (9th Cir.2009) ("[P]robable cause is an absolute defense to malicious prosecution.").

Defendants contend there was probable cause to arrest Plaintiff. "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) (citation omitted). "[M]ere suspicion, common rumor, or even strong reason to suspect are not enough." Id. (citation omitted). To defeat summary judgment, then, Plaintiff must identify evidence that would be sufficient to permit a reasonable jury to find that, at the time of his arrest, Defendants lacked "reasonably trustworthy information" supporting a "fair probability" that Plaintiff had committed the murder. Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004).

Whether Detectives had enough evidence to establish probable cause depends on the aforementioned events. Because the facts are hotly contested, summary judgment is denied.

Detectives rely on Ninth Circuit law holding that "[f]iling of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." Smiddy v. Varney, 665 F.2d 261, 266 (9th Cir. 1981). To defeat the presumption, a plaintiff must do more than offer his or her own conflicting account of the incident, but must show that the prosecutor was subjected to unreasonable pressure by the investigating officer, that officers knowingly withheld relevant information with the intent to harm the plaintiff, or that officers knowingly supplied false information. See Newman v. Cty. of Orange, 457 F.3d 991, 994-95 (9th Cir. 2006). Because Plaintiff has offered evidence that Defendants knowingly withheld evidence and knowingly fabricated evidence, he has demonstrated a genuine issue of material fact as to whether the prosecutor exercised independent judgment. Summary judgment is denied.

## E. Failure to Intervene (Fifth Count)

Plaintiff's Fifth Count alleges Defendants "stood by" without intervening to prevent the violation of Plaintiff's rights. SAC ¶¶ 193-96.

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen." Cunningham, 229 F.3d at 1289. "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." United States v. Koon, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994) rev'd in part on other grounds, 518 U.S. 81 (1996). However, the officer

must have a "realistic opportunity" to intercede. See Cunningham, 229 F.3d at 1289 (finding officers who were at the scene but did not shoot were not liable for Section 1983 violation).

Because Plaintiff's constitutional claims survive, a reasonable juror could conclude that Defendants passively participated in the constitutional deprivations that allegedly led to Plaintiff's conviction. Summary judgment is denied.

## F. Conspiracy (Sixth Count)

Plaintiff's Sixth Count alleges Defendants acted in concert to deprive Plaintiff of his rights. SAC ¶¶ 197-203.

"To establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional rights." Crowe, 608 F.3d at 440 (quoting Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283, 1301 (9th Cir. 1999)). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." Id. (citation omitted). To be liable each participant "must at least share the common objective of the conspiracy." Id. (citation omitted).

Plaintiff contends the record is "full of evidence" of an agreement or meeting of the minds among Defendants, starting with Officers Born and Cooley's shaky identifications, Detectives pressuring Officer East to make a false identification, Detectives' coercive interrogation, and several fabricated written reports. Defendants, of course, deny all of this. Given these disputed facts, summary judgment is not appropriate because there is "a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives." Mendocino Envtl. Ctr., 192 F.3d at 1301-02 (citation omitted).

## G. Municipal Liability (Seventh Count)

Plaintiff's Seventh Count alleges a Monell claim on three theories related to juvenile interrogations:  (1) the City's policies and practices are unconstitutional because detectives need not differentiate between juveniles and adults; (2) the City failed to adopt adequate procedural safeguards to ensure the interrogation of juveniles reflects the "special concern" the Constitution demands; and (3) the City has failed to adequately train its officers in conducting juvenile interrogations.  Mot. at 32-36.

Under Monell v. Dept. of Soc. Serv. of N.Y., 436 U.S. 658 (1978), a government entity may in certain circumstances be held liable for the unconstitutional conduct of its officers.  "Showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity is one way to establish municipal liability." Ulrich v. City & Cty. of San Francisco, 308 F.3d 968, 984-85 (9th Cir. 2002) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)) (internal quotation marks omitted); see also Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (the custom must be "so persistent and wide-spread that it constitutes a permanent and well settled city policy.").  Monell liability also may attach where a municipality fails to train its officers and it is clear that such failure to train will lead to constitutional violations.  Clement v. Gomez, 298 F.3d 898, 905 (9th Cir. 2002) (citing Cty. of Canton v. Harris, 489 U.S. 378, 389 (1989)).

Plaintiff has provided sufficient evidence to withstand summary judgment on the issue of municipal liability.  Plaintiff notes that although the City has Juvenile-specific manuals, those manuals do not instruct officers that interrogations should be conducted differently than when the suspect is an adult.  Instead, according to Plaintiff, LAPD's policy and practice is to use the same "confrontation techniques" used in adult interrogations, on

juveniles.  Plaintiff also notes that even if the LAPD has adequate policies and procedures concerning <u>Miranda</u>, it lacks rules and guidelines for what happens post-<u>Miranda</u> with respect to juveniles.  Plaintiff also argues Detectives were trained to treat him like an adult, as is evident from his interrogation.  This evidence demonstrates that there is a genuine issue of material fact regarding the City's liability.

## H. Qualified Immunity

Defendants argue they are entitled to qualified immunity as a matter of law.  "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time."  <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 589 (2018).

Defendant "bears the burden of proof on the issue of qualified immunity" and so "must produce sufficient evidence to require the plaintiff to go beyond his or her pleadings."  <u>Moreno v. Baca</u>, 431 F.3d 633, 638 (9th Cir. 2005).  On summary judgment, the "defendant's burden is to demonstrate the absence of a genuine issue of material fact."  <u>Id.</u>  Defendants offer insufficient evidence to meet this burden.  As explained, genuine disputes of material fact remain with respect to the constitutional claims against Defendants, and those rights in the context of this case are so well established that law enforcement officers must be deemed to have knowledge of them.  Defendants fail to establish their entitlement to qualified immunity is "beyond controversy."

## V.   CONCLUSION

Officer East's motion for summary judgment is DENIED in its entirety.  Officer Born, Officer Cooley, and the City of Los Angeles's motion for summary judgment is DENIED in its entirety.  Detectives Pere, Cortina, Arteaga, and Motto's motion

for summary judgment is DENIED, except with respect to the
interrogation claims against Detective Motto.

    IT IS SO ORDERED.


Date: September 17, 2018

                              Dale S. Fischer
                              United States District Judge