1  David B. Owens, Cal. Bar No. 275030
   david@loevy.com
2  Anand Swaminathan*
   *Attorney for Plaintiff, Art Tobias*
3  LOEVY & LOEVY
   311 N. Aberdeen Street, 3rd Floor
4  Chicago, Illinois 60607
   (312) 243-5900
5  *admitted pro hac vice

6

7  Charles Snyder
   csnyder@kbkfirm.com
8  KENDALL BRILL KELLY
   10100 Santa Monica Boulevard, Suite 1725
   Los Angeles, California 90067
9  (310) 556-2700

10

11        IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF CALIFORNIA
12

13 ART TOBIAS,                    ) Case No. 2:17-cv-1076-DSF-AS
                                  )
14          Plaintiff,            ) **PLAINTIFF'S RESPONSE IN**
       v.                         ) **OPPOSITION TO DEFENDANTS'**
15                                ) **MOTION *IN LIMINE* (#1) TO**
   CITY OF LOS ANGELES, et al.    ) **EXCLUDE EXPERT TESTIMONY**
16                                )
            Defendants.           ) Date:          October 29, 2018
17                                ) (Final Pretrial Conference)
                                  ) Time:          3:00 p.m.
18                                ) Courtroom:     7D
                                  ) Judge:         Hon. Dale S.
19                                )                Fischer
                                  )
20

                                  i
Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

Introduction ...................................................................................... 1

I.   Legal Standard .......................................................................... 2

II.  Dr. Richard Leo's Testimony Concerning the Psychology of False
     Confessions Should be Admitted ............................................. 3

     A. Dr. Leo is Amply Qualified ................................................ 5

     B. Dr. Leo's Testimony Will Assist the Jury ......................... 9

     C. Dr. Leo's Methods are Reliable ........................................ 13

        1.  The Study of False Confessions is a Reliable And Established
            Area of Study in the Social Sciences ............................ 13

        2.  Dr. Leo's Work is Reliable Science under Rule 702 ........ 16

        3.  Defendants' Objections Fail ........................................... 18

III. Police Practices Testimony Is Relevant And Admissible ........... 20

IV.  Dr. Marcy is a Properly Disclosed Rebuttal Expert .................. 23

CONCLUSION ................................................................................ 25

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

# TABLE OF AUTHORITIES

*Atencio v. Arpaio,* 2015 WL 11117187 (D. Ariz. Jan. 15, 2015) ........................ 14

*Caine v. Burge*, 2013 WL 1966381 (N.D. Ill. May 10, 2013)...................... *passim*

*Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860 (8th Cir. 2004) ......... 3

*Corley v. United States,* 556 U.S. 303 (2009).......................................... 7

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998) .......................... 22

*Crowe v. San Diego*, 608 F.3d 406 (9th Cir. 2010) ................................. 11

*Crow Tribe of Indians v. Racicot*, 87 F.3d 1039 (9th Cir. 1996) ....................... 21

*Davis v. Mason County*, 927 F.2d 1473 (9th Cir. 1991)............................. 22-23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... *passim*

*Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189 (N.D. Cal. 2004) .............................. 14

*Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998 (9th Cir. 2004).... 3

*Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012) ...................................... 7

*Harris v. City of Chicago*, 2017 WL 2436316
(N.D. Ill. June 6, 2017) ....................................................................... 15

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ................................ 22

*Johnson v. Hawe*, 388 F.3d 676 (9th Cir. 2004) ...................................... 7

*Kluppleberg v. Burge,* 2016 WL 6821138
(N.D. Ill. Sept. 16, 2016) ................................................................. 15-16

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).................................. 14, 20

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ................................ 22

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

*Livers v. Schenck*, 2013 WL 5676881 (D. Neb. Oct 18, 2013) ...................... 12, 17

*Lumbers v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010) ............................ 10

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ................................ passim

*Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989) ............................ 14

*Reed v. Lieurance*, 863 F.3d 1196 (9th Cir. 2017) .......................... 21,23

*Scott v. City of Chicago*, 2010 WL 3034254 (N.D. Ill. Aug. 3, 2010) ................ 16

*Sille v. Parball Corp.*, 2011 WL 2710102 (D. Nev. July 12, 2011) .................... 14

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) ........................... 22

*Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008) ........................... 20

*Tyus v. Urban Search Mgmt.,* 102 F.3d 256 (7th Cir. 1997)................................ 11

*United States v. Deuman*, 892 F.Supp. 2d 881 (W.D. Mich. 2012) ...................... 9

*United States v. Finley,* 301 F.3d 1000 (9th Cir. 2002)............................ 12

*United States v. Hall,* 93 F. 3d 1337 (7th Cir. 1996)................................ 11, 17

*United States v. Hall*, 974 F. Supp. 1198 (C.D. Ill. 1997)...................... 16

*United States v. Hayat*, 2017 WL 6728639 (E.D. Cal. Dec. 27, 2017) ........... 12, 16

*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)........................ 7

*United States v. Rahm,* 993 F.2d 1405 (9th Cir. 1993) ...................... 15

*United States v. Redlightening*, 624 F.3d 1090 (9th Cir. 2010) ...................... 8, 9

*United States v. Vallejo,* 237 F.3d 1008 (9th Cir. 2001) ...................... 12

*United States v. Whittle*, 2016 WL 4433685 (August 18, 2016).................... 11, 16

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

# STATUTES, RULES & OTHER AUTHORITIES

FED. R. EVID. 702 .......................................................................... *passim*

NINTH CIR. MODEL INSTRUCTION NO. 5.5 .......................................................... 21

Danielle E. Chojnacki et al., *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 AZ. S. L.J. 1 (2008) .................................... 13

Mark Costanzo et al., *Juror Beliefs About Police Interrogations, False Confessions, and Expert Testimony*,
7 J. EMPIRICAL LEGAL STUDS. 231 (2010) ............................................................ 12

Richard A. Leo & Brittany Liu, *What Do Potential Jurors Know About Police Interrogation Techniques & False Confessions*?, 27 BEHAV. SCIS. & L. 381-99 (2009) ................................................................................... 13

Saul Kassin et al., *I'd Know a False Confession If I Saw One: A Comparative Study of College Students and Police Investigators*, 29 L. & HUM. BEHV. 211 (2005) ............................................................................. 12-13

Saul Kassin, *Expert Testimony on the Psychology of Confessions: A Pyramid Model of the Relevant Science* 210-212, *in* BEYOND COMMON SENSE: PSYCHOLOGICAL SCIENCE IN THE COURTROOM
(Borgida & Fiske eds., 2008) ......................................................... 12, 15

**Introduction**

Defendants' challenges to Plaintiff's experts all fail. The main argument, concerning a small portion of Dr. Richard Leo's proposed testimony, rests upon a fundamental misunderstanding of Rule 702 and the manner in which social science testimony is relevant, reliable, and helpful to the jury. Indeed, Dr. Leo has testified literally hundreds and hundreds of times as an expert on the psychology of false confessions—something highly counter-intuitive to the average juror.  In addition, Dr. Richard Leo is an expert on established police standards and practices in the field of interrogations and has likewise offered relevant and reliable testimony about interrogation practices in training.

In a similar vein, longtime LAPD police officer and qualified expert, Timothy T. Williams, Jr., has offered reliable and helpful opinion testimony concerning police practices and procedures relevant to Defendants' conduct in prosecuting Plaintiff for the Castaneda homicide. Defendants have ignored completely the wealth of caselaw establishing the admissibility of this sort of testimony in civil rights actions like this one.

Finally, Plaintiff does not believe this trial should include any psychological treatment testimony, see Plaintiffs motion in limine No. 2, Dkt. 191, at 18-19. However, should Defendants' expert be permitted to testify that Plaintiff's trauma from being wrongfully convicted is truncated or limited, Plaintiff's rebuttal expert,

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

Dr. Stephanie Marcy, should be permitted to respond to this testimony and express her conclusion that Plaintiff has full-blown post-traumatic stress disorder as a result of being wrongfully incarcerated in a violent environment throughout puberty and for years as a teenager. The motion should be denied.

## I. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It requires that an expert witness may offer opinion testimony that would help a jury understand the case if there is a sufficient basis for the opinion. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; *and*
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. While the proponent of expert testimony bears the burden of proving its admissibility for each component of Rule 702, the Court's focus is not on the conclusions reached but the methodology involved in getting to those conclusions. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993).

2

Under Rule 702, "the rejection of expert testimony is the exception rather than the rule," FRE 702 (Advisory Note, 2000 amends.), and the Rule's inquiry is a "flexible one" focusing on an expert's principles and methodology, not her conclusions. *Daubert*, 509 U.S. at 594-95. Factual questions about an expert's opinions are for the jury because they go to weight of testimony—the credibility of the expert—not admissibility. *See Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1017 (9th Cir. 2004)*, quoting *Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004)* ("The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination"). Thus, rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

## II.   Dr. Richard Leo's Testimony Concerning the Psychology of False Confessions Should be Admitted

As an initial matter, it is worthwhile to lay out what Dr. Leo is opining about and what he is not. He is not opining on the ultimate issue of whether Plaintiff's confession was, in fact, false or coerced. That is for the jury to decide. Dr. Leo is offering opinions to assist the jury in making that assessment. In particular, based on his extensive research on the topic, he will explain the general phenomenon of

3

false confessions and why they occur, and will identify factors that are known to increase the risk of a false confession. Armed with that information, a jury can assess whether it believes, for example, which of those factors may have had some impact here, and ultimately whether they believe Plaintiff's confession was false or coerced.

When properly understood, it is plain that Dr. Leo's opinions easily satisfy the liberal standard for admission of expert testimony. The field of social psychology as it relates to interrogations and false confessions is legitimately amenable to scientific and empirical study, and Dr. Leo has been at the forefront of that inquiry for nearly twenty years.  He has designed and conducted studies and has frequently been cited by other professionals in his field.  There is no serious doubt that Dr. Leo is qualified to share his specialized knowledge. Nor is there legitimate dispute that Dr. Leo's specialized knowledge would assist the jury. Indeed, the testimony proposed here is at the most useful end of the spectrum because it involves a subject matter for which lay people believe they can rely on their common sense (*e.g.*, "I would never confess to a crime I did not commit, and therefore look dubiously on claims that someone did") when in fact that "common sense" is consistently contradicted by scientific study of the phenomenon.  Federal courts have long been and are increasingly receptive to expert testimony on the failure of that kind of "conventional wisdom."

4

In urging this Court to depart from that view, Defendants cite to distinguishable or unpersuasive cases representing a minority position.  The fact is, Dr. Leo has been permitted to testify in literally hundreds of courtrooms on the very sorts of opinions he offers here, and has been successfully excluded in a very small proportion of those cases—and even then usually for reasons like relevance in that particular case, not methodology. Courts that have barred this sort of testimony (an increasingly small percentage) have focused, as do Defendants here, on the wrong questions.  Defendants' focus on frequency rates and the like might make more sense if the subject matter was something like the tensile strength of steel, but fail to demonstrate that Dr. Leo has committed any scientific error from the perspective of social science.  At most, Defendants identify criticisms possibly appropriate for cross-examination, but none that justify total exclusion.

## A. Dr. Leo is Amply Qualified

Dr. Leo's credentials as a social scientist and an expert in the area of police interrogation and the phenomenon of false confessions are beyond dispute. With a Ph. D. in Social Policy (specializing in Criminology and Social Psychology) from the University of California, Berkeley, an M.A. in Sociology from the University of Chicago, and an A.B. in Sociology from Berkeley, Dr. Leo is both a Professor and Dean's Circle Research Scholar at the University of San Francisco, and a Fellow at the Institute for Legal Research Criminal Justice Studies Program at

Berkeley. Richard Leo CV, Ex. 1, at 1-2. Before that, Dr. Leo served as an Associate Professor at the University of California, Irvine, and an Assistant Professor at the University of Colorado, Boulder. *Id.*

Through nearly two decades of work on interrogation methods and false confessions, Dr. Leo is not only a respected member of the scientific community but a leading expert in his field. Last year, Dr. Leo was awarded a Distinguished Scholar Award from the American Society of Criminology, Division of Policing. *Id.* at 2. He was awarded a Lifetime Achievement Award from the Society for the Study of Social Problems in 2014; a Guggenheim Fellowship in 2011 from the John Simon Guggenheim Memorial Foundation; and a Career Achievement Award in 2000 from the American Psychology-Law Society and the American Academy of Forensic Psychology. *Id.* at 2-3. Dr. Leo obtained these awards and others, *id.* at 2-3, because his scholarly work has been prolific and highly-regarded. Dr. Leo literally wrote *the* book on police interrogation in the United States, Richard Leo, *Police Interrogation and American Justice* (2008), and has written seven books in the field of interrogations, *Miranda* and false confessions. Ex. 1, at 5-6. *See, e.g.*, *Confessions of Guilt: From Torture to* Miranda *& Beyond* (2012). Indeed, Dr. Leo's publications—dozens of which have been peer reviewed and subsequently cited by other scholars conducting research on false confessions—are too numerous to list here. *See id.* at 4-19 (listing dozens and dozens of publications).

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

Given his high regard in the field of interrogation and false confessions, Dr. Leo has served as a peer-reviewer for nearly 40 different journals (often for several terms) and more than 15 different book publishers. *Id.* at 55-56.[1]

Dr. Leo is one of the most cited researchers in his specialty, and has been cited favorably by many appellate courts, including the Supreme Court. *Id.* at 19-27; *see, e.g.*, *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 321 (2009) ("'[C]ustodial police interrogation, by its very nature, isolates and pressures the individual,' and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed, see, *e.g.,* Drizin & Leo, *The Problem of False Confessions in the Post–DNA World,* 82 N.C.L.Rev. 891, 906-907 (2004).") (internal citation omitted); *United States v. Preston*, 751 F.3d 1008, 1027 (9th Cir. 2014) ("Under interrogation, [arrestees] are not likely to understand that the police detective who appears to be friendly is really their adversary or to comprehend the long-term consequences of making an incriminating statement. Jon B. Gould & Richard A. Leo, *One Hundred Years Later: Wrongful Convictions After a Century of Research,* 100 J.Crim. L. & Criminology 825, 847 n.119 (2010)."); *Harris v. Thompson*, 698 F.3d 609, 632 n.12 (7th Cir. 2012) (*See generally* Richard A.

---

[1] Dr. Leo is also a member of the American Law Institute and many other professional organizations, like the American Psychological Association and Association for Psychological Science. *Id.* at 42.

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

Leo, *False Confessions: Causes, Consequences, & Implications,* 37 J. AM. ACAD. PSYCHIATRY & L. 332, 337 (2009) ("Interrogators help create the false confession by pressuring the suspect to accept a particular account and by suggesting facts of the crime to him, thereby contaminating the suspect's postadmission narrative.")).

Dr. Leo also has extensive practical experience. He has given interrogation training to law enforcement agencies, as well as several legislative, judicial, and/or executive organizations. *Id.* at 54 & 57. He has also attended several trainings on police interrogation techniques himself. *Id.* at 54. Dr. Leo has also been asked to consult with criminal and civil attorneys in almost 2,000 cases involving disputed interrogations and/or confessions, has provided sworn testimony nearly 80 times in the last four years.  Ex. 2, Report of Richard Leo, at. 1-2; Ex. 3, Testimony of Richard Leo, 2014-18. Overall, he has been qualified and testified as an expert **350 times** throughout his career on the subjects at issue here. Ex. 2, at 2.

Defendants' challenge to Dr. Leo's qualifications, to the extent actually raised or included in their criticism that Dr. Leo is not a psychologist or a psychiatrist, Dkt. 150, at 4, is beyond frivolous. Dr. Leo is a social psychologist, in fact, and the fact that he has not personally met or evaluated Plaintiff is completely irrelevant. He simply is not that sort of expert. He reviewed a mountain of relevant materials—including the video of the interrogation, the Detectives' depositions,

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

Plaintiff's deposition, and the policies and manuals of the City of Los Angeles. Ex. 1, at 2; Ex. 4, Supplemental Report, at 1; Ex. 5, Supplemental Report #2, at 1-4.

**B. Dr. Leo's Testimony Will Assist the Jury**

Defendants argue that Dr. Leo's testimony will not assist the jury, but the Defendants have not even discussed Dr. Leo's actual opinions.[2]  Indeed, Dr. Leo does <u>not</u> opine that Plaintiff's confession statement was coerced, and Plaintiff would have no objection to an order providing that Dr. Leo cannot testify on this "ultimate issue," which is for the jury. *See, e.g.*, *Caine v. Burge*, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013).

Dr. Leo's actual opinions—concerning the fact that false confessions do occur and an identification of risk factors associated with false confessions—are helpful to the jury. Indeed, social science is particularly useful for situations where lay jurors have assumptions about a topic, but those assumptions are wrong. The idea that someone, short of physical torture, would confess to a serious crime that they did not commit is highly counter intuitive. Accordingly, the testimony is helpful to the jury. *See, e.g.*, *id* at *2 (Although jurors' common sense may suggest

---

[2] Defendants' scattershot brief is somewhat hard to respond to because the movants have not actually identified which opinions they take issue with as a substantive matter, and those that they do not. For present purposes, it is useful to divide Dr. Leo's opinions into two categories: (1) those concerning the social psychology of false confessions and risk factors for false confessions, and (2) those related to accepted practices and training in the area of interrogations. Defendants' challenges to the latter opinions are addressed in part III, *infra*.

9

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

to them that someone would never falsely confess to committing murder, Dr. Leo's testimony will educate jurors that false confessions sometimes *do* occur.").

Ninth Circuit Judge Hawkins has addressed the issue in a persuasive concurrence in, *Lumbers v. Hornbeak*, 605 F.3d 754, 760 (9th Cir. 2010), explaining that expert testimony concerning the phenomenon of false confessions and the risk factors thereof can be so important in a criminal case that it would violate the constitution for a defense attorney to fail to investigate such an option. As Judge Hawkins put explained: it is "hard to image anything more difficult to explain to a lay jury" than the notion that someone would confess to a crime that they did not commit because the science shows that "it turns out that they sometimes do." *Id.* In a case extremely analogous to this one, involving a juvenile interrogation in the context of a § 1983 suit going to trial on both the claims that the confession was coerced and that it shocked the conscience, the Ninth Circuit relied upon Dr. Leo's opinions at summary judgment in finding that the interrogations would allow a reasonable jury to find for the Plaintiffs. *Crowe v. San Diego*, 608 F.3d 406, 431-32 (9th Cir. 2010), a strong indication that such testimony is both admissible and highly relevant to the jury's analysis.

The Seventh Circuit's decision in *United States v. Hall,* 93 F. 3d 1337 (7th Cir. 1996), is the leading case on the topic. There, the Court reversed the exclusion of a confessions expert who "would have testified about the fact that experts in his

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

field agree that false confessions exist, that individuals can be coerced into giving false confessions, and that certain indicia can be identified to show when they are likely to occur." *Id.* at 1342. *Hall* held that the district court's decision to exclude opinion testimony on the subject of false confessions "overlooked the utility of valid social science." *Id.* at 1345, and explained:

> Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct. Properly conducted social science research often shows that commonly held beliefs are in error. Dr. Ofshe's testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried.

*Id.*; *see also Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir. 1997) ("Social scientists in particular may be able to show that commonly accepted explanations for behavior are, when studied more closely, inaccurate. These results sometimes fly in the face of conventional wisdom. The court below erred insofar as it assumed that only evidence completely inaccessible to the jury could come in under Rule 702.").

As other courts have recognized, the same is true here, "there is no question that Dr. Leo has specialized knowledge that is not within an average juror's bank of knowledge or experience." *United States v. Hayat,* 2017 WL 6728639, at *10-*11 (E.D. Cal. Dec. 27, 2017); *see, e.g.*, *United States v. Whittle,* 2016 WL 4433685 (August 18, 2016), at *3; *Caine,* 2013 WL 1966381, at *2; *Livers v.*

11

*Schenck*, 2013 WL 5676881, at *4 (D. Neb. Oct 18, 2013) ("Dr. Leo's testimony could be helpful to the jury in understanding the phenomenon of false confessions."). And the Ninth Circuit likewise "recognizes the importance of expert testimony when an issue appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their knowledge." *United States v. Finley,* 301 F.3d 1000, 1013 (9th Cir. 2002) (citing *United States v. Vallejo,* 237 F.3d 1008, 1019-20 (9th Cir. 2001)). The Ninth Circuit has also favorably cited *Hall* for this proposition. *See id.* ("We must be cautious not to overstate the scope of the average juror's common understanding and knowledge.") (citing *Hall*, 93 F.3d at 1345); *cf. Lunbery*, 605 F.3d at 765.

To be sure, Dr. Leo's proffered testimony will assist the jury in this case because, while some jurors may know "about the subject" of false confessions, *Hall*, 93 F.3d at 1345, much about the reasons why they occur and when they are likely to happen is beyond the common knowledge of laypersons. *See* Saul Kassin, *Expert Testimony on the Psychology of Confessions: A Pyramid Model of the Relevant Science* 210-212, *in* BEYOND COMMON SENSE: PSYCHOLOGICAL SCIENCE IN THE COURTROOM (Borgida & Fiske eds., 2008), attached as Exhibit 6; Mark Costanzo et al., *Juror Beliefs About Police Interrogations, False Confessions, and Expert Testimony*, 7 J. Empirical Legal Studs. 231 (2010), attached as Exhibit 7.; Saul Kassin et al., *I'd Know a False Confession If I Saw One: A Comparative*

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

*Study of College Students and Police Investigators*, 29 L. & Hum. Behv. 211-227 (2005), Ex. 8; Richard A. Leo & Brittany Liu, *What Do Potential Jurors Know About Police Interrogation Techniques & False Confessions?*, 27 Behav. Scis. & L. 381-99 (2009), Ex. 9; Danielle E. Chojnacki et al., *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 Az. S. L.J. 1, 26-36 (2008), Ex. 10.

Indeed, unlike some of the distinguishable cases Defendants cite, *see infra n. 3*, there is no question that the "risk factors" for false confessions identified in the established body of research are present in the interrogation of Plaintiff by the Detective Defendants. Ex. 1, at 14-30. In other words, there is an absolute and direct link between the evidence in this case (Plaintiff's interrogation) and Dr. Leo's opinion about the risk factors present here, making the opinions useful.

## C. Dr. Leo's Methods are Reliable

### 1. The Study of False Confessions is a Reliable And Established Area of Study in the Social Sciences

In assessing reliability, a non-exclusive list of factors for trial courts to consider includes: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique; and (4) whether the theory or technique has been generally accepted in the particular scientific field. *Daubert*, 509 U.S. at 594-95. For some subject

13

matters, experience can be the predominant basis for reliable expert testimony. *Id.*; *see* FRE 702 (Advisory Note, 2000 amends). Again, the inquiry is a "flexible one" turning on the facts of the case, and none of these factors are dispositive or even necessary. *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)*. This flexible inquiry also allows the Court to assess the type of testimony being evaluated, so for example, social science testimony is different than that of "hard" sciences, like chemistry or the like. *See, e.g. Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191-92 (N.D. Cal. 2004) (finding an "acceptable social science methodology" where an expert reviewed documents and deposition testimony and evaluated that along side the experts professional research and literature in the field) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 235-36, 255 (1989) (considering similar evidence by an expert social psychologist)), and FED. R. EVID. 702 (referring to "scientific, technical, or other specialized knowledge")); *Atencio v. Arpaio,* 2015 WL 11117187, at *19 (D. Ariz. Jan. 15, 2015) (looking to the type of expert when assessing the methodology and particularly the type of information reasonably relied upon by social scientists in the relevant field); *Sille v. Parball Corp.*, 2011 WL 2710102, at *2 (D. Nev. July 12, 2011) ("Case law makes it clear that "soft" sciences, such as psychology cannot always be measured by objective tests. In cases involving social sciences, subjective tests, clinical observations and professional judgment play a bigger role. There can be no doubt

14

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

that expert psychological testimony is admissible."); *cf. United States v. Rahm,* 993 F.2d 1405, 1412 (9th Cir. 1993) ("In any area of science or social science, but particularly in matters of the mind, expecting an expert to reach a conclusion without the slightest doubt as to its accuracy is exceedingly unrealistic.").

Here, Defendants' challenge to Dr. Leo's methodology is entirely misplaced. Dr. Leo has been admitted hundreds of times, as have other experts on police interrogation tactics and the phenomenon of false confessions. *See* Ex. 2 (reporting 350 instances of being qualified and testifying); Ex. 3 (reporting nearly 80 instances of testimony in the last 4 years); Ex. 6, Saul Kassin, *supra*, at 195 & n.1, (noting 355 cases where interrogation and confession experts testified).

Dr. Leo has utilized the science applicable in his field, which is established and reliable. Indeed, a case cited by the Defendants in support of their motion explained it well: "Dr. Leo, through his report and its attachments, has demonstrated that the field of police interrogation practices, psychological coercion, and false confessions is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702. *Caine*, 2013 WL 1966381, at *3. And, there is a body of law finding such testimony to be reliable. See, *e.g.*, *Harris v. City of Chicago*, 2017 WL 2436316, at *7-*9 (N.D. Ill. June 6, 2017) (finding Dr. Leo's methods, and those in his field to be reliable and established); *Kluppleberg v. Burge,* 2016 WL 6821138, at *4 (N.D. Ill. Sept. 16,

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

2016) (having "little trouble" finding the methodology used by Dr. Leo's colleague, which Dr. Leo also uses, reliable); *United States v. Hayat*, 2017 WL 6728639, at *10-11 (E.D. Cal. Dec. 27, 2017) (noting that Dr. Leo had testified hundreds of times, and concluding that the fact a few courts exercised their discretion differently "almost has no relevance to the question of whether" he should be allowed to testify"); *Whittle*, 2016 WL 4433685, at *2; *Livers*, 2013 WL 5676881, at *5; *Scott v. City of Chicago*, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (admitting a false confessions expert); *United States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997) ("The Court further finds that the science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702.").

Defendants' arguments, therefore, should fail. Dr. Leo's work is nothing even remotely close to something like "junk science," as Defendants erroneously assert. At best, their criticisms go to the weight of Dr. Leo's testimony, not its admissibility.

## 2.  Dr. Leo's Work is Reliable Science under Rule 702

Dr. Leo's methodology and opinions are not, as Defendants suggest, "*ipse dixit* of the expert." Quite the contrary. Dr. Leo's methods are those specifically contemplated as acceptable within *Daubert* and one of the very cases Defendants

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

cite, *Caine*. And, Dr. Leo's methods are those accepted in the relevant scientific community, strongly illustrating their reliability.

As Dr. Leo put it in his report, there is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subject of police interrogation practices, psychological coercion, and false confession dating back to 1908. Ex. 2, at 4. Dr. Leo has relied upon the hundreds of empirical, statistical, qualitative, and experimental studies in his field—many of which are peer reviewed and dozens of which he conducted—as the foundation for his opinions here. *See, e.g.*, *Id.* at 4-14 & nn. 2-23. This is the sort of testimony that is reliable and accepted for the social sciences. *Id.* at 4. In addition, experts may also rely on their experience, which informs their opinions. FED. R. EVID. 702, Committee Note.  Dr. Leo has countless hours of such experience.

Indeed, to accept Defendants argument that this work is "junk," this Court would have to reject the fact that Dr. Leo's work has been cited and relied upon by numerous appellate courts, including the Supreme Court and the Ninth Circuit. Plainly, such a finding would be inappropriate and erroneous.

### 3. Defendants' Objections Fail.

Defendants' arguments about Dr. Leo's methodology fail.[3] Defendants point out the fact that Dr. Leo testified that there is no mechanical test or formulation for determining when a false confession will occur. Dkt. 180 at 3. Defendants also criticize Dr. Leo for not having a known rate of the frequency of false confessions nationally. These arguments are ones for cross examination, not exclusion. Dr. Leo's opinion is not to weigh-in on the ultimate issue—whether

---

[3] Defendants have cherry-picked the extremely few instances in which Dr. Leo has been excluded, and many of those were under different circumstances than the one confronted here. In *United States v. Redlightening*, 624 F.3d 1090 (9th Cir. 2010), for example, was a criminal case and the defendant in that prosecution failed to identify how or whether any of the risk factors for a false confession were present at all, making the testimony irrelevant. *See id.* at 1110 (noting th parties dispute the issues regarding the scientific support for testimony about the phenomenon of false confessions but that "the district court did not exclude Dr. Leo on those basis," and instead exclude the evidence because the defendant could not point to any evidence "I the record that any of these techniques are present in this case"); *id.* at 1111 ("Here, Redlightining did not sufficiently show how Dr. Leo's testimony would have applied to the facts of his case."). Similar factual differences apply to the criminal case almost entirely copy and pasted in to Defendants' brief, *United States v. Deuman*, 892 F.Supp. 2d 881 (W.D. Mich. 2012), which did not even involve a custodial interrogation and, like *Redlightining*, there was "there is no indication that [the police] applied the type of coercive interrogation techniques taught by Inbau and Reid that Dr. Leo argues may lead to false confessions*." Id.* at 890; *see also id.* ("there are significant differences between the instant case and the false confession cases that Dr. Leo has studied, and nothing indicates that Dr. Leo's research, methods, and theories are applicable under these circumstances."). And, most of the cases cited by the Defendants are criminal cases, rather than civil actions under 42 U.S.C. §1983, changing the relevancy inquiry substantially.

Indeed, defendants point to only one case where Dr. Leo has been excluded in a civil-rights case involving an allegation, as here, that a confession was false. Dkt. 180 at 6-7 (citing *Green v. City of Wenatchee*, 2003 WL 26089744 (E.D. Wash 2003)). But that decision was15 years ago and, whatever doubts it expressed about the state of the science in 2002 are certainly long gone, particularly given the 2010 publication of the "white paper," a peer-reviewed consensus document authored by six scholars in the filed of false confessions and published by the American Psychology–Law/Division 41 of the American Psychological Association. Saul M. Kassin et al., *Police–Induced Confessions: Risk Factors and Recommendations,* 34 LAW & HUM. BEHAV. 3 (2010).

18

Tobias's confession was coerced—but to provide the jury with helpful information about how and why someone could do something highly counterintuitive: confess to a murder they did not commit. Thus, as the authorities cited above recognize, this Court's flexible inquiry does not require something like a "mechanical test" for finding a confession was coerced, and the fact that the frequency of false confessions is unknown is a complete non-starter.

Indeed, the fact that Dr. Leo has not determined a national, universal rate of false confession does not suggest that his research about *why* innocent people falsely confess or the *factors* that increase the risk of false confessions are in any way flawed. Analogously, a doctor need not know the cancer rate to examine and understand the risk factors for individuals developing cancer by studying the patients who have developed the disease. The questions of *rate* and *cause* are different inquiries altogether. Dr. Leo's recognition that, even with all the studies that have been done, there is not enough data to determine some sort of "national false confession rate" is evidence of scientific restraint and reliability (a rejection of speculation), not a sign of failure.[4]

---

[4] Defendants reliance on *Deuman*, a criminal case which pointed to a state court case, as it concerns the unknown "frequency rate" of false confessions, is misplaced. The Court was simply wrong when it suggested that Dr. Leo's methods are un-testable or incapable of scientific criticism. Instead, Dr. Leo's empirical work relies upon data sets that can be scrutinized. A properly-trained social scientist could use their own data set, conduct their own regression analysis and determine whether they want to contend that Dr. Leo erred. Thus, Defendants (and the trial court in *Deuman*) focus on the wrong question when considering the "rate of error" or testability when criticizing Dr. Leo's methods. That is beside the point. After all, Dr. Leo is not

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

### III.    Police Practices Testimony Is Relevant And Admissible

Defendants' challenge to the portion of Dr. Leo's testimony concerning

interrogation practices and standard interrogation procedures fares no better than

their challenge above. As it concerns the interrogation practices and procedures

portion of Dr. Leo's testimony, and, apparently, the entirety of Timothy T.

Williams's testimony, Defendants make one cursory argument: that neither of the

experts' testimony can assist the jury because neither expert "base their opinions

on any federal *legal* standards of police officer conduct." Dkt. 180, at 9.[5]

This argument is nonsense. It is a strength that Plaintiff's experts do not

purport to offer legal opinions—such expert testimony is prohibited. *See Torres v.
City of Los Angeles*, 548 F.3d 1197, 1214 n.11 (9th Cir. 2008) (holding district

court abused its discretion when it allowed expert to offer legal conclusion on

---

offering opinions on the ultimate issue of whether this was a false confession; he is explaining
that false confessions do occur, and that certain conduct or techniques are scientifically
demonstrates to increase the risk of false confessions. Last, the trial court in *Deuman* failed to
appreciate how to apply *Daubert*'s methodological flexibility to the "rate of error" factor in the
context of social sciences, especially those involving human behavior. Unlike, for example,
performing a test on the effects of a particular drug or conducting stress tests on seatbelts, social
science is not replicable in the way some hard sciences are. Accordingly, the method of testing is
different, and does not, as some hard sciences do, rely upon the recreation of an identical test
subject—doing so is impossible because the subjects are human actors. At core, reliability
"depends upon the particular circumstances of the particular case at issue" *Kumho Tire*, 526 U.S.
at 150, as described by the relevant scientific community. A standard unquestionably met here.

[5] Defendants' argument is so cursory that arguably it should not even merit a response.
Defendants have not described which opinions they believe are irrelevant or should be excluded,
leaving Plaintiff—and the Court—to guess about what they mean.

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

existence of probable cause); *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law.").

In addition, Defendants have ignored completely the fact that the Ninth Circuit has repeatedly explained that police practices expert testimony—like the proffered testimony of Dr. Leo and Mr. Williams—is reliable as well as useful and helpful to the jury. *See, e.g.*, *Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018); *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017); *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004).

As the Court knows, Plaintiff must largely illustrate that Defendants' actions were more than negligent in violating Plaintiffs' constitutional rights. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). In addition, according to the law in this circuit, Plaintiff must also show deliberate indifference as it relates to his *Brady* claim. *Mellen*, 900 F.3d at 1102-04. Punitive damages also require Plaintiff to prove that the Defendants' actions were "malicious, oppressive or in reckless disregard of the plaintiff's rights." NINTH CIR. MODEL INSTRUCTION NO. 5.5. And, of course, Plaintiff bears the burden of proof at trial.

With that in the backdrop, it is well established that police practices testimony concerning established law enforcement standards and departures from those standards constitutes helpful and admissible circumstantial evidence of a defendant's state of mind, something that Plaintiff must prove. Evidence that an

officer's conduct "deviated from what would be expected of a reasonable police officer" can "assist the trier of fact in determining whether [the defendant's] conduct deviated so far from institutional norms that the jury could conclude that [the officer] was reckless or deliberately indifferent to [the plaintiff's] constitutional rights." *Mellen*, 900 F.3d at 1104. Or, as the Seventh Circuit put it in a case cited by the Ninth Circuit in *Mellen*: "Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013). This has been the established view of the Ninth Circuit for decades. *See, e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) ("Discussing whether the officers' conduct comported with law enforcement standards, the expert relied upon California's Peace Officer Standards and Training, which are applicable to all state police officers and are a part of Department policy. . . . A rational jury could rely upon such evidence in assessing whether the officers' use of force was unreasonable."); *Larez v. City of Los Angeles*, 946 F.2d 630, 635 (9th Cir. 1991) (as amended) (finding that testimony of "an expert on proper police procedures and policies" was relevant and admissible); *Davis v. Mason County*, 927 F.2d 1473, 1484–85 (9th Cir. 1991) (as

22

amended) (testimony of plaintiffs' police practices expert that officers violated law enforcement standards properly received)

Indeed, in *Mellen*, the Ninth Circuit just months ago found that the district court abused its discretion in striking police practices testimony because it "mistakenly concluded that a police practices expert cannot assist the jury in making the legal determination about whether an officer's conduct was 'reasonable.'" 900 F.3d at 1004. Doing so misunderstands why Plaintiff has offered such testimony: not "for a legal conclusion that [Defendants'] conduct was unreasonable; rather, [plaintiff] offered the report as circumstantial evidence of [Defendants'] state of mind and to show that" Defendants actions "deviated far from the norm of what would be expected of a reasonable police officer in" in their position. *Id.* The same is true here, and it would be reversible error to exclude Plaintiff's police practices testimony entirely on this basis, as it was in both *Mellen* and in *Reed*. *See Reed*, 863 F.3d at 1209.

## IV.    Dr. Marcy is a Properly Disclosed Rebuttal Expert

Defendants' motion has ignored completely the conferral process here. During the Local Rule 16-X conference, Plaintiff made it abundantly clear that Dr. Marcy has been disclosed solely as a rebuttal expert. Indeed, as explained in Plaintiff's motion *in limine* No. 1, Plaintiff's position is that Defendants' medical

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

1  expert should not be permitted to testify unless and until Plaintiff offers psychiatric

2  testimony.

3       Defendants now claim that it was "curious" Plaintiff did not disclose a

4  psychiatric damages expert, but Plaintiff made this position clear months ago and

5  informed Defendants of this fact when making Plaintiff's expert disclosures.

6  Specifically, counsel informed the defense:

> As you'll recall, during discovery we went back and forth about psych experts and even agreed to Plaintiff being subject to an IME under Rule 35. As we all know, discovery is much broader than trial. To that end, we have not disclosed a psych expert and do not intend to call one to testify at trial, and believe that Defendants' examiner should be out as well.

10  *See* Exhibit 11, (June 11, 2018 Correspondence).

11       Defendants have offered no substantive reason why Dr. Marcy's opinions

12  are not rebuttal testimony. Dr. Rosenberg, Defendants' expert, has opined that

13  Plaintiff suffered trauma from being incarcerated but has concluded that Plaintiff

14  does not have full blown PTSD. Dr. Marcy disagrees with this conclusion, and

15  finds that Plaintiff should be given such a diagnosis. This is quintessential rebuttal

16  testimony, and Defendants have offered no reason or example as to why that is not

17  the case.[6] Plaintiff has sought the exclusion of Dr. Rosenberg. Should he testify,

18  Dr. Marcy should be permitted to testify in rebuttal, just as she was disclosed.

19

20  ---
[6] Defendants' claim that Plaintiff refused to permit the deposition of Dr. Marcy is beyond misleading. For one, Defendants' motion includes a number of incorrect dates about the

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

## Conclusion

Defendants' motion *in limine* No. 1, to Exclude Plaintiff's expert testimony should be denied.

Respectfully submitted,

Dated: October 8, 2018

**ART TOBIAS**

By: /s/ David B. Owens
*One of Plaintiff's attorneys*

David B. Owens, Cal. Bar No. 275030
david@loevy.com
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
(312) 243-5902 (Fax)

---

sequence of events and agreed upon disclosure dates among the parties. *See* Mot., Dkt. 180, at 11. The parties agreed that their expert disclosures would be made on June 11, and that Rebuttal disclosures would be due on June 25, with expert discovery to be completed by July 13. Exhibit 12 (May 30 Email from Defense Counsel). Plaintiff disclosed Dr. Marcy on June 25, as agreed. Ultimately, because of Defense counsel's vacation schedule, *no* expert depositions were set for the last week of June of the First week of July. Instead, all expert depositions were crammed into the last week—July 10 (Dr. Leo in San Francisco), July 11 (Mr. Williams in Los Angeles), and July 12th (Defendants' experts Bumcrot and Rosenberg, also in Los Angeles). It was not until July 11, in the evening after a full-day deposition, that Defendants *asked* for a deposition date for Dr. Marcy, with the only possible available date being the Friday of that week, July 13th. Plainly, there was no way that deadline could be met.

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS

# __CERTIFICATE OF SERVICE__

I, David B. Owens, an attorney certify that, on October 15, 2018, I caused the foregoing motion to be filed via the Court's electronic filing system, which effected service on all counsel of record.


/ David B. Owens_____

Plaintiff's Response in Opposition to Defendants' Motion *In Limine* (#1)  Experts
2:17-cv-1076-DSF-AS