# EXHIBIT 2

**TO PLAITNIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NUMBER 2, SEEKING EXCLUSION OF EXPERT TESTIMONY**

Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

(415) 661-0162 (Phone)
(415) 422-6433 (FAX)
Email: rleo@usfca.edu

June 10, 2018

David Owens,
Attorney at Law
Loevy and Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL

Re:   *Art Tobias v. City of Los Angeles, et al.  Case No: 17-cv-01076 DSF-AS*

Dear Mr. Owens:

This report is per your request in the above-referenced case of *Art Tobias v. City of Los Angeles, et al.*

## I. Qualifications

I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine.  My areas of research, training, and specialization include social psychology, criminology, sociology, and law.  For more than two decades, I have conducted extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions.  In 1992 and 1993, I spent nine months doing field research inside the Oakland Police Department, which included sitting in on and contemporaneously observing one-hundred twenty-two (122) felony interrogations; in 1993, I also observed sixty (60) fully videotaped interrogations in the Vallejo and Hayward Police Departments in northern California.  Since then, I have analyzed thousands of cases involving interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

David Owens
Attorney at Law
June 10, 2018
Page 2


I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications.  My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court, on multiple occasions.  To date, I have consulted with criminal and civil attorneys on almost two-thousand (2,000) cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness three-hundred and fifty (350) times in state, federal and military courts in thirty-six (36) states and the District of Columbia.  I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus. My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the following materials

- DVD of interrogation of Art Tobias
- Transcript of interrogation of Art Tobias
- Statement of Art Tobias re Cruz Homicide (10/14/2015) in People v. Rocha & Higuera (PS 001639-PS001724)
- Los Angeles Police Department Arrest Reports (02213-02219)
- Trial Transcripts (PLA 000456-000727)
- LAPD Manual of Juvenile Procedures
- Second Amended Complaint for Damages and Other Relief
- Los Angeles Police Department Homicide Manual (January 1, 2009)
- Los Angeles Police Department Special Order No. 14, from 2011
- Deposition of Julian Pere (March 6, 2018)
- Deposition of Jeffrey Cortina (December 18, 2017)
- Deposition of John Motto (December 19, 2017)[1]

## III. Overview

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation

---

[1] I anticipate reviewing the deposition of Art Tobias, Detective Arteaga, and possibly others, which were not prepared in time for this report and will supplement this report, as appropriate, once those have been reviewed.

David Owens
Attorney at Law
June 10, 2018
Page 3

contamination, and indicia of unreliability.  I will then discuss these issues as they relate to the investigation, interrogation and confession statements of Art Tobias on August 20, 2012.

More specifically, in my professional opinion:

1) The custodial interrogation of Art Tobias was guilt presumptive, accusatory and theory-driven. The interrogation was not structured to find the truth but, instead, to intentionally incriminate Art Tobias by coercively, deceptively and unlawfully breaking down his denials of guilt and eliciting a statement of guilt from him that was consistent with the detectives' pre-existing and prematurely formed assumptions, beliefs and speculations about who must have committed the crime.

2) Detectives Pere, Cortina, and Arteaga used interrogation techniques that are known to increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confessions when misapplied to the innocent (i.e., *situational* risk factors). These included:  guilt presumptive accusatory interrogation; false evidence ploys, minimization and maximization, implied and explicit promises of leniency (in exchange for agreeing to the interrogators' accusations) and implicit and explicit threats of harsher punishment (if the absence of agreeing to the interrogators' accusations).

3) Detectives Pere, Cortina and Arteaga's interrogation of Art Tobias was psychologically coercive: They used interrogation techniques that, as social science research has shown, are highly likely to cause a suspect to perceive that he or she has no choice but to comply with the interrogator's demands and/or requests, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.

4) Art Tobias was at a substantially heightened risk during his interrogation of having his will overborne and making and/or agreeing to a false and unreliable confession statement because of his personality traits and psychological make-up (i.e., *personal* risk factors), especially his youth and psychosocial immaturity at the time.  Mr. Tobias' personality traits rendered him both more compliant and more suggestible in the face of sustained interrogation from multiple seasoned homicide detectives.

5) The interrogation of Art Tobias by Detectives Pere, Cortina and Arteaga involved interrogation contamination (i.e., leading and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Mr. Tobias' confession statement would, misleadingly, appear to be detailed and self-corroborating.

6) Detective Pere, Cortina and Arteaga repeatedly violated national police interrogation training, standards and practices in their custodial interrogation of Art Tobias, thereby substantially increasing the risk that they would elicit both involuntary and unreliable statements, admissions and/confessions from him.

David Owens
Attorney at Law
June 10, 2018
Page 4


## IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions.  This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community.  Significantly, numerous courts have held repeatedly that these principles, methods, and findings are generally accepted in the social science community and therefore accepted expert testimony in criminal and civil rights litigation.[2]

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[3]  The fact that police-induced false confessions can and do occur has been well-documented and is not disputed by anyone in the law enforcement or academic community.  Indeed, leading police interrogation training manuals have, at least since 2001, contained entire chapters and sections on the problem of police-induced false confessions and what investigators need to know to better understand and avoid eliciting false confessions from innocent suspects.[4]  Social scientists have

---

[2]   Saul M. Kassin et al., *Police–Induced Confessions: Risk Factors and Recommendations,* 34 L. & Hum. Behav. 3, 16 (2010) (noting that "false confessions tend to occur after long periods of time" and "sleep deprivation is historically one of the most potent methods used to ... extract confessions"); Gisli H. Gudjonsson et al., *Custodial Interrogation, False Confession and Individual Differences: A National Study Among Icelandic Youth,* 41 Personality & Individual Differences 49, 56 (2006) (finding that depressed mood is linked to a susceptibility to provide false confession to police); Brandon L. Garrett, *The Substance of False Confessions,* 62 Stan. L.Rev. 1051, 1087 (2010) ("The vast majority of these exonerees made statements in their interrogations that were contradicted by crime scene evidence, victim accounts, or other evidence known to police during their investigation."); Richard A. Leo, *False Confessions: Causes, Consequences, and Implications,* 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009) ("Interrogators help create the false confession by pressuring the suspect to accept a particular account and by suggesting facts of the crime to him, thereby contaminating the suspect's post-admission narrative.... If the entire interrogation is captured on audio or video recording, then it may be possible to trace, step by step, how and when the interrogator implied or suggested the correct answers for the suspect to incorporate into his post-admission narrative."); Steven A. Drizin & Beth A. Colgan, *Let the Cameras Roll: Mandatory Videotaping of Interrogations Is the Solution to Illinois' Problem of False Confessions,* 32 Loy. U. Chi. L.J. 337, 339–41 (2001) (*accord*).

[3]   *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

[4]   See, for example, *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001).  CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Aspen Publishers, Inc.) at 411-448; and David Zulawski and Douglas Wicklander (2002).  PRACTICALASPECTS OF INTERVIEWING AND INTERROGATION, 2nd Edition (CRC Press) at 73-104.

David Owens
Attorney at Law
June 10, 2018
Page 5

documented approximately four-hundred and fifty to five-hundred proven false confessions in America since the early 1970s,[5] but this is surely an underestimate and thus the tip of a much larger iceberg for several reasons.  First, false confessions are difficult for researchers to discover because neither the state nor any organization keeps records of the interrogations producing them.  Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of proving the confessor's *absolute* innocence.  As a result, Richard Ofshe and I coined the term "proven false confession" in 1998,[6] showing that there are only four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

1) When it can be objectively established that the suspect confessed to a crime that did not happen;
2) When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;
3) When the true perpetrator is identified and his guilt is objectively established; and/or
4) When scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of proven false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades.  There have almost certainly been thousands (if not tens or hundreds of thousands) more police-induced false confessions than researchers have been able to discover and classify as proven false.  Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[7]

---

[5]   The largest published study of proven false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007. For a review of the literature documenting proven false confessions, see Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE. At that time, there were approximately two-hundred and fifty to three-hundred proven false confessions in the documented literature. Since 2004, Steve Drizin, Gillian Emmerich and I have collected an additional two-hundred proven false confessions that are the subject of an academic article we are currently drafting but have not yet submitted for publication.

[6]   Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

[7]   Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs," Law and Human Behavior, 31, 381-400.

David Owens
Attorney at Law
June 10, 2018
Page 6

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[8]  Police detectives receive specialized training in psychological interrogation techniques; most people do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission.  In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are.  Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

## V. The Social Psychology of Police Interrogation[9]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions.  This is the sole purpose of custodial interrogation.  To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[10]  Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting unreliable confessions or statements.

Contemporary American interrogation methods are structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess.  Police interrogators know that it is not in any suspect's rational self-interest to confess.  They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess.  As a result, interrogators have, over the years, developed a set of

---

[8]   *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008), "An Empirical Basis for the Admission of Expert Testimony on False Confessions," *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009).  "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011) "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" in *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010), "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" in *The Journal of Legal Empirical Studies*, 7, 231-247.

[9]   See Richard A. Leo (2009).  "False Confessions: Causes, Consequences and Implications." *Journal of the American Academy of Psychiatry and Law*, 37, 332-343.

[10]   Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room," In William O'Donohue, ED (2004), *Handbook of Forensic Psychology* (San Diego: Academic Press).  Pp. 897-996.

David Owens
Attorney at Law
June 10, 2018
Page 7

subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them only on suspects believed to be guilty.[11]   When these same techniques are used on innocent suspects, they carry a heightened risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices.  The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation.  The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

### VI. How Interrogation Is Intended to Affect a Suspect's Perceptions

To understand how and why police-induced false confessions occur, one must first understand how interrogation is intended to influence and manipulate a suspect's perceptions, reasoning, and decision-making.  Police interrogation is designed for the guilty, not the innocent.  The purpose of interrogating a suspect (unlike the interviewing of witnesses or victims) is to elicit an incriminating statement, admission, and/or confession that will assist the state in its prosecution of the crime; accordingly, police are admonished in their training to interrogate only those whom they believe to be guilty.[12]   Because police expect the suspect to deny his guilt, the goal of interrogation is to break down the suspect's resistance and move him to admission.  As discussed above, police typically achieve this result by accusing the suspect of committing the crime, attacking the suspect's alibi or version of events, cutting off the suspect's denials and confronting the suspect with seemingly irrefutable (whether real or non-existent) evidence of his guilt.  The purpose of these techniques is to break down the suspect's confidence in his denials

---

[11]   *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain").  For empirical support for this observation, see Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[12]   *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain").  For empirical support for this observation, see Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

David Owens
Attorney at Law
June 10, 2018
Page 8

by convincing him that he is caught, that no one will believe his assertions of innocence, and that objective evidence of his guilt is so overwhelming that it will inevitably lead to his arrest and conviction, regardless of what he says or does during interrogation.

To elicit an admission or confession, however, it is often not sufficient simply to break down a suspect's resistance. Interrogators also try to persuade the suspect that given the circumstances in which he now finds himself—he is caught, all the evidence is against him, and there is no way out of his predicament—there are positive reasons for confessing that will improve his otherwise hopeless situation. In other words, interrogators seek not only to overcome a suspect's denials, but also to convince him of the positive benefits of compliance and confession.[13] Interrogators sometimes do this by focusing the suspect's attention on the processing of his case in the criminal justice system and implying or stating the benefits of cooperation and confession versus the disadvantages of continued denial and resistance. Interrogators sometimes do this by trying to focus the suspect's attention on how certain actors in the criminal justice system (police, prosecutors, judges, juries) can either help or hurt the suspect, depending on what he says in the interrogation room, or how they will react to the suspect's unsympathetic and implausible denials versus a confession that demonstrates remorse and accepts responsibility for the offense. Sometimes interrogators do this by trying to persuade the suspect that the alleged crime could be framed in a way that minimizes the suspect's culpability if he were to admit the underlying act (*e.g.*, a homicide could be portrayed as an accident or an act of self-defense), but that it will be framed in the way that maximizes his culpability if he does not admit during the interrogation to the underlying act (*e.g.*, a homicide will be portrayed as an intentional and premeditated murder). And sometimes interrogators do this by using explicit promises of prosecutorial leniency in exchange for a confession or statement that fits an interrogator's theory of the case and explicit threats of harsher treatment or punishment in the absence of a confession or statement that fits an interrogator's theory of the case.

Involuntary false confessions to police and situations where a suspect's will is overborne by police typically occur when detectives use inappropriate, improper, and/or coercive interrogation techniques that cause a suspect to feel hopeless and perceive that he has no choice but to comply with the detectives' demands if he wishes to put an end to the interrogation.[14] False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. However, these types of traditionally coercive techniques no longer appear to be common in the United States. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns:

---

[13]   *See* Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[14]   *See* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

David Owens
Attorney at Law
June 10, 2018
Page 9

(1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

## VII. The Different Types of False Confession

Whether a police-induced false confession is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation or some combination of both, there are three fundamental types of false confession: a *voluntary* false (i.e., a false confession knowingly given in response to little or no police pressure); a *compliant* false confession (a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and an *persuaded* false confession (a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime despite no actual memory of having done so). These different types of false confession typically involve different levels of police pressure, psychological logics of influence and decision-making, and different beliefs about the likelihood of one's guilt. Regardless, false confessors typically recant their confessions shortly after they are removed from the pressures and reinforcements of the interrogation environment.

It is important to briefly discuss the psychology of interrogation-induced *persuaded* false confessions. Some or all of the following sequence and pattern tends to occur in virtually all *persuaded* false confessions. First, the interrogator accuses (usually repeatedly) the suspect of committing a crime that the (innocent) suspect denies, repeatedly. At some point, the interrogator confronts the suspect with false evidence that the interrogator pretends he possesses, and that he pretends dispositively proves the suspect's guilt beyond any conceivable doubt. The suspect may continue to deny the interrogator's accusations, but at some point the suspect – not knowing that the interrogator is lying about the evidence and therefore naively assuming it must be true -- comes to doubt his memory and agree that it is possible he committed the crime, despite no memory of having done so. Often, but not always, the interrogator may suggest that the suspect had an amnesiac blackout, that such amnesiac blackouts are common, and that the amnesiac blackout accounts for the suspect's lack of memory. The interrogator mistakenly assumes that the suspect's claim of no memory is simply a lie and thus suggests the amnesiac blackout theory to get the suspect to admit to committing the crime despite no memory. As a result of the interrogator's techniques (especially the repeated accusations, the false evidence ploys, the amnesiac blackout theory and sometimes also psychologically coercive promises and threats) the suspect comes to believe it is more likely than not that he committed the crime, despite no memory of actually having done so. Once this occurs, the suspect "confesses" in hypothetical, tentative, equivocal and speculative language that reflects his uncertain belief state:

David Owens
Attorney at Law
June 10, 2018
Page 10

e.g., "I could have done X," "I must have done Y," I probably did Z."[15]  Sometimes the suspect, who not only does not remember committing the offense but also may not know the details, asks the interrogator what he did.  Poorly trained interrogators will tell suspects that they remember doing things that the suspect denies doing, and poorly trained interrogators will educate suspects about the details of the crime rather than have the suspect independently suggest those details. Regardless, interrogators who take *persuaded* false confessions are absolutely convinced (from the moment the interrogation begins) of the suspect's guilt and thus assume that the tentative, speculative and hypothetical language of the suspect's confession is due the suspect lying rather than the suspect's lack of memory and actual innocence.  As a result, interrogators will press suspects to move away from the speculative language of their confession to more declarative language and will, inadvertently, help suspects fill in the details of their confession.  Since the interrogator presumes the suspect's guilt, they never stop to consider whether they are eliciting a false confession from an innocent person.  *Persuaded* false confessions are the most counter-intuitive and least common of the two types of false confession, but they are also the most prejudicial.

## VIII. The Three Sequential Police Errors
## That Can Lead to False (But Sometimes Detailed) Confessions

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements. The first decision point is the police decision to classify someone as a suspect.  This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims.  There is a big difference between interrogation and interviewing:  unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime.  False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true.  This is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[16]

---

[15]   *Persuaded* false confessors will often agree to (and incorporate into their false confessions) events that are plausible to them, but not to events that are implausible to them.

[16]   Fred Inbau, John Reid and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 3 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case."). See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

David Owens
Attorney at Law
June 10, 2018
Page 11

The second important decision point in the process occurs when the police interrogate the suspect.  Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission.  To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques.  As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him.  However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may overbear a suspect's will and result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect.  This is referred to as the post-admission phase of the interrogation.  The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission.  Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit.[17]  Properly-trained police interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.  Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts.  Properly-trained police interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime.  Instead, they will let the suspect supply the details of the case independently.  Properly-trained police interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence.  Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[18]

---

[17]   Although the "Reid" Manual (CRIMINAL INTERROGATION AND CONFESSIONS by Fred Inbau et al.) did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades.  From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," implicitly, if not explicitly, suggesting that police interrogator do know that suspects can be made to falsely confess to crimes they did not commit.

[18]   Richard A. Leo and Richard Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*.  Vol. 88, No. 2.  Pp. 429-496.  This observation has been made in the police interrogation training literature as well.  See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL

David Owens
Attorney at Law
June 10, 2018
Page 12

### IX. Populations with Particular Vulnerability in the Interrogation Room

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession.  This includes individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. This also includes juveniles and individuals with a low IQ or low-level cognitive functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures.  Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of authority needed to resist simple police pressures and manipulations.  Finally, this also includes individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.[19]

Juveniles are especially vulnerable to the pressures of psychological interrogation and increased risk of making or agreeing to a false confession because of their psychosocial immaturity, which affects their perceptions, reasoning processes, judgements and decision-making.  Substantial empirical research shows that juveniles are more impulsive, more averse to stress, more conflict-avoidant, more impulsive and have fewer psychological resources with which to withstand pressure from authority figures.  As a result, juveniles are more naïve, more easily led and manipulated, and more suggestible and compliant.   For all of these reasons, juveniles are disproportionately represented in the known universe of documented false confessions.  The younger the juvenile, the greater the risk that they will make or agree to a false confession in response to police interrogation pressure..

### X. The Problem of Contamination

The problem of contamination in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer

---

INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

[19]   *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

David Owens
Attorney at Law
June 10, 2018
Page 13

correct answers, and sometimes even suggests plausible motives for committing the crime.[20]
Because they are trained to presume the guilt of those whom they interrogate, American police
assume that they are interrogating suspects who already know the correct crime facts.  But this is
not true when they are mistakenly interrogating an innocent person.

Instead, the innocent suspect is pressured to use facts disclosed to him by his
interrogators in order to construct a plausible-sounding confession and post-admission narrative.
Indeed, the presence of these details in the suspect's confession falsely gives the suspect's
narrative credibility and the appearance of corroboration.  Moreover, suspects who have been
pressured and coerced into falsely confessing are motivated to please their interrogator(s) in
order to put an end to the interrogation, and, as a result, often will make up and/or embellish
known or suggested facts in order to make their confession seem more plausible and pleasing to
the interrogators who, at that moment, control their fate in the interrogation room. After police
interrogators have contaminated the suspect with non-public crime facts, they often attribute
"guilty knowledge" to the suspect when he repeats back and incorporates into his confession the
very facts that they first educated him about.  One researcher has called these contaminated
details "misleading specialized knowledge."[21]  In many false confession cases, police and
prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts
only the true perpetrator would know," even though the suspect first learned these facts from his
interrogators.  Police contamination and scripting therefore increase the risk that false
confessions, once given, will cause third parties to erroneously believe that they contain indicia
of reliability and thus increase the risk that the (contaminated) false confession will lead to a
wrongful conviction.

Of course, if the interrogation process is not electronically recorded, the interrogator is
free to assert that these crime facts were volunteered by the suspect and the trial may devolve
into a swearing contest between the suspect and the interrogators over who was the source of the
details in the confession.  If the entire process is recorded, however, then it may be possible to
trace the contamination.

Researchers have found that contamination by police regularly occurs in interrogation-
induced false confession cases.  In a study of the first two-hundred and fifty (250) post-
conviction DNA exonerations of innocent prisoners in the American criminal justice system,
Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was
present in 95% of the false confession cases in this data set (38 of 40 cases).  In other words, in
the overwhelming majority of these proven false confession cases, police interrogators fed the
suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor
erroneously alleged that the suspect volunteered these facts and that the suspect thereby
corroborated the reliability of his confession.  But because the jury in each case mistakenly

---

[20]   Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).
[21]   Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A
       HANDBOOK (John Wiley & Sons Inc).

David Owens
Attorney at Law
June 10, 2018
Page 14

believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[22]   In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[23]

        In sum, the problem of contamination means that when applying the fit test to assess the reliability of the confession, it is essential to separate out the contaminated facts from the facts that unquestionably were provided by the defendant.

## XI. The Interrogation and Confession Statements of Art Tobias

        The interrogation of Art Tobias utilized psychologically coercive interrogation techniques and practices that the empirical social science research has shown to cause and/or significantly increase the risk of overbearing a suspect's will and eliciting unreliable and false confessions when applied to innocent suspects.  These include:

        1) *Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias.*[24] Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information.[25]  When investigators begin with or arrive at a premature presumption of guilt, they seek to build a case against an individual whose guilt they assume *a fortiori* -- rather than seeking to even-handedly collect factual information and objectively investigate a case.  Under these circumstances, investigators act as if they are seeking to prove their pre-existing theories or conclusions rather than investigate a hypothesis. This mental framework causes investigators to disregard contradictory information and evidence, selectively [mis]characterize existing information and evidence, misinterpret a suspect's statements and behavior to conform to the investigators' pre-existing assumptions, and to more aggressively interrogate suspects whose guilt they presume.[26]  Most significantly, social science research has demonstrated that investigators' pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession

---

[22]   Brandon Garrett (2011).  CONVICTING THE INNOCENT (Harvard University Press)
[23]   Brandon Garrett (2015).  "Contaminated Confessions Revisited," *University of Virginia Law Review*, 101, 395-454.
[24]   See Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008).  "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation." *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011), "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions." *Law and Human Behavior*, 35, 452-465.
[25]   See Carol Tavris and Elliott Aronson (2007*). Mistakes Were Made* (But Not By Me).  (Harcourt Books).
[26]   See Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt."  *Law and Human Behavior*, 27, 187-203.

David Owens
Attorney at Law
June 10, 2018
Page 15

in order to satisfy overzealous investigators and put an end to the accusatory pressures of
sustained police interrogation.[27]

In the interrogation of Art Tobias, Detectives Pere, Cortina and Arteaga presumed Mr.
Tobias' guilt from the start.  Based on the interrogation  techniques and approach they employed,
there was no doubt that their investigative approach was not to treat Mr. Tobias' guilt as a
hypotheses to be investigated and independently corroborated or falsified depending on where
the evidence took them.  Rather their investigative goal was to get a confession from Mr. Tobias
to confirm their pre-existing belief that he must be guilty of them. Here are some examples of the
investigators' presumption of guilt from the interrogation:

- Telling Tobias he was involved as they showed him the video: "Well, I'm here to
  tell you, man, that's the video of you being captured on the 18th after midnight.")
  (Interrogation Transcript, P. 27)

- They were unwilling to consider Mr. Tobias' repeated denials.  EG: Detective
  Pere: "You weren't in Arcadia.  You were right there on Alvarado Terrace
  blasting on people." (Interrogation Transcript, P. 30).

- "It was you and a friend" (Interrogation Transcript, P. 39)

- "Listen, we're not here to play games, okay? I'm going to tell you right now, I
  have our – we have our case here already. We're not going to bring you to the
  station for no reason, right?" (Interrogation Transcript, P. 45).

- "Right now you're just a big fucking liar. Big cold blooded killer" (Interrogation
  Transcript, P. 46).

- So listen, I'm done with your bullshit, okay? I've been doing this for too damn
  long, okay? I'm not going to tell you everything we have. I'm not going to tell
  you all the evidence we have…You're full of shit.  And when this case is
  presented to a district attorney's office they're going to see you're a cold-blooded
  killer….They're going to see that you're a gangster who lies, who kills people,
  who has no compassion, who fucking doesn't give a shit." (Interrogation
  Transcript, P. 49)

---

[27]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).
     "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

David Owens
Attorney at Law
June 10, 2018
Page 16

- The detectives repeatedly tell him that they are just trying to get the truth, in the face of his numerous denials.  The truth to them can only mean that he is guilty and did the crime (For example, see P. 51 of Interrogation Transcript).

In short, Detectives Pere, Cortina and Arteaga were biased against Mr. Tobias from the start in multiple ways that increased the risk that they would overbear his will and elicit an involuntary false confession from Mr. Tobias.  The detectives' interrogation of Mr. Tobias was not only guilt-presumptive, it was also truth-presumptive.  In pressuring and persuading Mr. Tobias to confess, the investigators sought not to objectively or independently investigate or test the truth, but rather to have Mr. Tobias parrot back their preconceived belief about what must have happened, and why, in order to build a  case against him.

In so doing, the detectives not only violated national best practice police interrogation standards, but they also were in violation of  Los Angeles Police Department policies and procedures, which state: "Before any interview or interrogation, the interviewer/interrogator must prepare a plan on how he or she will obtain a confession.  Before beginning an interrogation of a homicide suspect, the detective should be thoroughly familiar with all phases of the investigation; the crime scene, interviews, etc. The detective, in addition to having detailed knowledge of the crime itself, must have some background information on the suspect…Too often, valuable time and effort have been unnecessarily expended in the interrogation of an innocent suspect." (Los Angeles Police Department Homicide Manual, P. 134; LAPD 00411).

As well-established social science research has repeatedly demonstrated, an interrogator's guilt-presumptive investigative bias substantially increases the risk of eliciting involuntary, false and unreliable statements, admissions and/or confessions from innocent suspects.  The detectives unwavering presumption of Mr. Tobias' guilt and confession-driven interrogation led to investigative bias, behavioral confirmation bias and tunnel vision, phenomena that have been documented in so many psychological studies and in cases of police-induced false confession and erroneous conviction of the innocent.[28]

2) *False evidence ploys*.  Police interrogators routinely tell criminal suspects that the evidence establishes their guilt:  if police possess real evidence, this is called a true evidence ploy.  If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy.  The social science research literature has demonstrated that false evidence ploys are psychologically coercive techniques that virtually always present in, and substantially likely to increase, the risk of eliciting false statements, admissions, and/or confessions.  False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science

---

[28]   Keith Findley and Michael Scott (2006).  "The Multiple Dimensions of Tunnel Vision in Criminal Cases," University of Wisconsin Law Review, 291-397.

David Owens
Attorney at Law
June 10, 2018
Page 17

research literature.[29]  Many people do not know that police detectives can, in some circumstances, legally lie by pretending to have incriminating evidence that does not exist, is fabricated or is exaggerated; even those who suspect that the police may be bluffing about the evidence are likely to fear that police will manipulate evidence to prosecute them. The use of false evidence ploys can create or contribute to the suspect's perception that he or she is trapped, there is no way out, and/or that his/her conviction will be inevitable.  False evidence ploys can lead the suspect to perceive that he or she is in a hopeless situation and thus has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of his or her situation.

In their interrogation of Art Tobias, Detectives Pere, Cortina and Arteaga repeatedly lied to Art Tobias, pretending to possess irrefutable evidence of his guilt that did not happen or exist. For example

- "In order for me to survive I went on and I what, I rolled on my friend. I dimed him out. I told on him. . . . I'm here to tell you that your day just went from bad to worse because someone that knows you did you the same way . . . " (Interrogation Transcript, P. 25-26)

- "I'm here to tell you, man, that's the video of you being captured on the 18th after midnight (Interrogation Transcript, P. 27)

- "Somebody gave you up" (Interrogation Transcript, P. 28)

- "We have proof. Here's the proof. The proof is we already asked somebody that gave you up. That's number one. Number two is we have the video to support what they said you did." (Interrogation Transcript, P. 29)

- "I showed her [your mom] the video.  She said that was you." (Interrogation Transcript, P. 36; see also Pp. 38, 39, 40, 52, 53)

- "I showed Officer East the video. He said it was you." (Interrogation Transcript, P. 36)

- "Juries know that criminals [are] stupid…The bottom line is they're going to see the video. They're going to say yeah, it looks like him.  They're going to bring your mom to take the stand, yeah, I identify that as my son. Officer Reese is going to take the stand. Yah, that was Arturo Tobias.  Your homey's ID you." (Interrogation Transcript, P. 42)

- "We got you on video bro." (Interrogation Transcript, P. 43)

---

[29]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

David Owens
Attorney at Law
June 10, 2018
Page 18

- "Your homey got killed and you guys went over there to get some pay back because your home – you guys love your Homey. How do we know? People talk, right. Your fucking Homeys talked" (Interrogation Transcript, P. 46)

- "So listen, I'm done with your bullshit, okay? I've been doing this for too damn long, okay? I'm not going to tell you everything we have. I'm not going to tell you all the evidence we have…You're full of shit.  And when this case is presented to a district attorney's office they're going to see you're a cold-blooded killer….They're going to see that you're a gangster who lies, who kills people, who has no compassion, who fucking doesn't give a shit." (Interrogation Transcript, P. 49)

- "The evidence is there. We have people rolling on you. We have video." (Interrogation Transcript, P. 52)

- "Why is he [gang member] rolling on you?" (Interrogation Transcript, P. 54)

- "They [gang members and witnesses] fucking ratted you out big time, bro. they ratted you out big time." (Interrogation Transcript, P. 54)

- "One of your homeys who is rolling on you because – he got busted for something else. We have your mom taking your picture saying that's my son. We have Officer East. We have computer evidence that we have." (Interrogation Transcript, P. 58)

- "Well, you understand we told you we have a lot of evidence" (Interrogation Transcript, P. 84)

- In addition, Detective Motto comes into the interrogation room a couple times, with his gun visible, pretending to drop off incriminating evidence against Mr. Tobias the first time.

As a century of basic psychological research on misinformation effects has shown[30] (as well as decades of applied psychological research on police lying to suspects during interrogation),[31] false evidence ploys are effective at eliciting compliance,[32] confusing some suspects into believing that they have been framed or that such evidence really does exist,[33] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of

---

[30]   Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory, *Learning & Memory*, 12, 361-366.

[31]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[32]   Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[33]   Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

David Owens
Attorney at Law
June 10, 2018
Page 19

irrefutable evidence despite knowing they did not commit a crime),[34] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[35]  Based on well-established basic and applied social scientific research going back decades, the multiple false evidence ploys that the detectives in their interrogation of Mr. Tobias increased the risk of eliciting a false and unreliable confession from him.

Given Tobias was just 13 at the time, and had repeatedly asked the detectives to see his mother, telling Tobias that is mother had identified him was particularly egregious and in my professional opinion exerted a psychologically coercive effect on him.

3) *Minimization and Maximization*.  A common interrogation strategy is for investigators to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious.  Interrogation techniques and strategies that minimize the legal seriousness of the crime, in particular, are associated with and known to increase the risk of eliciting false confessions. Such minimization strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to making or agreeing to a confession statement (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[36]  Conversely, interrogation techniques and strategies that maximize the legal seriousness of the crime – i.e., suggest that the suspect will face a bad or perhaps the worst possible outcome if he or she does not make or agree to an incriminating statement -- are also associated with and known to increase the risk of eliciting false confessions. Such maximization strategies can imply harsher treatment, confinement, punishment, sentencing and/or other negative outcomes if the suspect fails to comply and confess.  Like minimization techniques, maximization techniques have been shown to increase the risk of overbearing a suspect's will and eliciting false and unreliable confessions.

In their interrogation of Mr. Tobias, Detective Arteaga used numerous *maximization* and *minimization* interrogation techniques to persuade Mr. Tobias to stop denying their accusations and to elicit an incriminating statement from him.  For example:

---

[34]   Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[35]   Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) See also Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence," *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014).  "Constructing Rich False Memories of Committing Crime," *Psychological Science*, Pp. 1-11. Published online, January 14, 2015; and Julia Shaw (2016) THE MEMORY ILLUSION (Random House).

[36]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

David Owens
Attorney at Law
June 10, 2018
Page 20

- "By lying and everything and us showing the evidence it makes you – it makes you look like a cold blooded killer." (Interrogation Transcript, P. 37)

- "You're 13 years of age. You're a young kid. The court is going to take that into consideration.  But you can't sit here and lie to the detectives.  You can't do that. That's making you look like a cold-blooded killer" (Interrogation Transcript, P. 41)

- "Right now it looks like you're a cold-blooded gang murderer. That is serious" (Interrogation Transcript, P. 43)

- "Right now you're just a big fucking liar. Big cold blooded killer" (Interrogation Transcript, P. 46).

- "It's like a big game, retal – retaliatory murder where you're the cold-blooded killer. I know you're not a killer" (Interrogation Transcript, P. 46)

-  "So listen, I'm done with your bullshit, okay? I've been doing this for too damn long, okay? I'm not going to tell you everything we have. I'm not going to tell you all the evidence we have…You're full of shit.  And when this case is presented to a district attorney's office they're going to see you're a cold-blooded killer….They're going to see that you're a gangster who lies, who kills people, who has no compassion, who fucking doesn't give a shit." (Interrogation Transcript, P. 49)

- "You know what? I'm done with you, bro…You sound like a cold-blooded killer" (Interrogation Transcript, P. 50)

- "We have a lot more evidence than you think, and right now when we take the case to court they're going to think you're a big time gang killer who didn't want to tell the truth who is down for the hood" (Interrogation Transcript, P. 55)

- "I know you were there. But the thing is, it looks like you're a cold blooded killer. I'm telling you from experience, a judge is going to look at the overall picture" (Interrogation Transcript, P. 58)

- "We're going to write this down like you're a cold-blooded killer who doesn't care?" (Interrogation Transcript, P. 61)

- "Right now it looks like you're a cold blooded MS gangster who doesn't give a fuck, who is down for the hood." (Interrogation Transcript, P. 62)

David Owens
Attorney at Law
June 10, 2018
Page 21

In these examples, Detective Arteaga suggested that Mr. Tobias would be seen as a cold-blooded killer and murderer if he did not confess, but if he did confess he would receive benefits (e.g., more favorable treatment from the judge, "help" from the police, and avoiding harm to his family) by confessing. They used the maximization interrogation techniques of implying or suggesting that if he continued to deny and did not confess, but that he would not be if he stopped denying and confessed to the murder. The *maximization* and *minimization* techniques used by Detectives Pere, Cortina and Arteaga significantly increased the risk that Mr. Tobias' will would be overborne and that he would make or agree to a false and/or unreliable statement, admission and/or confession.

4) *Promises of Leniency and Threats of Harm*. Minimization techniques sometimes imply that the suspect will receive help, leniency, immunity, freedom and/or a different benefit in exchange for compliance and confession, and maximization techniques sometimes imply harsher treatment of punishment in the absence of compliance and confession. As discussed earlier, the use of implicit or explicit promises of leniency, immunity and/or a tangible benefit significantly increases the risk of eliciting a false and/or unreliable statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes.

In their interrogation of Mr. Tobias, Detectives Pere, Cortina, and Arteaga repeatedly used implied and explicit promises of leniency and help, and repeatedly implied that Mr. Tobias would receive harsher treatment and/or punishment if he did not confess.   For example, Detectives Pere, Cortina and Arteaga used the following promises and threats:

- Detective Pere says, "I tell this guy, hey, I'll tell you something if you tell – if you help me out so that I can get out of here." (Interrogation Transcript, P. 25).

- "I guarantee you we're going to get you some help.  You're 13 years of age. You're not – You're not going to prison for life." (Interrogation Transcript, P. 25).

- P. 41 --"You're 13 years of age. You're a young kid. The court is going to take that into consideration.  But you can't sit here and lie to the detectives." (Interrogation Transcript, P. 41).

- "If you're going to draft your mom into this let me know so I can leave, okay." (Interrogation Transcript, P. 25).

- "We're going to get you some help, okay?  We're not here trying to fucking put you in prison for the rest of your life.  That's not our responsibility. Our

responsibility is to get the truth and to get you some help. (Interrogation Transcript, P. 44).

- "Do you think they're going to throw away the key on you? No. They're going to try to get you some help. You're going to go to Eastlake and they're going to try to get you some help. But we can't help you if you're going to sit there and lie and – just be a cold-blooded killer.′ (Interrogation Transcript, P. 44).

- "Well, you know what? I think it's fucking pitiful you're dragging your mom into this. You're dragging your homeys from fucking MS into this shit" (Interrogation Transcript, P. 50).

- "We're trying to get you some help. You got to understand, we're not here to – we're not here to put people away for life" (Interrogation Transcript, P. 51).

- "I'm trying to help you out. Okay? I'm trying to help you out here…it doesn't help you out by lying when the evidence is there." (Interrogation Transcript, P. 51).

- "But when you're honest and tell the truth it's going to help you out in the long run" (Interrogation Transcript, P. 55).

- The detectives tell him "they see a young 13 year old boy who is crying, who needs help…" (Interrogation Transcript, P. 55).

- The detectives tell him "they're going to try and get you some help…I know you need help." (Interrogation Transcript, P. 55).

- "It's going to look like you're down – You're so far down for the hood that you didn't want to speak so they might throw the book at you" (Interrogation Transcript, P. 55).

- "I can't help you if you can't – if you don't want to help yourself. I'm serious. I can't help you if you don't want to help yourself." (Interrogation Transcript, Pp. 55-56).

- "when people commit murders and it was an accident, self-defense, if it's a young kid who is only 13, 14 – you're still young – they're going to try to get you some help" (Interrogation Transcript, Pp. 56-57).

- "It's up to the judge. You know what a judge looks at? The judge looks at the overall picture…Have you seen 48 hours when you – when you have a bunch of

David Owens
Attorney at Law
June 10, 2018
Page 23

gangsters lined up and they're laughing and the judge has no compassion for them and throws the book at them? And there's been other cases where guys have told the truth, they've been hones, and they get a much reduced sentence, right? Like six, seven years. Right? So it's up to the judge. It's not up to us. But I'm telling you, what the judge looks at, he looks at the overall picture…Right now the judge is looking. He's probably tonging to look at the case and say, you know what, this is a gang case." (Interrogation Transcript, P. 57)

- "Well, I'll tell you what, juvenile hall, you know, the juvenile system, they – they actually try to help kids." (Interrogation Transcript, P. 59).

- Mr. Tobias asks if he really has to tell them who he was with. Their response: "Well, you don't have to but if you really want to help yourself out, we don't know who supposedly killed him".  Do not quote, but another implied promise of help." (Interrogation Transcript, P. 66).

- "We're going to try to get you some help." (Interrogation Transcript, P. 74).

- "Okay, when we take this case to the district attorney's office we're going to try to put everything down." (Interrogation Transcript, P. 74).

- "Right now it looks like you're a cold blooded MS gangster who doesn't give a fuck, who is down for the hood." (Interrogation Transcript, P. 62).

- "So when the judge looks at the case you think he's going to give a fuck about you?" (Interrogation Transcript, P. 62).

- "You know, you're going to feel so much better when you tell the truth and that you're not worrying about what the fuck's going to happen, if the judge is going to throw the book at you or give you a light sentence." (Interrogation Transcript, Pp. 62-63).

- "But I'm telling you this, he's going to look at you a lot more – with a lot more compassion if you told the truth what happened. You didn't mean to kill him, did you? I mean, if you meant to go kill him because you were down for the hood, is that what you wanted?" ((Interrogation Transcript, P. 63).

- "Do you want to go to jail by yourself?" (Interrogation Transcript, P. 67).

- "You're scared, right? You don't want anything to happen to you – to your family, right? Help us out a little bit so we can – I don't want you to go down by yourself, you know?" (Interrogation Transcript, P. 85).

David Owens
Attorney at Law
June 10, 2018
Page 24

The use of implicit and explicit promises of leniency, immunity and/or a tangible benefit, as well as the use of implicit and explicit threats of harm, significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency and threats of harm or harsher punishment are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. There may be no psychological interrogation technique more potent than the use of threats and promises. Promises and threats (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, promises and threats contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation.

5) *Psychological Coercion*. As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions. In my professional opinion, the interrogation of Mr. Tobias by Detectives Pere, Cortina and Arteaga was *very* psychologically coercive for several reasons. First, as just discussed and illustrated, the interrogation contained implicit and explicit promises of leniency, help and benefit, as well as implicit and explicit threats of harsher punishment techniques that are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements. The detectives were in violation of the Los Angeles Police Department's interrogation policies, which admonish them, "Do not make promises or threats," (Los Angeles Police Department Homicide Manual, P. 137, LAPD 00414). This admonition is so strong that elsewhere in the same manual, the LAPD instructs its interrogators to avoid even the appearance of making a promise of leniency: "The detective must, however, be careful not to appear to be making a promise of leniency."

There is no question that the Detectives made numerous threats and promises during his interrogation of Art Tobias. Yet all the detectives have denied making any promises or threats. Clearly, they were poorly trained and do not understand what constitutes a threat of harm or promise of leniency, one of the most fundamental prohibitions in American police interrogation.

Second, in my professional opinion the investigators' interrogation techniques and pressures appear to have caused Mr. Tobias to perceive that he had no meaningful choice but to comply with theirs requests and/or demands to confess if he wished to terminate an interrogation. For example, very early in the interrogation, and before any of the "Gladys R" or any form of *Miranda* warnings were given, Tobias asks if the detectives have spoken with his mother, and "What did she say?" In response, Detective Pere states:

David Owens
Attorney at Law
June 10, 2018
Page 25

- "[W]e got to ask you some questions right here and once we get the answers to our questions then we'll be free to answer any questions of your questions, okay?" (Interrogation Transcript, at 4).

Toward the end of the interrogation, the detectives bring in Mr. Tobias' mother, and he describes to her why he was confessed:

- "Because they told me that if I don't say that I did it then I'm – that they were going to tell the judge that I'm a cold blooded killer and I'm going to get more time….They – They said if I – if I keep lying to them in their face that they're going to tell the judge that I'm a cold blooded killer and that they're going to give me – they're going to – they're going to just throw the book at me and give me a lot of time." (Interrogation Transcript, P. 89)

And again:

- "I don't know anything but I told them that I was there and this and that just so they could believe me so they could give me less time and get me out of this as soon as possible. That's why I told them that but it's not true." (Interrogation Transcript, P. 106).

- "But you should tell the judge that they forced me to. They said that…if I keep lying to them that (unintelligible) the proof they have was they have a kid looking like me that they saw he shot – shot somebody."…They said – they said if I would do – if I would say yes to that, if I would say the truth that I did it they want to go to the judge and tell him I'm a cold blooded killer and that they're going to give me more time." (Interrogation Transcript, P. 108).

Third, Mr. Tobias repeatedly asked to speak to an attorney and was denied (see, for example, Pp. 31, 52) or to remain silent (Interrogation Transcript, P. 50, 51), and repeatedly asked to speak to his mother and was denied (see, for example, Pp. 35, 44). Instead the Detectives steamrolled his requests for counsel, steamrolled over his requests to see his mother (falsely telling him at one point that she left the police station crying) and steamrolled over his requests to make a phone call (Interrogation Transcript, P. 46, 61). The detectives' steamrolling of Mr. Tobias' repeated attempts to invoke his Miranda rights to counsel and silence (and their equivalent by asking for his mother) were not only psychologically coercive, they were also both illegal and in violation of Los Angeles Police Department policy. "Generally, Department personnel should refrain from conducting custodial interrogations once a suspect in custody unequivocally invokes either the right to silence or the right to an attorney." (Office of the Chief of Police, Special Order No. 14, June 21, 2011, LAPD 00777). See also the Los Angeles Police Department Manual of Juvenile Procedures: "Any time a subject requests the services of an attorney questioning shall cease. If a juvenile requests to speak with someone else, e.g., parents,

David Owens
Attorney at Law
June 10, 2018
Page 26

probation officer, teacher, minister, etc., questioning shall cease until the reason for the
juvenile's request is ascertained." (P. 7-3,LAPD 00578).

Fourth, Mr. Tobias was handcuffed during the interrogation, trapped in a corner (unable
to physically escape if he had wanted to), and yelled and cursed at by Detective Arteaga, who
was wearing a gun during this high pressure accusatorial interrogation.  In fact, all of the
detectives who entered the interrogation room did so with their firearms on and visible to Tobias.
Each of these factors individually would exert psychologically intimidating pressure on a 13 year
old juvenile; together they psychologically coerced and overwhelmed him.  Significantly, the
leading police interrogation training manual in the United States – Inbau and Reid's CRIMINAL
INTERROGATION AND CONFESSIONS -- admonishes police interrogators not to place
criminal suspects in handcuffs because it will be perceived as coercive.  The Inbau and Reid
manual also advises police interrogators not to wear guns in the interrogation room – again
because doing so will be perceived as coercive.  Even the Los Angeles Police Department
Homicide Manual advises its interrogators not to expose their weapon to a suspect: "Frequently,
because of the effects on a suspect, officers should conceal the most apparent symbol of
authority – the weapon." (P. 135, LAPD 00412).  In addition, the LAPD Homicide manual
advises its interrogators "Do not create an atmosphere of coercion or duress." (P. 137, LAPD
00414) Yet that is exactly what the Detectives did by aggressively interrogating Mr. Tobias in
handcuffs with their guns in plain view.

Fifth, the detectives interrogated Mr. Tobias before giving him Miranda warnings,
conveyed to Mr. Tobias that they would not answer his questions until he first answered theirs,
and never sought an explicit Miranda waiver from Mr. Tobias – all of which conveyed to Mr.
Tobias that he had no meaningful choice  but to answer their questions/respond to their
accusations, and that, for all practical purposes, he did not have a meaningful choice to either
invoke Miranda warnings or not consent to the interrogation.  On P. 4 of the interrogation,
Detective Pere tells Mr. Tobias, "We got to ask you some questions right here, and once we get
the answers to our questions, then we'll be free to answer any of your questions, okay."  The
detectives go on to question Mr. Tobias for almost another twenty pages before issuing Miranda
warnings starting on P. 21 of the interrogation transcript. Instead, the detectives fail to take an
explicit waiver from the 13 year old, instead merely asking him whether he understands the
words they have said to him.  All of these factors undermined not only Mr. Tobias ability to
exercise his Miranda rights, but also his perceived freedom to consent to the interrogation that
followed, and thus were highly psychologically coercive.

6) *Personality Traits as Risk Factors for False and/or Involuntary Confessions*.  In
addition to the *situational* risk factors present here – guilt-presumptive accusatory interrogation,
false evidence, minimization and maximization, promises and threats and psychological coercion
– Mr. Tobias, who was merely 13 years old at the time of interrogation, was at a heightened risk
of making and/or agreeing to a false and/or unreliable confession statement because of many of
his personality traits and characteristics, i.e., *personal* risk factors.  Juveniles are
disproportionately represented in the reported false confession cases.  They are particularly

David Owens
Attorney at Law
June 10, 2018
Page 27

vulnerable to the pressures of psychological interrogation for many of the same reasons as the mentally handicapped.  Adolescence is associated with psychological traits such as greater suggestibility, impulsiveness, emotional arousability, and a tendency to focus on the present rather than the future.  These psychological tendencies of youth significantly increase the risk of false confessions.  The risks are compounded by the fact that although police officers may realize that juvenile suspects are easily influenced, interrogators often apply the same interrogations tactics on juveniles that they use on adults.  Indeed, the depositions of Pere, Cortina, and Motto confirm that these interrogators did not take any steps to alter their interrogation techniques due to Tobias's young age nor did they appear to be aware of any special precautions when interrogating juveniles

. In addition to violating the Miranda protocols, the detectives also tainted the Gladys R requirement by not giving the Miranda warnings until after asking the Gladys R questions, and by signaling early in the interrogation that Mr. Tobias had no choice but to answer their questions first before he would answer theirs (Interrogation transcript, P. 4).

7) *Police Contamination and Scripting.* As mentioned earlier, police interrogators are universally trained not to contaminate a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements.  The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination taints and prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but the mistaken claim is made that they were volunteered by the suspect).  Related to contamination, police investigators sometimes "script" a suspect's confession when they not only provide the suspect with details of the crime, but coach or lead the suspect to adopt a narrative of how and why he and/or she committed the crime.  Like contamination, scripting can make otherwise completely false confessions appear not only to be true but persuasively so.[37]

As the interrogation transcript indicates, the detectives repeatedly fed crime details to Mr. Tobias, sometimes violating national police interrogation best practices standards that admonish police never to leak or disclose non-public facts to the suspect.  Some examples of the investigators contamination and/or scripting include:

- Showing Tobias surveillance video of the shooting.

- Telling Tobias the location of the shooting—Alvarado Terrace, by Pico and Hoover  (Interrogation Transcript, P. 29-30)

---

[37] Richard A. Leo (2008).  *Police Interrogation and American Justice* (Harvard University Press).

David Owens
Attorney at Law
June 10, 2018
Page 28

- "The murder was Saturday morning" (Interrogation Transcript, P. 45).

- "Your homey got killed and you guys went over there to get some pay back because your home – you guys love your Homey. How do we know? People talk, right. Your fucking Homeys talked" (Interrogation Transcript, P. 46)

- The detectives tell him (again) that the murder happened at 12:40 am (Interrogation Transcript, P. 53)

- That two people were involved ("The other person who shot. You shot and there was one other person from – from your hood that shot.") (Interrogation Transcript P. 56)

- The detectives believed motive for the crime. ("It's a gang retaliation – gang retaliation murder.")

- The victim died. (Interrogation Transcript, P. 59)

- "There were two types of guns." (Interrogation Transcript, P. 71)

- The other shooter, not in the video, "was across the street." (Interrogation Transcript, P. 72)

Police contamination and scripting is not so much a risk factor for eliciting a false confession – since it often occurs after an admission has already been made – as much as of making an otherwise false confession appear true.  Police contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is then said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and that it contains characteristics that most people associate with a true confession (e.g., a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[38]  Contamination and scripting therefore increase the risk that once a suspect has made or agreed to a false confession to a crime he or she did not commit, third parties – such as prosecutors, judges, juries, the media and outside observers – will mistakenly believe that the confession is, in fact, true.

## XII. Conclusion

In conclusion, a robust, peer-viewed empirical social science research literature has documented that, and sought to explain the underlying causes why, a substantial number of

---

[38] Richard A. Leo (2008).  *Police Interrogation and American Justice* (Harvard University Press).

David Owens
Attorney at Law
June 10, 2018
Page 29

innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit.  If called to testify at trial, I believe that I would provide both general, educational testimony describing the social science research on the psychology of police interrogation and false confessions, as well as the following case-specific opinions:

1) The custodial interrogation of Art Tobias was guilt presumptive, accusatory and theory-driven. The interrogation was not structured to find the truth but, instead, to intentionally incriminate Art Tobias by coercively, deceptively and unlawfully breaking down his denials of guilt and eliciting a statement of guilt from him that was consistent with the detectives' pre-existing and prematurely formed assumptions, beliefs and speculations about who must have committed the crime.

2) Detectives Pere, Cortina, and Arteaga used interrogation techniques that are known to increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confessions when misapplied to the innocent (i.e., *situational* risk factors). These included:  guilt presumptive accusatory interrogation; false evidence ploys, minimization and maximization, implied and explicit promises of leniency (in exchange for agreeing to the interrogators' accusations) and implicit and explicit threats of harsher punishment (if the absence of agreeing to the interrogators' accusations).

3) Detectives Pere, Cortina and Arteaga's interrogation of Art Tobias was psychologically coercive: They used interrogation techniques that, as social science research has shown, are highly likely to cause a suspect to perceive that he or she has no choice but to comply with the interrogator's demands and/or requests, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions.

4) Art Tobias was at a substantially heightened risk during his interrogation of having his will overborne and making and/or agreeing to a false and unreliable confession statement because of his personality traits and psychological make-up (i.e., *personal* risk factors), especially his youth and psychosocial immaturity at the time.  Mr. Tobias' personality traits rendered him both more compliant and more suggestible in the face of sustained interrogation from multiple seasoned homicide detectives.

5) The interrogation of Art Tobias by Detectives Pere, Cortina and Arteaga involved interrogation contamination (i.e., leading and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Mr. Tobias' confession statement would, misleadingly, appear to be detailed and self-corroborating.

6) Detective Pere, Cortina and Arteaga repeatedly violated national police interrogation training, standards and practices in their custodial interrogation of Art Tobias, thereby

David Owens
Attorney at Law
June 10, 2018
Page 30

substantially increasing the risk that they would elicit both involuntary and unreliable statements, admissions and/confessions from him.

    The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me.  Should any additional information or testimony come to my attention, I reserve the right to supplement and/or modify any opinions expressed herein accordingly.

    If you have any questions, please do not hesitate to contact me.

            Sincerely yours,

            Richard A. Leo, Ph.D., J.D.
            Hamill Family Professor of Law and
            Social Psychology
            University of San Francisco