# EXHIBIT 7

**TO PLAITNIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*
NUMBER 2, SEEKING EXCLUSION OF EXPERT TESTIMONY**

*Journal of Empirical Legal Studies*
Volume 7, Issue 2, 231–247, June 2010

# Juror Beliefs About Police Interrogations, False Confessions, and Expert Testimony

*Mark Costanzo, Netta Shaked-Schroer, and Katherine Vinson\**

Although there has been a rapid expansion in research on police interrogations and false confessions, little is known about the beliefs of potential jurors as to these issues. In collaboration with a trial research firm, we recruited 461 jury-eligible men and women who matched the demographic characteristics of jury pools in several states. Surrogate jurors responded to questions and statements in five areas: likely rates of false confessions for different crimes, the ability to discern true from false confessions, beliefs about false confessions, beliefs about permissible interrogation tactics, and beliefs about expert testimony on police interrogations. Results indicated that jurors believed that police interrogators are better than ordinary people at identifying lies and that this ability improves with experience. Jurors believed that they would be able to differentiate a true confession from a false confession by watching a videotape, but were less confident about making such a differentiation from an audio recording. A large majority of the sample reported that it would be helpful to hear expert testimony about interrogation techniques and reasons why a defendant might falsely confess to a crime. There were no significant gender differences. Compared to whites, nonwhite jurors had significantly less confidence in the abilities of the police and gave significantly higher estimates of false confession rates. Results are discussed in light of prior research and implications for jury decision making and expert testimony.

## I. Introduction

False confessions are a significant cause of wrongful convictions (Drizin & Leo 2004; Scheck et al. 2000). Particularly during the past two decades, researchers have used a variety of research methods to deepen our understanding of the interrogation process and the social influence techniques that sometimes lead to false confessions and wrongful convictions (Davis & O'Donahue 2003; Gudjonsson 2003; Kassin & Gudjonsson 2004; Leo et al. 2008).

A series of laboratory experiments by Kassin and his colleagues illustrate the power of confessions. For example, Kassin and Neumann (1997) systematically compared eyewitness, character, and confession evidence, and found that confessions produced the highest conviction rate among mock jurors. Extending this basic finding, Kassin and Sukel (1997)

---

*Address correspondence to Mark Costanzo, Claremont McKenna College, 850 Columbia Ave., Claremont, CA 92651; email: mark.costanzo@cmc.edu. Costanzo is Professor of Psychology & Co-Director, Center for Applied Psychological Research at Claremont McKenna College; Shaked-Schroer and Vinson are at the Claremont Graduate University.

found that even when mock jurors recognized that a confession was coerced, they were not able to discount it when reaching a verdict. More recently, laboratory researchers have induced college students to confess to cheating (Russano et al. 2005). Using this cheating paradigm, researchers have found that the risk of false confessions significantly increases when implied promises of leniency are used, and when a more accusatory interrogation style is used (Rigoni & Meissner 2008).

Systematic analyses of actual cases have greatly expanded our knowledge of false confessions. Based on case studies uncovered by the "Innocence Project" and others, we do know that approximately 24 percent of known wrongful convictions appear to involve false confessions (Innocence Project, n.d.). In the most comprehensive study of false confessions to date, Drizin and Leo (2004) examined 125 proven false confessions. They found that 80 percent of these false confessions occurred in murder cases, another 9 percent involved rape, and 3 percent involved arson. Although this overrepresentation of serious cases may be partly due to the greater availability of DNA evidence in murder and rape cases (Costanzo & Leo 2007), it is also likely to be the result of strong pressure on police to solve cases involving violent crime (Warden 2003). An especially important finding of the Drizin and Leo (2004) study was that when suspects falsely confessed and then pled "not guilty" and proceeded to trial, the conviction rate was 81 percent. Other research on actual cases has made use of systematic observation to analyze police tactics during actual interrogations (Corwin 2003; Leo 1996). These observational studies have shed light on some possible causes of false confessions, including lying about incriminating evidence, implied threats of punishment or promises of leniency, and individual vulnerabilities (Gudjonsson 2004).

In the area of interrogations and false confessions, there has been relatively little research exploring the beliefs and abilities of key actors in the legal system such as judges, police, and jurors. There has been almost no research on judges, probably because of the difficulty of gaining access to this important group. However, one recent study exposed judges to an interrogation viewed from different camera angles (Lassiter et al. 2007). Findings revealed that judges showed the same perceptual bias as mock jurors: a camera perspective showing only the suspect led to higher ratings of guilt and voluntariness than did a neutral "equal-focus" camera perspective showing both the suspect and the interrogator (Lassiter & Geers 2004). Using a questionnaire, a group of researchers recently analyzed police beliefs about the interrogation process (Kassin et al. 2007). Police investigators responding to the questionnaire estimated that about 68 percent of suspects make self-incriminating statements during interrogation. One striking finding was that police estimated that they could distinguish between truthful and deceptive statements from suspects at about a 77 percent rate of accuracy. This estimate is at odds with the available research. For example, in an experimental study comparing the lie detection abilities of police and college students, Kassin et al. (2005) found that although college students performed slightly better than chance at detecting lies, police did not. However, despite their poorer performance, police were significantly more confident about the accuracy of their judgments.

We know very little about juror beliefs in the area of interrogations and false confessions. One recent study made use of an Internet questionnaire to asses the attitudes of potential jurors (Chojnacki et al. 2008). Among the interesting findings of this study were

that 80 percent of respondents believed jurors would benefit from hearing expert testimony on interrogations and confessions; that 67 percent of respondents agreed that an innocent person would falsely confess to a crime after "strenuous pressure"; and that only 43 percent of respondents knew that interrogators are allowed to lie to suspects. This study produced some provocative findings, but used an unrepresentative convenience sample of potential jurors who were younger (63 percent aged 29 or less), better educated (94 percent with some college a college degree), more Caucasian (88 percent), and more female (72 percent) than the actual jury pool.

Research on jurors' beliefs is important because it is jurors who must evaluate the veracity of disputed confessions when making verdict decisions. Potential jurors arrive in the courtroom with beliefs, preconceptions, expectations, and biases. These beliefs—whether accurate or not—shape how jurors process and interpret evidence presented at trial. Indeed, research exploring the story model of juror decision making has demonstrated that jurors use their preexisting beliefs to construct narratives about whether a defendant is guilty (Huntley & Costanzo 2003; Olsen-Fulero & Fulero 1997; Pennington & Hastie 1994). To gain a full, empirically-based understanding of police interrogations and false confessions, we need research on jurors.

A second reason for studying jurors is that judges' decisions about whether to allow expert testimony at trial are largely determined by assumptions about jurors. Under *Daubert* (1993), judges have substantial discretion in deciding whether an expert witness will be permitted to testify. The decision to exclude such testimony is typically based on nothing more than judges' untested assumptions about what jurors believe and how jurors might be influenced by expert testimony. Similarly, defense attorneys must argue for allowing expert testimony without the benefit of data on what potential jurors are likely to know and believe. Despite the large and growing research literature on the psychology of interrogations and false confessions, there has been little research on juror attitudes toward interrogations and confessions. Some courts have taken note of this lack of research, and have excluded expert testimony on the grounds that there is no research showing that the content of expert testimony would be helpful for the average juror (*State v. Free* 2002).

An understanding of juror beliefs is also important for expert witnesses. If a false or disputed confession is presented at trial, the best means of challenging that confession is likely to be expert testimony. As the U.S. Supreme Court concluded in *Crane v. Kentucky* (1986):

> a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility. . . . stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?

Expert testimony has several functions: to educate jurors about police interrogation tactics, to summarize research on interrogations and confessions, and to explain how interrogation pressures and individual characteristics can sometimes lead to false confessions (Costanzo & Leo 2007; Fulero 2004). Generally, it is the job of the expert witness to

*234   Costanzo et al.*

assist the factfinder by pointing out what factors should be considered in evaluating the reliability of a confession. Jurors can then decide how much weight should be assigned to the disputed confession. Experts are charged with the difficult task of making research on interrogation tactics and false confessions clear and accessible to jurors. Knowledge of juror preconceptions is helpful for deciding what issues should be emphasized by experts. For all these reasons, research on juror beliefs is critical.

*A. The Present Study*

The study described below was an attempt to advance our understanding of juror beliefs about police interrogations and the possibility of false confessions. We recruited participants who matched actual jury pools. Many studies have relied on college student mock jurors who are not representative of actual jury pools. While there is some controversy about the external validity of college student samples (Bornstein 1999), the lack of realistic samples makes it difficult to convince legal professionals that research findings are generalizable to actual jurors. It is imperative to have a diverse, realistic sample of jurors that is demographically varied and similar to actual jury pools.

## II. Method

*A. Participants*

Four-hundred-sixty-one jury-eligible men and women were recruited by a professional trial research firm. The research firm was hired by corporate clients to collect data on juror psychology and trial strategy for actual cases that were likely to be litigated. Each research participant was paid $250 for one seven-hour day. The questionnaire used for the current study was unrelated to the corporate-sponsored research. The data used in this study were collected during seven research sessions. These sessions were conducted in the cities of Chicago, Illinois; Green Bay, Wisconsin; Las Vegas, Nevada; Los Angeles, California; New York, New York; Sacramento, California; and San Francisco, California. Surrogate jurors were selected to match the demographic characteristics of the jury pool in each city where the research was conducted. In an effort to match the actual venue jury pools, specific requirements were met by each surrogate juror. First, Census data for the venue were collected and carefully reviewed. Surrogate jurors fit into specific demographic categories relating to gender, age, race, education, and occupation. This was accomplished by using Census data to determine what percentage of surrogate jurors should be in each category. Although Census data provide a rough indication of the jury pool in a particular location, they do not include some information that is critical for jury service (e.g., which adult residents of an area have a valid driver's license or voter registration; which residents are fluent in the English language; which former residents have died or moved away from the area; what new residents have moved into the area; and which people have turned 18 years old since the time of last Census). In an additional effort to make the sample similar to actual jury panels in each location, trial lawyers who frequently practiced in each jurisdiction were consulted. These attorneys reviewed the participant characteristics and suggested

Table 1:  Demographic Characteristics of Participants ($N = 461$)

| Demographic Characteristic | N |
| --- | --- |
| Age | |
|   18–35 | 146 |
|   36–50 | 172 |
|   51+ | 143 |
| Gender | |
|   Male | 209 |
|   Female | 252 |
| Race | |
|   White | 223 |
|   Hispanic | 98 |
|   Black | 91 |
|   Asian | 34 |
|   Native American | 3 |
|   Other | 12 |
| Income | |
|   Under $20,000 | 68 |
|   $21,000–$40,000 | 115 |
|   $41,000–$60,000 | 114 |
|   $61,000–$80,000 | 77 |
|   $81,000–$100,000 | 52 |
|   Over $100,000 | 35 |
| Highest Level of Education Completed | |
|   Some high school or less | 28 |
|   High school diploma | 59 |
|   Some college or technical school | 172 |
|   Technical school degree | 21 |
|   College degree | 115 |
|   Some graduate school | 21 |
|   Graduate degree | 45 |

changes to make the participant sample better reflect the composition of actual jurors in the venue. Adjustments in recruiting were made in response to the recommendations of the trial lawyers. Finally, all participants were required to present a current driver's license and/or proof of voter registration.

    Table 1 summarizes the demographic characteristics of the surrogate jurors who participated in this study. Responses to nine demographic questions were obtained from each surrogate juror: age, gender, education level, ethnic background, marital status, parental status, annual household income, employment status, and occupation. Of the 461 jurors, 209 were male and 252 were female. Most checked the age category of 36 to 50 years old, and roughly half the sample fell into the annual income categories of either $21,000 to $40,000 or $41,000 to $60,000. Educational level varied considerably among our sample—18.9 percent had a high school degree or less, 28.6 percent reported some postgraduate work or a graduate degree, and the largest group (37.3 percent) reported having some college or technical school coursework. The racial distribution was as follows:

*236    Costanzo et al.*

48.4 percent Caucasian, 21.3 percent Hispanic, 19.7 percent African American, 7.4 percent Asian, 0.7 percent Native American, and 2.6 percent other. Put differently, roughly half the participants (51.6 percent) were nonwhite, and half (48.4 percent) were white. Table 2 provides a detailed breakdown of the demographic characteristics of the surrogate jurors by city.

*B. Procedure*

As participants arrived at the designated hotel, they were met and checked in by a research assistant. The check-in process involved showing picture identification, as well as a confirmation letter sent to respondents by the recruiting company. All participants read and signed informed consent forms agreeing to participate in the research project. Surrogate jurors were told that their individual responses would remain confidential, their names would not be attached to their answers, and they were free to withdraw at any time without penalty. Before any data were collected, a moderator informed respondents that they were going to be participating in an abbreviated, simulated trial that would involve listening to attorney arguments and key testimony and then answering questions about their reactions to the evidence. The questionnaire used in this study was administered to participants at the beginning of the day, prior to their participation in the corporate-sponsored trial simulations.

1. Materials

Each surrogate juror was assigned his or her own hand-held electronic recording device. On the face of the device is a dial that respondents can turn up to a range of 270 degrees in order to select a response. An LED screen above the dial allowed the respondents to view the responses they were about to select using a scale that was customized for the type of question asked. Questions were projected onto a large screen (9 × 6 ft.) at the front of the room. As each question appeared on the screen, surrogate jurors dialed in their answers, which were transmitted to a computer and were automatically entered into an SPSS spreadsheet.

On 15 of the questions, participants responded using a 10-point Likert scale where 1 designated "strongly disagree" and 10 indicated "strongly agree." Five additional questions asked for estimates on a 0–100 percent scale. The questionnaire addressed five areas: (1) the ability to discern true from false confessions (e.g., "Trained police interrogators are better than ordinary people at identifying lies"), (2) beliefs about false confessions (e.g., "If interrogated by the police, I would falsely confess to a serious crime"), (3) rates of false confessions (e.g., "What percentage of confessions in murder cases are false?"), (4) beliefs about permissible tactics (e.g., "To help persuade suspects to confess, interrogators should be allowed to lie to a suspect, falsely claiming that an eyewitness has identified him"), and (5) beliefs about expert testimony (e.g., "It would be useful for jurors to hear an expert testify about interrogation techniques used by police"). In answering the questions, respondents were instructed to assume that the interrogations did not involve physical threats or physical harm.

*Juror Beliefs About Interrogations*   237

Table 2: Participant Demographics by Data Collection Location (N = 461)

| | | New York (N = 220) | San Francisco (N = 90) | Sacramento (N = 24) | Las Vegas (N = 21) | Chicago (N = 21) | Los Angeles (N = 55) | Green Bay (N = 30) |
|---|---|---|---|---|---|---|---|---|
| | | | | | *City* | | | |
| Gender | Male | 45.5% | 50.0% | 45.8% | 42.9% | 57.1% | 34.5% | 43.3% |
| | Female | 54.5% | 50.0% | 54.2% | 57.1% | 42.9% | 65.5% | 56.7% |
| Race | Caucasian | 45.0% | 37.8% | 66.7% | 28.6% | 61.9% | 54.5% | 83.3% |
| | Hispanic | 24.5% | 14.4% | 16.7% | 28.6% | 14.3% | 29.1% | 6.7% |
| | African American | 21.4% | 26.7% | 12.5% | 33.3% | 9.5% | 12.7% | 3.3% |
| | Asian | 6.4% | 16.7% | 4.2% | 9.5% | 4.8% | 0% | 3.3% |
| | Native American | 0% | 1.1% | 0% | 0% | 4.8% | 0% | 3.3% |
| | Other | 2.7% | 3.3% | 0% | 0% | 4.8% | 3.6% | 0% |
| Age | 18–35 | 33.2% | 31.1% | 25.0% | 38.1% | 19.0% | 27.3% | 40.0% |
| | 36–50 | 35.5% | 41.1% | 41.7% | 33.3% | 47.6% | 34.5% | 36.7% |
| | 51+ | 31.4% | 27.8% | 33.3% | 28.6% | 33.3% | 38.2% | 23.3% |
| Income | $0–30,000 | 22.7% | 28.9% | 16.7% | 33.3% | 42.9% | 21.8% | 36.7% |
| | $31–60,000 | 39.0% | 41.1% | 25.0% | 33.3% | 38.1% | 40.0% | 40.0% |
| | $61–90,000 | 18.6% | 27.8% | 41.7% | 23.8% | 19.0% | 32.7% | 13.3% |
| | Over $91,000 | 19.5% | 2.2% | 16.7% | 9.5% | 0% | 5.5% | 10.0% |
| Marital Status | Married | 28.2% | 27.8% | 54.2% | 23.8% | 38.1% | 52.7% | 56.7% |
| | Single | 50.0% | 43.3% | 20.8% | 52.4% | 14.3% | 27.3% | 23.3% |
| | Divorced/separated | 7.7% | 14.4% | 16.7% | 9.5% | 33.3% | 16.4% | 13.3% |
| | Widowed | 2.3% | 1.1% | 4.2% | 14.3% | 9.5% | 0% | 3.3% |
| | Live w/partner | 11.8% | 13.3% | 4.2% | 0% | 4.8% | 3.6% | 3.3% |
| Education | Some college/technical school or less | 52.7% | 55.6% | 62.5% | 47.6% | 66.7% | 67.3% | 56.7% |
| | College/technical degree or more | 47.3% | 44.4% | 37.5% | 52.4% | 33.3% | 32.7% | 43.3% |
| Employment | Full time | 52.3% | 36.7% | 41.7% | 52.4% | 47.6% | 40% | 30.0% |
| | Part time | 21.4% | 26.7% | 8.3% | 19.0% | 23.8% | 29.1% | 26.7% |
| | Unemployed | 9.1% | 15.6% | 0% | 14.3% | 0% | 1.8% | 6.7% |
| | Student | 2.3% | 3.3% | 0% | 0% | 0% | 0% | 0% |
| | Homemaker | 4.5% | 2.2% | 20.8% | 0% | 4.8% | 5.5% | 20.0% |
| | Disabled | 2.7% | 6.7% | 4.2% | 0% | 0% | 5.5% | 3.3% |
| | Retired | 7.7% | 8.9% | 25.0% | 14.3% | 23.8% | 18.2% | 13.3% |

## III. Results

Means, standard deviations, and frequencies for responses across all participants are listed in Table 3. Responses of 1–4 on the 10-point scale were classified as "Disagree," responses of 5–6 were coded as "Uncertain," and responses of 7–10 were coded as "Agree." It is important to acknowledge that the mid-scale ratings (5 or 6) that we label as "uncertain" are also uncertain in their meaning—such noncommittal ratings may indicate uncertainty, neutrality, lack of conviction, or confusion (Saucier & Goldberg 2002).

### A. Beliefs About Interrogation Tactics

Participants indicated the extent of their agreement with statements that police should be permitted to engage in various interrogation tactics. Participants gave the lowest rating of agreement (9.5 percent) to the technique of falsely claiming that a suspect failed a polygraph test. The rate of agreement was only slightly higher for lying about the presence of matching fingerprints or DNA (16.9 percent), lying about the existence of an eyewitness who identified the suspect (18 percent), threatening a longer sentence (19.5 percent), or promising a more lenient sentence in exchange for a confession (24.3 percent). Put differently, a substantial majority of participants responded that they disagreed with interrogators' use of all five of these techniques. In addition, 63 percent of participants agreed with the statement that police should conduct an investigation to make sure the suspect actually committed the crime before subjecting that suspect to an interrogation.

### B. Detecting Lies and False Confessions

Participants tended to agree with the statement that police interrogators are better than ordinary people at identifying lies (53.2 percent), and with the statement that interrogators' ability to detect lies improves with experience (60.1 percent). Participants were considerably more uncertain about their own ability to distinguish between true and false statements. Only 18.7 percent agreed with the statement that they would be able to differentiate a true confession from a false confession by listening to an audiotape of an interrogation. However, more than twice that percentage (39.9 percent) agreed with the statement that they would be able to differentiate a true confession from a false confession by watching a videotape of an interrogation. This audio versus audio+video difference was significant, $t(460) = -12.17$, $p < 0.001$. Finally, participants believed that a false confession might be persuasive to juries—they estimated that there was a 52.1 percent chance that a jury would convict a suspect who falsely confessed to a murder, even when there was no other evidence that he or she was guilty.

### C. Beliefs About False Confessions

Jurors did not believe that they would falsely confess to a crime. When asked about minor crimes, 91.3 percent disagreed that they would be likely to falsely confess when interrogated by police. When asked about serious crimes (e.g., murder or rape), even more of the respondents (93.3 percent) said they would not falsely confess.

Table 3:   Overall Ratings ($N = 461$)

| Statement | M (SD) | Disagree | Uncertain | Agree |
|---|---|---|---|---|
| **Beliefs About Permissible Tactics** | | | | |
| To help police persuade suspects to confess, interrogators should be permitted to promise a more lenient sentence | 4.32 (2.75) | 237 | 112 | 112 |
| To help police persuade suspects to confess, interrogators should be permitted to threaten a longer sentence | 3.67 (2.81) | 293 | 78 | 90 |
| To help police persuade suspects to confess, interrogators should be permitted to lie about the existence of an eyewitness | 3.47 (2.88) | 303 | 75 | 83 |
| To help police persuade suspects to confess, interrogators should be permitted to lie about the presence of matching fingerprints or DNA | 3.27 (2.79) | 317 | 66 | 78 |
| To help police persuade suspects to confess, interrogators should be permitted to falsely claim that the suspect failed a polygraph test | 2.72 (2.45) | 349 | 68 | 44 |
| Before police interrogate a suspect with the goal of getting him or her to confess, they should conduct an investigation to make sure the suspect actually committed the crime | 7.04 (2.45) | 95 | 75 | 291 |
| **Detecting True and False Confessions** | | | | |
| Trained police interrogators are better than ordinary people at identifying lies | 6.28 (2.81) | 114 | 102 | 245 |
| Interrogators' ability to detect lies improves with experience | 6.78 (2.54) | 79 | 105 | 277 |
| If I were to listen to an audiotape of an interrogation and confession, I would be able to tell if the confession was true or false | 4.45 (2.35) | 204 | 171 | 86 |
| If I were to watch a videotape of an interrogation and confession, I would be able to tell if the confession was true or false | 5.59 (2.41) | 137 | 140 | 184 |
| A jury will convict an innocent suspect who falsely confessed to a murder when there is no other evidence that he or she is guilty | 52.1% (2.95) | — | — | — |
| **Beliefs About Expert Testimony** | | | | |
| It would be useful for jurors to hear an expert witness testify about interrogation techniques used by police | 7.27 (2.33) | 49 | 103 | 309 |
| It would be useful for jurors to hear an expert witness testify about why a defendant might falsely confess to a crime he or she did not commit | 7.15 (2.42) | 56 | 109 | 296 |
| **Beliefs About False Confessions** | | | | |
| If interrogated by the police, I would falsely confess to a minor crime | 1.68 (1.90) | 421 | 22 | 18 |
| If interrogated by the police, I would falsely confess to a serious crime | 1.58 (1.93) | 430 | 8 | 23 |
| Innocent suspects are more likely than guilty suspects to consent to police questioning without an attorney present | 6.02 (3.18) | 143 | 89 | 229 |
| **Rates of False Confessions** | | | | |
| Percentage of confessions in theft cases that are false | 24.2% (1.91) | — | — | — |
| Percentage of confessions in rape cases that are false | 22.5% (2.26) | — | — | — |
| Percentage of confessions in child molestation cases that are false | 19.5% (2.27) | — | — | — |
| Percentage of confessions in murder cases that are false | 22.3% (2.21) | — | — | — |

Participants also tended to believe that innocent suspects were more likely than guilty suspects to agree to be questioned by police without an attorney present. About half (49.7 percent) agreed with this statement, while only 31 percent disagreed.

We asked jurors to estimate the rates of false confessions in a variety of case types. The rate of false confessions was believed to be highest in theft cases (24.2 percent), but slightly lower for rape (22.5 percent), murder (22.3 percent), and child molestation cases (19.5 percent).

*D. Beliefs About Expert Testimony*

An overwhelming majority of participants indicated receptiveness to expert testimony. Roughly three-quarters (74.3 percent) indicated that it would be useful for jurors to hear an expert witness testify about interrogation techniques used by police, and only 11.8 percent indicated that they would not find such testimony helpful. Similarly, when asked if it would be helpful to hear testimony from an expert about why a defendant might falsely confess to a crime he or she did not commit, 71.2 percent said that such testimony would be helpful, while only 13.5 percent believed that it would not.

*E. Group Differences*

A MANOVA was carried out on all questions as a function of gender. No significant gender differences were found.

A second MANOVA was run to determine if the responses of white surrogate jurors ($N = 223$) differed from the responses of nonwhite surrogate jurors ($N = 238$). The differences between white and nonwhite participants are summarized in Table 4.

Nonwhite participants were significantly more likely than white participants to believe that they would falsely confess to a minor ($F(1, 459) = 5.37$, $p < 0.05$) or a serious ($F(1, 459) = 4.97$, $p < 0.05$) crime. Compared to whites, nonwhites were also significantly more likely to give higher estimates of the probability of false confessions in theft cases ($F(1, 459) = 13.94$, $p < 0.001$), child molestation cases ($F(1, 459) = 7.75$, $p < 0.05$), rape cases ($F(1, 459) = 18.85$, $p < 0.001$), and murder cases ($F(1, 459) = 6.27$, $p < 0.05$).

Whites also indicated greater confidence in the abilities of the police. Compared to nonwhites, white participants were significantly more likely to believe that police are better than ordinary people at detecting lies ($F(1, 459) = 10.74$, $p < 0.05$) and marginally more likely to believe that the interrogators' ability to detect lies improves with experience ($F(1, 459) = 3.57$, $p = 0.06$). With respect to police tactics, whites were more likely to believe that interrogators should be allowed to threaten a suspect with a longer prison sentence if he or she does not confess ($F(1, 459) = 4.60$, $p < 0.05$).

## IV. Discussion

The findings presented above make a significant contribution to the understudied area of juror beliefs about interrogations, confessions, and the usefulness of expert testimony. Perhaps the most straightforward finding of this study is that a strong majority of surrogate

Table 4: Response Differences Between White ($N = 223$) and Nonwhite ($N = 238$) Participants

| Statement | Race | M (SD) | Median | F(1, 459) |
|---|---|---|---|---|
| If interrogated by the police, I would falsely confess to a minor crime | White | 1.47 (1.50) | 1.00 | 5.37** |
|  | Nonwhite | 1.88 (2.19) | 1.00 |  |
| If interrogated by the police, I would falsely confess to a serious crime | White | 1.39 (1.60) | 1.00 | 4.97** |
|  | Nonwhite | 1.75 (2.18) | 1.00 |  |
| Percentage of confessions in theft cases that are false | White | 3.08 (1.76) | 2.00 | 13.94*** |
|  | Nonwhite | 3.74 (1.99) | 3.00 |  |
| Percentage of confessions in rape cases that are false | White | 2.79 (1.90) | 2.00 | 18.85*** |
|  | Nonwhite | 3.68 (2.47) | 3.00 |  |
| Percentage of confessions in child molestation cases that are false | White | 2.65 (2.04) | 2.00 | 7.75** |
|  | Nonwhite | 3.24 (2.44) | 2.00 |  |
| Percentage of confessions in murder cases that are false | White | 2.99 (1.99) | 2.00 | 6.27** |
|  | Nonwhite | 3.50 (2.38) | 3.00 |  |
| Innocent suspects are more likely than guilty suspects to consent to police questioning without an attorney | White | 6.36 (3.10) | 7.00 | 5.02** |
|  | Nonwhite | 5.70 (3.27) | 5.50 |  |
| Before police officers interrogate a suspect, they should conduct an investigation to make sure he or she actually committed the crime | White | 7.07 (2.77) | 8.00 | 0.04 |
|  | Nonwhite | 7.02 (2.97) | 8.00 |  |
| To help police persuade suspects to confess, interrogators should be permitted to promise a more lenient sentence | White | 4.42 (2.57) | 5.00 | 0.55 |
|  | Nonwhite | 4.23 (2.91) | 4.00 |  |
| To help police persuade suspects to confess, interrogators should be permitted to threaten a longer sentence | White | 3.96 (2.77) | 4.00 | 4.60** |
|  | Nonwhite | 3.39 (2.83) | 2.00 |  |
| To help police persuade suspects to confess, interrogators should be permitted to lie about the existence of an eyewitness | White | 3.69 (2.88) | 3.00 | 2.42 |
|  | Nonwhite | 3.27 (2.87) | 2.00 |  |

*242    Costanzo et al.*

Table 4    *Continued*

| Statement | Race | M (SD) | Median | F(1, 459) |
|---|---|---|---|---|
| To help police persuade suspects to confess, interrogators should be permitted to lie about the presence of matching fingerprints or DNA | White | 3.38 (2.77) | 2.00 | 0.70 |
| | Nonwhite | 3.16 (2.80) | 2.00 | |
| To help police persuade suspects to confess, interrogators should be permitted to falsely claim that the suspect failed a polygraph test | White | 2.91 (2.58) | 1.00 | 2.50 |
| | Nonwhite | 2.55 (2.31) | 1.00 | |
| Trained police interrogators are better than ordinary people at identifying lies | White | 6.72 (2.50) | 7.00 | 10.74** |
| | Nonwhite | 5.87 (3.01) | 6.00 | |
| Interrogators' ability to detect lies improves with experience | White | 7.01 (2.29) | 7.00 | 3.57* |
| | Nonwhite | 6.57 (2.75) | 7.00 | |
| If I were to listen to an audiotape of an interrogation and confession, I would be able to tell if the confession was true or false | White | 4.37 (2.24) | 5.00 | 0.58 |
| | Nonwhite | 4.53 (2.44) | 5.00 | |
| If I were to watch a videotape of an interrogation and confession, I would be able to tell if the confession was true or false | White | 5.54 (2.27) | 6.00 | 0.17 |
| | Nonwhite | 5.63 (2.53) | 6.00 | |
| It would be useful for jurors to hear an expert witness testify about interrogation techniques used by police | White | 7.23 (2.12) | 7.00 | 0.14 |
| | Nonwhite | 7.31 (2.51) | 8.00 | |
| It would be useful for jurors to hear an expert witness testify about why a defendant might falsely confess to a crime he or she did not commit | White | 7.29 (2.28) | 8.00 | 1.40 |
| | Nonwhite | 7.03 (2.54) | 7.00 | |
| Probability that a jury will convict an innocent suspect who falsely confessed to a murder when there is no other evidence that he or she is guilty | White | 6.35 (2.86) | 6.00 | 1.03 |
| | Nonwhite | 6.08 (3.03) | 6.00 | |

NOTE: ***$p < 0.001$; **$p < 0.05$; *$p < 0.10$. All responses are on a 10-point scale.

jurors reported that they would find it helpful to hear expert testimony about police interrogation tactics and about why a suspect might falsely confess to a crime he or she did not commit. Only about 11 percent thought that such testimony would not be useful, while about 64 percent thought it would be useful. This finding is consistent with the one other study in this area, which found that 80 percent of respondents to an Internet questionnaire believed that it would be useful to hear such testimony (Chojnacki et al. 2008). Jurors have the difficult job of sifting through testimony and evidence to reach a verdict. If they believe

a particular type of testimony would assist them in this difficult task, perhaps judges should be predisposed to allow it. Of course, judges may believe they are better judges of what jurors would find helpful than are the jurors themselves.

One concern of judges is that expert testimony might be too influential and would essentially "usurp the role of the jury." Because it is almost always the defense attorney who asks for expert testimony about interrogations and confessions to be presented at trial, some judges may fear that such testimony will cause jurors to overestimate the likelihood of a false confession (Costanzo & Leo 2007; Fulero 2004). Interestingly, in their recent survey, Kassin et al. (2007) found that police investigators estimated that 23.3 percent of innocent subjects provide some form of confession when interrogated. Similarly, our data suggest that jurors may already have a high estimate of the frequency of false confessions. Depending on the type of crime, our participants estimated that somewhere between 19 percent and 24 percent of confessions are false. These estimates are surprisingly high, and may be a consequence of an unusually large amount of media coverage of the phenomenon of false confessions in recent years. A few highly publicized false confessions (e.g., John Mark Karr, the confessor in the Central Park Jogger case), the long list of false confessions exposed through DNA exonerations, and revelations about torture-based interrogations in military settings (Costanzo & Gerrity 2010) have probably shifted public perceptions of the frequency of false confessions. It appears that potential jurors may arrive in the courtroom already willing to believe that a significant number of confessions are false. Because no responsible expert would argue that a fifth of all confessions are false, it is possible that expert testimony might actually lower jurors' estimates of the frequency of false confessions. Further, testimony by a responsible expert would focus the attention of jurors on factors that research indicates might increase the probability of a false confession (e.g., situational forces, interrogation tactics, and suspect vulnerabilities). This focus would improve the quality of juror decisions.

Jurors in this study were open to the idea that a significant number of criminal suspects offer false confessions. However, when we personalized the statement to read "If interrogated by the police, I would falsely confess to a crime I did not commit," approximately 92 percent disagreed. Although they could understand how *others* might be vulnerable to interrogation, most people believed they were personally immune. This finding is consistent with a large body of social-psychological research indicating that people underestimate the extent to which their own behavior might be shaped by strong situational pressures (Zimbardo 2007). It might be that surrogate jurors in our sample believe that false confessors suffer from individual deficits (e.g., retardation, mental illness, youth, drug addiction) that make them vulnerable to interrogators. However, although some false confessions do appear to be the result of individual deficits, it is important to note that the majority of false confessions are given by mentally normal adults (Leo 2008; Leo et al. 2008). Future research should investigate how jurors make sense of false confessions, for example, which individual and situational factors they believe might lead to false confessions.

Our study explored juror beliefs rather than juror knowledge of facts. However, for some beliefs, it is possible to compare what jurors believe to be true with what is actually true. For example, 52 percent of our sample believed that if someone falsely confessed to

*244   Costanzo et al.*

a crime, he or she would be convicted, even if there was no other evidence against the person. Research on actual false confession cases has revealed that when a suspect falsely confessed to a crime, then pled "not guilty" and proceeded to trial, he or she was convicted 81 percent of the time (Drizin & Leo 2004). This comparison suggests that potential jurors significantly underestimate the power of a false confession. Expert testimony would likely be helpful in helping jurors appreciate the potency of a false confession and the reasons why that confession might seem plausible (Costanzo & Leo 2007).

Research on lie detection is also relevant here. In this study, 53 percent of participants believed that police interrogators are better than ordinary people at identifying lies (only 25 percent disagreed). In addition, 60 percent believed that interrogators' ability to detect lies improves with experience (only 17 percent disagreed). In contrast, the available research indicates that people perform only slightly better than chance when asked to distinguish between truth and lies (Bond & DePaulo 2006). Police appear to be no better than laypeople at distinguishing truthful from deceptive statements, and police training does not appear to improve their performance (Granhag & Stromwall 2004; Meissner & Kassin 2002). However, despite mediocre performance, police are far more confident than laypeople about their ability to tell when a suspect is lying. This unfounded confidence is consequential because once an innocent suspect is misclassified as deceptive, that suspect can then be subjected to coercive interrogation techniques. Jurors' misplaced confidence in the lie detection abilities of police may cause them to give too much weight to confident but mistaken police judgments about the deceptiveness of a defendant.

The process of police interrogation is hidden from public view. Because interrogations are conducted in private, most of what occurs in the interrogation room is mysterious to potential jurors. Although police are legally permitted to lie to suspects about the existence of incriminating evidence, most potential jurors are not aware of this fact. For example, in the Chojnacki et al. (2008) survey, only 43 percent of respondents correctly identified lying to suspects as a legally permissible interrogation technique. In the study presented above, surrogate jurors expressed disapproval of interrogators lying about evidence. Strong majorities disapproved of lying about the existence of an eyewitness who identified the suspect (65.7 percent), lying about the presence of matching fingerprints or DNA (68.8 percent), and telling a suspect that he or she failed a polygraph test when the suspect had not (75.7 percent). These data suggest that when jurors are presented with a defendant's confession, they may assume that it was obtained without lying by interrogators. A capable lawyer may be able to point out this tactic without the assistance of an expert witness, but it is not clear that all lawyers raise the issue effectively. Because audio or video recording of interrogations is still not required in most jurisdictions, jurors may not even know that interrogators lied to a suspect to induce a confession. If jurors learn that police lied to elicit a confession, it might make them more skeptical of that confession.

Although gender played no significant role in accounting for the beliefs of jurors, race did. For every question where we found significant differences between white and nonwhite jurors, the differences were in the same direction: nonwhites expressed less confidence in police and a greater willingness to believe in the possibility of false confessions. Specifically, compared to whites, nonwhites were more likely to believe that they would confess to a minor or a serious crime, that a higher percentage of confessions in

theft, rape, child molestation, and murder cases are false, that innocent suspects are more likely than guilty suspects to consent to being questioned without an attorney present, and that interrogators should not be allowed to threaten a longer sentence if a suspect is reluctant to confess. Nonwhites were less likely to believe that interrogators are better than ordinary people at detecting lies, or that the ability of a police officer to detect lies improves with experience. These findings have implications for jury selection in cases involving disputed confessions. Because white and nonwhite jurors differ in beliefs relevant to many types of cases, some researchers have called for "racially conscious" jury selection as a means of ensuring greater fairness in verdicts, and as a way of lending greater legitimacy to verdicts (Fukurai & Krooth 2003).

Our study used a diverse and realistic sample of prospective jurors to assess what jurors actually know and believe about the process of interrogation and the possibility of false confessions. Although this study advances our understanding of juror knowledge and beliefs, it is only a first step. Further research is needed to determine if our findings can be replicated by others. It is also important to understand how jurors reason about confession evidence. The questionnaire used in this study was administered to individual jurors. It is unclear whether the process of jury deliberation would shift the beliefs of individual jurors. Those uncertain jurors who did not fall into either the "disagree" or "agree" categories might be especially persuadable during the process of group deliberation. Postverdict interviews with actual jurors would enable us to gain a better understanding of how jurors evaluate both confessions and expert testimony about interrogations and confessions.

It is jurors who must evaluate the credibility of disputed confessions. Research on jurors is an essential component of a deep, psychological understanding of police interrogations and false confessions. Such research also has implications for decisions made by lawyers, experts, and judges. Data on what jurors actually know and believe provide the best foundation for decision making. The findings presented above are a step toward building that foundation.

## References

Bond, Charles F., & Bella M. DePaulo (2006) "Accuracy of Deception Judgments," 10 *Personality & Social Psychology Rev.* 214.

Bornstein, Brian H. (1999) "The Ecological Validity of Jury Simulations: Is the Verdict Still Out?" 23 *Law & Human Behavior* 75.

Chojnacki, Danielle E., Michael D. Cicchini & Lawrence T. White (2008) "An Empirical Basis for the Admission of Expert Testimony on False Confessions," 40 *Arizona State Law J.* 111.

Corwin, Miles (2003) *Homicide: A Year with the LAPD's Elite Detectives.* New York: Holt.

Costanzo, Mark, & Ellen Gerrity (2010) "The Effects and Effectiveness of Using Torture as an Interrogation Device: Using Reseach for Inform the Policy Debate," 3 *Social Issues & Policy Rev* . 179.

Costanzo, Mark, & Richard A. Leo (2007) "Research findings and expert testimony on police interrogations and confessions to crimes," in M. Costanzo, D. Krauss, & K. Pezdek, eds., *Expert Psychological Testimony for the Courts.* (pp. 69–98). Mahwah, NJ: Erlbaum.

Davis, Deborah, & William O'Donahue (2003) "The Road to Perdition: Extreme Influence Tactics in the Interrogation Room," in W. O'Donahue & E. Levensky, eds., *Handbook of Forensic Psychology.* San Diego, CA: Elsevier Academic Press.

*246   Costanzo et al.*

Drizin, Steven A., & Richard A. Leo (2004) "The Problem of False Confessions in the Post-DNA World," 82 *North Carolina Law Rev.* 891.

Fukurai, Hiroshi, & Richard Krooth (2003) *Race in the Jury Box: Affirmative Action in Jury Selection.* Albany, NY: State Univ. of New York Press.

Fulero, Solomon (2004) "Expert Psychological Testimony on the Psychology of Interrogations and Confessions," in G. D. Lassiter, ed., *Interrogations, Confessions, and Entrapment.* New York: Kluwer Press.

Granhag, Par A., & Leif A. Stromwall (2004) *The Detection of Deception in Forensic Contexts.* Cambridge, UK: Cambridge Univ. Press.

Gudjonsson, Gisli H. (2004) *The Psychology of Interrogations and Confessions: A Handbook.* Chichester: John Wiley & Sons.

Huntley, Jill E., & Mark Costanzo (2003) "Sexual Harassment Stories: Testing a Story-Mediated Model of Juror Decision-Making in Civil Litigation," 27 *Law & Human Behavior* 29.

Innocence Project (n.d.) *False Confessions and Recording of Custodial Interrogation.* Available at <http://www.innocenceproject.org/Content/314.php#>.

Kassin, Saul, & Gisli H. Gudjonsson (2004) "The Psychology of Confessions: A Review of the Literature and Issues," 5 *Psychological Science in the Public Interest* 33.

Kassin, Saul M., Richard A. Leo, Christian A. Meissner, Kimberly D. Richman, Lori H. Colwell, Amy Leach, & Dana LaFon (2007) "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs," 31 *Law & Human Behavior* 381.

Kassin, Saul, Christian Meissner, & Rebecca J. Norwick (2005) "I'd Know a False Confession if I Saw One. A Comparative Study of College Students and Police Investigators," 29 *Law & Human Behavior* 211.

Kassin, Saul, & Katherine Neumann (1997) "On the Power of Confession Evidence: An Experimental Test of the Fundamental Difference Hypothesis," 21 *Law & Human Behavior* 469.

Kassin, Saul, & Holly Sukel (1997) "Coerced Confessions and the Jury: An Experimental Test of the Harmless Error Rule," 21 *Law & Human Behavior* 27.

Lassiter, Daniel, Shari S. Diamond, Heather C. Schmidt, & Jennifer K. Elek (2007) "Evaluating Videotaped Confessions: Expertise Provides No Defense Against the Camera-Perspective Effect," 18 *Psychological Science* 224.

Lassiter, Daniel, & Andrew L. Geers (2004) "Evaluation of Confession Evidence: Effects of Presentation Format," in G. D. Lassiter, ed., *Interrogations, Confessions, and Entrapment.* New York: Kluwer Press.

Leo, Richard A. (1996) "Inside the Interrogation Room," 86 *J. of Criminal Law & Criminology* 266.

——— (2008) *Police Interrogation and American Justice.* Cambridge: Harvard Univ. Press.

Leo, Richard, Mark Costanzo, & NeHa Shaked-Schroer (2008) "Psychological and Cultural Aspects of Interrogation and False Confessions: Using Research to Inform Legal Decision-Making," in J. Lieberman & D. Krauss, eds., *Psychology in the Courtroom.* London: Ashgate.

Meissner, Christian A., & Saul M. Kassin (2002) " 'He's Guilty!' Investigator Bias in Judgments of Truth and Deception," 26 *Law & Human Behavior* 469.

Olsen-Fulero, Lynda, & Solomon M. Fulero (1997) "Commonsense Rape Judgments: An Empathy-Complexity Theory of Rape Juror Story Making," 3 *Psychology, Public Policy, & Law* 402.

Pennington, Nancy, & Reid Hastie (1994) "The Story Model for Juror Decision Making," in R. Hastie, ed., *Inside the Juror.* New York: Cambridge Univ. Press.

Rigoni, Mary E., & Christian A. Meissner (2008). "Is it Time for a Revolution in the Interrogation Room? Empirically Validating Inquisitorial Methods," presented at the American Psychology-Law Society Conference, Jacksonville, FL.

Russano, Melissa B., Christian A. Meissner, Fadia M. Narchet, & Saul M. Kassin (2005) "Investigating True and False Confessions Within a Novel Experimental Paradigm," 16 *Psychological Science* 481.

Saucier, Gerard, & Lewis R. Goldberg (2002) "Assessing the Big Five: Applications of 10 Psychometric Criteria to the Development of Marker Scales," in B. de Raad & M. Perugini, eds., *Big Five Assessment.* Goettingen, Germany: Hogrefe & Huber.

Scheck, Barry, Peter Neufeld, & James Dwyer (2000) *Actual Innocence: Five Days to Execution, and Other Dispatches from the Wrongly Convicted.* Garden City, NJ: Doubleday.
Warden, Robert (2003) *The Role of False Confessions in Illinois Wrongful Murder Convictions Since 1970.* Center on Wrongful Convictions Research Report. Available at <www.law.northwestern.edu/depts/clinic/>.
Zimbardo, Philip G. (2007) *The Lucifer Effect: Understanding How Good People Turn Evil.* New York: Random House.

## Cases Cited

*Crane v. Kentucky*, 476 U.S. 683 (1986).
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S. CT. 2786 (1993).
*State v. Free*, 798 A.2d 83 (N.J. Ct. App. 2002).