# EXHIBIT 10

**TO PLAITNIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NUMBER 2, SEEKING EXCLUSION OF EXPERT TESTIMONY**

# AN EMPIRICAL BASIS FOR THE ADMISSION OF EXPERT TESTIMONY ON FALSE CONFESSIONS[‡]

Danielle E. Chojnacki,[†] Michael D. Cicchini,[††] & Lawrence T. White[†††]

*Modern interrogation techniques are designed to extract confessions from guilty suspects, but they sometimes induce false confessions from innocent suspects. Often, the only meaningful protection a defendant has against a false confession is to challenge its reliability at a jury trial. In so doing, defendants may attempt to offer expert testimony on false confessions. This typically includes testimony about specific interrogation techniques and their correlation to false confessions, as well as the personality traits that make a person most susceptible to confessing falsely. Courts, however, often exclude such expert testimony, holding that the subject matter is already within the jurors' common knowledge, and therefore the testimony would not assist the jury in determining the reliability of the confession. The purpose of this Article, then, is to determine what is actually within, and what is outside of, the common knowledge of jury-eligible citizens. The evidence presented in this Article shows that the body of knowledge on false confessions is, in fact, outside of the common knowledge, and further, that most individuals hold misconceptions that are potentially harmful to innocent defendants. Consequently, in light of this evidence, courts should admit expert testimony on false confessions. Such testimony would greatly assist the jury in evaluating the reliability of the alleged confession and deciding the guilt or innocence of the defendant.*

---

[‡]   The authors are listed in alphabetical order.

[†]   B.S., *magna cum laude*, Beloit College (2006). Danielle Chojnacki developed and tested the hypothesis that serves as the basis for this Article. She presented the results of this study to the Midwestern Psychological Association at its annual conference in Chicago, Illinois, May 3–5, 2007.

[††]   J.D., *summa cum laude*, Marquette University Law School (1999); C.P.A., Illinois Board of Examiners (1997); M.B.A., Marquette University Graduate School (1994); B.S., University of Wisconsin—Parkside (1990). Michael Cicchini is a criminal defense attorney practicing in Kenosha, Wisconsin. He has litigated confession issues at both the pretrial and trial stages of the criminal process.

[†††]   Ph.D., University of California, Santa Cruz (1984); M.A., *with distinction*, California State University at Fresno (1979); B.A., *with honors*, Whittier College (1975). Dr. White is Professor of Psychology and Legal Studies at Beloit College. He has testified in criminal cases as an expert in the areas of false confessions and eyewitness identifications.

EXHIBIT 19

I.    INTRODUCTION...........................................................................2
II.   THE CONFESSION AS EVIDENCE.......................................4
      A.   *The Power of the Confession*........................................4
      B.   *The Admissibility of the Confession*............................6
           1.   *Miranda* Rule................................................7
           2.   Voluntary Requirement..................................8
      C.   *The Reliability / Credibility of the Confession*.............11
III.  FALSE CONFESSION EXPERTS..........................................12
      A.   *The Expert's Role in the Defense*................................12
      B.   *What the Experts Know*...............................................13
           1.   Macro-Level Research on False Confessions..........14
           2.   Dispositional Factors Associated
                with False Confessions..............................15
           3.   Situational Factors Associated
                with False Confessions..............................17
           4.   Contextual Factors Contributing
                to False Confessions................................19
IV.   THE ADMISSIBILITY OF EXPERT TESTIMONY......................20
      A.   *The Legal Framework for Expert Testimony Generally*......20
      B.   *Application to False Confession Experts*.......................21
           1.   *State v. Davis*................................................22
           2.   *State v. Ritt*..................................................23
           3.   *State v. Free*.................................................25
V.    THE STUDY: WHAT JURORS KNOW....................................26
      A.   *Methodology*...............................................................27
      B.   *The "Social Science" Survey Results*...........................28
      C.   *Statistical Analysis of Composite Scores*.....................35
      D.   *The "Legal to Use" Survey and Statistical Analysis*............36
      E.   *Self-Knowledge Assessment*.......................................38
VI.   THE CASE FOR FALSE CONFESSION EXPERTS.....................39
      A.   *Framing the Issue*.......................................................39
      B.   *Police Commentary on Suspects' Statements*.....................40
      C.   *The Composite Scores*................................................42
      D.   *Limited Juror Knowledge*............................................43
VII.  CONCLUSION........................................................................44

## I.    INTRODUCTION

When the state charges an individual with a crime, often the most compelling piece of evidence it has is the defendant's confession. Many

times, this is the only significant piece of evidence. Confessions are usually obtained through police interrogations, which begin with the presumption of guilt. Interrogators then set out to confirm that presumption, using a variety of tactics in the process. While these tactics often extract true confessions from guilty suspects, they sometimes induce false confessions from innocent suspects.[1]

Criminal law has at least two doctrines designed to keep illegally obtained confessions—whether factually true or false—out of evidence. However, these doctrines—the *Miranda* rule and the voluntary requirement—focus on legal admissibility, rather than truth or falsity, and consequently cannot be relied upon to exclude false confessions from evidence.[2] As a result, a defendant's only real defense against a false confession and wrongful conviction is to challenge the confession's reliability and credibility at a jury trial.[3] In so doing, defendants have turned to research psychologists and their knowledge about the dynamics of false confessions.

Research psychologists can offer highly valuable information as expert witnesses at trial. Their role is to educate the jury about how often false confessions occur, what interrogation techniques cause them, and what types of people are most susceptible to confessing falsely.[4] This, along with other factual evidence about the actual interrogation and the individual defendant in the particular case, can assist the jury in deciding whether the confession is reliable.

Unfortunately, courts have often excluded such expert testimony, concluding that the research findings on false confessions are already within the common knowledge of the jury, and therefore the testimony would not be helpful.[5] These same courts, however, routinely admit expert testimony on other topics that are far more likely to be within the jury's common knowledge.[6] The purpose of this Article, then, is to determine what potential jurors actually know or believe about false confessions, and whether the body of knowledge on false confessions is within, or outside of, potential jurors' common knowledge.

The survey and statistical evidence presented in this Article shows that the body of knowledge on false confessions is not only well *outside* of the common knowledge of jury-eligible citizens, but also that most people

---

1.    *See infra* Part II.
2.    *See infra* Part II.B.1–2.
3.    *See infra* Part II.C.
4.    *See infra* Part III.
5.    *See infra* Part IV.B.
6.    *See infra* Part IV.B.2.

harbor significant misconceptions about false confessions.[7] These misconceptions include what tactics the police may use to extract confessions, the tactics' correlation to false confessions, what characteristics make a person susceptible to confessing falsely, and how unskilled police are at detecting truthful and untruthful statements.[8] Consequently, given that this information is not within the common knowledge of jury-eligible citizens, expert testimony on false confessions would be extremely beneficial in educating the jury, and assisting them in evaluating the evidence and ultimately reaching their decision on the defendant's guilt or innocence.[9]

Part II of this Article discusses the power of the confession as evidence, the legal doctrines that could, in theory, be used to exclude a false confession from evidence, and the defendant's right to challenge the credibility of the confession at trial. Part III discusses the false confession expert's role in the defense, as well as what the experts know about false confessions, their causes, and who is susceptible to them. Part IV discusses the legal doctrine governing the admissibility of expert testimony generally. It then focuses on the standard as applied to expert testimony on false confessions and shows how courts have excluded such testimony by concluding that it is already within the common knowledge of the jury, and therefore would not assist them.

Part V, "The Study: What Jurors Know," lies at the heart of this Article. The purpose of the study was to determine precisely what jurors know or believe about false confessions. This Part discusses the study's methodology and its results, including relevant statistical analyses. Part VI further discusses the results and argues that the body of research on false confessions is, indeed, outside of the common knowledge of jury-eligible citizens. Consequently, based on these data, courts should admit expert testimony on false confessions. Part VII concludes the Article.

## II. THE CONFESSION AS EVIDENCE

### A.     The Power of the Confession

When the state charges an individual with a crime, one of the most compelling pieces of evidence it can present to a jury is the defendant's

---

7.     *See infra* Part V.
8.     *See infra* Part V.
9.     *See infra* Part VI.

alleged confession. Confessions are powerful evidence due to the commonly held belief that such statements, made against one's own interest, simply *must be true*.[10] Conversely stated, "[t]he idea that an individual would [falsely] confess to a crime, particularly a horrific crime such as murder or rape, without being subject to physical torture, runs counter to the intuition of most people."[11] In fact, when used at trial, "the jury is likely to treat the confession as more probative of the defendant's guilt than *any other evidence*."[12]

The problem with confessions as evidence, however, is that some confessions are false.[13] These false confessions, due to the great weight accorded them by juries, often lead to wrongful convictions.[14] This poses two distinct and serious problems: first, an innocent person may be incarcerated and possibly executed; and second, in those cases in which a crime truly occurred, the guilty person goes unpunished.

Although the systematic study of this phenomenon is relatively new, false confessions and wrongful convictions are as old as the criminal law itself.[15] For example, "[m]any colonists falsely confessed to being witches in Salem, Massachusetts, in 1692. The trials resulted in at least nineteen executions before they stopped."[16] Far more recently, five young boys falsely confessed and were convicted, despite an absence of physical evidence, of beating and raping a Central Park jogger in 1989.[17] The boys served more than a decade in prison before they were exonerated and the real perpetrator was discovered.[18]

These, and other high-profile cases, should lead to the question of how police are able to obtain the false confessions. Certainly, interrogation

---

10.   Jacqueline McMurtrie, *The Role of the Social Sciences in Preventing Wrongful Convictions*, 42 AM. CRIM. L. REV. 1271, 1280 (2005).

11.   *Id.*

12.   Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 DENV. U. L. REV. 979, 984 (1997) (emphasis added).

13.   *Id.* at 983.

14.   Jury conviction rates of false confessors range from 73% to 81%. *See* Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. CRIM. L. & CRIMINOLOGY 429, 481–82 (1998); *see also* Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. REV. 891, 953 (2004) (finding a jury conviction rate of 64%).

15.   James R. Agar, II, *The Admissibility of False Confession Expert Testimony*, ARMY LAW., Aug. 1999, at 26, 26 (1999).

16.   *Id.*

17.   *See generally* TIMOTHY SULLIVAN, UNEQUAL VERDICTS: THE CENTRAL PARK JOGGER TRIALS (1992) (recounting the circumstantial nature of the evidence).

18.   *See id.*; Saul M. Kassin, *False Confessions and the Jogger Case*, N.Y. TIMES, Nov. 1, 2002, at A31.

6              *ARIZONA STATE LAW JOURNAL*              [Ariz. St. L.J.

techniques involving physical pain and torture are relatively uncommon today, at least domestically.[19] In their place, however, has emerged a host of more refined interrogation systems that are more psychologically sophisticated than their predecessors.[20] While these techniques are often effective in obtaining confessions from guilty suspects, their unwanted side-effect is that they also "convince some *innocent suspects* that their only rational choice is to confess."[21]

"While it may be impossible to determine how many false confessions occur, they do occur with enough frequency to deserve serious attention."[22] For example, in the first wave of DNA exonerations for wrongful homicide convictions, two-thirds involved false confessions.[23] The challenge facing the criminal justice system is how to address the reality that "[p]sychological interrogation methods will inevitably continue to produce many true and some false confessions."[24] One way of addressing this challenge, as the next Section discusses, is simply to exclude false confessions from evidence.

### B.    The Admissibility of the Confession

Two distinct legal doctrines—the *Miranda* rule and the voluntary requirement—offer, at least in theory, some protection against false confessions.[25] Even though these doctrines focus on the admissibility of evidence, rather than its truth or falsity, the inquiries overlap enough that the doctrines can be of some value in addressing the problem of false confessions. As the Sections below illustrate, however, these doctrines cannot be relied upon to consistently exclude false confessions from evidence.

---

19.   *See* Peter Kageleiry, Jr., *Psychological Police Interrogation Methods: Pseudoscience in the Interrogation Room Obscures Justice in the Courtroom*, 193 MIL. L. REV. 1, 7 (2007).

20.   *See infra* Part III.B.3.

21.   McMurtrie, *supra* note 10, at 1282 (emphasis added).

22.   Nadia Soree, Comment, *When the Innocent Speak: False Confessions, Constitutional Safeguards, and the Role of Expert Testimony*, 32 AM. J. CRIM. L. 191, 195 (2005).

23.   *See id.*

24.   Ofshe & Leo, *supra* note 12, at 996.

25.   *See* Miranda v. Arizona, 384 U.S. 436, 469 (1966); Malloy v. Hogan, 378 U.S. 1, 7 (1964).

### 1. *Miranda* Rule

If a suspect is in police custody *and* the police wish to interrogate him, they must first read the suspect his *Miranda* rights.[26] These include the suspect's right to remain silent and a warning that any statements may be used against him at trial.[27] In theory, a suspect would simply invoke these rights and there would be no risk that a confession—whether true or false—would be admitted at trial. Alternatively, if the police fail to issue *Miranda* warnings and the suspect confesses, the confession cannot be used at trial in the state's case-in-chief.[28] These *Miranda* protections, however, are often neutralized by any of several interrogation techniques.

First, police can structure the circumstances surrounding a suspect's statement so that the suspect is technically not in custody, and therefore *Miranda* warnings need not be given at all.[29] For example, police may ask a suspect to voluntarily accompany them to the police station, thereby taking advantage of the inherently coercive nature of the station house while still maintaining that, because the defendant came voluntarily, he was not in custody and therefore not entitled to *Miranda* warnings.[30]

Second, when *Miranda* warnings are given, they may be given in such a way as to induce the suspect to waive them:

> Investigators tend to introduce the *Miranda* advisement in a manner that is to their advantage. They might do so by presenting it as a bureaucratic formality and deliver the warnings in a perfunctory manner; they might actively deemphasize the significance or implications of *Miranda* and suggest that it is unimportant or something to be ignored; or they might try to persuade the suspect that it is in his best interest to waive *Miranda* altogether by telling him that if he does not consent to questioning, people will think him guilty.[31]

Third, and finally, even if a suspect invokes his *Miranda* rights, police have incentive to ignore the invocation and continue questioning the suspect. In fact, the case law interpreting *Miranda* specifically permits such

---

26.  *Miranda*, 384 U.S. 436.

27.  *Id.* at 469.

28.  *See id.* at 476–77.

29.  *See, e.g.*, State v. Koput, 418 N.W.2d 804, 809 (Wis. 1988) (reasoning that the defendant was not in custody because he "voluntarily accompanied" the officers to the police station before making his statement).

30.  *See id.*

31.  Ofshe & Leo, *supra* note 12, at 1001; *see* Soree, *supra* note 22, at 199 ("If *Miranda* warnings are administered, they will be delivered in a perfunctory manner, downplaying their importance.").

a practice when carefully employed by law enforcement.[32] Even assuming the worst case scenario for the government, in which the confession is excluded from the state's case-in-chief, the government is still better off for having ignored the *Miranda* invocation.[33] Had the invocation been honored, the police would have no statement and would have learned little or nothing about what happened. Having ignored the invocation, however, the police now have a statement obtained in violation of *Miranda*. This statement may lead to additional suspects or evidence and can still be used to impeach the defendant if he chooses to testify at trial.[34]

In reality, then, *Miranda* rights are either not administered or they are administered in such a way that the great majority of suspects are induced to waive them.[35] When suspects do not waive their rights, *Miranda* warnings may simply be ignored with no negative repercussions for the government.[36] As a result, the *Miranda* rule cannot be relied upon to exclude false confessions and cannot be used as the primary protection against false confession evidence.

### 2.   Voluntary Requirement

Before allowing the jury to hear a confession, the court must also find that the confession was given voluntarily.[37] A confession is voluntary only if made "in the unfettered exercise of [one's free] will."[38] Courts look to the "totality of the circumstances" surrounding the confession—including the interrogation techniques employed and the defendant's personal characteristics—to ensure the statement was not "'coerced, or the product of improper pressures exercised by the police.'"[39] Involuntary statements

---

32.   *See, e.g.*, State v. Shaffer, 292 N.W.2d 370, 374 (Wis. Ct. App. 1980) (holding that even though the defendant invoked his *Miranda* rights, the continued questioning that produced a confession did not violate *Miranda* because, after the *Miranda* invocation, the police waited nine minutes before continuing the questioning, and did so with a different officer who was not present for the defendant's *Miranda* invocation nine minutes earlier).

33.   *See* Ofshe & Leo, *supra* note 12, at 1001.

34.   *Id.*

35.   *See* Richard A. Leo, *Inside the Interrogation Room*, 86 J. CRIM. L. & CRIMINOLOGY 266, 275 (1996). In a study of 182 police interrogations, approximately 75% of suspects waived their *Miranda* rights. *Id.*

36.   *See* Ofshe & Leo, *supra* note 12, at 1001.

37.   *See* Malloy v. Hogan, 378 U.S. 1, 7 (1964) (citing Bram v. United States, 168 U.S. 532, 542–43 (1897)).

38.   *Id.* at 8.

39.   Pontow v. State, 205 N.W.2d 775, 776 (Wis. 1973) (quoting State v. Hunt, 193 N.W.2d 858, 863 (Wis. 1972)).

would, of course, violate the defendant's due process rights and therefore are not admissible.[40]

The factors analyzed under this inquiry—the interrogation techniques employed and the defendant's personal characteristics—overlap substantially with the factors studied in false confession research by social scientists.[41] In practice, however, this constitutional protection is malleable and left entirely to a pre-trial, judicial determination.[42] Consequently, much like the *Miranda* rule, the voluntary requirement sometimes fails to exclude false confessions from evidence.

> Courts determine the voluntariness of a confession, and therefore its admissibility, by analyzing the totality of the circumstances under which the confession was rendered. . . . Courts can use the totality test much like a checklist, maneuvering through and balancing the factors on one or the other side of the voluntariness scale, without careful review of any one factor to determine its actual coercive effect on the defendant, to arrive at the decision they wish to reach.[43]

An excellent case illustration of this claim is *Green v. Scully*, in which a suspect's in-custody interrogation was selectively recorded by officers.[44] The recording showed that the suspect was questioned for hours by two officers, was threatened with the "electric chair," was accused of lying, and was confronted with fabricated evidence of his guilt, in addition to being subjected to other techniques.[45] He was then offered psychiatric help and leniency in exchange for a confession.[46] Specifically, as part of a two-officer interrogation technique, one officer told the defendant "that he would tell the prosecutor that 'the brother needs help . . . . [F]or him to spend the rest of his life in an institution isn't going to give him any help.'"[47] The officer then stated, "you tell me what happen[ed.] I call the D.A. I get him down here man we get you some help."[48]

During the interrogation, the defendant was separated from family and friends, was crying, and suffered an "emotional collapse."[49] He then made some inculpatory statements that were ultimately used as a confession,

---

40.   *See Malloy*, 378 U.S. at 4–6.
41.   *See infra* Part III.B.2–3.
42.   *See Malloy*, 378 U.S. at 7.
43.   Soree, *supra* note 22, at 205–06.
44.   Green v. Scully, 850 F.2d 894, 895–96 (2d Cir. 1988).
45.   *Id.* at 896–98.
46.   *Id.* at 896.
47.   *Id.* (alteration in original).
48.   *Id.*
49.   *Id.* at 899.

although he continued to deny guilt.[50] Despite the factors indicating that the statement was involuntary—such as the threat of the electric chair, the emotional collapse, and the promise of leniency—the court nonetheless admitted the statements and the defendant was convicted.[51]

The appellate court upheld the admission of the confession, as well as the conviction, finding the statements voluntary because the defendant was "streetwise," had once previously been questioned by police on an unrelated matter, and in this instance was "furnished with food, drink and cigarettes."[52] Further, although the defendant was in custody and was not free to leave, he was not "handcuffed."[53]

More specifically, although the court found the "police conduct troubling," it still found that "nothing [the interrogator] said could be construed as holding out the hope of leniency in the courts or a shorter sentence."[54] Certainly, this finding is debatable given the interrogator's discussion of the "electric chair" and "life in an institution" that preceded his promises of leniency and "help."[55] Nevertheless, the court chose to give greater weight to particular—and arguably less determinative—factors.[56] As a result, the court decided that the defendant's statement "was his free and unfettered choice, and that it was not coerced by the conduct and tactics of law enforcement officials."[57]

Finally, it is a rare case to have such undisputed facts as were present in *Green*. Interrogations are usually not recorded, and when they are, they may be only selectively or partially recorded.[58] In such cases, the facts and circumstances surrounding the confession are usually disputed, which leads to a credibility determination by the court when making its findings of facts.[59] These credibility determinations about what was said and done are

---

50.  *Id.* at 897–98.

51.  *Id.* at 899–900.

52.  *Id.* at 902–03.

53.  *Id.* at 903.

54.  *Id.*

55.  *Id.* at 896.

56.  *Id.* at 902–03.

57.  *Id.* at 904.

58.  *See, e.g.*, Saul M. Kassin et al., *Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs*, 31 LAW & HUM. BEHAV. 381, 385 (2007) (recounting police department resistance to recording interrogations). In *Green*, actually, only part of the interrogation was recorded. 850 F.2d at 895–96. The record indicates that there was likely a lengthy discussion—or more accurately, a series of threats—about of the possibility of the "electric chair" before the police even began to record the interrogation. *Id.* at 896, 904. It was only the defendant's recorded statement that "you heard what he said about the electric chair," that alerted the court to this earlier, unrecorded interrogation. *See id.* at 895–96. Nevertheless, the court held the confession admissible. *Id.* at 904.

59.  *See, e.g.*, Krueger v. State, 192 N.W.2d 880, 884–85 (Wis. 1972).

often simply resolved in favor of the police and against the accused individual.[60] Consequently, the voluntary requirement—although it shares many common factors with the false confession analysis—cannot be relied upon as an adequate protection against false confessions.[61]

## C.     *The Reliability / Credibility of the Confession*

Given the ineffectiveness of the above doctrines in excluding false confessions from evidence, defendants must turn to the only meaningful protection available—the right to challenge the reliability of the alleged confession at trial, in front of a jury. This right was affirmed in *Crane v. Kentucky*, in which the Supreme Court made clear that, even after an alleged confession is deemed admissible by a court, "evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess."[62]

More specifically, "the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt."[63] In fact, given the tremendous weight that a defendant's own statements usually carry with the jury, it follows that his whole case "may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility."[64]

The problem, however, is that challenging the reliability or credibility of one's own statement is counterintuitive. As stated earlier, "[t]he idea that an individual would [falsely] confess to a crime, particularly a horrific crime such as murder or rape, without being subject to physical torture, runs counter to the intuition of most people."[65] Fortunately, however, psychological research has shown that this "commonly held belief that innocent people will not confess to a crime is countered by evidence establishing that police-induced false confessions are a substantial cause of

---

60.   *See, e.g., id.* at 885–86 (finding that the defendant's version of the events was exaggerated).

61.   Additionally, some individuals actually give false confessions completely voluntarily—to achieve notoriety, to protect someone else, to avoid detention, or to bring an end to lengthy, persistent questioning by police. *See* Saul M. Kassin & Gisli H. Gudjonsson, *The Psychology of Confessions: A Review of the Literature and Issues*, PSYCHOL. SCI. PUB. INT., Nov. 2004, at 33, 49.

62.   Crane v. Kentucky, 476 U.S. 683, 688 (1986).

63.   *Id.* at 689.

64.   *Id.*

65.   McMurtrie, *supra* note 10, at 1280.

erroneous convictions."[66] Consequently, suspects who have confessed to crimes and are prosecuted sometimes turn to psychologists to explain the false confession phenomenon to juries.

## III.   FALSE CONFESSION EXPERTS

### A.   *The Expert's Role in the Defense*

Expert testimony on false confessions may be a defendant's strongest piece of evidence when challenging the state's case. "If allowed to testify, an expert in this area tells jurors the factors that may contribute to a person giving a false confession to a crime."[67] As discussed below in greater detail, these factors include specific police interrogation strategies and a variety of personal characteristics, including mental status, that leave certain individuals susceptible to confessing falsely.

"[T]he role of an expert [is] an educational one. That is, the expert's focus should be on assisting the trier of fact in understanding general findings and social-scientific research regarding the interrogation processes, and how such processes can lead to false confessions."[68] For example, the expert may testify that promises of leniency by the police, when made to a young or mentally impaired suspect, greatly increase the likelihood of a false confession. The expert may also testify that a suspect's level of intoxication can play a part in the equation, also increasing the risk of a false confession. In so doing, the expert testifies as to the scientific research that forms the basis for an expert opinion.

The defense would also have to introduce evidence of the circumstances surrounding the particular defendant's confession, as well as evidence about the defendant's personal characteristics. For example, the interrogator may testify and admit that he hinted at a more lenient sentence in exchange for the defendant's confession. The defendant may testify to his young age and that he was intoxicated at the time of the interrogation. The testimony of a second expert—a clinical psychologist, for example—may show that the defendant is mentally impaired or unusually suggestible.

---

66.   *Id.*

67.   Janet C. Hoeffel, *The Gender Gap: Revealing Inequities in Admission of Social Science Evidence in Criminal Cases*, 24 U. ARK. LITTLE ROCK L. REV. 41, 66 (2001).

68.   Joshua E. Kastenberg, *A Three-Dimensional Model for the Use of Expert Psychiatric and Psychological Evidence in False Confession Defenses Before the Trier of Fact*, 26 SEATTLE U. L. REV. 783, 812 (2003) (discussing the views of Dr. Richard A. Leo).

Then, "[l]ike the other areas of 'group character' evidence, the evidence relies on a larger picture of those who have falsely confessed and then either the expert or the jury compares the factors at issue in the individual case with the overall picture."[69] In other words, at the very least, defense counsel would argue to the jury that the expert testified how certain things—e.g., promises of leniency, a suspect's young age, mental impairment, and state of intoxication—are all risk factors for a false confession. Further, he would argue in this particular case that the police promised a lighter sentence and the defendant was young, mentally impaired, and intoxicated at the time of the interrogation. Therefore, the argument continues, the confession is not reliable, but rather is false, and should not be believed. Consequently, without a reliable confession and with limited, if any, corroborating evidence, the defendant should be found not guilty.

## B.    *What the Experts Know*

Expert knowledge on false confessions can be divided into several areas. First, there is general, macro-level research on the phenomenon. This includes research on the frequency of *Miranda* waivers, the incidence of false confessions, and their relationship to wrongful convictions.[70] This research is significant because it establishes that false confessions do, in fact, occur. This macro-level research is also the foundation for more specific research on false confessions.

Second, other research focuses more narrowly on the two potential causes of false confessions: dispositional factors and situational factors.[71] Dispositional factors refer to traits inherent in an individual—e.g., mental disability—that increase that individual's susceptibility to making false statements when pressured by police.[72] Situational factors, on the other hand, refer to circumstances of the situation—e.g., promise of leniency— that increase the likelihood that an innocent person will confess to a crime he did not commit.[73]

Finally, other research analyzes the contextual factors surrounding law enforcement and its investigative practices. These factors include the presumptions built into the investigative process, as well as law

---

69.    Hoeffel, *supra* note 67, at 66.
70.    *See infra* Part III.B.1.
71.    *See* GISLI H. GUDJONSSON, THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK 308–31 (2003).
72.    *See id.* at 312–27.
73.    *See id.* at 312, 315–16.

enforcement officers' beliefs regarding their ability to detect deception.[74] These contextual factors are important because they, in turn, dictate the interrogative techniques employed by law enforcement.

### 1.   Macro-Level Research on False Confessions

The psychological research shows that most criminal suspects waive their *Miranda* rights and submit to questioning by police.[75] Innocent persons are especially likely to waive their *Miranda* rights, perhaps because they believe the legal system has safeguards in place to prevent the wrongful conviction of an innocent person.[76] "[I]t appears that people have a naive faith in the power of their own innocence to set them free."[77]

Furthermore, juvenile suspects under the age of fourteen typically do not fully understand their *Miranda* rights or how to apply them.[78] The same is true of adults who are mentally retarded.[79] Indeed, a recent analysis of *Miranda* warnings found that, in many jurisdictions, suspects must be able to read at a ninth-grade level in order to understand that: (1) an attorney will be appointed if they cannot afford one; and (2) they can assert their right to an attorney at any time, even after questioning has begun.[80]

The evidence also shows that, once *Miranda* rights have been waived, suspects sometimes confess to crimes they did not commit. While it is probably impossible to determine the exact number of false confessions that occur in a given jurisdiction over a period of time, several studies clearly document the false confession phenomenon. One early study identified as many as sixty-five cases in which innocent individuals were wrongfully convicted because of false confession evidence.[81] A more recent study

---

74.   *See infra* Part III.B.4.

75.   *See* Leo, *supra* note 35, at 275–76; *see also* Stephen Moston, Geoffrey M. Stephenson & Thomas M. Williamson, *The Incidence, Antecedents, and Consequences of the Use of the Right to Silence During Police Questioning*, 3 CRIM. BEHAV. & MENTAL HEALTH 30, 34–36 (1993).

76.   *See* Saul M. Kassin & Rebecca J. Norwick, *Why People Waive Their* Miranda *Rights: The Power of Innocence*, 28 LAW & HUM. BEHAV. 211, 217–18 (2004).

77.   Kassin & Gudjonsson, *supra* note 61, at 40.

78.   *See* THOMAS GRISSO, FORENSIC EVALUATION OF JUVENILES 49 (1998); Lois B. Oberlander & Naomi E. Goldstein, *A Review and Update on the Practice of Evaluating* Miranda *Comprehension*, 19 BEHAV. SCI. & L. 453, 465 (2001).

79.   *See* Solomon M. Fulero & Caroline Everington, *Mental Retardation, Competency to Waive* Miranda *Rights, and False Confessions*, *in* INTERROGATIONS, CONFESSIONS, AND ENTRAPMENT 163, 163–79 (G. Daniel Lassiter ed., 2004).

80.   *See* Richard Rogers et al., *An Analysis of* Miranda *Warnings and Waivers: Comprehension and Coverage*, 31 LAW & HUM. BEHAV. 177, 185 (2007).

81.   *See generally* EDWIN M. BORCHARD, CONVICTING THE INNOCENT: SIXTY-FIVE ACTUAL ERRORS OF CRIMINAL JUSTICE (1932) (documenting cases of erroneous criminal convictions).

documented 125 proven false confessions, some of which resulted in wrongful convictions.[82] Of the more than 200 DNA exonerations in recent years, approximately 25% involved false confession evidence.[83]

False confessions, in turn, often lead to wrongful convictions. Indeed, "[f]alse confessions are the primary cause of wrongful convictions in many cases—especially those involving high-profile murders and sexual offenses."[84] There are two reasons for this. First, people are generally unable to distinguish false confessions from true confessions.[85] As a result, confession evidence is presumed to be true unless there are obvious reasons to question its credibility.[86]

Second, confession evidence has more impact in court proceedings than eyewitness testimony, alibis, and other forms of evidence.[87] Even when it is logical and appropriate to discount a confession, people tend to be overwhelmed by the presence of a confession in their deliberations regarding guilt or innocence.[88] In one study of defendants who went to trial with confession evidence that was later proven false, 73% were wrongfully convicted.[89] Furthermore, in simulation studies, mock jurors are likely to convict a defendant who has confessed, even when they know the police made explicit promises of leniency to induce the confession.[90]

## 2.  Dispositional Factors Associated with False Confessions

Certain personal characteristics, or dispositional factors, are associated with false confessions.[91] First, highly compliant individuals are more likely to confess to police.[92] In this context, compliance refers to "an eagerness to

---

82.   Drizin & Leo, *supra* note 14, at 900, 932, 951.

83.   The Innocence Project, Know the Cases, http://www.innocenceproject.org/know/ (last visited Feb. 7, 2008); The Innocence Project, Understand the Causes: False Confessions, http://www.innocenceproject.org/understand/False-Confessions.php (last visited Feb. 7, 2008).

84.   Kassin & Gudjonsson, *supra* note 61, at 49.

85.   *See* Saul M. Kassin, Christian A. Meissner & Rebecca J. Norwick, *"I'd Know a False Confession if I Saw One": A Comparative Study of College Students and Police Investigators*, 29 LAW & HUM. BEHAV. 211, 221 (2005).

86.   *See id.*

87.   *See* Saul M. Kassin, *On the Psychology of Confessions: Does* Innocence *Put* Innocents *at Risk?*, 60 AM. PSYCHOLOGIST 215, 222 (2005).

88.   *See id.*

89.   Leo & Ofshe, *supra* note 14, at 481–82.

90.   Kassin & Gudjonsson, *supra* note 61, at 57.

91.   *See* GUDJONSSON, *supra* note 71, at 626.

92.   *See id.*

please . . . and a desire to avoid confrontation and conflict with others, particularly those in positions of perceived authority."[93]

Second, younger suspects generally confess more readily than older suspects.[94] The reasons for this are that younger suspects are less likely to have prior experience with law enforcement, less likely to invoke their *Miranda* rights, and more likely to comply with the demands of authority figures.[95] In a study of 125 false confessions, 71 (63%) of the 113 confessors who provided their age were younger than twenty-five years of age.[96]

Third, intellectually impaired individuals are more likely to confess falsely.[97] Mentally retarded persons are less likely to understand their *Miranda* rights[98] and often exhibit a strong tendency to say "yes" to even absurd questions.[99] In the aforementioned study of 125 false confessions, at least 28 (22%) of the confessors were mentally retarded.[100] Further, because intelligence test scores were not obtainable in most cases, this figure is likely an underestimate.[101]

Fourth, individuals who have poor memories or who distrust their memory capabilities are typically more suggestible and therefore more likely to confess falsely.[102] When persons doubt their own memories of an event, they often rely on cues from others to help them construct a plausible account of what actually happened.[103]

Fifth, individuals who are in a state of alcohol withdrawal are vulnerable to giving false confessions because they are cognitively impaired, unusually anxious, and less able to cope with pressure from the police.[104]

Sixth, individuals who suffer from a diagnosable psychiatric disorder— e.g., schizophrenia or depressive illness—are sometimes vulnerable because a breakdown in reality monitoring impairs the individual's ability to

---

93.   Kassin & Gudjonsson, *supra* note 61, at 51.

94.   *See* Drizin & Leo, *supra* note 14, at 944.

95.   *Id.* at 944 n.347.

96.   *Id.* at 945.

97.   *See* Solomon M. Fulero & Caroline Everington, *Assessing Competency to Waive* Miranda *Rights in Defendants with Mental Retardation*, 19 LAW & HUM. BEHAV. 533, 534 (1995).

98.   *Id.* at 535.

99.   *Id.*

100.  Drizin & Leo, *supra* note 14, at 971.

101.  *See id.* at 971 n.452.

102.  *See* GUDJONSSON, *supra* note 71, at 384–85, 404–07.

103.  *See id.* at 351–52.

104.  *See* Gisli H. Gudjonsson et al., *The Effects of Alcohol Withdrawal on Mental State, Interrogative Suggestibility and Compliance: An Experimental Study*, 13 J. FORENSIC PSYCHIATRY 53, 63 (2002); Gisli H. Gudjonsson et al., *The Effects of Alcohol Withdrawal on Memory, Confabulation, and Suggestibility*, 54 NORDIC J. PSYCHIATRY 213, 218–19 (2000).

differentiate fact from fantasy.[105] As a result, some mentally ill persons come to believe they have committed crimes that, in fact, they have not.[106]

Seventh, sleep deprivation impairs one's ability to cope with pressure applied by an interrogator.[107] The longer the sleep deprivation, the greater the effects on suggestibility.[108] Sleep deprivation impairs executive functioning in the part of the brain called the prefrontal cortex.[109] Executive functioning refers to the brain's ability to absorb information and make decisions.[110] Sleep-deprived individuals are more suggestible and less able to make good decisions.[111]

### 3.   Situational Factors Associated with False Confessions

Certain situational factors can also induce a person to confess falsely. First, isolation of the suspect is associated with false confessions.[112] Police investigators typically isolate suspects from family and friends before an interrogation begins.[113] Military interrogators isolate suspected terrorists, religious cults often isolate their members, and prison officials sometimes isolate inmates.[114] Social isolation within unfamiliar surroundings leads to anxiety and a desire to remove one's self from an uncomfortable situation.[115] In this kind of situation, individuals often comply, to a surprisingly high degree, with their interrogators' demands.[116]

Second, a lengthy interrogation elevates the risk of obtaining a false confession. Most police interrogations are completed within an hour or two.[117] The authors of a widely-used interrogation manual believe that most

---

105. *See* GUDJONSSON, *supra* note 71, at 317–19.

106. *See id.* at 317.

107. *See* Mark Blagrove, *Effects of Length of Sleep Deprivation on Interrogative Suggestibility*, 2 J. EXPERIMENTAL PSYCHOL.: APPLIED 48, 56 (1996).

108. *See id.*

109. *See* Jens P. Nilsson et al., *Less Effective Executive Functioning After One Night's Sleep Deprivation*, 14 J. SLEEP RES. 1, 1–5 (2005).

110. *See id.*

111. *See id.*

112. *See* Kassin et al., *supra* note 58, at 389.

113. *See id.*

114. *See* Peter Suedfeld, *Solitary Confinement in the Correctional Setting: Goals, Problems, and Suggestions*, 20 CORRECTIVE & SOC. PSYCHIATRY & J. BEHAV. TECH., METHODS & THERAPY 10, 11–12 (1974).

115. *See* Solomon E. Asch, *Studies of Independence and Conformity: A Minority of One Against a Unanimous Majority*, 70 PSYCHOL. MONOGRAPHS 9 (1956).

116. *See id.*

117. *See id.* at 392; Leo, *supra* note 35, at 279.

interrogations can be completed within three to four hours.[118] These statistics stand in sharp contrast to an analysis of forty-four proven false confession cases in which 34% of the interrogations lasted six to twelve hours, 39% lasted twelve to twenty-four hours, and the average length was 16.3 hours.[119] In a lengthy interrogation, an innocent suspect's resistance is worn down and police are likely to apply more pressure.[120]

Third, the interrogation technique known as "minimization" is associated with false confessions.[121] Minimization "is a 'soft sell' technique in which the detective tries to lull the suspect into a false sense of security by offering sympathy, tolerance, face-saving excuses, and moral justification; by blaming the victim or an accomplice; and by underplaying the seriousness or magnitude of the charges."[122] Controlled studies have demonstrated that minimization techniques are effective in persuading guilty suspects to confess.[123] Unfortunately, they also induce some innocent suspects to confess falsely.[124] Indeed, in one realistic simulation, an investigator induced 43% of *innocent* suspects to provide a false confession by promising leniency and minimizing the seriousness of the offense by offering sympathy and a face-saving excuse.[125]

Fourth, the interrogation technique known as "maximization" is also associated with false confessions.[126] In this approach, "the interrogator tries to scare and intimidate the suspect into confessing by making false claims about evidence (e.g., staging an eyewitness identification or a fraudulent lie-detector test) and exaggerating the seriousness of the offense and the magnitude of the charges."[127] Controlled studies have found that the presentation of manufactured evidence dramatically increases the likelihood that an individual will falsely confess and, at times, even internalize blame for the act.[128]

---

118. *See* FRED E. INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS 597 (4th ed., Jones & Bartlett Publishers 2004).

119. *See* Drizin & Leo, *supra* note 14, at 949 tbl.7.

120. *See* Kassin et al., *supra* note 58, at 395.

121. *See* Saul M. Kassin, *The Psychology of Confession Evidence*, 52 AM. PSYCHOLOGIST 221, 223 (1997).

122. *See id.*

123. *See, e.g.*, Melissa B. Russano et al., *Investigating True and False Confessions Within a Novel Experimental Paradigm*, 16 PSYCHOL. SCI. 481, 485 (2005).

124. *Id.*

125. *See id.* at 483–85.

126. *See* Ofshe & Leo, *supra* note 12, at 1088–1106; *see also* Kassin et al., *supra* note 58, at 394.

127. Saul M. Kassin & Karlyn McNall, *Police Interrogations and Confessions: Communicating Promises and Threats by Pragmatic Implication*, 15 LAW & HUM. BEHAV. 233, 234–35 (1991).

128. *See* Kassin, *supra* note 87, at 219–22.

### 4.   Contextual Factors Contributing to False Confessions

Interrogations are only one part of the investigative process. Once the police have identified a suspect, but prior to the interrogation itself, investigators are trained to conduct an initial interview to verify or refute their suspicion of guilt.[129] In this interview, the investigator evaluates the suspect's verbal and non-verbal behaviors to determine if the individual is lying.[130]

The Reid School in Chicago claims to have developed a behavioral analysis protocol that allows trained investigators to detect deception at high levels of accuracy.[131] Researchers, however, have demonstrated that investigators who use the Reid protocol are no more accurate than untrained individuals in detecting deception.[132] Other researchers have shown that professionals who have been trained to detect deception in an interrogation context perform no better than chance at identifying deceptive persons.[133] In short, it is unrealistic to think that police officers are, or can become, human lie detectors.

Finally, when police officers conduct interrogations, they typically believe the individuals they interrogate are guilty.[134] This presumption of guilt influences the way investigators interact with suspects and leads them to adopt a questioning style that is highly confrontational.[135] In one carefully-designed study, some investigators were led to believe that a suspect was guilty.[136] Compared to investigators in a control condition, they asked more guilt-presumptive questions and pressured the suspect more intently for a confession.[137]

---

129.   *See id.* at 216–17.

130.   *See id.* at 216.

131.   *See* INBAU ET AL., *supra* note 118, at 209.

132.   *See* Saul M. Kassin & Christina T. Fong, *"I'm Innocent!": Effects of Training on Judgments of Truth and Deception in the Interrogation Room*, 23 LAW & HUM. BEHAV. 499, 500–01 (1999).

133.   *See* Christian A. Meissner & Saul M. Kassin, *"He's Guilty!": Investigator Bias in Judgments of Truth and Deception*, 26 LAW & HUM. BEHAV. 469, 472 (2002).

134.   *See* Kassin, *supra* note 87, at 219.

135.   *Id.* at 215, 219–20.

136.   *See* Saul M. Kassin, Christine C. Goldstein & Kenneth Savitsky, *Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt*, 27 LAW & HUM. BEHAV. 187, 191 (2003).

137.   *See id.* at 199.

## IV.   THE ADMISSIBILITY OF EXPERT TESTIMONY

The preceding Section outlined precisely what the experts know about false confessions. However, this knowledge is of no value to defendants unless it can be shared with the jury. The following Sections explain the legal standards for admitting expert testimony generally, and also how these standards are applied in cases of false confession experts.

### A.   *The Legal Framework for Expert Testimony Generally*

The rules governing the admission of expert testimony vary by jurisdiction. Some states still cling to the *Frye* test, the most stringent test, which operates to exclude a great deal of potential expert testimony based on its level of acceptance within the relevant scientific field.[138] Other states have adopted the *Daubert* test, a more liberal standard for the admission of expert testimony, in which judges screen evidence for reliability.[139] Other states have adopted even more liberal standards and will permit expert testimony provided it will merely assist the jury, leaving the reliability of the evidence as a matter of weight, rather than admissibility.[140]

Furthermore, statutes or court orders may also require special notice of the proposed use of the expert, as well as certain disclosures about the expert's proffered testimony and qualifications.[141] Pretrial litigation often encompasses many of these issues, along with more substantive issues about the subject matter of the proposed testimony itself. Each case is unique, and involves a facts-and-circumstances analysis. Appellate courts generally give great deference to trial courts when deciding all of these issues, and court decisions conflict even among jurisdictions applying the same standard.[142]

Regardless of whether a jurisdiction has adopted *Frye*, *Daubert*, or some other standard, one issue repeatedly emerges in litigation across jurisdictions and is therefore the topic of this Article. That issue is whether the expert's proffered testimony: (1) will assist the jury in evaluating the credibility of the confession and is therefore admissible; or (2) is already

---

138.  Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923).

139.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).

140.  *See, e.g.*, Lievrouw v. Roth, 459 N.W.2d 850, 859 (Wis. Ct. App. 1990).

141.  *See, e.g.*, WIS. STAT. ANN. § 971.23(2m)(am) (West 2005).

142.  Agar, *supra* note 16, at 42 ("The days of consistency, however, are gone. The *Daubert* analysis has already led to a split of opinion on the admissibility of expert testimony in state courts. That trend will likely continue after the *Kumho Tire Co.* decision."); *see also* Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

within the common knowledge of the jury, making the testimony superfluous and therefore inadmissible.[143]

### B.        *Application to False Confession Experts*

It might seem a foregone conclusion that what psychologists know about false confessions is indeed *outside* the scope of a juror's common knowledge. Although many people certainly know that false confessions happen, few would understand the frequency with which they happen, or especially why or how they happen.

> Most lay people would not realize, for example, that people with compliant personalities may be so eager to gain approval of authority figures that they will confess to crimes that they did not commit to please police interrogators; similarly, most lay people do not understand the powerful effect of specific interrogation tactics, such as promising the suspect leniency or misrepresenting forensic evidence, much less the effect that a skillful combination of these tactics could have in the emotionally charged atmosphere of the interrogation room . . . .[144]

Rather, "false confessions might seem unlikely, irrational, and perhaps so rare as to be exotic for those unfamiliar with modern psychological interrogation techniques."[145] In fact, not only does the general public fail to understand the frequency of, and factors contributing to, false confessions, but so do the police who are trained in these tactics.[146]

Finally, it is highly unlikely that law enforcement would spend so much time developing and training in such techniques, and research psychologists would spend so much time studying the impact of such techniques, if the subject matter—the psychology of interrogation and confession—was so simple as to already be common knowledge for the average citizen.

Not surprisingly, then, some courts have indeed allowed defendants to present expert testimony on false confessions.[147] What is surprising, however, is that "most courts have *disallowed* false confession expert

---

143. This test, while often worded slightly differently, is the same in substance across jurisdictions. *See, e.g.*, Vent v. State, 67 P.3d 661, 667–68 (Alaska Ct. App. 2003); People v. Son, 93 Cal. Rptr. 2d 871, 883 (Ct. App. 2000); People v. Gilliam, 670 N.E.2d 606, 619 (Ill. 1996); State v. Ritt, 599 N.W.2d 802, 810–11 (Minn. 1999); State v. Davis, 32 S.W.3d 603, 608 (Mo. Ct. App. 2000); State v. Free, 798 A.2d 83, 95 (N.J. Super. Ct. App. Div. 2002).

144. Welsh S. White, *Confessions in Capital Cases*, 2003 U. Ill. L. Rev. 979, 1031 (footnotes omitted).

145. Ofshe & Leo, *supra* note 12, at 983.

146. McMurtrie, *supra* note 10, at 1282.

147. *See, e.g.*, United States v. Hall, 974 F. Supp. 1198, 1203–06 (C.D. Ill. 1997).

testimony,"[148] and many have done so because the subject matter of the testimony, the courts conclude, is already within the jury's common knowledge.[149] Three cases, from three different jurisdictions, are particularly useful in analyzing the courts' reasoning.

### 1.  *State v. Davis*

In *State v. Davis*, the defendant had allegedly confessed to a crime and, at trial, argued that the confession was false.[150] In so doing, he attempted to introduce expert testimony "about interrogation techniques, how such techniques influence criminal suspects, and whether the techniques correlate to false confessions."[151] The expert also intended to explain "how and why false confessions occur and principles to use to evaluate the reliability of a confession."[152]

The court in *Davis* framed the admissibility test as whether the proffered testimony would "aid the jury" or whether it concerned things already within the jury's "common knowledge."[153] In deciding, the court discussed a previous case from its state supreme court in which the *prosecutor* introduced expert testimony regarding a defendant's statement. "[T]he prosecutor asked an FBI agent, 'Do you have an opinion whether suspects accused of criminal activity, sir, downplay their involvement in that particular offense.' The agent answered: 'Yes. That's quite often the case. We call it minimizing. They minimize their involvement.'"[154]

The court held that this expert testimony from the government—about how suspects sometimes minimize their involvement in illegal activity—was properly admitted.[155] The court reasoned that this testimony "'came

---

148. Hoeffel, *supra* note 67, at 67 (emphasis added).

149.  Although this Article discusses the holdings of three cases in detail, numerous other cases have also foreclosed expert witness testimony on the basis that such information is, according to the courts, common knowledge among potential jurors. *See, e.g.*, Vent v. State, 67 P.3d 661, 673 (Alaska Ct. App. 2003) (Mannheimer, J., concurring) (excluding expert testimony because it was "nothing more than the common-sense notion that a confession must be tested against the known facts"); People v. Son, 93 Cal. Rptr. 2d 871, 883 (Ct. App. 2000) (excluding expert testimony because the effect of police inducements to obtain a confession is "a matter easily understood by a layperson without expertise"); People v. Gilliam, 670 N.E.2d 606, 619 (Ill. 1996) (excluding expert testimony because the reasons why the defendant may have falsely confessed were within "the understanding of ordinary citizens, and . . . not difficult to understand or explain").

150.  State v. Davis, 32 S.W.3d 603, 608–09 (Mo. Ct. App. 2000).

151.  *Id.* at 608.

152.  *Id.*

153.  *Id.* at 608–09.

154.  *Id.* at 608 (quoting State v. Skillicorn, 944 S.W.2d 877, 892 (Mo. 1997)).

155.  *Id.*

from [the agent's] special knowledge as a career law enforcement officer, *not from the realm of common experience shared by the members of the jury.*"[156]

However, the *Davis* court believed that the *defendant's* proffered testimony about interrogation techniques, their influence on suspects, and their correlation to false confessions, was *within* the common knowledge of the jury.[157] The court therefore held that the expert's testimony was "inadmissible since it would not aid the jury."[158] Conversely stated, the jury could use its "common knowledge" and "therefore, the introduction of expert testimony would be 'a superfluous attempt to put the gloss of expertise, like a bit of frosting, upon inferences which lay persons were equally capable of drawing from the evidence.'"[159]

This analogy, however, is not persuasive in light of the state supreme court's earlier ruling in which it permitted the state's expert witness—the FBI agent—to testify about how suspects' confessions are often minimized.[160] In fact, the defendant's expert evidence—including testimony about certain interrogation techniques and their correlation to false confessions—was far more likely to be *outside* the "realm of common experience"[161] than testimony about how people sometimes minimize their involvement in wrongdoing. Consequently, the court offered another reason for its decision. The court simply dismissed the earlier court decision that allowed the testimony of the FBI agent as a "qualified sanction of a brief foray into this perilous area."[162]

### 2.  *State v. Ritt*

In *State v. Ritt*, the defendant's alleged confession was videotaped.[163] At trial, he sought to introduce the testimony of an expert who would "take the jury through the videotape of [the defendant's] interview with [the interrogator] to point out the use of specific interview techniques."[164] The expert would then testify about the "reliability and effect of the Reid technique of interrogation."[165]

---

156. *Id.* (emphasis added) (quoting *Skillicorn*, 944 S.W.2d at 892).
157. *Id.* at 609.
158. *Id.* at 608.
159. *Id.* at 609 (quoting State v. Lawhorn, 762 S.W.2d 820, 823 (Mo. 1988)).
160. *Id.* at 608.
161. *Id.*
162. *Id.* at 609.
163. State v. Ritt, 599 N.W.2d 802, 806 (Minn. 1999).
164. *Id.* at 810.
165. *Id.*

The court in *Ritt* framed the admissibility test as whether the proffered testimony would be "'helpful to the jury in fulfilling its responsibilities'"[166] or whether it concerned things already "'within the knowledge and experience of a lay jury.'"[167] In deciding, the court analogized to expert witness testimony about battered women's syndrome.[168]

In domestic abuse cases, experts in battered women's syndrome nearly always testify for the state and are often themselves advocates for battered women.[169] These witnesses explain why a person, who initially reported a crime of domestic violence, would later minimize or even recant that account at the defendant's trial.[170] Reasons for the recantation, if it occurs, are obvious, and include fear of retaliation from the defendant, a desire to protect the defendant from the government, and fear of lost financial support from the defendant.[171] The *Ritt* court concluded that experts (or advocates) in this area were describing "a behavioral phenomenon *not within the understanding of an ordinary lay jury*."[172]

However, the court concluded that the *defendant's* proffered testimony—about the Reid interrogation method and the effects of the interrogation techniques—was *within* the common knowledge of the jury.[173] The court held that such testimony was properly excluded because it was unlikely to be helpful, as the jury's "'common experience affords sufficient basis for the assessment of credibility.'"[174] Further, there was "an extreme danger that it could confuse the jury," and the "purported expertise does nothing more at this time than offer the gratuitous opinion of an expert with respect to the credibility of certain evidence that may be admitted here."[175]

It is difficult to reconcile this position with the court's inconsistent position on battered women's syndrome evidence. Actually, it seems *likely* that jurors would already understand that witnesses sometimes testify falsely for a variety of reasons, including protecting one's spouse or even one's own financial self-interest. Conversely, it seems *unlikely* that jurors would already understand the Reid interrogation method, the impact of the

---

166. *Id.* at 811 (quoting State v. Miles, 585 N.W.2d 368, 371 (Minn. 1998)).

167. *Id.* (quoting State v. Helterbridle, 301 N.W.2d 545, 547 (Minn. 1980)).

168. *Id.*

169. *See, e.g.*, R. Michael Cassidy, *Reconsidering Spousal Privileges After* Crawford, 33 Am. J. Crim. L. 339, 349 (2006).

170. *See, e.g.*, State v. Schaller, 544 N.W.2d 247, 252 (Wis. Ct. App. 1995) (allowing a battered women's syndrome expert to testify for the state that it is common and consistent for a battered woman to recant an accusation at trial).

171. *See, e.g.*, Cassidy, *supra* note 169, at 348.

172. *Ritt*, 599 N.W.2d at 811 (emphasis added).

173. *Id.* at 810.

174. *Id.* at 811 (quoting State v. Myers, 359 N.W.2d 604, 609–10 (Minn. 1984)).

175. *Id.* at 810.

interrogation techniques, their correlation to false confessions, and the susceptibility of certain suspects to false confessions.

Despite this, there is a "nearly universal, but untested, assumption that the jurors *need* assistance because they are not sophisticated enough to recognize that victims sometimes recant."[176] On the other hand, however, is the widely-held and untested belief that jurors *are* sophisticated enough to recognize and understand, without assistance from psychologists, the scientific data on interrogation techniques, their impact, and their correlation to false confessions.[177]

### 3. *State v. Free*

Finally, in *State v. Free*, the defendant had allegedly confessed to a crime and sought to challenge the reliability of the confession at trial.[178] In so doing, he attempted to introduce expert testimony about relevant interrogation factors—including sleep deprivation, withholding of food, selective and partial recording of the interrogation, isolation from family and friends, confrontation with fabricated evidence of guilt, and other interrogation techniques—and their relationship to false confessions.[179]

The court in *Free* framed the admissibility issue, in part, as whether the testimony would "'assist the trier of fact to understand the evidence or to determine a fact in issue'"[180] or whether it concerned things already within "'the ken of the average juror.'"[181] In deciding, the appellate court analogized to its own state's rules of evidence.[182]

Rules of evidence are, of course, drafted by educated people and adopted after much review and debate. The court even acknowledged—specifically referring to its hearsay exception for statements against interest—that "our rules of evidence recognize that *people do not usually make statements against their penal interest unless they are true*."[183]

Despite this, the court held that the defendant's expert should have been excluded by the trial court, finding that there simply was not sufficient evidence "in the record in this case, to support the proposition that the

---

176. Mark S. Brodin, *Behavioral Science Evidence in the Age of* Daubert*: Reflections of a Skeptic*, 73 U. Cin. L. Rev. 867, 901 (2005).
177. *See id.* at 902–03.
178. State v. Free, 798 A.2d 83, 84 (N.J. Super. Ct. App. Div. 2002).
179. *Id.* at 84–89.
180. *Id.* at 91 (quoting N.J. R. Evid. 702).
181. *Id.* at 95 (quoting State v. Kelly, 478 A.2d 364, 379 (N.J. 1984)).
182. *Id.* at 96.
183. *Id.* at 96 (emphasis added).

general public believes that a person who confesses must be guilty."[184] Although this very "proposition" serves as the foundation for the state's rules of evidence, the court reasoned that "it does not follow that ordinary jurors" believe the same thing.[185] Consequently, the court reasoned that testimony about false confessions, much like testimony about faulty eyewitness identification, is "well within the knowledge of ordinary people" and therefore is not admissible.[186]

*Free* is similar to *Ritt* in that the court expresses beliefs that are not only untested but are also inconsistent with each other. *Free*, however, is unique in another respect. While appellate courts normally defer to trial court decisions on the admission of expert testimony,[187] *Free* reversed the trial court after an appeal by the state, found a "'clear abuse of discretion,'" and excluded the expert evidence.[188] The court concluded that the defendant had failed his burden of proving that the proffered testimony was admissible, in part due to a lack of evidence about what jurors actually know or believe about false confessions.[189]

## V.    THE STUDY: WHAT JURORS KNOW

The courts in *Davis* and *Ritt* concluded, without any empirical basis for doing so, that expert testimony on false confessions is already *within* the common knowledge of jurors.[190] The court in *Free* takes a slightly different approach and concludes that the defendant failed to prove that the expert testimony is *outside* of jurors' common knowledge.[191] In all cases, however, the result is the same—courts conclude that the testimony will *not* assist the jury and the defendant's evidence is excluded.

---

184. *Id.* at 93. Of course, even assuming that people generally do *not* believe that one who confesses must be guilty, this does nothing to address what people believe about why, how, and how frequently false confessions occur.

185. *Id.* at 96.

186. *Id.* at 95.

187. *See, e.g.*, State v. Ritt, 599 N.W.2d 802, 810 (Minn. 1999) ("The admission of expert testimony is within the broad discretion accorded a trial court."); State v. Davis, 32 S.W.3d 603, 608 (Mo. Ct. App. 2000) ("Because the trial court has discretion to allow or exclude expert testimony, we will only reverse the trial court for abuse of discretion."); *Free*, 798 A.2d at 96 ("In reviewing a decision to admit expert testimony, we recognize that generally such matters rest in the sound discretion of the trial court.").

188. *Free*, 798 A.2d at 96 (quoting Little Egg Harbor v. Bonsangue, 720 A.2d 369, 372 (N.J. Super. Ct. App. Div. 1998)).

189. *See id.*

190. *See supra* Part IV.B.1–2.

191. *See supra* Part IV.B.3.

The purpose of this study is to determine what jury-eligible citizens actually know or believe about false confessions. In other words, what exactly constitutes the "common knowledge" of jurors? The answer should, in turn, influence courts' decisions about the admissibility of expert testimony on false confessions.

### *A.     Methodology*

In order to test the knowledge of potential jurors, we constructed a thirty-three-item survey that could be completed online at www.surveymonkey.com.[192] We then recruited survey respondents via two sampling techniques: convenience sampling and snowball sampling. Convenience sampling refers to recruiting respondents who are easily accessible, including family, friends, students, and co-workers. Snowball sampling refers to asking initial respondents to recruit additional respondents. In our case, we asked respondents to forward the survey's on-line link to their family, friends, and colleagues. Respondents were provided an incentive to participate—a chance to win one-of-five twenty dollar lottery prizes.

A total of 502 jury-eligible citizens from thirty-eight states completed the survey. As shown in Table 1, respondents ranged in age from eighteen to more than eighty. Sixty-three percent of respondents were between the ages of eighteen and twenty-nine. Seventy-two percent of respondents were female and 88% identified themselves as "non-Hispanic Caucasian." All respondents had completed high school, 93% had completed at least some college, and 18% had earned a graduate degree. Clearly, our sample of respondents was younger and better educated than the typical jury pool.[193] We will return to these points later.

---

192. A copy of the survey may be obtained from the author, Lawrence T. White.

193. According to the U.S. Census Bureau, 15% of Americans twenty-five years of age and over have not completed high school. Press Release, U.S. Census Bureau News, High School Graduation Rates Reach All-Time High; Non-Hispanic White and Black Graduates at Record Levels (June 29, 2004), *available at* http://www.census.gov/Press-Release/www/releases/archives/education/001863.html. Further, only 9.4% of Americans twenty-five years of age and over have earned a graduate or professional degree. Press Release, U.S. Census Bureau News, Eastern States Lead in Graduate Degrees; Colorado and New Mexico Stand Out in West (Mar. 10, 2004), *available at* http://www.census.gov/Press-Release/www/releases/archives/american_community_survey_acs/001712.html.

Table 1        Demographic Characteristics of Respondents (N = 502)

| Age | Percent |
|---|---|
| 18–29 years old | 63 |
| 30–39 years old | 8 |
| 40–49 years old | 10 |
| 50–59 years old | 12 |
| 60–69 years old | 5 |
| 70–79 years old | 2 |
| 80+ years old | <1 |
| **Sex** | |
| Male | 28 |
| Female | 72 |
| **Highest Level of Education Completed** | |
| High School or GED | 7 |
| Some college | 61 |
| Four-year college degree | 15 |
| Graduate degree | 18 |
| **Ethnic Identity** | |
| African American | 4 |
| Asian American | 2 |
| Hispanic/Latin American | 1 |
| Mixed Race | 3 |
| Native American/American Indian | 1 |
| Non-Hispanic Caucasian | 88 |
| Other | 2 |

### B.        The "Social Science" Survey Results

The bulk of our survey tested juror knowledge of the social science of interrogation and confession. We present the results of this portion of the survey in Tables 2 through 6, below. Immediately following each table, we highlight and briefly discuss key findings. In the next Section, Part V.C., we

present the results of statistical analyses that identified significant predictors of prospective jurors' knowledge regarding the social science.

Where possible, we categorized respondents' beliefs as *informed* (correct) or *uninformed* (incorrect), judged in comparison to research findings published in peer-reviewed journals, including many of the studies cited in Part III.B. For example, one survey item asked respondents to estimate the percentage of detained and questioned suspects who eventually confess to committing a crime. According to published studies, between 42% and 55% of questioned suspects eventually confess.[194] To be generous, we categorized all responses between 32% and 65% as *informed*, with the remaining responses being categorized as *uninformed*.

Many of the survey items asked respondents to indicate their belief on a seven-point Likert scale. For example, the most frequently used scale was anchored by *strongly disagree* at one end and *strongly agree* at the other end. Intermediate values were *disagree*, *somewhat disagree*, *uncertain*, *somewhat agree*, and *agree*.

We used Likert scales to evaluate the strength with which respondents held particular beliefs. In the tables below, we combined the middle three points (i.e., 3 to 5) on each scale into a single category called "Somewhat Uncertain." This category essentially represents incipient or weakly-held beliefs. The remaining categories in the tables—"Disagree" and "Agree"— include the outermost values on the Likert scale (i.e., 1 and 2, or 6 and 7); these categories represent beliefs that are firmly held and asserted with at least some confidence.

We categorized responses in this way because, on surveys of this type, most respondents are disinclined to mark *uncertain*, even when they are fundamentally uninformed. Instead, because there is no consequence for being "wrong," most people make an educated guess in the form of marking *somewhat agree* or *somewhat disagree*. As a result, such responses often represent hunches or weakly-held beliefs. As discussed below, much of what potential jurors putatively "know" about interrogations and confessions falls into this category we call "Somewhat Uncertain."

Again, the survey results testing knowledge of the social science of interrogation and confession are located in the following Tables 2 through 6, with commentary following each table.

---

194. *See* GUDJONSSON, *supra* note 71, at 133–40.

Table 2     *Miranda* Rights

| Survey Item | Disagree | Somewhat Uncertain | Agree |
|---|---|---|---|
| 1. *Miranda* rights are designed to protect the accused. | 5 % | 29 % | 65 % |
| 2. Some individuals are not able to understand what *Miranda* rights are or how to apply them. | 6 % | 34 % | 60 % |
| 3. Almost all criminal suspects understand what *Miranda* rights are and what they mean. | 40 % | 50 % | 10 % |
| 4. Individuals who have no prior criminal record are more likely to surrender their rights, as compared to those with a history of criminal justice "experience." | 11 % | 59 % | 30 % |

We asked respondents to agree or disagree, on a seven-point Likert scale, with four statements about *Miranda* rights. As shown in Table 2, nearly two-thirds of respondents answered the first item correctly, i.e., they stated confidently that *Miranda* rights are designed to protect the accused. At the same time, 34% of respondents either believed *Miranda* rights are *not* designed to protect the accused or had only a weakly-held belief about the purpose of *Miranda*.

Most respondents (60%) answered the second item correctly, i.e., they stated confidently that some individuals are not able to understand their *Miranda* rights or how to apply them. An additional 34%, however, were unsure what to believe about the statement. Interestingly, the third item—a modified version of the second item—was answered with confidence by only half of the respondents.

Finally, only 30% of respondents were informed with respect to the fourth statement; most respondents (59%) were unsure if individuals with

no prior criminal records are more likely to surrender their rights, even though studies indicate they are.[195]

Table 3      Detecting Deception

| Survey Item | Disagree | Somewhat Uncertain | Agree |
|---|---|---|---|
| 1. Compared to the general public, police officers are more skilled at recognizing when a person is lying. | 12 % | 71 % | 17 % |
| 2. If an individual is properly trained, he or she can detect lying by observing a person's body language. | 5 % | 46 % | 49 % |

We asked respondents to agree or disagree, on a seven-point Likert scale, with two statements about the ability of police officers to detect deception. As shown in Table 3, only 12% answered the first item correctly, i.e., they stated confidently that police officers are *not* especially skilled at recognizing when a person is lying. Most respondents (71%) were either unsure or insecure in their belief.

Only 5% of respondents answered the second item correctly, i.e., they stated confidently that even trained individuals cannot detect lying by observing body language. Many respondents (46%) were either unsure or insecure in their belief, and nearly half (49%) held beliefs that are contradicted by multiple studies examining the ability of both trained and untrained individuals to detect deception.[196]

---

195. *See id.* at 144–46.
196. *See* Kassin & Gudjonsson, *supra* note 61, at 57–58.

32                    *ARIZONA STATE LAW JOURNAL*                [Ariz. St. L.J.

Table 4     False Confessions

| Survey Item | 0% to 30% | 33% to 65% | 70% to 90% |
|---|---|---|---|
| 1. What percentage of suspects detained by the police for questioning eventually confess to a crime? | 56 % | 30 % | 14 % |
|  | *Never Confess* | *Confess after Minimal Pressure* | *Confess after Strenuous Pressure* |
| 2. An innocent person who has been accused of a crime will: | 6 % | 26 % | 67 % |

| | Unlikely | Somewhat Uncertain | Likely |
|---|---|---|---|
| 3. How likely is it that a person would confess to a crime that he/she did NOT commit? | 31 % | 59 % | 10 % |
| 4. Imagine that a suspect confesses to a crime that he did not commit and is then tried by a jury for that crime. How likely is the defendant to be found guilty? | 3 % | 46 % | 52 % |

We asked respondents three questions about the incidence of false confessions and a fourth question about the power of confession evidence at trial. As shown in Table 4, and despite a generous scoring rule, only 30% of

respondents offered an accurate estimate, i.e., between 33% and 65%, to the first question; most respondents (56%) significantly underestimated the percentage of detained suspects who eventually confess.

Given that some people produce false confessions on their own or after only minimal police pressure, we can judge that a mere 26% of respondents answered the second question correctly. In response to the third question, 31% of respondents said it was unlikely that an innocent person would give a false confession, yet researchers have discovered that, over the years, hundreds of innocent persons have falsely confessed.[197] In response to the fourth question, most respondents (52%) were aware—correctly so—that false confessors are likely to be found guilty at trial, but a nearly equal number (46%) were either unsure or insecure in their belief.

Table 5      Vulnerable Individuals

| *Survey Item* | *Disagree* | *Somewhat Uncertain* | *Agree* |
|---|---|---|---|
| 1. Compared to adults, children and youth are MORE likely to falsely confess to a crime when interrogated by police. | 5 % | 52 % | 43 % |
| 2. Compared to individuals who are not mentally impaired, mentally impaired individuals are MORE likely to falsely confess when interrogated by police. | 4 % | 42 % | 54 % |
| 3. Compared to the general public, people who believe they have a faulty memory are MORE likely to falsely confess when interrogated by police. | 4 % | 70 % | 26 % |

---

197. *See* Deborah Davis & Richard Leo, *Strategies for Preventing False Confessions and Their Consequences*, *in* PRACTICAL PSYCHOLOGY FOR FORENSIC INVESTIGATIONS AND PROSECUTIONS, 121, 122 (Mark R. Kebbell & Graham M. Davies eds., 2006).

We asked respondents three questions about groups of individuals who are vulnerable to giving false confessions. As shown in Table 5, 43% of respondents answered the first item correctly, i.e., they confidently asserted that children and youth are more likely than adults to falsely confess, but most respondents (52%) held weak or uncertain beliefs on the issue. Most respondents (54%) answered the second item correctly, i.e., they confidently asserted that mentally impaired individuals as a group are more likely to falsely confess. Only 26% of respondents answered the third question correctly, i.e., people with faulty memories are more likely to falsely confess. A large majority of respondents (70%) held weak or uncertain beliefs on this issue.

Table 6      Distinguishing Between True and False Confessions

| *Survey Item* | *Disagree* | *Somewhat Uncertain* | *Agree* |
|---|---|---|---|
| 1. When listening to an audiotaped statement given by a defendant, most people are able to tell the difference between true and false confessions. | 51 % | 48 % | 2 % |
| 2. When watching a videotaped statement given by a defendant, most people are able to tell the difference between true and false confessions. | 30 % | 64 % | 6 % |

Laypeople and even police officers are generally unable to distinguish false confessions from true confessions.[198] As shown in Table 6, many people were unsure or held weak beliefs on this issue. In response to the second question, however, 70% of respondents were uninformed, i.e., they were either somewhat uncertain or agreed with the statement. In other words, only 30% correctly understood that people are generally unable to

---

198.  *See* Kassin, Meissner, & Norwick, *supra* note 85, at 221.

distinguish between true confessions and false confessions when watching a defendant's videotaped statement.

### C.    *Statistical Analysis of Composite Scores*

With regard to the survey results presented in Tables 2 through 6, we were able to aggregate the data—i.e., how well did respondents score overall?—and further analyze the data to determine which individual factors were correlated with informed (correct) answers. We first created a composite score for each respondent. The Knowledge (K) score represents the number of informed answers given by a respondent to all of the questions listed in Tables 2 through 6, save one. We eliminated the third question in Table 4—about how likely it would be for an innocent person to confess falsely—because it is not possible to determine which answers are correct.

For each question, we scored a respondent's answer as informed if their answer conformed to the conclusions of experts and researchers as stated in Part III.B. We were generous in our scoring because we gave respondents credit for an informed answer even when they expressed their belief with some hesitation, e.g., by choosing *somewhat agree*. As an illustration, one item asked respondents if *Miranda* rights are designed to protect the accused; all responses of agreement (*somewhat agree*, *agree*, and *strongly agree*) were scored as informed; all other responses (*uncertain*, *somewhat disagree*, *disagree*, and *strongly disagree*) were scored as uninformed.

Each composite K score was based on responses to fourteen items; therefore, the highest possible score was fourteen and the lowest possible score was zero. Respondents who did not answer all fourteen items were excluded from the analysis. As a result, our analysis of K scores was based on 432 respondents. K scores were normally distributed, i.e., distributed in the shape of a bell curve. The mean (average) K score was only 7.9. Despite our generous scoring method, respondents correctly answered only 57% of the fourteen items that tested knowledge of the social science of interrogation and confession.

We then performed a stepwise regression analysis to identify significant predictors of K scores. Stepwise regression is a statistical technique that calculates correlations between multiple predictor variables and a single outcome variable. In this case, we used a stepwise regression to identify those characteristics of potential jurors that were most strongly associated with high K scores. The stepwise regression identified three characteristics—level of education, hours of television watched daily, and age—that were statistically significant predictors of K scores. Specifically,

younger respondents who were highly educated and watched relatively little television were more likely to be well informed about the social science of interrogation and confession. Not surprisingly, level of education was the best predictor of K scores.

### D.    *The "Legal to Use" Survey and Statistical Analysis*

In a different part of our survey, we asked respondents to consider fifteen tactics sometimes used by police interrogators and to indicate, for each one, if the tactic is legally permissible or not. The fifteen tactics are listed in Table 7. Responses were judged to be informed (correct) if they agreed with judicial rulings regarding the permissibility of the tactic (e.g., lying to a suspect) and the admissibility of confession evidence that has been extracted with the use of the tactic.

Table 7     Knowledge of Legal Status of Fifteen Interrogation Tactics[199]

| *Can a Police Officer:* | *Percent of Respondents Who Answered Correctly* |
|---|---|
| 1. Physically harm the suspect? | 99 % |
| 2. Threaten violence? | 87 % |
| 3. Lie to the suspect? * | 43 % |
| 4. Accuse the suspect of lying? * | 74 % |
| 5. Deprive the individual of food and water? | 91 % |
| 6. Deprive the individual of sleep? | 77 % |
| 7. Physically isolate the suspect? * | 73 % |
| 8. Cut off a suspect's denials of guilt? * | 44 % |
| 9. Downplay the significance of the crime? * | 55 % |
| 10. Use rude or insulting remarks? * | 41 % |
| 11. Attack an individual's alibi? * | 68 % |
| 12. Make direct promises of leniency? | 77 % |
| 13. Threaten harsher punishment if the suspect does not confess? | 57 % |
| 14. Hint at lenient treatment in exchange for cooperation? * | 72 % |
| 15. Ignore the suspect's *Miranda* rights? | 98 % |

As shown in Table 7, respondents generally were well informed about the permissibility of various interrogation tactics. There were, however,

---

199.  Tactics that are generally considered permissible are indicated with an asterisk. Tactics that are, at least in theory, impermissible are left unmarked. For a discussion of which tactics are generally permissible and which tactics, or combination of tactics, are more likely to render a statement inadmissible, see MICHAEL MONICO & BARRY SPEVACK, FEDERAL CRIMINAL PRACTICE: A SEVENTH CIRCUIT HANDBOOK §§ 76–77 (2006).

four notable exceptions. First, only 43% of respondents knew that police officers can lie to suspects. Second, only 44% of respondents knew that police officers can cut off a suspect's denials of guilt. Third, only 55% of respondents knew that a police officer can downplay the significance of a crime when interrogating a suspect. Fourth, and finally, only 41% of respondents knew that police officers can use rude or insulting remarks while interrogating a suspect. The significance of these findings will be discussed in Part VI.

We again created a composite score for each respondent, called the Legal to Use (LTU) score. The LTU score represents the number of informed answers given by a respondent to the questions about interrogation tactics. The highest possible LTU score was fifteen and the lowest possible score was zero. All 502 respondents were included in the analysis. LTU scores were normally distributed, with a mean score of 10.6. Interestingly, because the items are essentially true-false questions, a respondent who guessed blindly in response to the fifteen LTU items would achieve a score of seven or eight. Thus, an average LTU score of 10.6 is only three points higher than one would expect by chance.

We again performed a stepwise regression analysis. In this case, we sought to identify those characteristics of potential jurors that were most strongly associated with high LTU scores. The stepwise regression identified two characteristics—level of education and ethnicity—that were statistically significant predictors of LTU scores. Specifically, respondents who were highly educated and white, as opposed to non-white, were more likely to be well informed about the permissibility of various interrogation tactics. As in the analysis of K scores, the best predictor of LTU scores was level of education.

### E.    *Self-Knowledge Assessment*

Finally, we asked respondents to agree or disagree with two statements related to the desirability of expert testimony on false confessions. These statements, discussed below, are not in table form. Further, they are not included in either the K score or LTU score because there is no right or wrong answer. Nonetheless, they do offer some insight into jurors' knowledge.

Eighty-one percent of respondents *disagreed* with the statement that "[m]ost jurors know enough about interrogation tactics and confessions to make informed judgments about the confession evidence in a criminal trial." In a similar vein, 80% *agreed* with the statement that "[i]n a case

where the truthfulness of a confession is disputed, jurors would benefit by hearing from a witness who is an expert on interrogation and confession."

These two responses—or perhaps more accurately stated, admissions—are logically consistent. When taken together, they strongly suggest that most respondents suspect that they are relatively uninformed on the subject of interrogation and confession. Further, when considered in light of the other survey and statistical evidence presented in this Article, a very strong case can be made for the admission of expert testimony on false confessions. This is the subject of the next Part.

## VI.   The Case for False Confession Experts

The findings from our survey indicate that, at best, most individuals do not know what experts know about false confessions and, at worst, hold serious misconceptions that might infringe on a defendant's right to receive a fair trial. Consequently, expert testimony on false confessions should be admissible, as the research evidence falls well outside the common knowledge of prospective jurors and the expert testimony would assist the jury in evaluating a defendant's alleged confession.

### A.   *Framing the Issue*

Many courts have excluded expert testimony because there is no proof that "the general public believes that a person who confesses must be guilty."[200] First, this reasoning badly misses the point. Excluding testimony on this basis would be akin to excluding expert testimony on battered women's syndrome because the general public already knows that people are capable of falsely testifying in court.[201] No court would rule in this manner or on this basis. Such a superficial inquiry would do nothing to address the issue of what jurors know about *why*, *how*, and *how often* a particular event occurs—whether recantations by victims or false confessions by suspects.

Second, our survey findings indicate that the false confession phenomenon itself, even its broadest sense, is in fact *outside* the common knowledge of potential jurors. In other words, the general public *does* believe that a person who confesses must be guilty. For example, nearly one-third (31%) of respondents said it was unlikely—which included Likert scale responses of "unlikely" and "very unlikely"—that a person would

---

200.  State v. Free, 798 A.2d 83, 93 (N.J. Super. Ct. App. Div. 2002).
201.  *See generally* Hoeffel, *supra* note 67.

confess to a crime he or she did not commit, yet researchers have uncovered hundreds of proven false confessions.[202]

Even more significantly, nearly three-quarters (73%) of respondents believed that an innocent person who has been accused of a crime would either "never confess" or would only confess after "strenuous interrogation pressure." However, as discussed previously in this Article, there are many documented cases in which innocent people have confessed in response to only minimal interrogation pressure.

These two survey questions alone indicate two things that strongly support the admission of expert testimony on false confessions: First, there is now evidence that a significant proportion of jurors *do* generally assume that suspects who confess to crimes are guilty; and second, jurors are uninformed about subtle interrogation pressures, their relationship to false confessions, and the personality characteristics of individuals who are most likely to succumb to such tactics.

### B.  *Police Commentary on Suspects' Statements*

Perhaps the most surprising result of the survey is that 92% of respondents were either somewhat uncertain or agreed that "compared to the general public, police officers are more skilled at recognizing when a person is lying." Furthermore, 95% were either somewhat uncertain or agreed that when "properly trained, he or she can detect lying by observing a person's body language." Conversely stated, only 5% of respondents correctly answered this question.

This strongly held but unfounded belief in the ability of police officers to act as human lie detectors is especially harmful to innocent defendants. The reason is that police are frequently allowed to comment in court on defendants' truthfulness, and ultimately on their guilt or innocence, despite the general prohibition on such testimony.[203] The following two cases are excellent examples of how easily a court can circumvent the rules of evidence to permit such police testimony.

In *Vent v. State*, the defendant gave several statements, the first one being exculpatory.[204] At trial, however, the interrogating officer was allowed to testify that "he did not believe [the defendant's] statement in the first interview."[205] The court held that "in some situations" it would be

---

202.  *See* Davis & Leo, *supra* note 197, at 122.

203.  *See, e.g.*, State v. Haseltine, 352 N.W.2d 673, 676 (Wis. Ct. App. 1984) (prohibiting a witness from commenting on the truthfulness of another witness's testimony).

204.  Vent v. State, 67 P.3d 661, 665–66 (Alaska Ct. App. 2003).

205.  *Id.* at 666.

inappropriate for an officer to testify about the truthfulness of a defendant.[206] However, the court said that in this situation it was appropriate because "the purpose of the exchange was not to prove that [the defendant] was a dishonest person, but rather to illustrate the reasons why the [the interrogator] decided to interrogate [the defendant] a second time."[207]

Likewise, in *State v. Skillicorn*, the case discussed in *Davis*,[208] the court allowed an FBI agent to testify that suspects who give statements generally "minimize their involvement" in the criminal activity.[209] Even though this testimony came from the same FBI agent that interrogated the defendant, and the defendant's statement was the only statement at issue in the case, the court inexplicably held that the FBI agent's testimony "was a statement of how suspects *generally* respond. It was *generic*. As such, it was not testimony directly impugning [the particular defendant's] credibility."[210]

Finally, any time an interrogation is recorded—as is now mandatory in some states[211]—an innocent suspect will likely proclaim innocence, at least initially.[212] Interrogation, however, is a guilt-presumptive process.[213] As soon as police determine that an initial statement does not confirm their predetermined notion of guilt, they will either call the suspect a liar or otherwise express their disbelief in the suspect's statement, as the police did in *Green*.[214] When the recorded interrogation is played in court, jurors will hear the police expressing their disbelief in the suspect's statement of innocence and, conversely, their belief in the suspect's guilt.

The problem, then, is that there is a very strong, commonly-held belief that police officers have the ability to determine when a suspect is lying and when a suspect is telling the truth.[215] During trial, jurors will learn—either through direct testimony, as in *Vent* and *Skillicorn*, or through a video or audio recording, as in *Green*—that the police believe the particular defendant is lying and factually guilty. Consequently, there is a significant

---

206. *Id.*

207. *Id.*

208. *See* State v. Davis, 32 S.W.3d 603 (Mo. Ct. App. 2000); *supra* Part IV.B.1.

209. State v. Skillicorn, 944 S.W.2d 877, 883, 892 (Mo. 1997).

210. *Id.* at 892 (emphasis added).

211. *See, e.g.*, WIS. STAT. ANN. § 968.073(2) (West 2005) (stating that it is the policy of the state to record custodial interrogations). If the interrogation is not recorded, the defendant is *not* entitled to suppression of the statement. *See id.*

212. *See* Ofshe & Leo, *supra* note 12, at 989.

213. *See supra* note 135 and accompanying text.

214. *See* Green v. Scully, 850 F.2d 894, 896–97 (2d Cir. 1988) (after the defendant maintained his innocence, even after the police lied to him and fabricated incriminating evidence, the police responded "I know you did it. I know you did it, Robert. I know you did it.").

215. *See supra* Part V.B.

risk, if not a probability, that a jury will convict based *not* on the evidence but rather on the opinions of the interrogating officers.

Therefore, expert testimony on false confession evidence would be extremely helpful in breaking this link and educating the jury that police, while more confident in their ability, are actually no better at detecting deception than the general population.[216]

### C.    *The Composite Scores*

The average K score for all respondents was only 7.9 on a scale of fourteen.[217] The average LTU score was 10.6 on a scale of fifteen.[218] These numbers strongly suggest that the body of research on which respondents were tested, taken as a whole, was *not* within their common knowledge. The LTU scores, although higher than the K scores, are especially informative. The LTU scores show that respondents were uninformed regarding the tactics that police can legally use to obtain confessions, let alone the correlation between those tactics and false confessions.

Several examples illustrate this. First, only 43% of respondents knew that police officers can lie to suspects.[219] This represents a potentially harmful gap in jurors' knowledge because several studies have demonstrated an association between the presentation of fabricated evidence of guilt by police and the risk of a false confession.[220]

Second, only 44% of respondents knew that police officers can cut off a suspect's denial of guilt, and only 41% knew that police officers can use rude or insulting remarks while interrogating a suspect.[221] When an innocent suspect is unable to assert his innocence, and instead is verbally degraded, he may come to feel helpless and eventually comply with an interrogator's demands.

Third and finally, only 55% of respondents knew that a police officer can downplay the significance of a crime when interrogating a suspect.[222] As noted earlier, however, several studies have demonstrated an association between using minimization tactics—which downplay the significance of a

---

216. *See* Kassin & Gudjonsson, *supra* note 61, at 57–58.
217. *See supra* Part V.C.
218. *See supra* Part V.D.
219. *See supra* Part V.D. tbl.7.
220. Davis & Leo, *supra* note 197, at 129.
221. *See supra* Part V.D. tbl.7.
222. *See supra* Part V.D. tbl.7.

crime through the use of several effective strategies—and rates of false
confessions.[223]

Furthermore, the K scores and LTU scores actually *overestimate* the
knowledge of jury-eligible citizens for two reasons. First, with regard to the
K scores, and as discussed in the methodology Section, answers were
generously scored for accuracy, and questions were designed to encourage
correct responses rather than to trick respondents into giving incorrect
responses.

Second, and more significantly, the survey respondents as a group were
far better educated than the general, jury-eligible population. This
difference in education, discussed in Part V.A. is highly significant because
the regression analyses of both composite scores (K and LTU) indicated
that the single best determinant of scores was level of education. In other
words, the higher the education levels, the higher the composite scores.

Considering that our survey was designed and scored to produce correct,
rather than incorrect, responses, and considering that our respondents were
far better educated than the general population, it follows that our
respondents were better informed than what we would expect to find in the
jury-eligible population at large. This inference only strengthens the point
already made by the survey evidence—that jurors would greatly benefit
from expert testimony on false confessions.

### D.    Limited Juror Knowledge

Many respondents admitted, either indirectly or directly, that their
knowledge of the issues was limited. Indirectly, in response to seven of
thirteen questions that used a Likert scale, the majority of respondents
answered tentatively, i.e., they circled one of the three middle-points on the
seven-point scale. Clearly, most respondents were not confident in the
"correctness" of their answers and recognized that they are relatively
uninformed with respect to the social science of interrogation and
confession.

Directly, in response to questions about juror knowledge and whether
jurors would benefit from expert testimony, 81% *disagreed* that most jurors
already know enough about the topic to make informed judgments about
confession evidence at trial.[224] Further, 80% *agreed* that jurors would
benefit by hearing expert testimony on the social science of interrogation

---

223.  Davis & Leo, *supra* note 197, at 36–37.
224.  *See supra* Part V.E.

and confession.[225] When respondents admit a lack of knowledge, that admission is generally a good indicator that the respondents are, in fact, uninformed.

At the same time, many survey respondents were informed on certain limited aspects of false confessions. For example, about half knew that children are more likely than adults to confess falsely, and that mentally impaired individuals are more likely than the non-mentally impaired to confess falsely.[226] While the knowledge on these two points may come closer to the standard of "common knowledge," this represents only a small portion of the body of research on false confessions. For example, this knowledge would not be useful in cases where police employed "minimization" or other subtle interrogation tactics, or in cases where the jury hears a police officer—via either a recorded interrogation or direct testimony—indicate his belief in the defendant's guilt.

Finally, "[t]hat a lay witness of ordinary intelligence may also understand the subject matter does not mean that an expert in the field would not be of assistance to the trier of fact in issue."[227] Rather, the defendant need only show that the testimony would assist, aid, or help the jury—for these, and not some ultra-strict standard, "are the touchstones of admissibility."[228] In light of this—and in light of the courts' admission of other expert evidence that is more likely to be within the true common knowledge—defendants should be allowed to educate the jury about the body of false confession research through expert testimony.


## VII.   CONCLUSION

Confession evidence is probably the most powerful evidence the state can introduce against a defendant. Often, it is the only evidence, or at least the only significant evidence, presented by the state. In reality, however, some confessions are false.[229] Unfortunately, existing safeguards—the *Miranda* rule and the voluntary requirement—are often ineffective in protecting defendants from false confessions.[230] Therefore, the only real protection a defendant has against a false confession is to challenge its reliability and credibility at trial.[231]

---

225. *See supra* Part V.E.
226. *See supra* Part V.B tbl.5.
227. DANIEL D. BLINKA, WISCONSIN PRACTICE: EVIDENCE § 702.202, at 478 (2d ed. 2001).
228. *Id.*
229. *See supra* Part II.A.
230. *See supra* Part II.B.
231. *See supra* Part II.C.

When attempting to challenge false confessions at trial, defendants have turned to the experts. Social science research shows that false confessions do in fact occur, that certain interrogation techniques increase the risk of false confessions, and that certain individuals are more susceptible to confessing falsely.[232] The research also shows that police, despite their greater confidence, are no better at detecting false statements than the general public.[233]

Courts, however, often exclude expert testimony on false confessions, holding that such topics are already within the common knowledge of the average juror and therefore would not assist the jury in evaluating the reliability and credibility of the confession.[234] Courts have repeatedly excluded expert testimony on false confessions even though the courts allow expert testimony on other topics, including battered women's syndrome, that are more likely to be within the true common knowledge.[235]

This Article, then, has set out to determine precisely what potential jurors know about false confessions and how their knowledge measures up to what the experts know. The survey evidence presented herein shows that the body of research on false confessions is *not* within the common knowledge of jury-eligible citizens.[236] In fact, many individuals hold beliefs that are contrary to the scientific findings on false confessions.[237]

Consequently, defendants should be permitted to present expert testimony on false confessions. The specifics of such testimony are well outside the common knowledge of prospective jurors and would, therefore, greatly assist the jury in assessing the reliability of the defendant's statement and determining the defendant's guilt or innocence.[238]

---

232. *See supra* Part III.B.
233. *See supra* Part III.B.
234. *See supra* Part IV.B.
235. *See supra* Part IV.B.
236. *See supra* Part V.
237. *See supra* Part V.
238. *See supra* Part VI.